**HEARING DATE AND TIME: November 28, 2018 at 10:00 a.m. (ET)**
**RESPONSE DEADLINE: November 21, 2018**

Michael J. Edelman
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, NY 10019
Phone: (212) 407-7700

Michael Eidelman (admitted *pro hac vice*)
VEDDER PRICE P.C.
222 N. LaSalle St., Ste. 2600
Chicago, IL 60601
Phone: (312) 609-7500

*Counsel for Counsel to React Presents, Inc.,*
*Clubtix, Inc., Lucas King and Jeffery Callahan*

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**ROBERT FRANCIS XAVIER SILLERMAN,**<br>*aka* **Robert F.X. Sillerman,**<br>*aka* **Robert F. Sillerman,**<br>*aka* **Robert X. Sillerman,**<br><br>**Debtor.** | Chapter 11 Case<br><br>Case No. 17-13633 (MKV) |

### MOTION OF REACT PRESENTS, INC., CLUBTIX, INC., LUCAS KING AND JEFFERY CALLAHAN FOR ENTRY OF AN ORDER (A) APPOINTING EXAMINER PURSUANT TO 11 U.S.C. § 1104 AND (B) TERMINATING DEBTORS' EXCLUSIVITY PERIODS PURSUANT TO 11 U.S.C. § 1121(d)

React Presents, Inc., Clubtix, Inc., Lucas King, and Jeffery Callahan (collectively, the

"*Movants*" or the "*React Parties*"), by and through their undersigned counsel, hereby move (this

motion, the "*Motion*") this Court for entry of an order, in substantially the form annexed hereto as

Exhibit B (the "*Proposed Order*"): (a) pursuant to Section 1104(c) of Title 11 of the United States

Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"), Rules 2007.1 and 9014 of the Federal

Rules of Bankruptcy Procedure ("*Bankruptcy Rules*") and Local Bankruptcy Rule 9014-1,

directing the appointment of an independent examiner for the above-referenced Chapter 11 case (i) to investigate the assets of the above-referenced debtor and debtor-in-possession, Robert Francis Xavier Sillerman ("*Sillerman*" or the "*Debtor*"), (ii) to investigate the optimal mechanism for effecting a Chapter 11 Plan based upon such assets, and (iii) to coordinate with and facilitate the efforts of parties-in-interest in formulating a plan of reorganization for the Debtor based upon such investigation and the information derived from such investigations; and (b) pursuant to Bankruptcy Code Section 1121(d), terminating the Debtor's exclusivity periods for filing and soliciting acceptances for a Chapter 11 plan (the "*Exclusivity Periods*").  In support of the Motion, the React Parties respectfully state as follows:

## **PRELIMINARY STATEMENT**[1]

1.      As evidenced by the numerous allegations of securities law violations asserted by the Securities and Exchange Commission and various creditors in their proofs of claim, the Debtor has utilized various financial structures and transactions (both prepetition and postpetition) for his personal profit, while his creditors are either being denied or delayed in obtaining full repayment. The Debtor's failure to treat his creditors fairly, combined with his failure to pay his debts when they came due, led the Movants to commence an involuntary bankruptcy case against the Debtor so that his actions would be subjected to bankruptcy oversight.

2.      No creditors committee has been appointed in the Debtor's bankruptcy case.  This lack of oversight has allowed the Debtor to obtain the advantages of the automatic stay in order to continue his treatment of his creditor constituencies.  Specifically, the lack of any estate oversight has allowed the Debtor:[2]

---

[1]  Capitalized terms used in this Preliminary Statement shall have the meanings ascribed to such terms in the Background section set forth below.

[2]   Each of these matters are set forth detail in the background and body sections of this Motion.

- to utilize his opaque holding structures, in which he holds almost all of his assets, to hide the true nature, location and amount of his estate's assets;

- to file misleading, incomplete and distorted accounts of his assets in his Schedules and SOFA;

- to continue to make material distributions to numerous insiders (exceeding in excess of $1 million (including over $400,000 to Laura Sillerman) as set forth in the recent operating reports),[3] which transactions have not been justified in any way or subjected to any scrutiny;

- to hide behind an affiliate's retention of an investment procurement agent to provide a false face of progress; whereas the Debtor has in reality made no tangible progress in his Bankruptcy Case – in fact, the investment procurement agent has apparently disappeared and has recently failed to make the required reports mandated by this Court;

- After such investment procurement agent made its initial report that alleged arrangements for financing were being procured within about ten days, to (a) fail to delineate anything further about such amorphous, hoped for financing and (b) in express contravention of this Court's order, to fail to file any further regarding the investment procurement agent's activities;

- to file his Plan that is premised upon another empty promise of an undisclosed and amorphous financing in which neither the source, nor substance of the financing are disclosed;

- to file his Plan without a disclosure statement and effectively seek to further stall this Bankruptcy Case past the end of this year; and

- to continue to live a life of luxury.

Because there has been no effective estate oversight of this Bankruptcy Case, the Debtor has been abusing the bankruptcy process and continuing living a lavish lifestyle – including his postpetition use of a personal helicopter, use of golf club memberships worth in excess of $2.3 million and the use of luxury cars – and failing to move this Bankruptcy Case forward or otherwise to pay his unfavored postpetition and prepetition creditors.

---

[3] *See* Docket No. 122, at 2, 14; *see also infra* at ¶ 35.

3.      Given the lack of disclosure and clarity in this Bankruptcy Case, the Movants hereby request that an examiner be appointed under Bankruptcy Code Section 1104 (a) to investigate the nature, scope and location of the Debtor's assets, (b) to investigate the optimal mechanism for effecting a Chapter 11 Plan based upon such assets, and (c) to coordinate with, and facilitate the efforts of any party-in-interest to formulate a plan of reorganization for the Debtor based upon such investigation and the information derived from such investigation. Based upon the circumstances present here, the requirements for both the mandatory retention of an examiner under Section 1104(c)(2), and the permissive retention of an examiner Section 1104(c)(1), are satisfied.

4.      The Movants also request the immediate termination of the Exclusivity Periods under Bankruptcy Code Section 1121(d) because the Debtor has abused the bankruptcy process by continuing to lead a lavish lifestyle, while at the same time both (i) failing to keep current on his postpetition obligations, and (ii) failing to make any progress towards moving this Bankruptcy Case forward.

5.      In sum, the Debtor is continuing to utilize his corporate web of transactions and insider self-dealings to delay and hinder creditor recoveries, while preserving his life of luxury. The Movants respectfully request that this Court (a) appoint an examiner to investigate the Debtor's assets and (b) terminate the Exclusivity Periods, which relief should ameliorate some of the harm being inflicted upon the creditors here.

## Jurisdiction

6.      This Court has jurisdiction under 28 U.S.C. sections 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. sections 157(b)(2)(A) and (O). Venue is proper in this district pursuant to 28 U.S.C. section 1408.

7.     The statutory basis for the relief requested in this Motion are section 1104(c) and 1121(d) of the Bankruptcy Code and Bankruptcy Rules 2007.1, 9006 and 9014 and Local Bankruptcy Rule 9014-1.

## BACKGROUND

### II.    BACKGROUND

#### A.    MOVANTS ARE JUDGEMENT CREDITORS OF DEBTOR

8.     The React Parties are secured creditors of the Debtor pursuant to that certain Judgment Order entered by the United States District Court for the Northern District of Illinois, Eastern Division on November 15, 2017 in the matter captioned as React Presents, Inc., Clubtix, Inc. Lucas King and Jeffery Callahan v. Robert F.X. Sillerman, Case No. 1:17-mc-00505-JMF. The React Parties also exercised various levies upon the Debtor's property in December 2017.

9.     As set forth in the React Parties' proof of secured claim, the Debtor currently owes the React Parties in excess of $7.5 million. *See* React Parties' proof of secured claim, designated as Claim No. 64 of the Debtor's Claims Registry in the above-referenced bankruptcy case (the "*Debtor's Claims Registry*").

#### B.    MOVANTS' PRE-BANKRUPTCY INVESTIGATION OF CERTAIN REAL PROPERTY TRANSACTIONS REVEALS DEBTOR'S EFFORTS TO STRUCTURE TRANSACTIONS THAT CAUSE DIFFICULTY IN ASCERTAINING LOCATION, SCOPE AND VALUE OF HIS ASSETS

10.    After obtaining their judgment, in an effort to enforce such judgment, the Movants started to investigate the Debtor's real property assets.  Through this investigation, the Movants learned that Debtor undertook extensive efforts to conceal the scope, location and value of his assets through myriad corporate structures.

11.    The Movants discovered, upon information and belief, that the Debtor's use and enjoyment of real property is facilitated by a complicated web of ownership in limited liability companies.  For example, upon information and belief, the Movants uncovered that:

(a)    the Debtor's affiliated entity, Elderberry X, LLC, of which the Debtor claims to be a 50% owner, owns two parcels of property in Southampton, New York: 520 Montauk Highway and 52 Westway Dr. (the "*Southampton Properties*").  Property records indicate that the address for the entity that owns 52 Westway Dr. is listed as 1100 Meadow Lane, Southampton, NY ("*1100 Meadow Lane*") -- the property listed in the next clause.

(b)    The Debtor's affiliated entity, Sillerman Residential Properties, LP, of which the Debtor claims to be a 99% limited partner, sold property located at 1100 Meadow Lane, Southampton, New York, in December 2015 for $37,500,000.  Tax records, however, indicate that the Debtor, through his entity MJX, LLC, continued to pay property taxes for the real estate in 2016 – if sold to an unaffiliated entity, why would a Debtor-owned entity continue to pay taxes for the property?

(c)    The Debtor's affiliated entity, Sillerman Residential Properties, LP,[4] sold property located at 1116 Meadow Lane, Southampton in November 2014 for $38,000,000.  Approximately $15.5 million of the sale proceeds from the sale went directly to the Debtor.

(d)    The Debtor previously owned a home located at 1080 Meadow Lane, Southampton, New York.  In September 2016, the Debtor sold this property for $38,000,000.

(e)    The Debtor previously owned a home located at 157 East 70th Street, New York City. In December 2014, the Debtor sold this property for $26,050,000.

In sum, the Debtor utilized his corporate holdings to conduct most of his business and personal activities which, in turn, has created difficulties in ascertaining the nature, scope and value of the Debtor's assets.  Upon information and belief, the Debtor conducted his affairs in this manner to make it difficult and expensive for creditors to undertake enforcement actions against him.

---

[4]  Interestingly, this same entity appears to be the affiliate that is the primary source of the Debtor's recent income.  *See* Docket No. 122 (Monthly Operating Report for September 2018), at 2 ($200,000 of the Debtor's $203,252 of income for September 2018 was paid by such affiliate).

C.   **THE DEBTOR'S HISTORY OF PROFITING THROUGH
OPAQUE, MULTI-LAYERED TRANSACTIONS**

12.     Similar to the real estate records uncovered by the Movants, proofs of claim filed

by the Debtor's various creditors evidence the Debtor's predilection for conducting his affairs in

a manner that provides personal profit through the use of complicated corporate holding structures

and/or other machinations.  This Court may take judicial notice of the proofs of claim filed in this

case that evidence, *inter alia*, the following prepetition transactions:

(a)    ***SFX Litigation Trust Claims***:  Claims asserted by Dean Ziehl as Litigation Trustee
of the SFX Litigation Trust (the "*SFX Litigation Trustee*"), in which the SFX
Litigation Trustee details multiple transactions orchestrated by the Debtor through
numerous tiers of entities owned or controlled by the Debtor that yielded substantial
profits for the Debtor at the expense of other investors in companies owned or
controlled by the Debtor.  *See* Claim No. 38 in the Debtor's Claims Registry.
Because a brief summary cannot adequately convey the character, type and nature
of the transactions and allegedly tortious and fraudulent activity alleged by the SFX
Litigation Trustee, a copy of Claim No. 38 is attached hereto as **Exhibit A**.

(b)    ***SEC Claims***:  The United States Securities and Exchange Commission filed claims
against the Debtor for "penalties, disgorgement, and prejudgment interest arising
from possible violations of the federal securities laws.  The U.S. Securities and
Exchange Commission . . . has been conducting an investigation into certain pre-
bankruptcy transactions and practices involving Function(x) Inc. and its former
CEO Robert F.X. Sillerman."  *See* Claim No. 10 in the Debtor's Claims Registry.

(c)    ***The Guevoura Fund Class Action Claims***:  A class action alleging securities law
violations relating to investments in SFX Entertainment, Inc. ("*SFX*"), which allege
claims against the Debtor, as the founder, former chief executive officer and largest
shareholder of SFX, for "alleged market manipulation and the alleged issuance of
false and misleading statements."  *See* Claim No. 35 in the Debtor's Claims
Registry.

(d)    ***Claims for Charter Jet Services***:  Claims asserted by VistaJet US Inc. for over $4
million for charter aircraft flight services in which the Debtor utilized substantial
private jet flight services while only making partial payments. *See* Claim No. 9 in
the Debtor's Claims Registry.

(e)    ***Claims Asserted by Ryan Seacrest for Failure to Pay***:  Ryan Seacrest asserted
claims against the Debtor for a failure to pay amounts arising under put obligations
owed to the Ryan Seacrest Revocable Trust relating to the Debtor's alleged failure
to repurchase equity interested in LOBS, LLC.  *See* Claim No. 8 in the Debtor's
Claims Registry.

The above summaries are just a sampling of the approximately sixty-five claims asserted against the Debtor. In sum, regardless of whether his activities constitute transactions that violate securities laws, tortious conduct or simple contractual breaches, the Debtor's prepetition actions are characterized by his orchestration of opaque business dealings in which he promoted his self-profit and an indulgent lifestyle while leaving a web of loss that is difficult to unravel due to the myriad of wholly and partially owned entities through which the Debtor operates.

### D.    BANKRUPTCY FILING

13.    The Movants determined that the oversight of a bankruptcy court was needed after discovering that the Debtor was continuing his lavish lifestyle, while appearing to secrete assets into, and through controlled entities that made enforcement actions very difficult. Accordingly, on December 27, 2017 (the "*Petition Date*"), the Movants filed an involuntary petition under Chapter 7 of the Bankruptcy Code against Sillerman in this Court. On February 2, 2018, the Debtor consented to the entry of an Order for Relief and moved to convert the bankruptcy case to a Chapter 11 reorganization case. On March 1, 2018, this Court entered an order approving the conversion of the Debtor's Chapter 7 case to a case under Chapter 11 of the Bankruptcy Code (this "*Bankruptcy Case*").

14.    The Debtor continues to operate his affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

### E.    NO CREDITORS' COMMITTEE APPOINTED; NO ESTATE-APPOINTED OVERSIGHT OF DEBTOR

15.    When this Bankruptcy Case commenced, no creditors' committee was appointed. Nor has this Court, as of the date hereof, appointed an examiner or Chapter 11 trustee. Accordingly, there is no estate-appointed representative overseeing the Debtor's actions, inactions and insider dealings in this Bankruptcy Case.

8

### F. DEBTOR'S SCHEDULES AND SOFA CONTINUE DEBTOR'S OBFUSCATION OF THE VALUE AND SCOPE OF HIS ESTATE

16. In a series of filings towards the end of March, the Debtor filed his schedules of assets and liabilities (the "*Schedules*"), statement of financial affairs (the "*SOFA*"), and the Local Bankruptcy Rule 1007-2 affidavit (the "*Debtor's Local Rule 1007-2 Affidavit*"). *See* Docket Nos. 29, 30, 36 and 37. Further, the Debtor has filed several monthly operating reports that provide certain further financial disclosures. See Docket Nos. 50, 58, 77, 96, 106, 117 & 122 (the "*Monthly Operating Reports*"). Rather than provide a clear picture of the Debtor, his assets and transactions, these documents do not illuminate the extent, location or value of the Debtor's interest in most of his assets. Rather, these documents demonstrate (a) numerous inconsistencies and contradictions, (b) many insider transactions and insider favoritism, (c) evidence of luxurious living, and (d) many value distortions. Without an estate appointed representative reviewing the Debtor's filings, there is no oversight to ensure that creditors' interests are being safeguarded and that creditors are being dealt with in a fair manner. Several of these matters are highlighted below.

17. For example, in his Schedules, the Debtor identified the Southampton Properties as assets of Elderberry X, LLC and listed the fair market value of the two largest assets owned by such entity as having an aggregate gross value of $23.75 million, with such properties being encumbered by only $10.3 million of mortgage debt. Notwithstanding that the Debtor's estate would seem to have a material stake and valuable interest in Elderberry X, LLC, the Debtor represents in his Schedules that the value of his total equity in Elderberry X, LLC is worth only $18.00, but his wife's 50% stake is worth in excess of $12 million. *See* Docket No. 29, Attachment to Schedule 19, at 2-3. He also fails to list a $1.7 million receivable owed by Elderberry X, LLC to the Debtor as an asset of the Debtor's estate. *Id.* In sum, through such machinations, the Debtor

seems to be seeking to hide valuable assets for the benefit of insiders (his wife) and to the detriment of his bankruptcy estate.

18.     Nor do the Schedules, SOFA or the Debtor's Local Rule 1007-2 Affidavit support the Debtor's contention that he suffers from a "lack of liquidity," as the Debtor alleges in his Debtor's Local Rule 1007-2 Affidavit.  *See* Docket No. 37, ¶ 14.  In contrast to such claims, the Debtor alleges in his Schedules to have more than $550 million in assets, and approximately $118 million in liabilities.  *See* Docket No. 29, at 1.[5]  The Debtor's monthly operating report for September 2018 further supports the Debtor's allegation that his assets exceed $540 million.  *See* Docket No. 122.  In this regard, the Debtor's Schedules indicate that the Debtor possesses approximately $474 million of his assets in equity interests in no less than forty-seven limited liability companies, partnerships and corporations, which equity interests constitute a vast majority of his estate.  Through these affiliated entities, the Debtor indirectly, wholly or partially, owns a multitude of apparently valuable assets. *See* Docket No. 29, at 19.  Based upon such contentions that his assets so vastly exceed his liabilities, the Debtor's claim of illiquidity lack credibility.  The lack of an estate representative to investigate the true nature and value of the Debtor's assets held through such entities is allowing the Debtor to avoid any scrutiny of his seemingly contradictory claims of illiquidity and material solvency

19.     The lack of an estate representative to investigate the Debtor's assets is also allowing the Debtor to avoid disclosing the true nature and value of his assets in his Schedules and other financial disclosures.  For example, there is no mention in the Schedules or the SOFA of the property sold by Sillerman Residential Properties, LP in 2014 and 2015 as described in paragraph

---

[5]   The bar date for filing claims in this Bankruptcy Case occurred on October 1, 2018, by which date all prepetition claims were required to be filed. As of the date hereof, the Debtor's Claims Registry indicates that sixty-five creditors have asserted in the aggregate approximately $275 million of claims.

12 above.  Despite the more than $75 million of sale proceeds recently obtained by Sillerman Residential Properties, LP, the Debtor alleges that Sillerman Residential Properties, LP's only assets include $11,460 in cash and a note receivable in the amount of $621,433.00.  *See* Docket No. 29, at 19.  Again, the lack of any estate oversight is allowing numerous insider transactions and transfers to be remain free from investigation or challenge.

20.    The Schedules also indicate that the Debtor is (i) the sole owner of MJX, LLC, an entity that has over $22 million in private equity investments; (ii) the sole owner of Digital Media Investors, LLC, an entity that has interests in over $200 million assets; and (iii) the sole owner of MJX Ventures, LLC, an entity that owns two real properties and an interest in development property in Anguilla worth over $37,000,0000.  No further description is provided as to the nature, liquidity or real value of the above assets.  The existence of such allegedly valuable assets belies any justification for why the Debtor has made no progress towards moving this Bankruptcy Case forward.

21.    The Debtor also alleges in his Schedules and SOFA that he possesses an extraordinarily large income.  Specifically, the Debtor represents that his income for 2017, 2016 and 2015 was $19,924,730, $59,500,000, and $153,000,000, respectively.  *See* Docket No. 30, at 1-2.  The Debtor's reported monthly income in March 2018 was $1,358,559.67.  *See Chapter 11 Statement of Monthly Income,* Docket No. 31.  Such a large income not only undercuts the Debtor's claims of illiquidity, but indicates that the Debtor is continuing a lavish lifestyle.

22.    The Debtor further reports that he received $2,355,182.00 in IRA distributions in 2016, and $1,294,293.00 in pension and annuity payments in 2015.  *See* Docket No. 30, at 2-3. The only retirement or pension account identified in the Schedules, however, is an IRA with Fidelity, which the Debtor values at $3,000.  *See* Docket No. 29, at  7-8; *see also* Schedule C

11

(claiming Fidelity IRA as exempt). The lack of any estate representative to investigate the Debtor's claims appears to be allowing the Debtor's to play fast and loose with his disclosure and other fiduciary obligations owed to his creditors – he is, on the one hand, claiming vast amounts assets, while at the same time claiming a lack of liquidity. Movants believe that the Debtor's alleged lack of liquidity is more likely an unwillingness to liquidate assets or restrict his extravagant lifestyle so that this case can move forward.

23.    Lastly, the Debtor's SOFA reveals that in the year prior to the Petition Date, the Debtor transferred over $1 million to insiders, as that term is defined in 11 U.S.C. § 101. *See* Docket No. 30, at 4. The Debtor also made over $140 million in charitable contributions in the two years prior to the Petition Date, including a contribution valued at $138,750,000 to The Tomorrow Foundation, a foundation affiliated with the Debtor's family.[6] *See* Docket No. 30, at 6 & 13. Nor has the Debtor stopped making insider transactions during these cases. *See infra* at ¶ 35.

24.    In sum, the terse descriptions of extensive assets, massive incomes, and recent largesse, and the numerous inconsistencies and insider dealings raise multitudes of questions. The Movants have no confidence that any of the above listed omissions, inconsistencies, questionable value allocations and largesse, among other issues, will be adequately addressed by the Debtor – especially given (a) the lack of an estate representative investigating the Debtor's affairs for the benefit of his creditors, and (b) the Debtor's historical record of holding his creditors at bay while living the most lavish of lifestyles. Indeed, even a cursory review of the Debtors Schedules and

---

[6] *See* Function (x) Inc.'s Form 8-K, dated February 24, 2017, filed with the Securities and Exchange Commission (referring to The Tomorrow Foundation as "[a] family foundation affiliated with Robert F.X. Sillerman.").

SOFA highlight the need for an estate representative to bear down and investigate the actual nature, scope and value of the Debtor's estate.

### G. DEBTOR'S RETENTION OF "INVESTMENT" PROCUREMENT AGENT THROUGH NON-DEBTOR AFFILIATE CONTINUES EFFORTS TO UTILIZE LAYERED CORPORATE STRUCTURE TO FOSTER OPAQUENESS AND LACK OF OVERSIGHT

25.     In May 2018, the Debtor moved for entry of an order authorizing an affiliated non-debtor entity, RFXS, LLC, to retain Castle Placement, LLC as an investment procurement agent (the "*Investment Procurement Agent*") in order to assist the Debtor in obtaining financing to "maximize the value of certain investment opportunities" (the "*Castle Retention Motion*").  *See* Docket Nos. 56-1 and 69.   As other parties in interest in this case have highlighted,[7] the Castle Retention Motion contained scant detail on how Castle Placement, LLC's retention as an Investment Procurement Agent would lead to a plan of reorganization, and why the "proposed investments" were necessary to provide liquidity for the Debtor to fund a plan.

26.     Nor did the Castle Retention Motion explain why the retention of an Investment Procurement Agent needed to be retained through an affiliate.  The Movants believe the Debtor sought this indirect retention to place the services of the Investment Procurement Agent through an entity that was not under this Court's supervision.  Why else would such an arrangement be made – if the Debtor exercises enough control over his affiliate to retain the Investment Procurement Agent for his benefit, the Debtor could have caused the retention on a joint basis or arranged for his affiliates to pay for the retention.

27.     The Court granted the Castle Retention Motion over several creditors' objections, but ordered the Debtor to file a report with the Court every forty-five days on the status of Castle

---

[7] *See Limited Objection of Dean Ziehl, as Litigation Trustee of SFX Litigation Trust, to Debtor's Motion, Pursuant to Sections 105 and 1121(d) of the Bankruptcy Code, for an Order Extending the Exclusive Periods Within Which He May File a Plan of Reorganization and Solicit Acceptances Thereto*, dated July 10, 2018 [Docket No. 93].

Placement, LLC's efforts as the Investment Procurement Agent to solicit a "Transaction," as contemplated in the retention motion. *See* Docket No. 91 (Order dated July 3, 2018 (the "*Investment Procurement Agent Order*")).

### H.    DEBTOR'S REQUESTS FOR EXCLUSIVITY EXTENSIONS BASED UPON PROGRESS IN OBTAINING INVESTMENTS AND COMPLIANCE WITH POSTPETITION OBLIGATIONS

28.    The Debtor has requested and obtained two extensions of exclusivity in his Bankruptcy Case. *See* Docket Nos. 88 and 109.  In each, he cited progress in obtaining investment through the retention by an affiliate of the Investment Procurement Agent to raise money for the Debtor.  *See* Docket No. 88, ¶ 28, and Docket No. 109, ¶¶ 28-31.  He also represented that "he is paying his bills as they come due." *See* Docket No. 88, ¶ 29, and Docket No. 109, ¶ 32.

29.    Based upon such representations, among other things, this Court granted the Debtor's requests for extensions of the Exclusivity Periods.  As set forth below in subparts I, J and K below, each of these representations lacks any factual basis.

### I.    DEBTOR'S LUXURIOUS LIFESTYLE CONTINUES WHILE HE IGNORES FIDUCIARY OBLIGATIONS TO PAY HIS POSTPETITION CREDITORS

30.    In direct contravention of the representations the Debtor made in his motions for the extension of his Exclusivity Periods, a recent spate of motions filed by creditors confirm that the Debtor is continuing a life of luxury, while ignoring his obligations to pay his postpetition creditors.  Specifically, as described more fully below, the Debtor has been using a helicopter and driving a luxury automobile while, at the same time, failing to pay his lease obligations relating to such luxury items.

31.    As set forth in ECN Aviation Inc.'s ("*ECN*") Motion for Relief from the Automatic Stay with Respect to Debtor's Lease of AW109SP Grand New Helicopter [Docket No. 123], the Debtor has been freely using a helicopter during the course of this Bankruptcy Case that is owned by Aircraft Acquisition Corp. ("*AAC*").  The Debtor is the sole owner of AAC, and he personally

14

and unconditionally guaranteed AAC's payment obligations to ECN. *Id.* The Debtor in turn leases such helicopter from AAC. As set forth in ECN's motion, despite being the primary user and lessee of the helicopter during this Bankruptcy Case, ECN alleged that the Debtor failed to make any postpetition payments for the use of the helicopter. *Id.* Additionally, the Debtor's schedules do not ascribe any value to the lease between the Debtor and AAC, pursuant to which Sillerman apparently maintained his right to possess, use, operate and rent the helicopter – and pursuant to which he is required to pay for related costs and charges. *Id.*

32.    Similarly, as set forth in Toyota Motor Credit Corporation's Motion for Relief from Automatic Stay Pursuant to 11 U.S.C. §§ 362(d)(1) & (d)(2) and 1301(c) [Docket No. 129], the Debtor has continued to make use of one 2017 Lexus RX350 without paying Toyota Motor Credit Corporation. The Debtor's use of the Lexus is identified on schedule G of the Schedules. *See* Docket No. 29, at 49.

33.    Further, the Debtor also lists ***golf club memberships*** with a value of ***$2,366,875*** that he is maintaining. *See* Docket No. 122, at 6.

34.    The Debtor, through his ownership of Sillerman Sports Holdings, LLC, is a part owner (0.4%) of the New York Yankees and the Brooklyn Nets. *See* Docket No. 29, at 19.

35.    Further, without explanation, the Debtor has transferred in excess of $400,000 to Laura Sillerman – which are obvious insider transactions. *See* Docket Nos. 50, 58, 77, 122, each at 2 (Monthly Operating Reports). Further, the Debtor has paid $110,000 to Aircraft Acquisition Corporation, which is presumably an insider transaction to support his private jet use. *See* Docket No. 122, at 14. Indeed, the Debtor has made in excess of an additional $559,000 of payments and transfers to insiders. The postpetition transfers in excess of $1 million outlined in this paragraph to insiders merits oversight and review.

36.     In sum, the Debtor is apparently not keeping current on his postpetition obligations, while, at the same time, keeping the accoutrements of his opulent lifestyle.

**J.      DEBTOR IS SEEKING TO DECEIVE THIS COURT BY PROMISING PROGRESS THROUGH THE GUISE OF UNNAMED AND UNSUBSTANTIATED INVESTORS, SALES AND FINANCINGS THAT LACK ANY TANGIBLE BASIS OR SUPPORT**

37.     Similar to the Debtor's prepetition activities in which he allegedly misled investors and delayed repaying his creditors and investors, the Debtor has repeatedly taken advantage of the lack of creditor committee oversight here to let this case linger; which delay is undermining the expeditious repayment of his creditors.  Such delay is a violation of the Debtor's fiduciary duty that he owes to his creditors.

38.     In this regard, the Debtor has repeatedly alleged that he has arranged and is close to completing financing from unnamed and amorphous sources that will allow him to move this case forward.  Initially, he did this through the guise of his Investment Procurement Agent.  To guard against stagnation and delay, this Court directed that the Debtor file a report every forty-five days regarding the Investment Procurement Agent's progress, with the first such report being due on August 17, 2018. *See* Investment Procurement Agent Order, at 3.

39.     The Investment Procurement Agent filed its first report on August 31, 2018.  In such report, the investment advisor reported that:  (a) 72 unnamed investors had requested information regarding the financing opportunity with the Debtor, (b) 40 likewise unnamed investors had signed non-disclosure agreements, (c) 19 anonymous investors are in the process of "evaluating the investment" and (d) the Investment Procurement Agent had "received four draft term sheets from qualified investors" with another anticipated to come.  *See* Docket No. 113, ¶¶ 6– 9.  The Investment Procurement Agent then stated that "[w]e have guided the [D]ebtor to select a preferred investor and negotiate final terms ***in the next ten days*** [i.e., September 10,

2018].” (emphasis added). September 10, 2018 came and went several months ago, and no such term sheet, binding offering memorandum or name of any such mystery investor followed.

40.      Rather than procure an investment that would move this case forward, the Investment Procurement Agent effected a disappearing act:  neither it nor the Debtor have filed any reports with this Court – in direct contravention of this Court's Investment Procurement Agent Order.  In fact, in the 133 days since the Court's entry of the Investment Procurement Agent Order, only one such report was filed with the Court.  Further, the Debtor's recently filed Plan contains no mention of the Investment Procurement Agent.

41.      The Debtor similarly misled this Court in his motion to extend the Exclusivity Periods, dated August 24, 2018, in which he reported that:

> Mr. Sillerman has reached an agreement with a third party to acquire a portfolio of assets and the sale proceeds will likely enable the repayment of all secured claims. The Debtor intends to file a motion shortly seeking approval of the transaction.

*See* Docket No. 109, ¶ 31.  No such motion has ever been filed, nor has any such agreement been identified.  The mysterious "third party" also has never been identified.

42.      In sum, the Debtor has continuously sought to mislead this Court that he is making progress by alleging unspecified transactions and unnamed counterparties.  Again, the lack of any estate representative to provide oversight has allowed the Debtor to languish in bankruptcy without any material progress being made.

**K.      DEBTOR'S FILING OF PLAN WITHOUT DISCLOSURE STATEMENT EVIDENCES CONTINUING EFFORT OF OBFUSCATION AND SMOKE-AND-MIRROR DELAY**

43.      The Debtor's efforts to mislead this Court and his creditors through smoke-and-mirror promises of progress continues through his recent Plan of Reorganization, filed on October 31, 2018 [Docket No. 132] (the "*Plan*").  In the Plan, the Debtor again provides an amorphous description of some theoretical financing source:

5.1    **Plan Funding**.

(a)    ***Plan Distribution Account***. The Plan shall be funded by Cash on deposit in the Plan Distribution Account on the Effective Date. At least five (5) days prior to the Confirmation Hearing, the Debtor shall deposit all Plan Distribution Funds into the Plan Distribution Account. The Debtor anticipates that the proceeds from the disposition of Assets constituting non-real estate collateral will be a part of Plan Distribution Funds, available for distribution on account of Allowed Secured Claims.

(b)    ***Debtor Funding***. Over the past several years the Debtor has invested over $150 million in three (3) new operating initiatives in the digital space. The filing of the Involuntary Petition precluded the Debtor from making the final investment in all three. Based upon the advice of third parties as well as appraisals, the Debtor believes that the final investments will create approximately $500 million of value.

One of these entities is obligated to share with the Debtor funds raised in excess of $50 million, such that the Debtor will be entitled to 48% of such funds, up to a maximum $154 million. This entity is pursuing two initiatives that seek to raise $600 million in total, more than enough to fund the Debtor's share of $154 million.

(c)    ***Financing***. The other two entities will be public companies. By a reverse merger of each entity into a fully compliant public shell, the shares of each will be publicly traded. The reverse mergers are well underway.

The Debtor anticipates obtaining Financing to fund investments in these operating initiatives. The Financing, which the Debtor estimates will yield proceeds of approximately $20 million, will take place simultaneously with or shortly after an agreed upon number of transactions have taken place that generate a minimum amount of historical pro forma cash flow. As discussed in Article X, below, Closing of the Financing is a condition precedent of Confirmation.

Subject to having a minimum number of shareholders, these entities will be able to access, almost immediately, various elements of the capital markets. The Debtor's shares, which will be valued at over $300 million, will be restricted, subject to a six-month holding period; however, these shares will provide leverage for additional financing, if necessary, to obtain the funds necessary to make the Distributions pursuant to the Plan.

*See* Plan, § 5.1.

18

44.    Such a provision of the Plan furthers the Debtor's penchant for providing rank speculation and little substantive progress.  Nowhere is the identity of any source of funding mentioned.  Nor is there any binding term sheet, commitment or memorandum of understanding.  Rather, the Debtor again is using the artifice of motion as a façade that is hiding a complete lack of any forward movement in this Bankruptcy Case.  In this regard, the Debtor is seeking to preserve and elongate the time that he continues to receive the benefits of the automatic stay and attendant nonpayment of his creditors.

45.    The Debtor's attempt at obfuscation and delay is being furthered by his failure to file a disclosure statement accompanying the Plan.  The reason for this omission is that the Debtor is neither seeking to move his bankruptcy case forward, nor progressing towards obtaining a feasible Chapter 11 plan of reorganization.  Indeed, the Debtor's leisurely scheduling of his recent motion for permission to file a belated disclosure statement (see Docket Nos. 131 and 132), [8] where the hearing is scheduled a full month after he filed his Plan and he is seeking approval of a two month delay in filing a disclosure statement, highlights his true intent here:  the Debtor wants to continue the sluggish pace of his Bankruptcy Case, while keeping his creditors at bay and continuing to live his lavish, jet-streaming (or helicopter-streaming, as the case may be) lifestyle.  In fact, the Debtor's Belated Disclosure Statement Motion, in reality, amounts to a *sub-rosa* effort to obtain an extension of the Exclusivity Periods without meeting any of the requirements for an extension of exclusivity.

46.    As set forth below, based upon the foregoing facts, the Movants hereby request that (a) this Court appoint an examiner (i) to investigate the assets of the above-referenced debtor and debtor-in-possession, Robert Francis Xavier Sillerman ("*Sillerman*" or the "*Debtor*"), (ii) to

---

[8]  Such motion, the "*Debtor's Belated Disclosure Statement Motion*."

19

investigate the optimal mechanism for effecting a Chapter 11 Plan based upon such assets, and (iii) to coordinate with and facilitate the efforts of parties-in-interest in formulating a plan of reorganization for the Debtor based upon such investigation and the information derived from such investigations; and (b) this Court immediately terminate the Exclusivity Periods.[9]

**REQUESTED RELIEF**

**I.**

**THE APPOINTMENT OF AN EXAMINER TO INVESTIGATE THE
DEBTOR'S ASSETS TO SUPPORT THE PROMULGATION OF A
FEASIBLE PLAN IS REQUIRED UNDER SECTION 1104(C)**

47.     The appointment of an examiner to investigate the Debtor's assets and oversee the Debtor's formulation of a plan of reorganization is both mandatory under Section 1104(c) of the Bankruptcy Code, and appropriate under the circumstances.  To say that the Debtor is an individual with high net worth who is capable of paying his debts is an understatement.  The Debtor's Chapter 11 case has lingered for six months without any meaningful progress towards moving this Bankruptcy Case forward or confirming a meritorious Chapter 11 plan.  And, here, the Debtor is clearly neglecting his obligations as a debtor in possession and continuing to live a lavish lifestyle at the expense of his creditors.

48.     The Debtor's Schedules, SOFA, and other filings suggest that the Debtor has ample assets to pay all of his liabilities, in full, immediately.  However, Sillerman professes that he is suffering from a liquidity crisis and requires outside investment to "protect and maintain various assets and make certain investments in existing assets in order to fund a plan of reorganization." *See* Docket No. 109 (Second Motion for Extension of Exclusivity Periods), ¶ 12.  One thing is clear:  The assets currently available to fund a potential plan of reorganization are held through a

---

[9] The Movants hereby reserve their rights to submit an objection to the Debtor's Belated Disclosure Statement Motion, which objections are due on November 21, 2018.

20

tangled network of affiliated entities, for which very little information has been provided by the

Debtor.  With no official creditors' committee or appointed trustee to investigate the Debtor's

affairs, the appointment of an examiner is necessary to fully investigate the Debtor's assets and

provide assurance to creditors that a plan of reorganization will be formulated without further

delay.

**A.    Standard for Appointment of an Examiner**

49.    Section 1104(c) of the Bankruptcy Code provides, in relevant part, as follows:

> If the court does not order the appointment of a trustee under this section,
> then at any time before the confirmation of a plan, on request of a party in
> interest or the United States trustee, and after notice and a hearing, the court
> shall order the appointment of an examiner to conduct such an investigation
> of the debtor as is appropriate, including an investigation of any allegations
> of fraud, dishonesty, incompetence, misconduct, mismanagement, or
> irregularity in the management of the affairs of the debtor of or by current
> or former management of the debtor, if –
>
> > (1)    such appointment is in the interests of creditors, any equity
> > security holders, and other interests of the estate; or
> >
> > (2)    the debtor's fixed, liquidated, unsecured debts, other than
> > debts for goods, services, or taxes, or owing to an insider, exceed
> > $5,000,000.

50.    The plain language of Section 1104(c) mandates the appointment of an examiner if

(i) no trustee has been appointed, (ii) no plan has been confirmed, (iii) a party in interest or the

United States Trustee requests that an examiner be appointed, and (iv) either the examiner's

appointment is in the interests of the creditors of the estate, *or* the debtor has more than $5 million

in fixed, liquidated, unsecured debts to non-insiders. 11 U.S.C. § 1104(c) (emphasis added).

51.    Here, there is no dispute that the first three conditions for the appointment of an

examiner are satisfied. There has been no trustee appointed, no plan has been confirmed, and the

Movants are parties in interest. Additionally, the conditions set forth in §§ 1104(c)(1) and (c)(2)

are both satisfied. Even if the appointment of an examiner was not mandated by Section

21

1104(c)(2), the appointment would still be warranted under Section 1104(c)(1) because it is in the best interests of creditors.

### 1. Appointment of Examiner Is Mandatory under Section 1104(c)(2)

52.     The appointment of an examiner is required in this case under Section 1104(c)(2). Pursuant to Section 1104(c), an appointment of an examiner is mandatory if the debtor's "fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." 11 U.S.C. § 1104(c)(2).  Despite the express language of the statute, courts have reached different conclusions as to its mandatory nature. *Compare Morgenstern v. Revco D.S., Inc.*, 898 F.2d 498, 500-01 (6th Cir. 1990) (appointment of examiner is mandatory); *In re Loral Space & Commc'ns, Ltd.*, No. 04 Civ. 8645 RPP, 2004 WL 2979785, at *5 (S.D.N.Y. 2004) (holding that a bankruptcy court has no discretion to deny appointment of examiner where all predicate conditions and $5,000,000 debt threshold are met) *with In re Residential Capital, LLC*, 474 B.R. 112, 121 (Bankr. S.D.N.Y. 2012) (reasoning section 1104(c)(2) requires appointment of examiner when no plan has been confirmed, no trustee appointed, the debtor has in excess of $5 million of fixed debts, *and* facts and circumstances of a case do not render the appointment of an examiner inappropriate) (emphasis added). Notwithstanding this disagreement among courts, the appointment of an examiner under Section 1104(c)(2) is both mandatory and appropriate here.

53.     The Debtor's Schedules reflect that his unsecured liabilities are approximately $61 million. Additionally, the Debtor's Claims Registry shows that 65 claimants have filed claims totaling approximately $275 million. The $5 million threshold of fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, is easily met.

54.     Moreover, even if the appointment of an examiner were not mandated by Section 1104(c)(2), the facts and circumstances of this case do not render the appointment of an examiner

22

inappropriate. *See Residential Capital*, 474 B.R. at 121. In *Residential Capital*, the court noted that the appointment of an examiner would be "inappropriate if the motion was filed for an improper purpose such as a litigation tactic to delay a case, or if there is no factual basis to conclude that an investigation needs to be conducted, or if an appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee or a governmental agency." *Id.* None of those circumstances are present in this case.

55.    First, the Movants did not file this Motion for an improper purpose. No confirmable, feasible plan of reorganization has been proposed, and the Movants are not trying to use this Motion for leverage in any litigation.  To the contrary, the Movants are requesting the appointment of an examiner so that an investigation into the Debtor's assets may be conducted in an expeditious fashion, and a confirmable and feasible plan of reorganization, along with the associated disclosure statement – with express, tangible and disclosed details regarding funding and finance – may be formulated and filed expeditiously by any party-in-interest.  Second, no investigation has been conducted by any official creditors' committee or any governmental agency regarding the Debtor's assets and whether a viable Chapter 11 plan can be attained.

56.    Lastly, there is ample factual basis to conclude that an investigation needs to be conducted.  The Debtor's assets are primarily owned through limited liability companies, but the Debtor has disclosed little information regarding these entities. The Debtor's Schedules also reference multi-million dollar transfers to insiders and charitable institutions within the two years preceding the Petition Date, and the Schedules and SOFA appear to contain inconsistencies and a purposeful lack of detail regarding the scope, value and location of the Debtor's assets and businesses.  Further, the Debtor appears to be mismanaging the estate through his continued use of assets, without payment, to maintain a luxurious lifestyle.  Finally, the Debtor has been dilatory

in moving these cases forward – as evidenced by misleading and unsubstantiated statements regarding financings and investments from unknown sources. Indeed, the Debtor's refusal to file a disclosure statement with the Debtor's Plan confirms that the Debtor is utilizing the lack of any oversight from an estate representative to abuse the bankruptcy process.

57.     The Movants are well aware that the Debtor's actions and inactions here also fully establish cause for dismissal or the appointment of a trustee under Bankruptcy Code Section 1112. The Movants, however, only seek the appointment of an examiner (and the concurrent termination of the Exclusivity Periods) in the hopes that the appointment of an Examiner to investigate the assets and options available for a Chapter 11 plan will enable such a plan to be formulated by either the Debtor or another party-in-interest (which may be the Movants) in the near future and in an expeditious manner.

58.     In short, the Court is required to order the appointment of an examiner under Section 1104(c)(2), but even if it were not, the appointment of an examiner to investigate the Debtor's assets, including any mismanagement by the Debtor, is appropriate under the circumstances.

### 2.    Appointment of Examiner Is Warranted under Section 1104(c)(1)

59.     Similarly, the appointment of an examiner in this case is warranted under Section 1104(c)(1) because such appointment "is in the interests of creditors, any equity security holders, and other interests of the estate[.]" 11 U.S.C. § 1104(c)(1). The legislative history of section 1104(c) suggests that "[t]he standards for the appointment of an examiner are the same as those for the appointment of a trustee[.]" *Residential Capital*, 474 B.R. at 120 (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 402 (1977)). In determining whether the appointment of a trustee is in the interests of creditors, factors courts consider include "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's

24

rehabilitation; (iii) the confidence –or lack thereof—of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *In re Soundview Elite, Ltd.*, 503 B.R. 571, 583 (Bankr. S.D.N.Y. 2014). Courts assessing whether the appointment of a trustee or an examiner is in the interests of creditors employ a flexible standard, "eschew[ing] rigid absolutes and look[ing] to the practical realities and necessities." *Id.*

60.     Here, the appointment of an examiner is clearly in the best interests of creditors. The lack of confidence creditors have in the Debtor's ability to formulate a plan after an unnecessary six-month delay is obvious from the numerous objections to the Castle Retention Motion and recent motions to modify the automatic stay.  The Debtor's trustworthiness has also been called into question. The Debtor claims to have assets well in excess of his liabilities, but he seemingly refuses to liquidate any of them or to identify his sources of financing or liquidity, while at the same time professing to have a liquidity problem that requires third-party investment.  The Debtor is also continuing to misuse assets of the estate without proper payment.  An examiner could expeditiously investigate the assets (including their value, type, scope and location) of the Debtor and independently determine the liquidity of such assets.  The costs of the investigation to be paid by the estate also do not seem severe, as the Debtor's asserted assets exceed his liabilities by hundreds of millions of dollars.

61.     Accordingly, since the appointment of an examiner in this case would be in the interests of creditors, the Court should order the appointment of an examiner pursuant to Section 1104(c)(1).

## II.

## AMPLE CAUSE EXISTS FOR TERMINATING DEBTOR'S
## EXCLUSIVITY PERIODS UNDER SECTION 1121(d)

62.    Upon the filing of a Chapter 11 case, Section 1121 of the Bankruptcy Code establishes 120-day and 180-day periods during which a debtor has the exclusive right to file and solicit acceptance of a Chapter 11 plan. 11 U.S.C. §§ 1121(b) and (c).  At the end of such periods, the debtor's exclusive right terminates, and creditors and other parties in interest are authorized to file and solicit acceptances of Chapter 11 plans.  11 U.S.C. § 1121(d). Congress did not intend, however, for a debtor to have an absolute entitlement to such exclusive periods. On the contrary, section 1121(d) of the Bankruptcy Code provides that on request of a party in interest made within a pending Exclusivity Period, and after notice and a hearing, the court may for cause reduce or increase the exclusivity periods. 11 U.S.C. § 1121(d).  The legislative history of Section 1121 reflects that Congress recognized that, in certain circumstances, eliminating creditors from the plan formulation process would be inappropriate and unfair:

> [C]hapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions in the bill until it would be too late for them to be an effective remedy.  At the same time, the bill recognizes the legitimate interests of creditors, whose money is in the enterprise as much as the debtor's, to have a say in the future of the company.  The bill gives the debtor an exclusive right to propose a plan for 120 days.  In most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors.  The court is given the power, though, to increase or reduce the 120-day period depending on the circumstances of the case.  For example, if an unusually large company were to seek reorganization under chapter 11, the court would probably need to extend the time in order to allow the debtor to reach an agreement.  If, on the other hand, a debtor delayed in arriving at an agreement, the court could shorten the period and permit creditors to formulate and propose a reorganization plan.  Again, the bill allows the flexibility for individual cases that is unavailable ... [under the Bankruptcy Act of 1898].

H.R. Rep. No. 595, 95th Cong., 1st Sess. 231-32 (1977) (footnotes omitted).  The United States

Court of Appeals for the Fifth Circuit, in a landmark decision affirmed by the United States

Supreme Court, denounced the use of Section 1121 of the Bankruptcy Code as a tool to control

one's creditors.  Specifically, the Fifth Circuit found that:

> [A]ny bankruptcy court involved in an assessment of whether 'cause' exists
> should be mindful of the legislative goal behind 1121.  The bankruptcy court
> must avoid reinstituting the imbalance between the debtor and its creditors
> that characterized proceedings under the old chapter XI.  Section 1121 was
> designed, and should be faithfully interpreted, to limit the delay that makes
> creditors the hostages of Chapter 11 debtors.

*In re Timbers of Inwood Forest Assocs.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd,* 484 U.S. 365

(1988) (emphasis added); *see In re Curry Corp.*, 148 B.R. 754, 755 (Bankr. S.D.N.Y. 1992)

(same); *In re Gibson & Cush Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989) ("the present

Section 1121 seeks to cure the prior practice that gave debtors 'undue bargaining leverage' to delay

and thereby force a settlement out of otherwise unwilling creditors") (citations omitted).  The

absence of a statutory definition of the term "cause" gives the bankruptcy court "maximum

flexibility to suit various types of reorganization proceedings." *In re Public Service Co. of N.H.*,

88 B.R. 521, 524 (Bankr. D.N.H. 1988).  The balance which the Court must reach between the

debtor's interest in having a reasonable opportunity to develop and formulate a reorganization plan

and the creditors' interest in an expeditious resolution of the case is reflected in the seminal case

of *Teachers Ins. & Annuity Ass'n v. Lake in the Woods (In re Lake in the Woods),* 10 B.R. 338

(E.D. Mich. 1981).  In *Lake in the Woods*, the district court held that cause to extend exclusivity

had not been demonstrated by the debtor's contention that a feasible plan of reorganization had to

await the resolution of a title dispute relating to the land on which the debtor's apartment complex

was situated.  Indeed, the court determined that the debtor's request for an extension was merely

a tactic designed to delay the case and prolong the debtor's operation of the apartment complex.

In reversing the lower court's extension of exclusivity, the district court noted:

> Rather than enforcing a relatively equal relationship between the debtor and its creditors, as the Code's drafters envisioned, the bankruptcy court's finding of cause leaves Lake's creditors in the disadvantageous position that Chapter 11 was designed to remedy. Lake continues to operate the complex and maintains a "take it or leave it attitude," refusing to file a plan until TIAA concedes the title issue. Figuratively, appellant's hands are tied, because the bankruptcy court has denied it any opportunity to file a plan of its own. While Lake's contention that no party can file a feasible plan until title has been settled may ultimately prove correct, valid cause to bar the creditor's efforts has not been shown.

10 B.R. at 345.

63.    While the elements that constitute "cause" for termination of the Exclusivity Periods are not stated in the Bankruptcy Code, "courts have held that certain factors should be considered when determining whether "cause" exists to, 'on the one hand, extend, or on the other, terminate, a debtor's statutory period of exclusivity.'" *In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 674 (Bankr. S.D.N.Y. 2006) (citations omitted). Those factors include:

(a)    the size and complexity of the case;

(b)    the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan;

(c)    the existence of good faith progress towards reorganization;

(d)    the fact that the debtor is paying its bills as they become due;

(e)    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f)    whether the debtor has made progress in negotiations with its creditors;

(g)    the amount of time which has elapsed in the case;

(h)    whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and

(i)    whether an unresolved contingency exists.

*Id.*

64.    Each of the factors relevant here supports the termination of the Exclusivity Periods.  First, these cases may be large in terms of dollar amounts, but there are only sixty-five creditors.  Also, the Debtor holds most of his assets through equity interests – accordingly, the Debtor's estate is not actually running any businesses.  In sum, absent the Debtor's failure to properly disclose the nature and extent of his assets, there is nothing complex here.

65.    Second, the Debtor has had almost a year under the protection of the Bankruptcy Code in which he should have made efforts to formulate a Chapter 11 plan with adequate disclosure to his creditors.  Instead, the Debtor has gamed the system and abused the bankruptcy process.  This Court should not countenance such dilatory and abusive tactics.  What individual debtor should be allowed to hop around in his helicopter while using the automatic stay to avoid paying both his postpetition and prepetition creditors?  Further, the Debtor has willfully ignored this Court's requirement for current and frequent updates regarding the "successes" from his Investment Procurement Agent.  Indeed, the Debtor's efforts to delay filing a disclosure statement with the Plan demonstrate the Debtor's abuse of process here – he is just using the protections of a bankruptcy case to keep his creditors in limbo.

66.    Third, as described above, the Debtor has made absolutely no good-faith progress towards a Chapter 11 plan – in fact, he has taken advantage of the lack of estate oversight to abuse the bankruptcy process.

67.    Fourth, as evidenced by the recent motions by his helicopter and luxury automobile creditors, the Debtor is not paying his postpetition obligations as they come due in his Bankruptcy Case.

68.    Fifth, given the Debtor's actions here, he has not demonstrated any reasonable prospect for filing a viable plan.  The Debtor's recently filed Plan contains unsupported and vague financings from undisclosed third parties, and utterly fails any standard of viability.

69.    Sixth, upon information and belief, the Debtor has had no meaningful plan negotiations with his creditors.

70.    Seventh, as of the hearing on this motion, eleven months will have elapsed from the Petition Date.  For an individual debtor with sixty-five alleged creditors, more than enough time has elapsed for real progress to have been made in this bankruptcy.  The Debtor's smoke-and mirrors approach likewise fails this factor.

71.    Eighth, the Debtor is solely utilizing the delay and the lack of estate oversight to prejudice the interests of all of the estate's creditors.

72.    Ninth, there is no unresolved contingency here – the only existing contingency is the amount of time that it takes for the Debtor's creditors to tire of the Debtor's utilization of the bankruptcy process to sustain his luxurious lifestyle while avoiding his bankruptcy obligations to this Court, his estate and his creditors.

73.    In sum, all the exclusivity factors favor the immediate termination of the Debtor's Exclusivity Periods.  In the instant case, allowing the Debtor to retain the Exclusivity Periods imposes a substantial burden and an unacceptable hardship on this estate's creditors.  During his Chapter 11 case, the Debtor has abused his protection under the Bankruptcy Code to maintain a lavish lifestyle, while avoiding paying his creditors, including his postpetition creditors, and hiding behind opaque and misleading claims of progress to mire his Bankruptcy Case in delay.  Such actions and inactions by the Debtor amount to an utter abuse of the bankruptcy process. Particularly where, as here, retention of the Exclusivity Periods will not benefit the Debtor's estate,

but only enables the Debtor to further defer resolving his difficulties, the balance required by Section 1121(d) tips decidedly in favor of terminating the Exclusivity Periods.

74.     By terminating the Exclusivity Periods, this Court will not prejudice the Debtor's coexistent right to file a meaningful and meritorious plan.  The other parties are simply allowed to protect their interests by coming forward with alternative plans.   In numerous instances, termination of exclusivity has facilitated the process of negotiating and proposing a consensual plan. *See, e.g.*, *In re First RepublicBank Corp.*, Case Nos. 388-34546-SAF-11 *et al.* (Bankr. N.D. Tex.) (parties continued to negotiate after termination of exclusivity and, shortly thereafter, reached the terms of a consensual plan).

75.     In the instant case, it is plainly inequitable to require that the Debtor's creditors bear the financial costs and risks associated with the Debtor's exclusivity, while the Debtor fully ignores his fiduciary duties owed to his estate and his creditors.

## MOTION PRACTICE

76.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Movants submit that this Motion satisfies Local Bankruptcy Rules 9006-1(b) and 9013-1(a).

## NOTICE

77.     Notice of the hearing on the relief requested in the Motion has been provided by the Movants in accordance and compliance with Bankruptcy Rule 9014, as well as the Local Bankruptcy Rule , and is sufficient under the circumstances.  Without limiting the forgoing, due notice was afforded by either overnight courier or hand delivery, to parties-in-interest, including (a) the United States Trustee for the Southern District of New York (the "*U.S. Trustee*"); (b) the Debtor's counsel; (c) any party that has requested notice pursuant to Bankruptcy Rule 2002

(collectively, the "*Notice Parties*").  The Movants submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

78.     No prior request for the relief sought in this Motion has been made to this or any other court.

## **CONCLUSION**

For the reasons set forth herein, the Movants respectfully request that this Court enter the Proposed Order that, *inter alia,* (a) grants the Motion, (b) directs the appointment of an examiner to (i) to investigate the assets of the above-referenced debtor and debtor-in-possession, Robert Francis Xavier Sillerman ("*Sillerman*" or the "*Debtor*"), (ii) to investigate the optimal mechanism for effecting a Chapter 11 Plan based upon such assets, and (iii) to coordinate with and facilitate the efforts of parties-in-interest in formulating a plan of reorganization for the Debtor based upon such investigation and the information derived from such investigations;, (c) terminates the Debtor's Exclusivity Periods, and (iv) grants such other and further relief as this Court deems just and proper.

Dated:  November 13, 2018
        New York New York

**VEDDER PRICE P.C.**

*/s/ Michael J. Edelman*
Michael J. Edelman, Esq.
1633 Broadway, 31st Floor
New York, NY  10019
Telephone:  (212) 407-7700
Facsimile:  (212) 407-7799
Email:  mjedelman@vedderprice.com

and

Michael M. Eidelman, Esq. (admitted *pro hac vice*)
222 North LaSalle Street
Chicago, IL  60601
Telephone:  (312) 609-7500
Facsimile:  (312) 609-5005
Email:  meidelman@vedderprice.com

*Counsel to React Presents, Inc., Clubtix, Inc., Lucas King and Jeffery Callahan*

# EXHIBIT A

SFX Litigation Trustee's Claim No. 38

**Fill in this information to identify the case:**

Debtor 1 ___Robert Francis Xavier Sillerman___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the:  Southern District of New York

Case number ___17-13633-mkv___

Official Form 410

# Proof of Claim

04/16

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

1. **Who is the current creditor?**

Dean Ziehl, as Litigation Trustee of the SFX Litigation Trust (see Addendum)
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

2. **Has this claim been acquired from someone else?**

☐ No
☑ Yes. From whom? Successor in interest to SFX Entertainment, Inc. and affiliated entities pursuant to their chapter 11 plan (see Addendum)

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Reid Collins & Tsai LLP (Attn: Eric D Madden)
Name

1601 Elm Street, Suite 4250
Number     Street

Dallas                    TX          75201
City                      State        ZIP Code

Contact phone _214-420-8900_____

Contact email _emadden@rctlegal.com_____

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number     Street

_____
City                      State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

4. **Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

**7. How much is the claim?**  $_____160,000,000.00_  **Does this amount include interest or other charges?**

(See Addendum)

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Addendum

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe:  _____

**Basis for perfection:**  _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                        $_____

**Amount of the claim that is secured:**       $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**       $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**       $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property:  _____

Official Form 410                              **Proof of Claim**                              page 2

12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  07/24/2018
MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Dean Ziehl | | |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Litigation Trustee of the SFX Litigation Trust

Company    Pachulski Stang Ziehl & Jones LLP
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    10100 Santa Monica Blvd., 13th Floor
Number    Street

Los Angeles                          CA        90067
City                                 State     ZIP Code

Contact phone    310-277-6910        Email  dziehl@pszjlaw.com

## ADDENDUM TO PROOF OF CLAIM

Dean Ziehl, as Litigation Trustee of the SFX Litigation Trust (the "Trustee"), the duly authorized successor-in-interest to SFX Entertainment, Inc. and its affiliated debtors (collectively, "SFX"),[1] hereby submits this proof of claim against Robert F.X. Sillerman, the debtor in Case No. 17-13633-MKV (Bankr. S.D.N.Y.).

## Introduction

SFX sought to revolutionize the electronic dance music industry ("EDM"). It never came close. Thanks to the mismanagement, conflicted dealing, and broken promises of SFX's management, including its former CEO and Chairman, Robert F.X. Sillerman ("Sillerman"), the company plummeted from a $1 billion valuation to filing bankruptcy two years later. SFX's claims now belong to the Trustee, whose investigation has uncovered viable causes of action to recover more than $160 million in damages.

The Trustee's claims can be grouped into three categories. First, three of SFX's former officers—including Sillerman—breached their fiduciary duties to SFX by duping it into paying $5 million to bail out another failing Sillerman venture. Second, Sillerman breached his duty of loyalty to SFX by freezing investments into it and by requiring SFX to spend precious capital to pay down his personal guaranties, causing $19.8 million in damages. Finally, the securities fraud allegedly committed by Sillerman and three former members of the SFX board of directors (the "Board"), if proven, breached their duties of loyalty and caused SFX to suffer approximately $140 million in damages.

## Factual Background

### "I know nothing about EDM. I really don't."
- *Robert Sillerman (Sept. 2012)*

That's how Sillerman blithely confessed his ignorance to a reporter while posing for a *Billboard* cover shoot. As the photographer snapped away, Sillerman made sure the handkerchief in his breast pocket remained in focus. As he told the reporter, it displayed his motto, "F__k off." *See* Ex. A.[2] Maybe his flippancy sprang from having made and lost fortunes in enterprises as diverse as radio stations in New York, golf in Anguilla, and tours of Graceland. Whatever the reason, he believed that he could capture lightning

---

[1] The SFX Litigation Trust was created pursuant to the *Fifth Amended Joint Plan of Reorganization of SFX Entertainment, Inc., et al. Under Chapter 11 of the Bankruptcy Code* (the "SFX Plan"), which was confirmed by the United States Bankruptcy Court for the District of Delaware on November 15, 2016. *See In re SFX Entertainment, Inc.*, Case No. 16-10238-MFW (Bankr. D. Del.) (Docket No. 1293).

[2] The exhibits supporting the Trustee's claims are voluminous and not attached to this proof of claim, but have been provided to Sillerman. The exhibits, moreover, may be made available to any party-in-interest upon written request.

1

once again, this time with EDM, an industry both still in its infancy and yet already infamous for its drug culture and massive losses. Sillerman planned to do with EDM what he had done before with radio stations and concert promotion: buy, consolidate, and sell. Sillerman got his start in the late '70s and early '80s buying and selling radio stations. In 1992, Sillerman went big and bought another 120 stations. When he sold off his radio empire for $2.1 billion, Sillerman kept the live music piece that he had also developed and used the proceeds to gobble up as many concert venues and promoters as he could, eventually flipping that business to Clear Channel in 2000. Clear Channel wrote down 75% of its purchase months later. As a former associate recounted, "He gambled big and he won."

Sillerman and his cohorts parlayed their winnings—funded at Clear Channel's expense—into their next ventures. There were Broadway musicals to produce, Elvis's likeness to sell, and Anguillan golf resorts to build. Some projects were winners; others losers. But each was led by Sillerman and his loyal followers.

Sheldon Finkel, a concert and boxing promoter, and Howard Tytel, an attorney, had been with Sillerman since the radio days. Now, Sillerman's circle also included: (a) Eddie Simon, whose friendship and business ties with Sillerman stretched as far back as those of Finkel and Tytel; (b) John Miller, who served on several Sillerman-controlled boards and profited from other Sillerman projects; (c) Michael Meyer, who also profited from Sillerman's past endeavors; and (d) Geoff Armstrong, who co-founded Sillerman's radio empire and served as its CFO and COO. These were men who, through their years of service, camaraderie, and success, had blind allegiance to Sillerman and who Sillerman could rely on to do his bidding. This was not a benefit-of-the-doubt trust. By now it bordered on fealty with assurances to Sillerman that, no matter the cost, they would "never question his business judgment" and that they had "no qualms about [his] taking whatever compensation or anything else" out of his companies. *See* Ex. B; Ex. C at 1. After all, blindly trusting Sillerman had paid off in the past.

**"We don't have enough time on this call to talk about the mistakes I made."**
- *Robert Sillerman (Aug. 2015)*

Sillerman went from having no connection to EDM in January 2012 to crowning himself its new champion five months later. Fawning interviews appeared across various media that summer with the same message: the man who had reimagined the concert business was back to do it again for EDM. He was even calling it the same name. The Sillerman business that Clear Channel had overpriced was called SFX Entertainment, Inc. And Sillerman revived that name for his EDM experiment.

Sillerman revived the old SFX strategy as well. He had the new SFX buy everything it could. As *Billboard* summarized, Sillerman wanted "increased power" in EDM "through sheer scale." He planned to spend $1 billion consolidating promoters and

2

events, even though EDM struck many as a fad.  In building his radio empire, Sillerman gained a reputation for overreaching and overpaying, and he brought those "strategies" to EDM.  "The last thing we'll be thinking about is margins," Sillerman told *Forbes*.

Those sifting through the ashes point to clear examples of SFX, in their words, "growing too fast" and "paying too much."  Even Sillerman doesn't quibble that SFX overpaid, only that he "bought companies based on what [he] anticipated" their value to be once integrated into SFX.  But that integration never happened.  As one SFX insider later put it, "there was never a point at which the company was functional."

Sillerman and his team, by their own admission, knew nothing about the EDM business, culture, or dynamics.  "I meet the people whose places we're buying," Sillerman bragged to *Billboard*, "[a]nd I haven't a f__king clue what they do or what they're talking about.  Not a clue."  The dysfunction, however, did not stop the buying spree or the hunger for debt.  The proceeds of SFX's first $75 million credit facility, obtained before going public in October 2013, were spent on acquisitions.  Two months later, SFX had bought 13 businesses on three continents.  With its IPO proceeds largely spent, its credit facility nearly exhausted, and no profits in sight, SFX began a disturbing pattern that endured until bankruptcy:  incur more and more debt both to refinance old debt and to continue to "pay[] too much" for targets that Sillerman found appealing.

**"The pricing and structure of all deals . . . is decided by me."**
                            -  *Robert Sillerman (March 2014)*

Not all deals with were with strangers.  Take Viggle, Inc. ("Viggle"), for example. Viggle was a social media app designed to reward television watching.  Viggle would award loyalty points for "checking-in" to different TV shows, and users could then redeem those points for products and services.  But Viggle was in trouble.  It had lost nearly $200 million in two years, and it couldn't solve its mounting liquidity problems. This gravely concerned the man who had guaranteed all its debt, Sillerman.

Sillerman founded Viggle in 2010, owned 80% of it, and was its Chairman and CEO.  To save Viggle, Sillerman rejiggered its focus, hoping to make it attractive to SFX. Given that a TV-watching app didn't offer much to an EDM company like SFX, Sillerman had Viggle engineers build software to identify live music in real time.  "The only reason Viggle added the live matching capability," Sillerman would later insist, "was for SFX." The Board had not commissioned this work; nor had it greenlit another costly Viggle project:  retooling the loyalty program to support SFX's operations.  Nevertheless, Sillerman would later highlight both efforts to justify SFX's bailing out Viggle on his terms and timeline.  And that timeline was short.  On Wednesday, February 26, 2014, Sillerman wrote to Tytel that SFX should invest $5 million in Viggle during its next public offering, which was two weeks away.  By Monday, March 4th, Sillerman was having the paperwork drawn up, the terms now changed to reflect SFX buying a 10-year license to

3

use Viggle's unfinished technology for an up-front, non-refundable fee of $5 million, more than all of Viggle's revenue for the prior year.

Next, Sillerman told Tytel which SFX directors should vet the deal (the "<u>License Committee</u>"), making sure to exclude Jared Cohen (of Google), the only SFX director with a technology background and no prior ties to Sillerman. *See* Ex. D. Unsurprisingly, the men that Sillerman picked—Simon, Armstrong, and Pat Mannochia—were close confidantes. Armstrong even began his tenure on the License Committee by assuring Sillerman that he "would never question [his] business judgment." Ex. B. With his handpicked "opposition" in place, Sillerman turned up the heat. On Thursday, March 6th, Sillerman told Tytel that their deal "need[ed] to happen this week." Ex. E. Losing out on Viggle, Sillerman warned, would cause SFX to lose an unrelated deal with a different company, Viagogo, a large ticket reseller that Sillerman was also eyeing.

Having chosen his "opponents" and created urgency, Sillerman then cut off their resources. The License Committee wanted to hire Paul Weiss as counsel; Sillerman said no. *See* Ex. F. Cohen, whom Tytel had "encouraged . . . to not take part" in the Viggle talks, asked to be involved; Tytel ignored him. Ex. G. The License Committee asked for two reports—one regarding Viggle's necessity to the Viagogo deal and one from SFX engineers verifying Viggle's technology; Sillerman went ballistic. "Tell the committee to get off their asses and open up the Viggle app," he snapped. Ex. H. Mocking their requests as "stupid" and "ridiculous," Sillerman lamented, "I guess I made a mistake in assuming that people actually respected our business judgment." Ex. I; Ex. J at 1. Reworking the parental cliché, Sillerman wasn't just mad; he was also disappointed.

Sensing a stalemate with his friend of 40 years, Tytel softened the request, limiting it to (a) a statement from SFX's CFO that a loyalty program should boost revenues, and (b) confirmation from an SFX engineer that Viggle's software worked. Sillerman still refused, instead offering to have Finkel prepare a statement for the License Committee concerning the need for a loyalty program. In reality, however, Sillerman actually wrote the statement. *See* Ex. K. "I need an email from you explaining why we believe a loyalty program is viable, important and will be profitable," Sillerman wrote. *Id.* at K01. "Include in it our plans to use the loyalty program to give us cover to do the Viagogo deal." *Id.* Finkel's first attempt apparently wasn't acceptable, so Sillerman coached, "[I]nclude things other than our festivals and why we need [a loyalty program] to cover us on the Viagogo deal." *Id.* at K02. To conceal his ghostwriting, Sillerman added, "Do an entirely new email, not a reply." *Id.*

Deeming Finkel's second attempt satisfactory, Sillerman sent it to Tytel. *See id.* at K03-K04; Ex. L. But Sillerman's frustration was growing. The License Committee had also asked for confirmation that Finkel, not Sillerman, had negotiated the Viagogo deal. It wanted assurance that Sillerman was not using Viagogo as a means for SFX to bail out Viggle. "Enough is enough," Sillerman steamed to Tytel. Ex. L. "What you know is that

the pricing and structure of all deals happens by consensus, but then is decided by me." *Id.* Then, sidestepping the request, Sillerman ghostwrote another Finkel missive. "Please send me an email explaining why we ned [sic] to couch the Viagogo deal as part of a broader loyalty program," Sillerman asked, adding that it needed to address "why a corporately announced secondary ticket sale program" was bad for business. Ex. K at K07. Finkel again complied. As before, Sillerman didn't like Finkel's draft. He told him to "change your letter" and to specifically emphasize "a big opportunity [for SFX] using Viggle's loyalty program and audio recognition system." *Id.* at K09-K10. Finkel obeyed, of course, again composing a new email to conceal Sillerman's handiwork. *See id.* at K11. Sillerman forwarded this rewrite to the License Committee. *See id.* at K13.

The License Committee, however, was still asking to evaluate Viggle's technology, a request that Sillerman flatly refused. Tytel suggested giving them "a piece of paper . . . as a check the box exercise." Ex. M at 1. Sillerman wouldn't budge. So Tytel fibbed. He emailed the License Committee that SFX engineers had, in fact, "reviewed the functionality of [Viggle's] system" over Sillerman's objections. Ex. N. Yet no such review had occurred. The License Committee thought that their demand had been met; they had no idea that Tytel had misled them (or that Sillerman was ghostwriting Finkel's reports). After this deception, Tytel felt guilty. But not for misleading the License Committee. After giving them a bogus report, Tytel confessed his misconduct to Sillerman, adding that the License Committee was now "very happy." *Id.* But he still needed absolution. "I hope you don't think that I overstepped my authority," Tytel offered. "Fine," pardoned Sillerman. *Id.*

SFX ultimately approved the $5 million license with Viggle based on the false reports of Finkel and Tytel. *See* Ex. O at 1; Ex. P. But it was soon clear why honest reports were needed. One year into SFX's 10-year license, Viggle quit using its technology. *See* Ex. Q. Perhaps remorseful as SFX's outlook grew dour, Tytel remarked to Sillerman that "one of the reasons SFX is in such dire straits [are] several non-productive deals with Viggle," the $5 million license "being [among] the most egregious." Ex. R. Armstrong was even more blunt. Emailing Tytel in the fall of 2015, he wrote, "It is my understanding that SFX hasn't received [a] sublicense or virtually any value under" the Viggle license agreement. Ex. S. These regrets were two years too late.

**"Our stock price has been supported by the existence of the offer."**
-  *Howard Tytel (May 2015)*

SFX's buying spree and debt load accelerated. Profits, though, were nowhere in sight. As 2014 concluded, Wall Street was expecting Sillerman's efforts to have paid off. But Sillerman and other insiders knew that the world was about to witness what happens when you mix suspect financial planning and poor management with hubris. The results for 2014 were going to be disastrous and have a devastating effect on SFX's stock price.

This, of course, would have an outsized impact on Sillerman, who by then owned almost 40% of SFX. So he hatched a plan that he had used before.

Back when Sillerman and his buddies were buying reality shows and the rights to celebrity likenesses, their company, CKX, hit a rough patch. To prop up the company and its stock price, Sillerman made multiple bids to take it private, despite lacking the necessary financing. Although his offers were illusory and experts labeled the episode a "disaster," this strategy kept CKX afloat long enough for someone else to buy it. Sillerman decided to employ the same strategy for SFX. As investors awaited SFX's fourth quarter results, Sillerman announced that he would take the company private at a 47% premium. Never mind that he didn't have the resources. Never mind that a pending lawsuit accusing him of stealing the idea for SFX made financing the buyout impossible. Never mind that SFX's stock price was already inflated and a collapse imminent. CKX had taught him that he could convince everyone that SFX was underpriced. Forget the metrics; Sillerman was promising to pay $4.75 a share.

The market bit. SFX's stock price soared higher than Sillerman's bid; banks refinanced SFX's debt; and SFX appointed a special committee of Miller, Meyer, and Armstrong (the "Special Committee") to negotiate a take-private transaction with Sillerman. They eventually agreed that Sillerman would pay $5.25 per share to merge SFX with a private company he already owned (the "Merger Agreement"). *See* Ex. T. Of course, as with CKX, the deal never closed. Sillerman never got financing, and the Special Committee never recouped the $7.8 million termination fee that the Merger Agreement required Sillerman to pay. In the end, the ploy was only successful in saddling SFX with extra debt and making Sillerman's friends rich. "I am really troubled by the trading of some of the insiders particularly 'your guys'," Tytel wrote Sillerman in May 2015. Ex. C at 1. "I'm sure you know that for a long period of time our stock price has been supported by the existence of [your] offer . . . . [T]he prior history of CKX . . . will not help us if there was an [SEC] inquiry based on failure to close." *Id.*

As the banks kept lending, SFX kept spending. In the first nine months of 2015, SFX's balance sheet deteriorated by $135 million, with assets declining $40.9 million and liabilities increasing $53.9 million. *See* Ex. U at U002-U003. Its net loss for that period was $144 million, nearly $60 million more than the same period a year before. *See id.* at U0014. By September 2015, SFX was clearly insolvent, and the directors and officers knew it. "We cannot get to next Thursday without a significant cash infusion," Tytel reported to Sillerman on August 28th. Ex. V. Letting things lie, he continued, would mean "debtor-in-possession financing" that could prompt an investigation into "mismanagement and all the details of how the company was run," which, Tytel made sure to highlight, was "the last thing an[y] of us would want." *Id.* So Sillerman intervened once again, this time agreeing to invest $30 million in SFX. And yet again, his promises proved to be empty.

**"You can criticize me for not funding the Series A.  I did agree to that."**

- *Robert Sillerman (Nov. 2015)*

By this point, the wolves were at the door.  Sillerman watched as SFX's credit line shrank and its stock price plummeted below $1 thanks to the failed Merger Agreement. SFX couldn't go to the market for cash; a public offering would reveal its insolvency. Complicating matters for Sillerman was that in SFX's latest refinancing, the banks had required him to commit to post $31.5 million in cash collateral.  An SFX default would see his cash seized and his equity erased.  So Sillerman fashioned an escape.

SFX would refinance its debt once again, with the new arrangement allowing Sillerman to rescue his previously frozen funds.  As a tradeoff, however, the new lenders required Sillerman to invest those funds in SFX.  That investment was governed by the Subscription Agreement, dated September 17, 2015, whereby his company, Sillerman Investment Company III, LLC ("SIC") would invest $30 million "in immediately available funds" into SFX in exchange for Series A Preferred Stock. Ex. W at 1-2.  SIC was to pay the first $15 million at closing and the rest in cash installments every five days thereafter (collectively, the "Installments").  SFX's debt was refinanced by the Amended and Restated Credit Agreement (the "Revolver").  A condition to the Revolver going effective was that SIC's first $15 million investment under the Subscription Agreement had to be paid with at least $11.5 million "in cash."  Ex. X at X002.  Conversely, SIC's failure to pay at least $11.5 million in cash at closing and its failure to complete the Installments by November 16th were both events of default that could accelerate SFX's debt. *See id.* at X010 (defining "Additional Sillerman Investment"), X023 (defining "Initial Sillerman Investment"), X069 (designating failure to make Initial Sillerman Investment and failure to make Additional Sillerman Investment as separate events of default).

Sillerman and SIC made a mockery of the Subscription Agreement and the Revolver.  Despite agreeing to invest $15 million "in immediately available funds" at closing, SIC wired only $8.2 million in cash.  It "paid" the rest by taking $6.8 million worth of loan and interest offsets, $3.3 million more than what SFX had told the lenders that it would allow.  SIC also never made any of the Installments.  Sillerman defended SIC's breach by claiming that SFX owed him (not SIC) money for guaranties that he had issued in the past to support SFX's buying spree.  Of course, nothing in the Subscription Agreement excused SIC's obligations until SFX paid Sillerman for past guaranties.  Yet Sillerman held the purse strings.  He was SIC's sole member and manager and thus could ensure that SIC not pay a dime to SFX until his demands were met.  Acknowledging his remarkable position, Sillerman conceded to his fellow directors, "You can criticize me for not funding the Series A.  I did agree to that."  Ex. Y at 1.  When he was warned that his holdout would "cause a default under the" Revolver and "push SFX into bankruptcy,"

7

Sillerman remained unmoved.  Ex. Z at 1.  And even when SFX's lenders then declared default because of SIC's actions, Sillerman refused to allow SIC to pay the Installments.

Sillerman remained obstinate until it benefited him to relent.  The guaranties prompting his demands had been issued as he pushed SFX to buy companies it could not afford and to strike deals it could not meet.  Now those chickens were coming home to roost.  For example, he had pushed SFX to buy React Presents, Inc. and Clubtix, Inc. (collectively, "React") in a deal that required SFX to make an earn-out payment.  When SFX could not pay the earn-out, React agreed to a payment plan, and Sillerman issued a $7 million guaranty in support.  Similarly, when Sillerman had pushed SFX to get a $10 million cash advance from Spotify AB ("Spotify") as part of a larger partnership, he had guaranteed its repayment.  As SFX sank deeper into insolvency in the summer of 2015, it could not honor its obligations to React or Spotify.  Unsurprisingly, they demanded their money.  As it became clear that his guaranties would be called, finally Sillerman flinched.

With React about to call Sillerman's guaranty, SIC wired $5 million to SFX— purportedly to pay Installments now eight weeks late—but with a catch.  Despite knowing that SFX was insolvent, Sillerman required that $2 million of that wire be "allocated . . . to React."  Ex. AA; *see also* Ex. BB at 2.  When the company's CFO warned that SFX did "not have adequate cash reserves to make this payment," Sillerman ignored him, saying: "Let me repeat myself.  Pay this immediately."  Ex. BB at 1.  Per his command, SFX wired $2 million to React on December 1, 2015.

A payment to Spotify was handled similarly.  When Spotify's initial demand did not mention Sillerman's guaranty, he told SFX to fight while he continued to demand personal compensation in exchange for the rest of the investment due under the Subscription Agreement.  On November 22nd, however, Spotify threatened to sue him "personally for the guaranty."  Ex. CC.  Two days later, Sillerman suddenly proclaimed that a Spotify lawsuit "would essentially destroy our entire business."  Ex. DD at 1. Negotiations with Spotify suddenly morphed from whether any money was owed to how much SFX would pay and when.  And on December 17, 2015, Sillerman wired $2.5 million to SFX—again purportedly to pay down SIC's commitment under the Subscription Agreement—and then wired this money immediately on to Spotify.

SFX filed bankruptcy a few weeks later on February 1, 2016.  SFX never received the remaining $7.5 million owed under the Subscription Agreement.

### The Trustee's Claims

The Trustee has claims against Sillerman, Finkel, Tytel, and the Special Committee for breaching their fiduciary duties to SFX.  The Trustee also has claims against SIC for breaching its contract with SFX and against Sillerman for the preferences that he received through the payments to React and Spotify.  As explained below, the Trustee can establish

the elements of his claims, defeat any purported defenses, and recover substantial damages. The Trustee's claims are organized by the transaction giving rise to them.

## A. Claims Related to the Viggle License

The Trustee has breach-of-fiduciary-duty claims against Sillerman, Tytel, and Finkel for their role in convincing SFX to agree to the Viggle License, whereby SFX paid Viggle a $5 million upfront, non-refundable fee for a 10-year license to use technology that Viggle itself would scrap only twelve months later. *See* Ex. P; Ex. Q.

As officers, Sillerman, Tytel, and Finkel undoubtedly owed fiduciary duties of care and loyalty to SFX. *See Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).[3]  The duty of care required them to act in an informed, deliberate, and rational manner, with candor and full disclosure of material information, and with the degree of care that an ordinary prudent person would exercise in similar circumstances. *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005); *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 781 (Del. Ch. 2016) ("Officers also have a duty to provide the board of directors with the information that the directors need to perform their statutory and fiduciary roles."). The duty of loyalty required them to act in good faith, with candor and full disclosure of material information, and in SFX's best interests. *See Disney*, 907 A.2d at 751; *see also Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (noting that an officer violates the duty loyalty when he "intentionally acts with a purpose other than that of advancing the best interests of the corporation"). Sillerman, Tytel, and Finkel breached these duties in multiple respects.

Finkel breached his duties of care and loyalty by not investigating the purported business justifications for the Viggle license, as the License Committee asked him to do. *See* Ex. EE at 2 (stating that Finkel was to provide the License Committee with "certain representations" concerning "the business reasons for entering into the [license]"). The report that he allowed to be presented to the License Committee was not his own. He let Sillerman—whose affiliation with Viggle required appointment of this committee in the first place—write it. *See generally* Ex. K. And even if he agreed with Sillerman's report, Finkel never disclosed that Sillerman had written it or otherwise dictated its content. *See* Ex. O at 1. Finkel duped the License Committee and robbed it of its independence. By playing Sillerman's shill, Finkel caused the entire investigation to be a farce and ensured that the License Committee—and, by extension, SFX—never received an unbiased assessment.

Tytel breached his duties of care and loyalty by failing to actually investigate Viggle's technology as he was asked to do, and he further breached his duties by

---

[3] SFX was incorporated under Delaware law. Accordingly, under the internal affairs doctrine, Delaware law governs the Trustee's breach-of-fiduciary-duty claims.

misrepresenting that the investigation had occurred. *See* Ex. FF at 2 (noting the License Committee's request for materials "regarding the functionality of the Technology and potential integration in sponsorship deals"); Ex. EE at 2 (noting Tytel's email "attesting to the veracity of the Technology"). Like Finkel, Tytel misled the License Committee and therefore SFX into believing a false narrative that he knew would deprive SFX of $5 million. Ex. N. *See, e.g., Palmer v. Reali*, 211 F. Supp. 3d 655, 666-67 (D. Del. 2016) (sustaining allegations that officers breached fiduciary duties by presenting false reports to their board regarding a proposed transaction).

Sillerman breached his fiduciary duties of care and loyalty by orchestrating this ruse and by aiding and abetting the breaches of Finkel and Tytel. He knew that Finkel and Tytel were fiduciaries and that their conduct misled SFX, and he knowingly participated in and substantially assisted their breach. *See RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (listing elements for aiding and abetting breach of fiduciary duty under Delaware law). By writing Finkel's report and concealing the falsity of Tytel's report, Sillerman ensured that the License Committee's investigation was a sham. As he had planned, the License Committee relied on the reports of Finkel and Tytel. *See* Ex. O at 1. And as a result, SFX paid Viggle $5 million, an amount that it never would have paid had Sillerman, Finkel, and Tytel honored their fiduciary obligations.

## B.   Claims Related to the Subscription Agreement

The Trustee has contract claims against SIC for breaching the Subscription Agreement, breach-of-fiduciary-duty claims against Sillerman related to SIC's breach, and breach-of-fiduciary-duty and preference claims against Sillerman related to payments that SFX made with proceeds from the Subscription Agreement.

SIC breached the Subscription Agreement in at least two ways. First, SIC breached Article 1.3(c)'s requirement to make payments "in immediately available funds." Ex. W at 2. To pay the initial $15 million investment under the Subscription Agreement, SIC wired only $8.2 million in cash and claimed $6.8 million in loan and interest offsets, which are not "immediately available funds." *See, e.g., United States v. Rigas*, 490 F.3d 208, 221 (2d Cir. 2007) (affirming securities fraud conviction of defendants for representing that debt offsets were "immediately available funds"). SIC therefore still owes $6.8 million under the Subscription Agreement, and the Trustee may recover that amount from SIC. Second, SIC breached Article 1.2's requirement to pay the Installments before October 19, 2015. *See* Ex. W at 1. SIC failed to timely pay any Installments. Five weeks after the final one was due, SIC wired $5 million to SFX, and a month later, an SIC affiliate wired SFX another $2.5 million on SIC's behalf. However, the remaining $7.5 million balance was never paid. Therefore, the Trustee can recover another $7.5 million from SIC.

The Trustee also has claims against Sillerman to recover this same $7.5 million. First, Sillerman breached his duty of loyalty. Despite being SFX's chairman, CEO, and

controlling shareholder, Sillerman openly refused to make the required Installments until SFX first compensated him for guaranties and collateral that he had posted in past, unrelated deals. *See, e.g.*, Ex. GG at GG003, GG005, GG018.[4] That is, despite knowing of both SFX's desperate need for cash and SIC's obligation to pay that cash, Sillerman held hostage the overdue Installments while demanding ransom for himself.[5] *See Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (remarking that a fiduciary "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest"). Second, Sillerman's conduct tortiously interfered with SFX's right to receive the $7.5 million. He acted intentionally, in bad faith, and without justification or privilege, putting his personal interests ahead of both SIC and SFX. *See ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 750-51 (Del. 2010) (affirming judgment that fiduciary tortiously interfered with his principal's contract). Sillerman's actions directly injured SFX by depriving it of the investment that SIC would have made had he not breached his fiduciary duties or tortiously interfered. Therefore, in addition to his claims against SIC, the Trustee can recover $7.5 million from Sillerman.

The Trustee, moreover, can recover attorney's fees from Sillerman and SIC. Their actions threatened SFX's very existence, and they knew it. Under Section 7.01(m) of the Revolver, SFX was in default if SIC failed to complete the Installments by November 16, 2015. *See* Ex. X at X067, X069. That default allowed the lenders to accelerate the Revolver, which would have ended SFX. *See id.* Sillerman knew all this and tried to use it to his advantage. *See* Ex. HH ("The only consequence of me not funding the Preferred [doesn't] happen until the 61st day, when it would create an event of default under the . . . loan."); *see also* Ex. Z at 1 (warning Sillerman that SIC's default could push SFX into bankruptcy). Because of Sillerman's bad faith, the Trustee can recover attorney's fees. *See In re Nine Sys. Corp. S'holders Litig.*, C.A. No. 3940, 2015 WL 2265669, at *2 (Del. Ch. May 7, 2015) (awarding fees to punish "bad faith" conduct and "outright acts of disloyalty").[6]

Sillerman's misconduct exposed him to additional liability as well. SIC's untimely payments in late 2015 were made specifically to reduce his personal guaranties. As discussed above, when React threatened to trigger his $7 million guaranty and Spotify threatened to sue him on his $10 million guaranty, Sillerman momentarily unfroze SIC's checkbook and had it pay $7.5 million to SFX. But he required SFX to immediately wire out SIC's investments to React and Spotify. The payments to React and Spotify did not

---

[4] Exhibit GG is a collection of emails and Board minutes documenting Sillerman's refusal to pay the Installments.

[5] That the Board never caved to Sillerman's demands is immaterial. *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (noting breaches of loyalty can occur without the fiduciary's receiving a personal benefit).

[6] Because SIC acknowledged but never defended its breach, the Trustee may seek attorney's fees from it, too. *See Abex Inc. v. Koll Real Estate Group, Inc.*, C.A. No. 13462, 1994 WL 728827, at *20 (Del. Ch. Dec. 22, 1994) (awarding fees where party acknowledged its breach before "refus[ing] to honor its clear legal obligation and forc[ing] the institution of litigation").

11

benefit SFX, which was deeply insolvent, had retained bankruptcy counsel by that point, and would file bankruptcy only a few weeks later. Their sole purpose was to reduce Sillerman's personal liability to these third parties. Thus, Sillerman's self-interested conditions breached his duty of loyalty.

The payments to React and Spotify also allowed Sillerman to benefit from avoidable preferences. These two payments, plus another $1,029,231.35 payment that SFX made to React in July 2015 (a) were made to SFX's creditors, (b) in order to satisfy antecedent debts, (c) were made while SFX was insolvent and within one year of bankruptcy, and (d) enabled React and Spotify to receive more than they would have in a Chapter 7 liquidation. Accordingly, the Trustee can avoid all three payments as preferences under the Bankruptcy Code. *See* 11 U.S.C. § 547(b). The Bankruptcy Code also allows the Trustee to recover these payments, totaling $5,529,231.35, from Sillerman as the person for whose benefit the transfers were made. *See* 11 U.S.C. § 550(a)(1); *see also Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988) (explaining that when debt is reduced, "Lender is the initial transferee and Guarantor is the entity for whose benefit [the] transfer was made"). Therefore, the Trustee has an additional $5.5 million in loyalty and preference claims against Sillerman.

## C.    Claims Related to the Merger Agreement

The Trustee has breach-of-loyalty claims against Sillerman and the Special Committee to the extent that they committed securities fraud in connection with Sillerman's tender offer and the subsequent Merger Agreement. The tick-tock of how Sillerman and the Special Committee violated the Exchange Act and Rule 10(b)-5 is detailed in the latest complaint filed in *Guevoura Fund, Ltd. v. Sillerman, et al.*, Case No. 1:15-cv-07192-CM (S.D.N.Y.), and will be summarized in other mediation statements. More important here, though, is that their alleged commission of securities fraud, if proved, also breached their duty of loyalty to SFX.

Under Delaware law, "a director acts in bad faith when he acts with the intent of violating applicable positive law." *Freedman v. Adams*, Civ. No. 4199-VCN, 2012 WL 1345638, at *11 (Del. Ch. Mar. 30, 2012). Moreover, "acts taken in bad faith breach the duty of loyalty." *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007). If they committed securities fraud, Sillerman and the Special Committee are liable for the harm that they caused SFX. *See, e.g., Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("[B]y consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused."); *cf. In re Duke Energy Corp. Derivative Litig.*, Civ. No. 7705-VCG, 2016 WL 4543788, at *2 (Del. Ch. Aug. 31, 2016) (upholding loyalty claim against directors based on their violating state securities laws).

12

The Trustee is continuing to assess the magnitude of SFX's damages for these claims, but it is certainly substantial. In addition to the $1.5 million that SFX has spent defending their violations of securities laws, SFX was also injured by the additional debt, increasing operational losses, and other damages totaling more than $140 million suffered while SFX's stock price was artificially inflated to avoid bankruptcy. Although additional work may be necessary to build a complete damage model, it is apparent—even at this early stage—that the model is at least nine figures.

### Pre-Bankruptcy Mediation of the Trustee's Claims

In late 2017, after mediation and extensive settlement negotiations, the Trustee, along with the *Guevoura* class plaintiffs, reached a tentative global settlement of their claims with Sillerman and others. Before the parties could finalize the terms of this settlement, however, an involuntary bankruptcy petition was filed against Sillerman, thereby commencing this bankruptcy case. The Trustee is hopeful that the settlement can be finalized and funded through a confirmed chapter 11 plan in this case. Until then, the Trustee asserts the full amount of his claims against Sillerman through this proof of claim.

### Reservation of the Trustee's Rights

The Trustee reserves the right to amend and/or supplement this proof of claim at any time and in any respect, either before or after any bar date established by the Court and/or to file additional proofs of claim for additional claims which may be based on the same or additional supporting facts. This proof of claim is filed without prejudice and in no way limits the Trustee's ability to file additional proofs of claim with respect to any liability or indebtedness of Sillerman.

The filing of this proof of claim is not: (a) a waiver or release of the Trustee's rights against any person, entity, or property; (b) a consent by the Trustee to the jurisdiction of the Court with respect to the subject matter of the claim or any objection or other proceedings commenced in this case; (c) a waiver or release of the right to have any and all final orders in non-core matters or proceedings entered only after de novo review by the United States District Court; (d) a waiver or release of the right to move to withdraw the reference or otherwise challenge the jurisdiction of the Court with respect to the subject matter of the proof of claim or any objection or other proceedings commenced in this case; (e) an election of remedies; or (f) a waiver or release of any rights or claims that the Trustee may have against Sillerman or any other person or entity. The Trustee expressly reserves all of his procedural and substantive defenses, rights, and remedies against Sillerman, any trustee for Sillerman's estate, and any other party-in-interest with respect to this claim, including but not limited to rights of setoff and recoupment.

13

# EXHIBIT B

PROPOSED ORDER

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**ROBERT FRANCIS XAVIER SILLERMAN,**<br>*aka* **Robert F.X. Sillerman,**<br>*aka* **Robert F. Sillerman,**<br>*aka* **Robert X. Sillerman,**<br><br>       **Debtor.** | **Chapter 11 Case**<br><br>**Case No. 17-13633 (MKV)** |

## ORDER GRANTING MOTION OF REACT PRESENTS, INC., CLUBTIX, INC., LUCAS KING AND JEFFERY CALLAHAN FOR ENTRY OF AN ORDER (A) APPOINTING EXAMINER PURSUANT TO 11 U.S.C. § 1104 AND (B) TERMINATING DEBTORS' EXCLUSIVITY PERIODS PURSUANT TO 11 U.S.C. § 1121(d)

Upon the motion, dated November 13, 2018 (the "*Motion*"),[1] of React Presents, Inc., Clubtix, Inc., Lucas King and Jeffery Callahan (the "*Movants*") for an order, pursuant to: (a) pursuant to Section 1104(c) of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"), Rules 2007.1 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 9014-1, directing the appointment of an independent examiner (i) to investigate the assets of the above-referenced debtor and debtor-in-possession, Robert Francis Xavier Sillerman ("*Sillerman*" or the "*Debtor*"), (ii) to investigate the optimal mechanism for effecting a Chapter 11 Plan based upon such assets, and (iii) to coordinate with and facilitate the efforts of parties-in-interest in formulating a plan of reorganization for the Debtor based upon such investigation and the information derived from such investigation; and (b) pursuant to Bankruptcy Code Section 1121(d), terminating the Debtor's exclusivity periods for filing and soliciting acceptances for a Chapter 11 plan; and upon consideration of the pleadings

---

[1] All capitalized terms not defined herein have the respective meanings ascribed to them in the Motion.

and the exhibits filed in this matter and the arguments of counsel; and a hearing having been held on this matter on November 28, 2018; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction of this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O).  Venue of these chapter 11 cases and this motion is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Due, sufficient and proper notice of the Motion was given in the manner as provided in the Motion and no further notice need be given.

C.    A hearing having been held before this Court on November 28, 2018 (the "Hearing"), and based upon the pleadings herein and the responses hereto and the evidence presented at the Hearing and the arguments of counsel; and due deliberations having been had thereon; and the Court having determined that (a) the Debtors fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000, and (b) the appointment of an examiner as provided herein is in the best interest of creditors, any equity security holders, and other interests of the Debtor's estate; and the court having determined after due deliberation that sufficient cause appears to grant the Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion be, and hereby is, granted in its entirety.

2.    The appointment of an examiner is mandated pursuant to 11 U.S.C. § 1104(c)(2).

3.    Cause exists for the appointment of an examiner pursuant to 11 U.S.C. § 1104(c)(1).

---

[2]    Finding of fact shall be construed as conclusions of law and conclusions of law shall be construed as finding of fact as and when appropriate.

4.       Pursuant to Bankruptcy Code section 1104(d), the U.S. Trustee is directed to appoint an examiner for the Debtor forthwith (and in no event later than four days from the date hereof) having the duties and powers hereinafter set forth (the "*Examiner*").  The U.S. Trustee is hereby directed to consult with the Debtor's largest creditors, including the Movants, prior to selecting such Examiner.

5.       The Examiner shall:

(a)       perform the duties set forth in Bankruptcy Code sections 1104(c);

(b)       investigate the assets of the Debtor;

(c)       investigate the optimal mechanism for effecting a Chapter 11 Plan based upon such assets

(d)       provide a report to this Court regarding the scope, location, value and such further information regarding the Debtor's assets so as to facilitate the development of a plan of plans of reorganization by one or more parties-in-interest in this Bankruptcy Case; and

(e)       coordinate with and facilitate the efforts of parties-in-interest in formulating a plan of reorganization for the Debtor based upon such investigation and the information derived from such investigations.

6.       The Examiner shall have the authority, subject to this Court's approval, to appoint or employ pursuant to Bankruptcy Code section 327, accountants, attorneys, financial advisors, and/or other agents or representatives to assist the Examiner in the performance of the Examiner's duties and the exercise of the Examiner's powers hereunder, and the Examiner and its professionals may seek compensation for the Examiner's services and reimbursement of costs and expenses in accordance with Bankruptcy Code sections 330 and 331

7.      Any person's or entity's appointment as Examiner shall be effective upon acceptance of its appointment as Examiner and shall continue until terminated or modified by further order of this Court;

8.      The Debtor is hereby directed to provide full, reasonable cooperate with the Examiner to facilitate the Examiner performing his functions herein

9.      Furthermore, pursuant to Section 1121(d) of the Bankruptcy Code, the Debtor's Exclusivity Periods are hereby terminated as of the date hereof and any and all parties-in-interest may file a Chapter 11 Plan for the Debtor at any time on or after the date that this Order is entered by this Court.

10.     The Debtor are hereby directed to perform all of the terms and provisions of the Adequate Protection Fee Payment Procedures as set forth in the Orders.

11.     This Order shall be effective immediately upon entry and Bankruptcy Rules 6004(h) and 7062 (or any other rule staying the immediate efficacy of this Order) shall not apply.

12.     The Court shall retain jurisdiction over any and all issues arising from or related to the implementation of this Order.

Dated:  November __, 2018

_____
Honorable Mary Kay Vyskocil
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

---

In re:

**ROBERT FRANCIS XAVIER SILLERMAN,**
*aka* **Robert F.X. Sillerman,**
*aka* **Robert F. Sillerman,**
*aka* **Robert X. Sillerman,**

        **Debtor.**

Chapter 11 Case

Case No. 17-13633 (MKV)

---

## CERTIFICATE OF SERVICE

I, Michael J. Edelman, certify that I am not less than 18 years of age and that on this 13th day of November 2018, I caused a true and correct copy of the foregoing MOTION OF REACT PRESENTS, INC., CLUBTIX, INC., LUCAS KING AND JEFFERY CALLAHAN FOR ENTRY OF AN ORDER (A) APPOINTING EXAMINER PURSUANT TO 11 U.S.C. § 1104 AND (B) TERMINATING DEBTORS' EXCLUSIVITY PERIODS PURSUANT TO 11 U.S.C. § 1121(d), dated November 13, 2018, along with the associated notice of motion and the proposed order, to be served upon the parties on the attached service list via Federal Express overnight courier.

Under penalty, I declare the foregoing is true and correct.

Dated:  November 13, 2018
       New York New York

**VEDDER PRICE P.C.**

*/s/ Michael J. Edelman*
Michael J. Edelman, Esq.
1633 Broadway, 31st Floor
New York, NY 10019
Telephone: (212) 407-7700
Facsimile: (212) 407-7799
Email: mjedelman@vedderprice.com

## SERVICE LIST

**Service List for In re Sillerman as of Nov. 13, 2018**

Sanford P. Rosen, Esq.
Rosen & Associates, P.C.
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
E-Mail:        SRosen@Rosenpc.com
[Counsel for Robert Francis Xavier Sillerman]


Yonah Jaffe
Reid Collins & Tsai LLP
810 Seventh Avenue, Suite 410
New York, New York 10019
(212) 344-5200 (telephone)
E-Mail:        yjaffe@rctlegal.com
[Counsel for Dean Ziehl, as Litigation Trustee of SFX Litigation Trust]


Alan J. Lipkin, Esq.
James H. Burbage, Esq.
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
E-mail:        alipkin@willkie.com
               jburbage@willkie.com
[Attorneys for ID Wheel (FL), LLC and IDrive Mezz Lender (FL) LLC]


Brian D. Glueckstein
Leonid Traps
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000
Facsimile: (212) 291-9305
E-Mail:        gluecksteinb@sullcrom.com
               trapsl@sullcrom.com
[Counsel for Counsel to ESFX Holdings LLC]

John R. Ashmead, Esq.
Catherine V. LoTempio, Esq.
Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Tel.: (212) 574-1200 Fax: (212) 480-8421
E-Mail:              ashmead@sewkis.com
              lotempio@sewkis.com
[Counsel for Counsel to Deutsche Bank Trust Company Americas]


Michael S. Etkin, Esquire
Gabriel L. Olivera, Esquire
Lowenstein Sandler LLP
One Lowenstein Drive
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
E-Mail:              metkin@lowenstein.com
E-Mail:              golivera@lowenstein.com
[Attorneys for Guevoura Fund Ltd., on behalf of Class Action Plaintiffs]


Kozeny & McCubbin, L.C. LLC
Sabita Hajaree Ramsaran, Esq.
Wesley T. Kozeny, Esq.
12400 Olive Blvd, Ste 555
St. Louis, MO 63141
Phone: (314) 991-0255
Fax: (314) 567-8019
E-Mail:        nybk@km-law.com
[Counsel for Toyota Motor Credit Corporation]


Latham & Watkins LLP
Jeffrey E. Bjork, Esq.
Adam E. Malatesta, Esq.
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-Mail:              Jeff.Bjork@lw.com
              Adam.Malatesta@lw.com
[Counsel for Ryan Seacrest]

Ted A. Berkowitz, Esq.
Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street, 17th Floor
New York, NY  10005
[Counsel for the State of New York]


Michael R. Enright
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
T (860) 275-8290 F (860) 275-8299
E-Mail:        menright@rc.com
[Counsel for Barton Gullong]


Leo T. Crowley, Esq.
David S. Forsh
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036-4039
Tel.:  212.858.1000
E-Mail:        leo.crowley@pillsburylaw.com
               David.Forsh@Pillsburylaw.com
[Counsel for ECN Aviation Inc.]


Office of the United States Trustee for Region 2
U.S. Federal Office Building
201 Varick Street
New York, NY 10014
Attn.:  Richard C. Morrissey, Esq.