*Hearing Date: December 19, 2018*
*Time: 10:00 a.m.*

ROSEN & ASSOCIATES, P.C.
*Attorneys for the Debtor and*
  *Debtor in Possession*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRPUTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Robert Francis Xavier Sillerman<br>aka Robert F.X. Sillerman<br>aka Robert F. Sillerman<br>aka Robert X. Sillerman,<br><br>                    Debtor. | Chapter 11<br><br>Case No. 17-13633 (MKV) |

**DEBTOR'S RESPONSE TO MOTION FOR ORDER**
**APPOINTING EXAMINER AND TERMINATING EXCLUSIVITY**

TO THE HONORABLE MARY KAY VYSKOCIL,
UNITED STATES BANKRUPTCY JUDGE:

      Robert F.X. Sillerman, aka Robert F. Sillerman, aka Robert X. Sillerman, improperly named in the involuntary petition commencing this case as Robert Francis Xavier Sillerman,[1] the above captioned debtor and debtor in possession (the "**Debtor**" or "**Mr. Sillerman**"), by his counsel, Rosen & Associates, P.C., as and for his response to the motion (the "**Motion**") of React Presents, Inc., Clubtix, Inc., Lucas King and Jeffrey Callahan (collectively,

---

[1] Mr. Sillerman has never been known as Robert Francis Xavier Sillerman.

"**Movants**") for the entry of an order (a) appointing an examiner pursuant to 11 U.S.C. § 1104(c) and (b) terminating the Debtor's exclusivity pursuant to 11 U.S.C. 1121(d), represents as follows:

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

**Procedural History**

2. On December 27, 2017 (the "**Petition Date**"), Movants filed an involuntary petition under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York against Mr. Sillerman. Pursuant to a stipulation by and between Movants and Mr. Sillerman, February 2, 2018 was fixed as the date by which Mr. Sillerman was required to respond to the involuntary petition.

3. Mr. Sillerman responded by consenting to the entry of an order for relief and moving to convert his case to one under chapter 11 of the Bankruptcy Code. No objections to the motion were filed, and after a hearing on the motion on February 28, 2018, this Court entered an order for relief on March 1, 2018 that also converted Mr. Sillerman's case to one under chapter 11.

4. The Debtor has continued to operate his businesses and manage his properties and affairs as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. To date, no trustee, examiner, or creditors' committee has been appointed.

**Debtor's Background**

6. Mr. Sillerman is an American businessman and media entrepreneur. He was the owner of a range of television and radio stations during the 1980s and 1990s. In 1993 he formed SFX Broadcasting, Inc. and then built SFX Entertainment, Inc., a concert and stage performance promoter. In 1998, Mr. Sillerman sold SFX Broadcasting to Capstar Communications for $2.1 billion, keeping only a small nascent entertainment portfolio. As CEO of SFX Entertainment, he combined concert promoters around the world and in 2000 sold the enterprise to the broadcaster Clear Channel Communications for $4.4 billion. Clear Channel subsequently spun it out and it now operates as Live Nation. That network of promoters and theaters remains the basis of Live Nation Entertainment's concert division.

7. In 2005, Mr. Sillerman founded CKX Entertainment, and acquired Elvis Presley Enterprises, Muhammed Ali Enterprises, and the company that owned the Idol franchise around the world, including American Idol. In a series of transactions those businesses were sold for over $1.5 billion.

8. In 2012, Mr. Sillerman re-founded SFX Entertainment, Inc. as a promoter of electronic music festivals. He was Chairman, CEO, and owned about 40% of its shares. SFX Entertainment was the largest global producer of live events and digital entertainment content focused on electronic music culture and other world-class festivals. SFX Entertainment's

mission was to provide electronic music fans with the best possible live experiences, music discovery, media and digital connectivity. The company went public in 2013 at a valuation of just over $1 billion.

9. Investors grew impatient with SFX Entertainment's efforts to build a profitable business by attracting corporate sponsors. In 2015, Mr. Sillerman offered to take the company private at $5.25 a share, valuing the company at $774 million, including its debt. However, as growth continued to slow, problems continued to mount through the fall of 2015 and in August he was forced to abandon his bid as the company's declining performance made financing the transaction impossible. During this period, Mr. Sillerman continued to provide the company with credit support in the forms of significant cash contributions and a series of guarantees that allowed the company to continue to operate. On February 1, 2016, following a default under its bonds, SFX Entertainment and certain of its subsidiaries filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.

10. Mr. Sillerman resigned as CEO of SFX Entertainment in March of 2016 and in late 2016, SFX Entertainment emerged from bankruptcy as a privately owned company and its case was closed. SFX Entertainment's plan of reorganization created a litigation trust, and its trustee (the "**Litigation Trustee**") is pursuing certain claims of SFX Entertainment against Mr. Sillerman that were conveyed to the trust. Mr. Sillerman also has claims for indemnification under SFX Entertainment's D&O policy based upon non-reimbursed legal fees and expenses that he incurred as an officer and director of SFX Entertainment. As of the filing date of the involuntary petition, such claims were the subject of mediation. Although the

4

Litigation Trustee has not commenced an adversary proceeding asserting such claims against Mr. Sillerman, the Litigation Trustee and Mr. Sillerman have agreed to toll the statutory period within which the Litigation Trustee must bring such claims.

11. Movants' claims are premised upon a judgment to which Mr. Sillerman ultimately consented based upon his guarantee of an obligation of SFX Entertainment. Prior to the filing of the involuntary petition, SFX Entertainment unilaterally withdrew its agreement to indemnify Mr. Sillerman against Movants' claims as well as its agreement to compensate him for providing such credit support to SFX Entertainment.

12. With few exceptions, Mr. Sillerman's property consists of interests in limited liability companies, most of which directly or indirectly own an interest in a particular asset or assets. In certain of such companies, he is the sole member; in others, Mr. Sillerman's wife is also a member or third parties are also members. While most of the limited liability companies own all of the underlying asset(s), some own a percentage of the asset(s).

13. Mr. Sillerman's inability to pay his debts as they became due is attributable to a lack of liquidity. Thus, the *raison d'etre* of the chapter 11 case has been to afford him the opportunity to protect and maintain various assets and make certain investments in existing assets in order to fund a plan of reorganization under which creditors will receive payment in full of their respective allowed claims.

**The Plan of Reorganization/Disclosure Statement**

14. On October 31, 2018, Mr. Sillerman timely filed a plan of reorganization. It provides for the payment in cash to all creditors of the full amount of their respective allowed claims. Although confirmation is conditioned upon, among other things, closing under a

financing facility, the Debtor is confident that this condition as well as the others will be satisfied and that confirmation will occur in the first quarter of 2019.

15. The Debtor also filed on October 31, 2018 a motion (the "**Extension Motion**") seeking to extend his time to file a disclosure statement and the hearing on that motion will be held at the same time as the hearing on Movant's Motion.

16. The Debtor argues in his Extension Motion that although he has worked diligently to draft the disclosure statement, he requires additional time to complete it. "As is clear from the Debtor's filed Schedules of Assets and Liabilities and Statement of Financial Affairs, his financial affairs are extensive and complicated; consequently, a complete discussion of his affairs requires significant time and attention." "Allowing the Debtor additional time to file the Disclosure Statement will facilitate the preparation of a draft that fully addresses the concerns of creditors and the various issues that must be resolved in connection with confirmation of the Plan." *See* Debtor's Mot. for an Order Extending the Time to File a Disclosure Statement in Connection with his Filed Chapter 11 Plan, ¶¶ 17, 20.

## ARGUMENT

### A. The Appointment of an Examiner is Not Mandatory under 1104(c)(2)

17. Section 1104(c)(2) of the Bankruptcy Code provides that the court "shall order the appointment of an examiner ... if ... the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." 11 U.S.C. §1104(c)(2).

18. Although Movants contend that this Court has no choice but to order the appointment, even under the seemingly mandatory language of section 1104(c)(2), the

appointment of an examiner has been held as a matter of judicial discretion and courts routinely refuse to "slavishly and blindly follow [its'] so-called mandatory dictates," especially in circumstances which would "cause the debtor to incur substantial and unnecessary costs and expenses detrimental to the interests of creditors and parties in interest." *In re Shelter Resources Corp.,* 35 B.R. 304, 304-05 (Bankr. N.D. Ohio 1983); *see also In re Rutenberg*, 158 B.R. 230, 233 (Bankr. M.D. Fla. 1993) (appointment of an examiner was denied notwithstanding $10 million in unsecured debt), *In re GHR Companies, Inc.*, 43 B.R. 165, (Bankr. D.Mass. 1984).

19. In *In re Dewey & LeBoeuf LLP,* this Court held that, "[a]ssuming arguendo that the Debtor had fixed, liquidated, unsecured debts in excess of $5 million, this Court has already concluded and adheres to the view that it retains the discretion to deny a motion for appointment of an examiner." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 639 (Bankr. S.D.N.Y. 2012); *see also In re Residential Capital, LLC,* 474 B.R. 112, 121 (Bankr. S.D.N.Y 2012) ("[T]he facts and circumstances of the case may permit a bankruptcy court to deny the request for appointment of an examiner even in cases with more than $5 million in fixed debts.").

20. The Court's authority to deny the appointment of an examiner is further supported by the language of the statute itself: "the [C]ourt shall order the appointment of an examiner to conduct such investigation of the debtor *as is appropriate* ...." 11 U.S.C. §1104(c)(2) (emphasis added), *see In re Gilman Services, Inc.*, 46 B.R. 322, 327 (Bankr. D. Mass 1985) (notwithstanding its' literal text, section 1104(c)(2) cannot be read in insolation from the rest of the statute).

21. Here, as discussed below, appropriate circumstances for appointment of an examiner do not exist. Rather, appointment would constitute egregious abuse and unnecessarily

7

drain the estate assets and delay the administration of this case to the detriment of all parties in interest.

### B. The Appointment of an Examiner is Unwarranted under 1104(c)(1)

22.     Under section 1104(c)(1), the court shall order the appointment of an examiner to conduct an investigation of the debtor as is appropriate, "including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate …" 11 U.S.C. § 1104(c)(1).

23.     Under section 1104(c)(1), the appointment of an examiner to investigate a debtor's financial condition for allegations of fraud, dishonesty or gross mismanagement, "as is appropriate," is a matter of discretion for the court. *In re Gilman Servs., Inc.*, 46 B.R. 322 (Bankr. D. Mass. 1985). In exercising its discretion, the court must consider whether the costs and expenses are "disproportionately higher than the value of the protection afforded." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 402 (1977).

24.     Indeed, many courts have denied examiner motions based on the cost to the estate, and, ultimately, to the creditors. *See, e.g., In re Rutenberg*, 158 B.R. at 233 (denying motion, in part because of cost), *In re The GHR Companies, Inc.*, 43 B.R. at 176 (denying the appointment of an examiner in light of the "great sums of money to sustain the expenses of the professionals" already employed), *In re Shelter Resources Corp.,* 35 B.R. at 305 (noting that an examiner would "most likely cause the debtor to incur substantial and unnecessary costs and expenses.").

25. Moreover, in considering section 1104(c)(1), courts have distinguished between evidence of systematic wrongdoing and allegations of isolated mismanagement: "[S]ome degree of mismanagement exists in virtually every insolvency case ... mere mismanagement does not, by itself constitute cause." *In re Sletteland*, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001); *see In re Lenihan*, 4 B.R. 209, 211 (Bankr. D.R.I. 1980) (naked allegations of fraud did not justify examiner appointment). Although there is no requirement that misconduct or incompetence be proven, "there should be at least some evidence presented that [the] allegations have some factual basis." *In re Bel Air Assoc.*, 4 B.R. 168, 173 (Bankr. W.D. Ok. 1980).

26. It follows that courts have held that the appointment of an examiner pursuant to section 1104(c)(1), "should not be routinely granted" but limited to cases in which there is "sufficient evidence to provide a factual basis for the granting of such relief." *In re Tyler*, 18 B.R. 574 (Bankr. S.D. Fla. 1982), *In re 1243 20th Street, Inc.*, 6 B.R. 683 (Bankr. D.D.C. 1980); *see also In re Rutenberg*, 158 B.R. at 233 (suggesting court must consider "totality of the factors"). According to this Court, "[m]ere allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor of or by current or former management" are insufficient to justify the appointment of an examiner. *Dewey & Leboeuf,* 478 B.R. 627, 640 (Bankr. S.D.N.Y 2012).

27. In *In re Tyler*, the court denied the request for the appointment of an examiner made by creditors of an individual chapter 11 debtor, described as heavily involved in the financial affairs of several subsidiary and affiliate companies, as there was no showing that any creditor had been prejudiced by the debtor's intercompany advances. *In re Tyler*, 18 B.R. 574. The court reasoned that although a picture has emerged that the debtor created a "very

9

complex interpersonal and intercorporate structure," Movants failed to establish that the debtor or the affiliated corporations were fraudulent or dishonest: "The existence of several related corporate entities … *does not, per se, constitute a factual predicate for the appointment of a trustee or an examiner.*" *Id.* at 578 (emphasis added). In fact, the court noted that intercompany advances are perfectly logical as a mechanism to provide day-to-day working capital for the transferee entity and potentially conferred tax benefits. *Id*.

28. Here, Movants have failed to make the requisite evidentiary showing of misconduct by the Debtor. Instead, the Motion manifests a wholesale attempt to justify the drastic relief of appointing an examiner based upon conclusory statements that are not premised on any facts, but on self-serving suppositions that are themselves baseless. For example, Movants conflate concepts of assets and liquidity and suggest, irrationally, that considering only the value of the Debtor's assets, his search for liquidity in the form of financing is a sham. However, courts have rejected such conclusory assertions of a need for an "impartial assessment" as grounds for the appointment of an examiner. *See, e.g., In re Table Talk, Inc.*, 22 B.R. 706 (Bankr. D.Mass. 1982).

29. It does not follow that by virtue of owning assets indirectly through holding companies the Debtor is hiding the "true nature, location and amount of his estate's assets"; or that by virtue of listing his assets as interests in such holding companies, his schedules and/or statement of financial affairs are "misleading, incomplete and distorted"; or that by virtue of making properly reported transfers to his wife, the transfers have not "been justified . . . or subjected to scrutiny"; or that by virtue of causing a holding company to retain, with this Court's approval, an "investment procurement agent," the Debtor is hiding behind someone to "provide a

10

false face of progress"; or that by virtue of filing a plan, which discloses "neither the source nor substance of the financing" (a required feature of a disclosure statement, not a plan), the Debtor has acted improperly; or that by virtue of filing a plan without a disclosure statement, the Debtor is "[seeking] to further stall this Bankruptcy Case past the end of the year."

30. As in *Taylor*, the fact that the Debtor is wealthy and his financial affairs complicated is insufficient in and of itself to justify the appointment of an examiner. *In re Taylor* 18 B.R. at 575 ("[the debtor] appears to be a bright, articulate and energetic 'deal maker' in the accepted American tradition").

31. Movants have done nothing to educate themselves about the Debtor's financial affairs. They have sought no examination under Rule 2004 of the Federal Rules of Bankruptcy Procedure; they have made not a single informal inquiry, orally or in writing, of the Debtor or his counsel. Disappointed that the United States Trustee did not appoint a committee of unsecured creditors that would have functioned at the expense of the Debtor's estate, Movant's quest for an examiner is an ill-founded attempt to shift to the estate the cost and expense of conducting the due diligence that Movants have chosen to ignore.

32. In follows that, when considering the Debtor's filed plan of reorganization that provides for the payment in full to all creditors, an examiner would confer no benefit on the creditors and other interests in this case. To the contrary, the appointment would only waste estate assets, impair the Debtor's ability to obtain exit financing and delay confirmation.

33. Other courts have refused to appoint an examiner in analogous circumstances. *See In re Rutenberg,* 158 B.R. 230, 233 (Bankr. M.D. Fla. 1993) (denying appointment of an examiner where plan and disclosure statement had been filed and the

appointment of an examiner would "cause further delay in the administration of [the] Chapter 11 case"); *In re Schepps Food Stores, Inc.,* 148 B.R. 27, 30-31 (Bankr. S.D. Tex. 1992) (holding that there was "ample support in the record to conclude that [movant's] interest in the appointment of an examiner [was] *a tactic to prevent confirmation,* rather than to investigate bad faith allegations.") (emphasis added).

34.     Accordingly, because the appointment of an examiner is inappropriate and improvident and will impose expenses that far exceed any value the "protection" would bring to the estate, the Motion must be denied.

### C. No Cause Exists for Terminating the Debtor's Exclusivity Periods under 1121(d)

35.     Under section 1121(d) of the Bankruptcy Code, a bankruptcy court may extend or reduce the debtor's exclusivity periods for confirming a plan of reorganization "for cause." *See* 11 U.S.C. § 1121(d).

36.     In enacting section 1121(d), Congress intended "to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan." *In re Clamp–All Corp.*, 233 B.R. 198, 207–08 (Bankr. D.Mass. 1999). According to this Court, "[i]t was intended that at the outset of a Chapter 11 case, a debtor should be given the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco, Inc.*, 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) (citing H.R. Rep. No. 595, 95th Cong., 2d Sess. 221–22, reprinted in 1978 U.S.C.C.A.N. 5787).

37.     The exclusivity period enjoyed by chapter 11 debtors arises from a belief that the debtor is generally best suited to orchestrate the process of rehabilitation based on familiarity with the business, and has been considered essential to the debtor's "ability to

stabilize its operations and retain control over the reorganization process." *In re Clamp–All Corp.*, 233 B.R. at 207. "The adoption of a limited period of exclusivity also assures speed by motivating the debtor to be more fair and reasonable in its negotiations with creditors, because the debtor knows that the bargaining leverage of exclusivity will soon end." *Id*; *see also In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989).

38.    Courts have held that, as a general rule, the party seeking to terminate or modify a debtor's exclusivity period bears the burden of proof since it is the moving party who seeks to change the status quo. *See In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D. Mich. 1997). "[M]ost cases state that the standard of proof for such motions is a heavy one[.]" *Id.; see also In re Interco, Inc.*, 137 B.R. 999, 1000 (Bankr. E.D.Mo. 1992) ("A party in interest which seeks to establish 'cause' to terminate the exclusivity period 'bears a heavy burden.'").

39.    In *In re Texaco*, this Court also noted that in most cases where "cause" was found to terminate exclusivity, factors such as gross mismanagement of the debtor's operations or acrimonious feuding between the debtor's principals, were regarded as the major obstacles to a successful reorganization. 76 B.R. 322 (Bankr. S.D.N.Y. 1987) (citing *In re Crescent Beach Inn, Inc.*, 22 B.R. 155 (Bankr. D.Me. 1982), *In re Texas Extrusion Corp.*, 68 B.R. 712, 725 (N.D.Tex. 1986)).

40.    In *In re Adelphia Commc'ns Corp.*, this Court held that when exercising discretion to extend or terminate exclusivity, the Court should consider several factors: (a) the size and complexity of the case; (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan; (c) the existence of good faith progress towards

13

reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. *In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 674 (Bankr. S.D.N.Y.), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006).

41. Here, because the debtor has timely filed a plan of reorganization, many of the relevant factors have been rendered moot. Indeed, the *Adelphia* court itself held that once a plan is filed, the relevant inquiry is "whether the plan … will secure favorable reaction from the Debtors' creditors." *In re Adelphia Commc'ns Corp.* 352 B.R. 578, 588 (Bankr. S.D.N.Y. 2006) ("this factor, which I consider to be the most important under the facts of these cases, strongly favors retention of exclusivity by the Debtors.").

42. Here, as mentioned, there is no question that the plan of reorganization will secure favorable reaction from creditors, as it proposes to pay all of them in full.

43. Moreover, despite Movants claims that the recently filed plan "utterly fails any standard of viability," feasibility of a plan is a standard of confirmation that the Bankruptcy Code contemplates being addressed in a disclosure statement, not a plan, and the Debtor will do so in his disclosure statement.

44. In light of the foregoing, Movants request to terminate exclusivity should be denied, as they have failed to meet the heavy burden for demonstrating cause.

## **NOTICE**

45. Notice of this Response has been given to: (a) Movants; (b) the Office of the United States Trustee for Region 2; (c) the Debtor's 20 largest unsecured creditors; and (d) and all those who have requested notice and service of papers in the Debtor's chapter 11 case.

WHEREFORE, the Debtor respectfully requests that this Court (i) deny the Motion and (ii) grant such other and further relief as it deems just and proper.

Dated: December 7, 2018
      New York, New York

                    ROSEN & ASSOCIATES, P.C.
                    *Counsel for Debtor and Debtor in*
                       *Possession*

                    By: /s/ Sanford P. Rosen
                        Sanford P. Rosen

                  747 Third Avenue
                  New York, NY 10017-2803
                  (212) 223-1100