Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
Telephone: (516) 357-3700
tslome@cullenanddykman.com
jmazermarino@cullenanddykman.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

                                          Chapter 11

Robert Francis Xavier Sillerman,
aka Robert F.X. Sillerman,                Case No. 17-13633 (MKV)
aka Robert F. Sillerman,
aka Robert X. Sillerman,

                        Debtor.
------------------------------------------------------------x

### OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 1104(a) AND 1112(b) FOR ORDER APPOINTING A CHAPTER 11 TRUSTEE OR CONVERTING CASE TO A CHAPTER 7 CASE

The Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned

debtor and debtor in possession Robert Francis Xavier Sillerman, aka Robert F.X. Sillerman, aka

Robert F. Sillerman, aka Robert X. Sillerman (the "**Debtor**"), as and for its motion (the "**Motion**"),

pursuant to sections 1104(a) and 1112(b) of the United States Bankruptcy Code (the "**Bankruptcy**

**Code**"), for an order appointing a chapter 11 trustee or converting the case to a chapter 7 case sets forth as follows:[1]

## JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the Southern District of New York (the "**Court**" or "**Bankruptcy Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 1104(a) and 1112(b) and 1115 and Rules 1017(f), 2002(a)(4), 2007.1, and 9014 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**").

## INTRODUCTION

4.     In the six months since the Committee and its professionals have been involved in this chapter 11 case, the Committee has proceeded on two tracks. Track one was to work with the Debtor to determine if there was any realistic possibility for the Debtor to propose and fund a meaningful chapter 11 plan. That approach focused first on the Debtor's "three initiatives" to make investments to fund a confirmable plan, and then, after the Debtor suddenly abandoned those initiatives, to make the same determination respecting his new initiative —development of his Anguilla property. The second track was to launch an immediate investigation into the Debtor's finances and to minimize further erosion of his estate, in case track one proved to be a dead end.

---

[1] Filed contemporaneously herewith is the *Declaration of Neil Bivona in Support of Official Committee of Unsecured Creditors' Motion Pursuant to Bankruptcy Code Sections 1104(a) and 1112(b) for Order Appointing a Chapter 11 Trustee or Converting Case to a Chapter 7 Case* dated July 16, 2019 (the "**Bivona Dec.**") and the *Declaration of Jil Mazer-Marino in Support of Official Committee of Unsecured Creditors' Motion Pursuant to Bankruptcy Code Sections 1104(a) and 1112(b) for Order Appointing a Chapter 11 Trustee or Converting Case to a Chapter 7 Case* dated July 16, 2019 (the "**Mazer-Marino Dec.**").

1772526

5.     After spending substantial time and effort to see if the Debtor's latest initiative could serve as the basis for a consensual plan of reorganization, the Committee believes there are no realistic prospects for a consensual plan, and considering the Debtor's waste of time and resources, a trustee should administer the Debtor's assets for the benefit of the estate.

6.     The Debtor has shown no willingness or ability to act as a fiduciary for his estate. Instead, he has acted solely for his and his wife's benefit.  A trustee has the power to commence avoidance actions to recover transfers the Debtor made to his wife, their not-for-profit foundation and other related entities the Debtor owns alone or with his wife.  The Debtor, as debtor in possession, has not even investigated, let alone pursued such claims.  Also, a trustee would have the power to cause the Debtor's companies to dispose of their assets in the manner most beneficial to the estate.  In contrast, to date, the only assets the Debtor has sold have been the Debtor's golf memberships, the proceeds of which were used to fund the Debtor's and his wife's lavish lifestyle.

7.     The Committee cannot sell the Debtor's assets or take control of his companies. With respect to avoidance actions, the Committee would have to seek derivative standing for each specific cause of action the Committee wants to prosecute, after first making presumably futile demand on the Debtor to sue his wife and other related transferees.  These potential avoidance actions include ones to recover securities he valued in excess of $100 million and $765,000 in cash transferred to his and his wife's not-for-profit foundation, despite pending creditor lawsuits seeking to recover millions of dollars in damages from him.

8.     Numerous grounds exist for appointment of a trustee (under either Bankruptcy Code chapter 11 or 7) due to the Debtor's pre- and post-bankruptcy actions.  First, prior to entry of the order for relief in this case, the Debtor "invested" and lost over $150 million in his three

initiatives. On the Debtor's Schedules, the Debtor valued these initiatives at approximately $400 million. Until just after the Committee was appointed and started asking questions, he made multiple material misrepresentations regarding these initiatives to support the illusion the initiatives would get creditors repaid in full in short order. Now, he says they are worthless.

9. Second, after entry of the order for relief, and as set forth more fully in the Committee's previously filed Motion to Restrict (defined below), the Debtor made substantial unauthorized transfers to his wife and his companies, spent well over one million dollars on personal expenditures, and failed to file required financial reports (which he has still failed to file months after being ordered to do so). Further, the Committee learned that in December 2018, the Debtor improperly converted into equity a $1.9 million note receivable owed to him by an entity owned by him and his wife, resulting in the transfer of significant value from the Debtor's estate to the Debtor's wife.

10. Third, without Bankruptcy Court approval or even advance notice to creditors, the Debtor executed an agreement committing one of his companies to transfer the Debtor's Anguillan property notwithstanding that the Committee specifically had advised the Debtor that entry into such an agreement required prior notice and court approval.

11. Further, the Debtor has not been transparent with respect to the Anguilla property. As to ownership, he claimed in sworn Schedules that his wife has an interest in the Anguilla property when documentation executed by the Debtor shows otherwise. Moreover, the Debtor failed to schedule the liens, claims and encumbrances related to the Anguilla property. Also, he refused to provide information concerning the liens to the Committee until two months after the Debtor announced he intended to fund a plan through development of the Anguilla property.

1772526

The documents belatedly produced demonstrate the Debtor pledged all his interests in the entities that own the Anguilla property and such interests are purported to be fully encumbered.

12. Alone, any one of such misdeeds would constitute sufficient cause to appoint a chapter 11 trustee or convert this case to one under chapter 7. *See* 11 U.S.C. § 1104(a), 1112(b). Cumulatively, and together with the Debtor's unwillingness or inability to make progress in this case, the Debtor's lack of credibility, and his creditor's mistrust and lack of confidence in the Debtor, present a compelling case for a trustee. Consequently, the Committee seeks an order substantially in the form annexed hereto as **Exhibit A** appointing a chapter 11 trustee for the Debtor or, in the alternative, converting this case to a chapter 7 case.

## FACTS

### A.    Chapter 11 Case in General

13. On December 27, 2017, React Presents, Inc., Clubtix, Inc., Lucas King, and Jeffrey Callahan filed an involuntary petition under chapter 7 of the Bankruptcy Code against the Debtor (ECF No. 1).

14. The Debtor consented to entry of an order for relief and moved to convert his case to one under chapter 11. On March 1, 2018 (the "**Relief Date**"), the Court entered an order for relief and converted this case to one under chapter 11 (ECF No. 26).

15. Since conversion of the case to chapter 11, the Debtor has been legally entitled to operate his business and manage his properties and affairs as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.[2]

16. On March 16, 2018, the Debtor filed his Schedules of Assets and Liabilities (ECF

---

[2] Although the Debtor is a debtor in possession, as described in this Motion the Debtor has not operated his businesses or managed his properties in accordance with his fiduciary duties to the bankruptcy estate and creditors as required of a debtor in possession pursuant to the Bankruptcy Code and Bankruptcy Rules.

1772526

No. 29) and Statement of Financial Affairs (ECF No. 30). On March 20, 2018, the Debtor filed an amended schedule of secured creditors (ECF No. 36).

17. On May 4, 2018, the Debtor was examined at a Bankruptcy Code section 341 meeting of creditors (the "**341 Meeting**").

18. To date, no trustee or examiner has been appointed.

19. By Order entered July 3, 2018 (ECF No. 91), the Court granted the Debtor's *Motion for Entry of an Order Authorizing the Debtor to Cause RFXS, LLC, His Non-Debtor Affiliated Entity, to Retain Castle Placement, LLC* (ECF No. 56). After a year, the Castle Placement, LLC retention has not resulted in any debtor-in-possession or exit financing.

20. By Orders entered July 17, 2018 (ECF No. 98) and October 11, 2018 (ECF No. 121), the Debtor's exclusive periods to file a plan of reorganization and solicit acceptances thereto were extended through and including October 31, 2018 and December 31, 2018, respectively.

21. On October 31, 2018, the Debtor filed a chapter 11 plan (the "**Plan**") (ECF No. 132). On December 31, 2018, the Debtor filed a related disclosure statement (ECF No. 169). On January 9, 2019, the Debtor amended his disclosure statement (as amended, the "**Disclosure Statement**") (ECF No. 173). The Debtor has repeatedly adjourned the hearing on his Disclosure Statement, with the hearing currently scheduled for August 7, 2019, 2019 (ECF No. 345). The Debtor's exclusive periods to file a plan of reorganization and solicit acceptances have expired.

22. On January 11, 2019, the Office of the U.S. Trustee (the "**US Trustee**") appointed the Committee. (ECF No. 177).

23. The Committee retained Meyer, Suozzi, English and Klein, P.C. as its counsel, and

the financial advisory firm of RSR Consulting, LLC ("**RSR**") as the Committee's financial consultant. By separate application, the Committee is seeking authority to retain Cullen and Dykman LLP as substitute general counsel *nunc pro tunc* to June 29, 2019, because the Meyer Suozzi attorneys handling this case have joined Cullen and Dykman.

B.    **The Debtor's Material Misstatements Concerning the "Three Initiatives"**

24.    In his Disclosure Statement, the Debtor represented he would be able to pay creditors in full through three initiatives: proposed investments in Rocket Member and DGTLx (under Digital Media Investors, LLC) and Cirx, (under LBSX, LLC).

25.    The Disclosure Statement, signed by the Debtor, represents:

a.    The Debtor owns 100% of the interests in Digital Media Investors, LLC, which in turn holds a thirty percent interest in each of DGTLX LLC, Subscription Media Investors and Cryptocurrency Investors. Digital Media Investors, LLC has no liabilities and the "**value of the Debtor's interest is approximately $228,000,000**."

b.    DGTLx owns and operates two successful companies that generate seven figure EBITDA and has anchor investments in two other companies that it intends to acquire outright.

c.    LBSX, LLC has no liabilities and the value of the "**Debtor's interest is approximately $171,750,000**."

d.    "LBSX/Cirx has been in development for close to two years. The Debtor has directly and indirectly invested well over $100,000,000. . . . LBSX will launch a capital raising initiative outside the United States in February/March of 2019. . . . The Debtor has an agreement in place to share proceeds of any capital raised until his initial investment has been

7

repaid in full. Under this agreement, **the Debtor expects to realize $154,000,000**."

*See* Mazer-Marino Dec. at ¶ 5.

26. The Debtor's Schedule A/B, signed under penalty of perjury, values the Debtor's interests in Digital Media Investors, LLC at $228,000,000 and LBSX, LLC at $171,750,000. *See* Mazer-Marino Dec. at ¶ 6.

27. The Debtor testified under penalty of perjury at his Section 341 Meeting that he had invested $140 million to $150 million into LBSX, LLC alone. *See* Mazer-Marino Dec. at ¶ 7.

28. On February 6, 2019, Committee counsel forwarded to Debtor's counsel a document request seeking documents and information related to the "three initiatives" and all other businesses in which the Debtor had an interest. *See* Mazer-Marino Dec. at ¶ 8. Contemporaneously, RSR was granted access to the Castle Placement data room. However, that data room contained no meaningful financial data regarding the "three initiatives." *See* Bivona Dec. at ¶ 3.

29. On February 19, 2019, the Debtor and his counsel met telephonically with the Committee's retained professionals. Bivona Dec. at ¶ 4; Mazer-Marino Dec. at ¶ 9. The Debtor informed the Committee's professionals that the Debtor no longer was pursuing any of the "three initiatives." *Id*. On March 13, 2019, the Debtor and his counsel met in person with the Committee's professionals and informed them LBSX had been discontinued and the Debtor no longer had any interest in the other two initiatives; rather, his interests in those other two initiatives had been, in essence, contingent on further investment by the Debtor. *Id*. Yet, there is no disclosure in the Debtor's Schedules or the Disclosure Statement of any contingencies

related to the valuations he had ascribed to them, let alone that the Debtor would have no legal interest in the initiatives or they would be completely worthless absent additional financing. *Id*.

30.     As of February 27, 2019, the only documents the Debtor produced to the Committee in response to its February 6, 2019 document request were the Debtor's 2015 and 2016 tax returns and, except for the documents in the Castle Placement data room, no documents had been produced concerning the "three initiatives" or any of the Debtor's other businesses.  Bivona Dec. at ¶ 5; Mazer-Marino Dec. at ¶ 10.  Accordingly, the Committee filed its first Rule 2004 motion seeking production of documents from the Debtor and authority to issue subpoenas to the Debtor's wife, the entities controlled by the Debtor individually and with his wife, certain banks and financial institutions, the Debtor's accountants, and other individuals with knowledge of the Debtor's assets, liabilities, and financial condition.  *See* ECF No. 237.  On March 20, 2019, this Court entered an order granting the Committee's first 2004 Motion (the "**2004 Order**").  *See* ECF No. 253.

31.     The Debtor's deadline to respond under the 2004 Order was April 11, 2019. Mazer-Marino Dec. at ¶ 11.  Although by then the Debtor had produced numerous documents informally, the Debtor never produced any meaningful documentation concerning the Debtor's "three initiatives."  Bivona Dec. at ¶ 6; Mazer-Marino Dec. at ¶ 11.  For example, the Debtor has not produced the agreement that would allow him to share in the proceeds of the LBSX capital raise referenced in the Disclosure Statement, any of the documents concerning the two "successful companies" owned by DGTLx that, as set forth in the Disclosure Statement "generate seven figure EBITDA," or the agreements with DGTLx's anchor investors that were also referenced in the Disclosure Statement. *Id*.  Moreover, the Debtor has provided neither

9

documents supporting nor an accounting of the approximately $150 million he had invested in the "three initiatives" according to his sworn testimony and disclosures. *Id.*

32.     In short, the Debtor either has misled the Court and his creditors about the value of his assets or permitted valuable assets to become worthless, while continually resisting Committee efforts to obtain documentation about what he repeatedly said were the assets that would promptly generate funds to pay creditors in full.

**C.      The Debtor's Interference with the Committee's**
**        Investigation of the Anguilla Property**

33.     As soon as the Committee asked for information about the "three initiatives" and the Debtor asserted they had become worthless, he told the Committee that he had recently obtained an opportunity from which he would repay his creditors fully. The opportunity related to his two fee-owned acres and tenancy on a 99-year ground lease for an additional seven acres in Anguilla (collectively, the "**Anguilla Property**"). Bivona Dec. at ¶ 7. The Debtor owns and leases the Anguilla Property through several layers of limited liability companies. *Id*.

34.     The Debtor's Schedules value his interest in the Anguilla Property at $37,500,000. *See* Mazer-Marino Dec. at ¶ 12. Nonetheless, the Debtor now claims the Anguilla Property has minimal value absent his ability to contribute it to a joint venture that would develop the Anguilla Property along with property to be contributed by others. *Id*.

35.     The Debtor's counsel represented to the Committee (for the first time during the February 19, 2019 meeting) and to this Court at hearings on February 28, 2019 and April 1, 2019, that the Debtor intends to fund a plan of reorganization by developing the Anguilla Property. *See* Mazer-Marino Dec. at ¶ 13.

36.     As part of its investigation of whether the Debtor's proposed Anguilla development project could realistically serve as a basis for a confirmable chapter 11 plan, the Committee made

numerous requests of the Debtor for all documents related to the entities through which the Debtor owns/leases the Anguilla Property, including the formation documents, operating agreements and financials related to those entities. *See* Mazer-Marino Dec. at ¶ 14. The Debtor repeatedly and adamantly refused to provide that information, stating it was irrelevant, and the Committee should only be focused on the future proposed ownership structure. *Id*.

37. Eventually, after the Committee's professionals insisted on production of these documents, the Debtor produced certain of the operating agreements related to the entities with an interest in the Anguilla Property, a copy of a ground lease, and what appears to be one property record related to the two acres the Debtor owns. *See* Bivona Dec. at ¶ 9. However, it appears the Debtor has not produced all relevant operating agreements. *Id*.

38. To the extent documents were produced, they reveal the Debtor's lack of candor or understanding of his own interests in the Anguilla Property. For instance, on March 31, 2019, the Debtor emailed to the Committee's professionals an organizational chart purporting to show the existing ownership structure of the Anguilla Property—but the organizational chart was inconsistent with documents previously produced to the Committee. Bivona Dec. at ¶ 10. Among other things, the organizational chart showed the Debtor and his wife each having a <u>50%</u> direct ownership interest in Flag Pelican, LLC, which indirectly owns the Anguilla Property. *See* Bivona Dec. at ¶ 10; Mazer-Marino Dec. at ¶ 16. In contrast, in his Schedules, the Debtor represented he has a <u>75%</u> indirectly-owned interest in Flag Pelican, LLC. *Id*. Moreover, on or about April 24, 2019, months after the Committee's initial requests for Anguilla-related documents, the Debtor produced documents reflecting that in April 2016, the Debtor's wife transferred her 25% interest in Flag Pelican, LLC to the Debtor. *Id*. However, other documents indicate the Debtor's interests in Flag Pelican, LLC are not owned directly by the Debtor, but indirectly through MJX Ventures,

11

LLC. *Id.* Those documents also state that in April 2016, MJX Ventures, LLC pledged its 100% interest in Flag Pelican, LLC to an individual, Brett Torino, or his company, OPW, LLC, to secure indebtedness owed by the Debtor (original principal amount of $5,722,984.01) and by his wife (original principal amount of $7,250,000). *Id.* The Debtor failed to disclose Mr. Torino's or OPW, LLC's liens or claims in his Schedules. *Id.* Further, although the Debtor claims Pelican Lease Owner, LLC holds the leasehold interest for the seven leased acres of the Anguilla Property, the ground lease identifies the tenant as Flag Pelican, Ltd. *See* Bivona Dec. at ¶ 10.

39.     Whether Flag Pelican LLC is owned by the Debtor or MJX Ventures, LLC is significant because the pledge of the Flag Pelican, LLC interests to OPW, LLC was granted by MJX Ventures, LLC, not the Debtor. Therefore, if the Debtor owns the interests, MJX Ventures, LLC's pledge of those same interests should be ineffective. Furthermore, if MJX Ventures, LLC owns some but not all of the interests (i.e., the Debtor's wife owns 25% or 50% of the interests), then OPW, LLC's rights as a secured creditor would be limited largely to receiving distributions, if any, on account of its equity in the entities as opposed to having the right to exercise managerial control over the entities, thus preventing this creditor from carrying out its threat to liquidate the Anguilla Property. Similarly, whether Pelican Lease Owner, LLC is the actual tenant on the Anguilla Property lease is significant because Pelican Lease Owner, LLC guaranteed the debt owed to OPW, LLC by the Debtor and his wife but Flag Pelican, Ltd. did not. Accordingly, if the tenant is Flag Pelican, Ltd., then OPW, LLC might not be able to enforce its debt against the leased Anguilla Property.

40.     Notwithstanding the potential vulnerability of OPW, LLC's liens and the Debtor's contention that the Anguilla Property is critical to the reorganization, the Debtor has not challenged OPW, LLC's liens and has undermined the Committee's ability to investigate those liens, perhaps

because the liens also purportedly secure a debt owed to OPW, LLC by the Debtor's wife. For example, although the Committee made several demands for the documents related to all liens on the Anguilla Property -- the first of which was made on February 6, 2019 -- the Debtor did not produce documents related to Torino's liens until months later. *See* Mazer-Marino Dec. at ¶ 17; Bivona Dec. at ¶ 11. Furthermore, the Debtor has not produced the Flag Pelican LLC operating agreement or any other document definitively evidencing the ownership of the Flag Pelican, LLC membership interests or any documents concerning an assignment of the Anguilla Property lease from Flag Pelican, Ltd. to Pelican Lease Owner, LLC. *Id.*

41.     Consequently, the Debtor not only lacks an understanding of his legal position, but has potential conflicts related to how his legal position is resolved.

**D.     The Debtor's Agreement to Transfer the
        Anguilla Property Without Court Approval**



42.     On April 3, 2019, the Debtor advised the Committee that he caused his company Flag Pelican, Ltd. to enter into a ▮▮▮▮▮▮▮▮▮▮▮▮[3] and ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ providing for Flag Pelican, Ltd. to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to a ▮▮▮▮ company that will ▮▮▮ ▮▮▮ by the Debtor. *See* Mazer-Marino Dec. at ¶ 18. The ▮▮▮ purports to be ▮▮▮ regarding Flag Pelican, Ltd.'s obligation to ▮▮▮▮▮▮▮▮. *Id.* Further, the ▮▮▮ permits the ▮▮▮▮ company to encumber such property. *Id.*

43.     The Debtor executed the ▮▮▮▮▮▮▮▮▮▮▮ without prior notice to the Committee or Bankruptcy Court approval, and notwithstanding that: (a) on March 13,

---

[3] The ▮▮▮▮▮▮▮ may be confidential and governed by the terms of the So Ordered Confidentiality and Non-Disclosure Stipulation Between Debtor and Official Committee of Unsecured Creditors for Certain Disclosure by Debtor, entered by the Court April 11, 2019 (ECF No. 271). The Committee has requested authority to file this motion, the supporting declarations and certain exhibits thereto, under seal.

2019, the Committee had moved for an order, among other things, restricting the Debtor's ability to use the assets that were owned by the Debtor's limited liability companies (ECF No. 246) (the "**Motion to Restrict**"); and (b) on March 29, 2019, Committee's counsel advised the Debtor that the Committee believed execution of any document ███████████████████████ ██████ would be outside the ordinary course of business and would require prior Bankruptcy Court approval. *See* Mazer-Marino Dec. at ¶ 19.

44. Although purportedly executed on March 29, 2019, the executed ██████ was not disclosed to the Committee until two days after the April 1, 2019 hearing on the Motion to Restrict, at which hearing the Debtor (through counsel) agreed to the relief requested in the Motion to Restrict and agreed the Debtor would not cause or permit any related entity to transfer assets. *See* Mazer-Marino Dec. at ¶ 20.

**E.    The Debtor Converted His Note Receivable in Elderberry X, LLC Into Equity Without Bankruptcy Court Approval.**

45. In his Schedules, the Debtor represented that Elderberry X, LLC is owned 50% by the Debtor and 50% by his wife. *See* Mazer-Marino Dec. at ¶ 21; Bivona Dec. at ¶ 12. Elderberry X, LLC, in turn owns directly and indirectly, real property, including property in Southampton that is believed to have equity in excess of $1 million. *Id*. In addition to his ownership interest in Elderberry X, LLC, Elderberry X, LLC owes a debt to the Debtor in the principal amount of $1,900,000. *Id*. As a <u>debt</u> obligation, Elderberry X, LLC would have to repay the $1,900,000 principal plus interest in the approximate amount of $273,000, for a total of $2,173,000, to the Debtor's estate in full <u>prior to</u> distributing money to the Debtor's estate and his wife on account of their purported 50-50 equity interests in that company. *Id*. In December 2018, without Court authorization, the Debtor converted the debt obligation from Elderberry X, LLC into an equity interest in Elderberry X, LLC. *Id*. If this purported equitization of the $2,173,000 debt remains

14

in effect, no distribution would be made to the Debtor's estate until all other creditors of Elderberry X, LLC are paid in full. *Id.* In effect, only if there are funds remaining after paying creditors, would there be a distribution on account of equity. And, whereas the full note amount would have been paid to the Debtor's estate <u>before</u> any distribution would have been made to the Debtor's wife on account of her equity interest in Elderberry X, LLC, due to the purported conversion of the note to equity, distributions to the Debtor's estate would be made *pari passu* with payments to the Debtor's wife on account of her 50% ownership interest in Elderberry X, LLC, diminishing the possibility the Debtor's estate will receive full payment of the $2,173,000 debt. *Id.* Moreover, despite the equitization of the debt, the Debtor's interest in Elderberry X, LLC apparently did not increase and he remains a 50% owner. *See* Mazer-Marino Dec. at ¶ 21.

**F.**     <u>**Violations Detailed in the Motion to Restrict**</u>

46.     Reference is made to the Committee's Motion to Restrict, which details many of the Debtor's unauthorized transfers and violations of the Bankruptcy Code and Bankruptcy Rules. The facts set forth in the Motion to Restrict, which are not repeated here, independently support appointment of a chapter 11 trustee or conversion of this case to chapter 7 and are incorporated into this Motion by reference. The following updates several facts in the Motion to Restrict:

       a.     <u>**Unauthorized Transfers to Laura Sillerman.**</u> The Debtor transferred over $1 million to his wife Laura Sillerman after the Relief Date and without Court authorization. *See* Motion to Restrict at ¶ 13–15. To date, the Debtor has not commenced an action seeking to recover those transfers and has obvious conflicts of interest in that regard. *See* Mazer-Marino Dec. at ¶ 22.

       b.     <u>**Questionable Charitable Contributions.**</u> Based on the Debtor's Schedules, in the two years prior to the Relief Date and while a defendant

15

in several lawsuits which have resulted in substantial unsatisfied judgments, the Debtor made over $139,592,000 in "charitable" contributions to the Tomorrow Foundation (a purported charity formed and/or run by the Debtor and his wife), including: (x) a 2016 transfer of securities in LBSX, LLC (a company controlled by the Debtor) that the Debtor valued at $138,750,000; and (y) a 2015 transfer of $765,000 in cash. *See* Bivona Dec. at ¶ 13. The Debtor has not commenced any actions to recover those improper transfers and has obvious conflicts of interest in that regard. *See* Mazer-Marino Dec. at ¶ 22.

c. **The Debtor's Excessive Personal Expenses**. Despite excessive carrying costs (and the Debtor's lack of equity in the New York town house), the Debtor did not seek to retain a broker to market the Townhouse until fifteen months into the case or the Southampton properties until seventeen months into the case. (ECF Nos. 228, 325). Based on the Debtor's projections, carrying costs for the Southampton properties and the town house exceed $70,000 and $100,000 per month, respectively. *See* Mazer-Marino Dec. at ¶ 22. Further, although the Debtor agreed to vacate the New York City townhouse and move to his New Hampshire property (which would greatly reduce estate expenses), the Debtor did not do so until May, 2019. *Id*. Further, without Bankruptcy Court approval, the Debtor made severance payments to his employees, which payments are prepetition claims that cannot be paid without Bankruptcy Court approval. *Id.*

16

d.  **<u>Unauthorized Transfers to Professionals</u>**.  As set forth in the Motion to Restrict, the Debtor spent in excess of $86,000 on lawyers and accountants that had not been retained by Court order. *See* Mazer-Marino Dec. at ¶ 22. To date, the Debtor has neither attempted to recover those payments nor moved to retain any of these professionals. *Id.*

e.  **<u>Failure to Produce Documents and Information</u>**.  The Debtor has not complied with his obligation to provide complete information concerning his interests in the Anguilla Property or the "three initiatives."  The Debtor also failed to provide much of the information required under the 2004 Order.  By way of example only, the Debtor produced bank statements for certain of his accounts, but numerous bank statements are still missing.  *See* Bivona Dec. at ¶ 14.  The Debtor apparently has documents responsive to the 2004 Order but has not retrieved them from storage. *See* Bivona Dec. at ¶ 14; Mazer-Marino Dec. at ¶ 22.  Also, it does not appear the Debtor has made appropriate inquiry of his accountants or attorneys for documents responsive to the 2004 Order because the Debtor has not produced any general ledgers, K-1s, balance sheets, or other documents typically generated or reviewed by accountants in connection with preparation of federal and state tax returns.  *See* Bivona Dec. at ¶ 14.

f.  **<u>Failure to File Rule 2015.3 Reports</u>**.  As set forth in the Motion to Restrict, the Debtor failed to file reports under Bankruptcy Rule 2015.3.  *See* Mazer-Marino Dec. at ¶ 22.  Under the stipulation resolving the Motion to Restrict that was "so ordered" by this Court, the Debtor had until May 12, 2019, to

17

file those reports with information current as of March 1, 2019.  *See* Mazer-Marino Dec. at ¶ 22.  The Debtor has not filed those reports and is in violation of a Court order.  *Id.*

**G.**   **The Debtor's Violation of the Interim Fee Order**

47.    In addition to violating this Court's order granting the Motion to Restrict, the Debtor violated this Court's order concerning payment of professionals.  On May 9, 2019, this Court entered an order directing the Debtor to deposit $150,000.00 with Rosen & Associates, P.C. for distribution to professionals retained in this case.  *See* ECF No. 305.  To date, the Debtor has failed to make such deposit and the professionals retained by the Committee have not been paid as required by the Order.  Further, there is no provision in the Debtor's proposed June or July budgets to pay professional fees and expenses.  *See* Mazer-Marino Dec. at ¶ 23.

48.    Further, this case has been pending for over 18 months and, to date, the Debtor has not filed a confirmable plan nor taken any meaningful actions to reorganize, such as obtaining approval to sell, abandon or otherwise dispose of assets.  Additionally, the Debtor has not satisfied his duties as a debtor in possession to file tax returns for the bankruptcy estate for 2017 or 2018. *See* Mazer-Marino Dec. at ¶ 24.

## ARGUMENT

**A.**   **The Court Should Appoint a Chapter 11 Trustee**

49.    Section 1104(a) of the Bankruptcy Code provides that "the court shall order the appointment of a trustee --

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

18

1772526

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

50.     Under section 1104(a), there are two independent bases for appointing a trustee in a chapter 11 case.  Section 1104(a)(1) provides that an independent trustee must be appointed "upon the showing of cause—inclusive of fraud, dishonesty, incompetence or gross management of the debtors' affairs by current management."  *In re Ashley River Consulting, LLC*, No. 14-13406(MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. March 31, 2015).  *See also In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).  If cause does not exist under section 1104(a)(1), a court may still, in its discretion, appoint a trustee under section 1104(a)(2) as being in the interests of the estate.  *See In re China Fishery Grp. Ltd. (Cayman)*, No. 16-11895(JLG), 2016 WL 6875903, at *14 (Bankr. S.D.N.Y. Oct. 28, 2016).

51.     "[I]n considering a motion for the appointment of a trustee, a bankruptcy court is not required to conduct a full evidentiary hearing" and has "wide discretion in considering the relevant facts."  *In re Ancona*, No. 14-10532(MKV), 2016 WL 7868696, at *9 (Bankr. S.D.N.Y. Nov. 30, 2016).  "[T]he party moving for appointment of a chapter 11 trustee bears the burden of showing cause by clear and convincing evidence."  *Id*.

52.     The requirements of both section 1104(a)(1) and section 1104(a)(2) are plainly satisfied here and therefore the appointment of a trustee in this chapter 11 case is warranted.

**B.      Abundant Cause Exists for Appointment**
**of a Trustee Under Section 1104(a)(1)**

53.     While section 1104(a)(1) of the Bankruptcy Code expressly identifies four bases upon which "cause" may be found, namely <u>fraud, dishonesty, incompetence, and gross mismanagement</u>, those enumerated grounds are not exclusive. *Ancona*, 2016 WL 7868696, at

*9. "Other factors warranting the appointment of a trustee under section 1104(a)(1) include conflicts of interest, inappropriate relations between corporate parents and subsidiaries, misuse of assets and funds, inadequate record keeping and reporting, failure to disclose relevant and material information, lack of credibility and creditor confidence, and various other similar instances of conduct." *Id*. Furthermore, appointment of a chapter 11 trustee is proper when the debtor defaults in his responsibilities. *See id.* at *10.

54.     In this case, the Debtor's conduct evinces many of these factors, including dishonesty, incompetence and gross mismanagement:

- The Debtor's gross misstatements of value concerning the "three initiatives" in his Schedules, in his testimony at the Section 341 Meeting, and in his Disclosure Statement (the Debtor stated that his interests were worth hundreds of millions of dollars and now claims the estate has no legal interest in those initiatives or they are worthless).

- The Debtor's misstatements concerning the value of the Anguilla Property – claiming in his schedules that the property is worth $37 million and now claiming it has minimal value.

- The Debtor's failure to schedule Brett Torino's and OPW's claims and encumbrances on the Anguilla Property or to produce promptly documents concerning those liens and claims to the Committee, notwithstanding repeated requests.

- The Debtor's entry into ██████ without Bankruptcy Court approval.

- The Debtor's failure to disclose his entry into ██████ until after the hearing on the Motion to Restrict.

20

- The Debtor's claim that he owns only a 50% interest in the Anguilla Property and his wife owns the other 50% interest, in contrast to his representation in his Schedules that he owns a 75% interest in the property and the subsequent revelations that he apparently owns 100% of the interests in the property and that those interests are purportedly fully encumbered.

- The Debtor's investing and losing "over $150 million" in connection with the three initiatives.

- The Debtor's persistent focus on the "three initiatives" for the first fifteen months of this case and failure to consummate any transaction concerning those initiatives, and then his sudden revelation that such initiatives are worthless.

- The Debtor's failure for over 18 months to abandon or sell his New York City townhouse, which has cost the estate hundreds of thousands of dollars in carrying costs despite the estate apparently having no equity.

- The Debtor's failure for over 18 months to sell or otherwise dispose of his Southampton properties, which cost the estate over $70,000 per month in upkeep.

- The Debtor's transfer to his wife of $866,000, representing one-half of the tax refund received by the estate, without Court authorization or evidence that the Debtor's wife was entitled to any portion of the tax refund.

- The Debtor's transfer of over $500,000 to his wife for living expenses for the last year while he has been in chapter 11.

21

- The Debtor's unauthorized equitization of the indebtedness owed to him by Elderberry X, LLC, which resulted in the loss of a structurally senior right to recovery from the liquidation of the Southampton properties for the sole benefit of the Debtor's wife.

- The Debtor's extravagant lifestyle during this case, including keeping three owned homes, a leased apartment, helicopters, three golf memberships and an extensive personal staff, which caused the Debtor to burn through well over $1 million of estate cash in only a year.

- The Debtor's failure to file Bankruptcy Rule 2015.3 statements since the Relief Date and after being specifically directed to do so by this Court by Order entered April 12, 2019.

- The Debtor's failure to deposit $150,000 with his counsel to pay accrued professional fees after being specifically ordered to do so by this Court on May 9, 2019.

- The Debtor's payment of accountants and lawyers who have not been retained by Court order.

- The Debtor's unauthorized and improper payment of prepetition severance claims.

- The Debtor's failure to file tax returns for the last two years.

## C. Appointing a Trustee is Independently Authorized Under Section 1104(a)(2) as it is in the Interests of Creditors and the Estate

55. In addition to there being more than sufficient cause to appoint a trustee under section 1104(a)(1), the Court may also appoint a chapter 11 trustee under section 1104(a)(2), because in this case doing so is in "the interests of" the parties and the estate. *See In re Ashley*

22

*River Consulting*, 2015 WL 1540941, at *11. Section 1104(a)(2) envisions a flexible standard. *See In re Soundview Elite, Ltd.*, 503 B.R. 571, 583 (Bankr. S.D.N.Y. 2014). In essence, section 1104(a)(2) "reflects 'the practical reality that a trustee is needed'." *In re V. Savino Oil & Heating*, 99 B.R. at 527 n.11 (*quoting In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988)). Factors to consider include: "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *In re Soundview Elite, Ltd.*, 503 B.R. at 583. Here, those factors all weigh heavily against the Debtor remaining in possession.

56.     First, the Debtor lacks credibility. Set forth above are numerous examples of the Debtor gross misstatements about material valuations, as well as substantial improper transfers.

57.     Second, the Debtor's past performance shows he has been unwilling or unable to rehabilitate. He has been in bankruptcy for over a year and one half, while doing virtually nothing to advance this case, other than filing his placeholder Plan and Disclosure Statement based on worthless initiatives. Similarly, his current scheme of funding a plan through the development of the Anguilla Property is highly speculative and temporally remote, and thus cannot form the basis of a confirmable plan—certainly not one his creditors would ever support.

58.     Third, the Debtor's creditors have no confidence in the Debtor or his ability to do anything constructive with his assets. This lack of confidence is due to the Debtor's lack of cooperation, his misuse of assets for his and his wife's benefit, his lack of candor with the Court and creditors, his failure to comply with the Bankruptcy Code, Bankruptcy Rules and Court orders, his wasting of assets, his failure to sell assets despite their exorbitant carrying costs, his

failure to reduce expenses, his transfers and loss of large amounts of cash both before and after

the Relief Date, his inability to show creditors any credible way to repay them, and his entry into

████████ without prior Court approval or disclosure to the Committee.

59.     The benefits of appointing a trustee far outweigh the costs.  Once appointed, the

Debtor would lose his ability to use cash (over $100,000 per month) to pay for his and his wife's

lavish lifestyle.  That cash could be used to fund distributions under a plan.  Based on the

Debtor's historical misuse of cash, it is unlikely the Debtor will segregate cash sufficient to pay

the administrative expense and priority claims that are required to be paid in full upon

confirmation.  *See* 11 U.S.C. § 1129 (a)(9)(A).  In addition, appointment of a chapter 11 trustee

would reduce the estate's costs to investigate the Debtor's assets and causes of action.  With the

Debtor in charge, almost every document and piece of information received by the Committee

has to be preceded by verbal requests, email requests, and/or motion practice.  In contrast, a

trustee would immediately be entitled to possession, custody and control of all of the Debtor's

books and records and could immediately access the Debtor's records in storage and obtain

turnover of documents from the Debtor's accountant and other professionals.

60.     Further, a trustee would be entitled to immediate possession of all the estate's assets

and could move forward, using all of the tools available under the Bankruptcy Code, to sell or

abandon them as will best benefit the estate.

61.     As importantly, a trustee can utilize the results of the Committee's investigation, in

order immediately to pursue actions to avoid and recover preferences, fraudulent conveyances

and unauthorized post-petition transfers, including those enumerated in the Motion to Restrict

and herein.  Clearly, the Debtor is conflicted and will not pursue those avoidance actions because

the transfers were made <u>by him</u> to his wife and related entities.  The Committee cannot pursue

24

those claims without first identifying each particular claim, making demand on the Debtor to bring such claims, and only if after the Debtor fails to bring the claims, the Committee obtains Bankruptcy Court approval to prosecute such claims. *See Unsecured Creditors Comm. of Debtor STN Enters. Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901 (2d Cir.1985)**.** The additional time and administrative expense to accomplish these things indirectly would be an unjustified burden on the estate and waste of estate resources.

**D.     Alternatively, the Court Should Convert this
         Chapter 11 Case to a Chapter 7 Case**

62.    Section 1112(b) of the Bankruptcy Code provides:

(1) Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the state, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

63.    Under Section 1112(b)(4), "cause" includes, among others:

(A)    substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(B)    gross mismanagement of the estate;

. . .

(E)    failure to comply with an order of the court;

(F)    unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(I)    failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief

11 U.S.C. § 1112(b)(4).

1772526

64.     Many of the enumerated instances of cause that are set forth at Bankruptcy Code section 1112(b)(4) are present here.  But the list is illustrative only and not exhaustive.  *See generally* 11 U.S.C. §102(5) ("includes" is "not limiting").  *See also In re C-TC 9th Avenue P'ship*, 113 F.3d at 1311 (pre-BAPCA case holding Bankruptcy Court may dismiss Chapter 11 filing on motion or *sua sponte* upon a finding that the filing was in "bad faith" even without consideration of factors set out in section 1112(b), and the Court may fashion cause from the operative facts of the case).

65.     As the bases for the appointment of a chapter 11 trustee overlap with the bases for conversion of the case to chapter 7, the Committee incorporates the discussion above concerning the Debtor's dishonesty, incompetence, gross mismanagement, failure to comply with the 2004 Order, failure to file tax returns, and the unexcused failures to make timely filings and reporting to the Court, the U.S. Trustee and creditors, all of which are glaringly present.

66.     On the issue of whether the Debtor's estate has suffered a substantial or continuing loss or diminution, "'negative post-petition cash flow and an inability to pay current expenses establishes that the estate is suffering continuing losses'."  *In re 347 Linden L.L.C.*, 2011 WL 2971496*5 (E.D.N.Y. July 20, 2011) (*citing Taub v. Adams (In re Taub)*, 2010 WL 8961434 at *10).  Here, from the Relief Date to the present, Debtor has not generated any substantial income (*i.e.*, he has merely collected tax refunds and sold golf memberships for money to support his lavish lifestyle), and has used up substantially all available cash notwithstanding the need for cash to confirm a plan.  Similarly, respecting the absence of a reasonable likelihood of rehabilitation, the Debtor's track record concerning his three initiatives and now his Anguillan initiative and how they purportedly could serve as the foundation for a plan to repay creditors speaks for itself.

1772526

## CONCLUSION

67. Since its appointment, the Committee has provided the Debtor every opportunity to show this Court, the Committee and his creditors that he can reorganize and repay creditors, while also explaining to him the need for him to cooperate with the Committee's efforts to investigate his financial affairs. In response, the Debtor has failed completely, has refused to share most critical information, and has failed to shed assets that burden the estate with unnecessary expenses, and has ███████████████████████████████████████ ██████████ without Court approval or notice to creditors. A trustee is needed to prevent further damage to the estate through the Debtor's conduct and to collect and liquidate assets and commence appropriate litigation to recover avoidable transfers.

## NOTICE

68. Notice of this Motion is being given to: (i) the US Trustee; (ii) counsel for the Debtor; (iii) all parties filing a notice of appearance; and (iv) all creditors pursuant to Fed. R. Bankr. P. 2002(a)(4). The Committee respectfully submits that, in light of the nature of the relief requested, no further notice is necessary or required.

## NO PRIOR REQUEST

69. No prior request for relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, the Committee respectfully requests that the Court enter the Order, substantially in the form attached hereto as **Exhibit A,** granting the relief requested herein and granting such other relief as is just and proper.

Dated: Garden City, New York
August 8, 2019

CULLEN AND DYKMAN LLP

By:      */s/ Jil Mazer-Marino*
Thomas R. Slome
Jil Mazer-Marino
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
(516) 357-3700

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

**EXHIBIT A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

Robert Francis Xavier Sillerman,
aka Robert F.X. Sillerman,
aka Robert F. Sillerman,
aka Robert X. Sillerman,

                                        Debtor.
------------------------------------------------------------x

Chapter 11

Case No. 17-13633 (MKV)

### ORDER GRANTING OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 1104(a) AND 1112(b) FOR ORDER APPOINTING A CHAPTER 11 TRUSTEE OR CONVERTING CASE TO A CHAPTER 7 CASE

Upon the *Official Committee of Unsecured Creditors' Motion Pursuant to Bankruptcy Code Sections 1104(a) and 1112(b) for Order Appointing a Chapter 11 Trustee or Converting Case to a Chapter 7 Case* ("**Motion**") [ECF No. ___] of the Official Committee of Unsecured Creditors (the "**Committee**") of the above-captioned debtor and debtor in possession (the "**Debtor**"); and upon the *Declaration of Robert S. Rosenfeld in Support of Committee of Unsecured Creditors' Motion Pursuant to Bankruptcy Code Sections 1104(a) and 1112(b) for Order Appointing a Chapter 11 Trustee or Converting Case to a Chapter 7 Case* [ECF No. ___]; and upon the *Declaration of Jil Mazer-Marino in Support of Official Committee of Unsecured Creditors' Motion Pursuant to Bankruptcy Code Sections 1104(a) and 1112(b) for Order Appointing Chapter 11 Trustee or Converting Case to a Chapter 7 Case* [ECF No. ___]; and a hearing on the Motion having been held on _____, 2019 (the "**Hearing**"); and good and sufficient notice of the Motion and the Hearing having been given and no other or further notice being required; and upon the record of the Hearing and all proceedings in this case; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and objections, if any, to the relief requested in the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted to the extent set forth herein;

ORDERED that the Office of the United States Trustee is hereby directed to appoint a chapter 11 trustee; **[or, alternatively]**

ORDERED that the Debtor's chapter 11 case is converted to chapter 7 of the Bankruptcy Code;

ORDERED that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and

ORDERED that the Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: New York, New York
_____, 2019

_____
HONORABLE MARY KAY VYSKOCIL

1772526