*Hearing Date: September 5, 2019*
*Time: 10:00 a.m.*

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and Debtor*
  *in Possession*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Robert Francis Xavier Sillerman<br>*aka* Robert F.X. Sillerman,<br>*aka* Robert F. Sillerman,<br>*aka* Robert X. Sillerman,<br><br>                                    Debtor. | Chapter 11<br><br>Case No. 17-13633 (MKV) |

**DEBTOR'S RESPONSE IN OPPOSITION TO THE COMMITTEE**
**OF UNSECURED CREDITORS' MOTION FOR ORDER APPOINTING A**
**CHAPTER 11 TRUSTEE OR CONVERTING CASE TO A CHAPTER 7 CASE**

TO THE HONORABLE MARY KAY VYSKOCIL,
UNITED STATES BANKRUPTCY JUDGE:

Robert F.X. Sillerman aka Robert F. Sillerman, aka Robert X. Sillerman, improperly named in the involuntary petition commencing this case as Robert Francis Xavier Sillerman,[1] the above-captioned debtor and debtor-in-possession ("**Mr. Sillerman**" or the "**Debtor**"), through his counsel, Rosen & Associates, P.C., as and for his response in opposition to the Official Committee of Unsecured Creditors' (the "**Committee**") *Motion Pursuant to Bankruptcy Code Sections 1104(a) and*

---

[1] Mr. Sillerman has never been known as Robert Francis Xavier Sillerman.

*1112(b) for Order Appointing a Chapter 11 Trustee or Converting Case to a Chapter 7 Case* [Doc. No. 404] (the "**Motion**"), respectfully represents as follows:[2]

## PRELIMINARY STATEMENT

1. In its Motion, the Committee disingenuously claims that the Debtor's unwillingness or inability to confirm a "consensual plan," together with the Debtor's lack of credibility and mistrust from his creditors, support the appointment of a trustee or conversion of this chapter 11 case. *See* MOT. ¶ 5.

2. However, the record demonstrates that throughout this proceeding, the Debtor has worked tirelessly to develop and implement a viable emergence strategy that would maximize the value of his estate for the benefit of all constituents. In fact, the Debtor's efforts to procure funding for various business prospects began prior to the commencement of this case. *See* SILLERMAN DECL. ¶ 6

3. Since then, the Debtor promptly retained Castle Placement, LLC to assist in finding a lender and has continued to work diligently to procure post-petition financing by engaging in extensive arms'-length negotiations with multiple parties. *See id.* ¶¶ 5-10. Most recently, the Debtor successfully negotiated a $15 million DIP facility with Metropolitan Partners Group ("**Metropolitan**"), the proceeds of which will enable the estate to compromise secured debt at a substantial discount, preserve valuable collateral that would otherwise be forfeited by foreclosure, generate cash for payment of immediate obligations of the estate and pave the way to a confirmable plan. *See id.* ¶¶ 61-66. The Committee's contention that the Debtor has been "wasting time" is specious in light of the Debtor's ongoing efforts to successfully reorganize.

---

[2] Filed contemporaneously herewith is the *Debtor's Declaration in Support of Debtor's Response in Opposition to the Committee's Motion For An Order Appointing a Chapter 11 Trustee or Converting the Case to a Chapter 7 Case* dated August 29, 2019 (the "**Sillerman Declaration**").

4. The inherent weakness in the arguments advanced in the Motion is evidenced by the Committee's "scattergun approach," as well as its reliance on a plethora of unsubstantiated allegations and gross distortions of fact. Indeed, while there are reasonable explanations to debunk each and every accusation the Committee has made, most important is the fact that the Committee has not proffered any credible evidence to support the extraordinary relief it seeks.

## FACTUAL AND PROCEDURAL BACKGROUND

5. On December 27, 2017, React Presents, Inc., Clubtix, Inc., Lucas King, and Jeffrey Callahan filed an involuntary petition (the "**Involuntary Petition**") under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") against Mr. Sillerman. Pursuant to a stipulation by and between the Petitioning Creditors and Mr. Sillerman, February 2, 2018 was fixed as the date by which Mr. Sillerman was required to respond to the Involuntary Petition.

6. Mr. Sillerman responded by consenting to the entry of an order for relief and moving to convert his case to one under chapter 11 of the Bankruptcy Code. After a hearing on the motion on February 28, 2018, this Court entered an order for relief on March 1, 2018, converting Mr. Sillerman's case to one under chapter 11 of the Bankruptcy Code.[3]

7. The Debtor has continued to operate his businesses and manage his properties and affairs as debtor and debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8. On January 11, 2019, the Office of the United States Trustee filed a *Notice of Appointment of the Committee* [Doc. No. 177], appointing the Committee of unsecured creditors

---

[3] Additional information regarding the Debtor's assets and liabilities and the circumstances leading to the commencement of this proceeding is set forth in the *Declaration of Robert F.X. Sillerman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York* [Doc. No. 37].

3

consisting of two members: VistaJet US, Inc. and ID Wheel (FL) LLC.  No trustee or examiner has been appointed in this chapter 11 case.

9. On October 31, 2018, the Debtor filed his chapter 11 plan of reorganization [Doc. No. 132], and on December 31, 2018, he filed his disclosure statement with respect to the plan [Doc. No. 169].

10. On August 1, 2019, the Debtor filed a *Motion for an Order Authorizing (A) Debtor to Incur Debt Pursuant to 11 U.S.C. Section 364 Secured by a Senior Lien on Certain Estate Property and with Priority over All Administrative Expenses of the Kind Specified in 11 U.S.C. Section 503(b) or 507(d); and (B) Payment of Expense Deposit to Proposed Lender* [Doc. No. 394] (the "**DIP Loan Motion**"), with respect to the loan facility negotiated with Metropolitan.

11. Despite these efforts, on August 9, 2019, the Committee filed the Motion. However, as discussed below, because the Motion is factually unsupportable and legally unsustainable, it must be denied in all respects.

## ARGUMENT

### I. The Committee Has Failed to Satisfy Its Burden Sufficient to Warrant the Appointment of a Trustee

12. The appointment of a trustee is an extraordinary and disfavored remedy to be exercised only in the most dire of circumstances. *See In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 658 (Bankr. S.D.N.Y. 2006); *In re Marvel Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 1998) ; *see also In re W.R. Grace & Co.,* 285 B.R. 148, 158 (Bankr. D. Del. Oct. 24, 2002) (appointment of a trustee is warranted only as "a last resort").

13. Generally, there is strong presumption under the Bankruptcy Code that a debtor be permitted to remain in possession, which "arises from a belief that the debtor and current management are generally best suited to orchestrate the process of rehabilitation for the benefit of

4

creditors and other interests of the estate." *In re V. Savino Oil & Heating Co., Inc.,* 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989); s*ee also Marvel Entertainment*, 140 F.3d at 471 (strong presumption against appointing a trustee is based on "the debtor-in-possession's usual familiarity with the business it had already been managing at the time of the bankruptcy filing, often making it the best party to conduct operations during the reorganization.").

14.     Accordingly, courts have held that the party seeking the appointment of a trustee carries the substantial burden of demonstrating clear and convincing evidence that one or more of the requirements under section 1104(a) have been satisfied. *See Adelphia*, 336 B.R. at 655; *In re Cajun Elec. Power Co-op., Inc.,* 69 F.3d 746 (5th Cir. 1995), *opinion withdrawn on other grounds, on reh'g,* 74 F.3d 599 (5th Cir. 1996).

15.     As set forth below, the Committee's conclusory and opaque allegations of wrongdoing relied upon in the Motion, intended to mask the lack of specific allegations necessary for the appointment of a trustee or conversion of this case, fall well short of clear and convincing evidence.

### A. There is No "Cause" Sufficient to Warrant Appointment of a Trustee under Section 1104(a)(1)

16.     Section 1104(a)(1) of the Bankruptcy Code provides (in relevant part), that the court shall order the appointment of a trustee:

> for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*See* 11 U.S.C. § 1104(a)(1).

17.     "Cause" under 1104(a)(1) is reserved for cases where clear and convincing evidence has been adduced establishing that management, now under the supervision and control

5

of the Bankruptcy Court and the Office of the United States Trustee, will dissipate the assets of the estate by fraud, gross mismanagement and/or incompetence, leaving little or no hope for reorganization. *See In re North Star Contracting Corp.,* 128 B.R. 66,68 (Bankr. S.D.N.Y. 1991); *see also Schuster v. Dragone*, 266 B.R. 268, 271 (Bankr. D. Conn. 2001) ("the Court must find something more aggravated than simple mismanagement in order to appoint a trustee.").

18. Courts have consistently refused to appoint a trustee simply because the debtor has experienced financial problems, is insolvent, or has even made imprudent business decisions, reasoning that such factors are not "conclusive of the debtor's lack of integrity or his inability to superintend the reorganization." *See In re Eichorn*, 5 B.R. 755, 757 (Bankr. D. Mass. 1980)*; see also Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239 (4th Cir. 1987) ("[T]o require the appointment of a trustee, regardless of the consequences, in the event of an act of dishonesty by the debtor, however slight or immaterial, could frustrate the purpose of the Bankruptcy Code.").

19. To satisfy the burden of proof under section 1104 of the Bankruptcy Code, the movant must present probative evidence of misconduct. *See* COLLIER ON BANKRUPTCY ¶ 1104.03 (15th rev. ed. 2009). As aptly stated by one court: "mere naked allegations are not enough to warrant the necessary expense and delay involved with such an appointment and investigation … although there is no requirement that actual misconduct or incompetence be proved, there should at least be some evidence presented that such allegations have some factual basis." *In re Bel Air Assoc., Ltd.* 4 B.R. 168, 173 (Bankr. W.D. Okla. 1980).

*(i) Alleged Misrepresentations*

20. Throughout the Motion, the Committee cites various examples of alleged misrepresentations or material omissions of fact regarding the value of certain of the Debtor's assets. Specifically, the Committee alleges that the Debtor misrepresented the valuations of the

"three initiatives" by failing to disclose any potential contingencies of the projects. *See* MOT. ¶¶ 24-29.

21.     However, as set forth in the Sillerman Declaration, at the time the Debtor's schedules were prepared, the Debtor had a good faith belief that the necessary financing would be readily available in the market. *See* SILLERMAN DECL. ¶¶ 25-27. In fact, prior to the Petition Date, the Debtor had procured a potential lender and was in the process of negotiating a loan commitment. *Id.* The Debtor's valuation of the initiatives as a going concern with anticipated future earnings, is not only reasonable, but standard practice in the industry. As stated by the United States Supreme Court, in the context of reorganizational efforts the proper valuation of an entity must encompass the value of the "whole enterprise by a capitalization of prospective earnings." *Consolidated Rock Prods. Co. v. Du Bois,* 312 U.S. 510, 525 (1941). *See also In re Steinberg,* 229 B.R. 238, 249 (S.D. Fla. 1998) ("The best test of the value of a going commercial enterprise is its earning capacity. The value of property results from the use to which it is put, present and prospective, actual and anticipated.") (citing *Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Backus,* 154 U.S. 439, 445, (1894)).

22.     Moreover, the record in this case is abundantly clear that in order to realize the scheduled values of the initiatives, additional investments were required, and the Debtor and his counsel have made no secret of this fact. *See* SILLERMAN DECL. ¶¶ 25-27.

23.     In *In re Spansion*, the Court denied a similar inappropriate and baseless request for the appointment of an examiner, holding that, instead of sufficient evidence to support the relief sought, the record revealed nothing more than "deep and heated differences of opinion about the value of the Debtor [sic] companies." *In re Spansion*, 426 B.R. 114, 128 (Bankr. D.Del. 2010). The Court noted that the enterprise valuation was not a misrepresentation, despite allegations that the debtor's optimistic emphasis on future opportunities was improper, where the

7

debtor identified the risks which could affect their ability to perform consistently with projections. *Id.*

24. Here too, the Committee's unsubstantiated allegations that the Debtor misrepresented the value of certain assets do not rise to the level of establishing that misstatements in the Debtor's bankruptcy schedules were made knowingly, intentionally and with fraudulent intent. *See In re Wingate*, 377 B.R. 687 (Bankr. M.D. Fla. 2006) (In valuing and characterizing a survivorship interest in his parents' home, the debtor did not "knowingly and fraudulently" make any false oaths, when debtor's method of valuation appeared reasonable and his testimony credible, and he did not attempt to conceal the property, but listed it on his original schedules).

25. Similarly, the Committee's claim that the Debtor improperly scheduled the value and extent of his interest in the Anguila property is also unavailing. As set forth in the Sillerman Declaration, the Debtor's valuation of the property was based on the prospective development of a 125 room 5-star luxury resort, valued by the developer of the project at $50 million. *See* SILLERMAN DECL. ¶¶ 35-36.

26. Further, the Debtor admits that, although his counsel inadvertently misrepresented the ownership structure of the Anguilla property while documenting a pre-petition loan transaction, such error was simply a mistake, and not attributable to the Debtor's intent to conceal or misrepresent any information relating to his assets. *Id.* Similarly, the Debtor submits that as soon as he became aware of errors in his schedules, he amended them immediately. *See id.* ¶¶ 37-38.

27. As this Court is well-aware, the Debtor's assets and those owned by the various affiliates are complex and voluminous, and although the Debtor admits that mistakes were made in preparing the schedules, the Debtor submits that the mistakes were unintentional and that any errors or omissions have been explained and corrected. *See id.* ¶¶ 25-26.

8

28. Accordingly, the Committee has not shown—certainly not by clear and convincing evidence—that there has been any affirmative effort on the part of the Debtor to misrepresent or conceal any matters from the Court, the U.S. Trustee or the creditor body.

### *(ii) Allegations of Mismanagement or Incompetence*

29. The Committee also cites a number of examples of the Debtor's alleged mismanagement or incompetence in managing the affairs of his estate, including, the Debtor's (i) entry into the *Memorandum of Agreement* without court approval and failure to disclose such entry; (ii) conversion of a note receivable; (iii) failure to sell certain assets of the estate; (iv) transfers of funds to his wife; (v) post-petition expenses; and (vi) failure to pursue avoidance actions. *See* MOT. ¶¶ 45-46, 54, 61.

30. As set forth in the Sillerman Declaration, the Debtor did not intentionally withhold any information relating to the *Memorandum of Agreement* at any time in this proceeding. *See* SILLERMAN DECL. ¶ 44.

31. Moreover, the Committee's assumption that notice was required and whether the execution of the *Memorandum of Agreement* required court approval is clearly a question of law for this Court and beyond the Committee's conjecture. *See e.g., In re Washburn*, No. 84-05282, 1987 WL 857551 at *3 (Bankr. D.N.D. Oct. 26, 1987) ("In the current case the court finds that [the individual Chapter 11 debtor's] contributions of labor and expertise were essential to operating the business as allowed by section 1108.").

32. With respect to the allegation that the Debtor equitized a note receivable, the Debtor submits that the Committee has misinterpreted the nature of the transaction, despite having been provided all financial documentation regarding such. *See* SILLERMAN DECL. ¶¶ 46-48. As set out in the Sillerman Declaration, the capital contributions made to Elderberry X, LLC were never intended as a loan to the corporation nor were any loan agreements or any other

documents prepared to that effect. *Id.* The Committee's allegations to the contrary are simply remarkable in light of the Debtor's document production. *Id.*

33. As far as the Committee's charge that the Debtor made "unauthorized transfers to Laura Sillerman," the Committee incorrectly assumes that the $866,000 transfer to the Debtor's wife (representing one-half the tax refund) required Court authorization. *See* MOT. ¶¶ 46 and 54. To the contrary, bankruptcy courts in the Southern and Western Districts of New York adhere to the "50/50 Rule," under which the refund on a joint tax return is considered a joint asset that spouses own in equal shares for purposes of allocating property of the estate. *See, e.g., In re Marciano,* 372 B.R. 211 (Bankr. S.D.N.Y. 2007); *In re Barrow,* 306 B.R. 28 (Bankr. W.D.N.Y.2004). "[U]nder the 50/50 Rule … the non-debtor's portion is ***not considered*** property of the bankruptcy estate [pursuant to 11 U.S.C. § 541]" *In re Spina*, 416 B.R. 92, 95 (Bankr. E.D.N.Y. 2009) (emphasis added). *See also* SILLERMAN DECL. ¶¶ 45-47.

34. In its *Motion to Restrict* [Doc. No. 246], the cases cited by the Committee to support its proposition that the Debtor made unauthorized transfers to his wife are inapposite, as the courts in those cases had adopted alternative approaches to allocating a tax refund between a debtor and a non-debtor spouse. *See* MOT. TO RESTRICT ¶ 31 (citing *In re Duarte* 492 B.R. 100 (Bankr. E.D.N.Y. 2011) and *In re Mecka*, 547 B.R. 139 (Bankr. D. N.J. 2016)); *see also Spina*, 416 B.R. at 96 (describing three lines of analysis which have developed: the withholding rule; the income rule; and the 50/50 Rule).

35. In fact, the Committee's reliance on *In re Durarte* is inappropriately misleading at best, as it is one of the few cases applying New York State law that ***did not*** adopt the 50/50 rule. *See* 9 A.L.R. Fed. 3d Art. 4 ("[M]ost cases within the Second Circuit applying New York state law have adopted the Fifty/Fifty approach.") (distinguishing *In re Duarte* where the court applied the "separate filing" approach).

10

36. Regardless of the propriety of the transfers, the Committee has failed to establish how such transfers rise to the level of fraud and dishonesty needed to appoint a trustee. In *In re The Liberal Market. Inc.,* the court refused to appoint a trustee despite the fact that the debtor transferred funds to a family corporation and to salaried employees for "vacation pay," holding that, although such transfers indicated a "callous disregard for the fiduciary duties incumbent upon the officers of the Debtor-in-Possession," they did not demonstrate fraud or dishonesty sufficient to establish cause for the appointment of a trustee. *In re The Liberal Market. Inc.,* 13 B.R. 748 (Bankr. S.D. Ohio 1981).

37. Further, although the Committee makes much of the Debtor's potential conflicts of interest, allegedly preventing him to pursue potential avoidance actions against OPW, LLC, his wife and related entities,[4] *potential* conflicts of interest alone do not justify appointment of a trustee. *See In re Royster Co.,* 145 B.R. 88, 90-91 (Bankr. M.D. Fla. 1992) (complicated relationships between debtor and non-debtor affiliates not sufficient for appointment of trustee or examiner). Rather, a trustee is justified only where the potential conflicts threaten the viability of the business or a serious loss to the estate, such that an independent trustee would accomplish the goals and objectives of chapter 11 more efficiently and effectively than the debtor-in-possession. *See In re Microwave Prods. of Am., Inc.,* 102 B.R. 666, 672 (Bankr. W.D. Tenn. 1989).

38. Although the Committee is apparently averse to obtaining derivative standing to prosecute potential avoidance actions, according to the leading treatise, "[n]early all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession if the committee is able to establish" that a debtor is neglecting its fiduciary duty. 7 COLLIER ON BANKRUPTCY ¶ 1103.05[6][a] (15th rev. ed. 2002).

---

[4] *See* MOT. ¶¶ 39-41, 61.

11

39. Moreover, bankruptcy courts have long recognized the need to employ less draconian and disruptive means than appointing a trustee to preserve avoidance claims, and routinely authorize creditors' committees to investigate and prosecute causes of action against insiders. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 576-77 & 580 (3d Cir. 2003) (bankruptcy courts can authorize creditors' committees to avoid fraudulent transfers for the benefit of the estate to solve "the proverbial problem of the fox guarding the henhouse" and that this result is preferable to the appointment of a chapter 11 trustee); *In re Mechem Fin. Ohio, Inc.,* 92 B.R. 760, 761 (Bankr. N.D. Ohio 1988) (denying motion to appoint examiner because U.S. Trustee and creditors' committee can fulfill proposed duties).

40. As to the alleged failure of the Debtor to sell certain estate assets, the Debtor submits that thus far, he has marketed his New York City townhouse, Southampton property and his interest in the Yankees for sale, and is currently in the process of liquidating his private equity interests. *See* SILLERMAN DECL. ¶¶ 16-18. The Committee is well aware of all such efforts. *Id.*

41. With respect to post-petition expenses, the Committee provides no support for their claims that the Debtor's post-petition expenditures were improper as a matter of law. The Committee's mere concerns with the propriety of post-petition expenses, which, obviously have been fully disclosed, do not rise to the level of proof required for the appointment of a trustee.

42. Furthermore, courts have routinely held that individual debtors in chapter 11 have the right to use property of the estate to cover their ordinary living expenses without obtaining a court order, recognizing living expenses as "every bit as much a part of the ordinary course of business and financial affairs as [business] expenses." *In re Bradley*, 185 B.R. 7, 8 (Bankr. W.D.N.Y. 1995), *In re Keenan*, 195 B.R. 236, 241 (Bankr. W.D.N.Y. 1996) ("personal expenses "unquestionably within the 'ordinary course' of ... financial affairs"), *In re Seely*, 492

12

B.R. 284, 290 (Bankr. C.D. Cal. 2013) (chapter 11 debtors, no less than chapter 13 debtors, "need[] to pay [for] living expenses in order to continue generating revenues for the estate").

43. Accordingly, given the absence of any credible evidence demonstrating fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the Debtor, the Committee has failed to satisfy its burden of proving that there is "cause" for the appointment of a trustee under section 1104(a)(1) of the Bankruptcy Code.

### B. The Appointment of a Trustee is Not in the Best Interests of Creditors as Required by Section 1104(a)(2)

44. Under Section 1104(a)(2) of the Bankruptcy Code, the court may appoint a trustee in a chapter 11 case:

> if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

*See* 11 U.S.C. § 1104(a)(2).

45. Although subsection (a)(2) seemingly provides a more flexible standard for the appointment of a trustee than that provided under subsection (a)(1), the "best interests" test of subsection (a)(2) is not a "catch-all" provision for the appointment of a trustee when "cause" cannot be established under subsection (a)(1). As articulated by the leading treatise: "Few situations come to mind in which grounds will exist for the appointment of a trustee under subsection (a)(2) although "cause" for such appointment does not exist under subsection (a)(1)." 7 COLLIER ON BANKRUPTCY § 1104.02[3][d][iii], at 1104-17 (L. King 15th ed. 2002).

46. The presumption in favor of the continuation of current management, places a "substantial burden" on the party seeking the appointment of a trustee. To prevail under subsection (a)(2), there must be a showing of clear and convincing evidence of egregious conduct, such as to warrant the grant of extraordinary relief. *See, e.g., In re W.R. Grace & Co.,* 285 B.R.

13

148, 157 (Bankr. D. Del. Oct. 24, 2002) (movant must prove facts under section 1104(a) by "clear and convincing evidence"); *In re Oklahoma Ref. Co.,* 838 F.2d 1133, 1136 (10th Cir. 1988) (any conclusion to the contrary would permit subsection (a)(2) to eviscerate the established law under subsection (a)(1)).

47. The moving party must show that the benefit to be derived from ousting the debtor in possession clearly outweighs the detriment to the estate and the bankruptcy process that results from the appointment of a trustee. *Ionosphere*, 113 B.R. at 168-69; *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 232-33 (1977); *In re Table Talk,* 22 B.R. 706, 710 (Bankr. D. Mass. 1982) (denying motion for appointment of examiner, concluding that examiner should be appointed only if such protection is needed and costs and expenses not "disproportionately high"); Kenneth N. Klee & K. John Shaffer, *Creditors' Committees Under Chapter 11 of the Bankruptcy Code,* 44 S.C. L. Rev. 995, 1045, 1049 (1993) (observing generally that "the incremental costs" of a trustee usually "outweigh[ ] the benefits," and that "maximization of value rarely lies down this path.").

48. Here, the attendant costs of appointing a trustee—including the trustee's fees and expenses, the fees and expenses of its counsel, and the delay associated with the need to familiarize any trustee with the Debtor's assets and liabilities as well as the outstanding issues in this case—greatly outweigh any potential benefit to the estate. *See In re General Oil Distribs., Inc.,* 42 B.R. 402, 410 (Bankr. E.D.N.Y. 1984) (despite finding mismanagement, appointment of trustee was denied to avoid "saddling the estate with the expense of a trustee and additional counsel.").

49. Of particular concern would be the inability to obtain the financing needed to fund the Anguila Project, if the motion was granted. *See* SILLERMAN DECL. ¶¶ 10 and 43. Such an outcome would prevent the Debtor from effectively reorganizing to the detriment of all parties-in-interest. In *In re General Oil Distributors*, the court noted that the "harm" from the appointment

14

of a trustee can include harm to the debtor's the inability to obtain financing or concessions from lenders and other creditors. *In re General Oil Distributors,* 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984). As a result, the court held that, despite findings the that the debtor had engaged in dishonesty and mismanagement, the appointment of a trustee was not warranted because the appointment "would be harmful to everyone involved." *Id.* Similarly, in *In re Stein & Day, Inc.*, the Court determined that a trustee would not benefit any interests in the case where the trustee's costs would not only place an undue burden on the estate, but also, like here, "current managements' experience and knowledge are essential to the debtor's future." *In re Stein & Day, Inc.* 87 B.R. 290, 295 (Bankr. S.D.N.Y.),

50.    In addition, as mentioned above, throughout this proceeding the Debtor has fully cooperated with the Committee's on-going investigations of the Debtor's pre-petition and post-petition financings, including the DIP Loan, and will continue to provide any and all information requested in the future. To require the Debtor's estate to fund another independent party to replicate these efforts, would merely burden the estate with unnecessary costs and delay. *See In re Sletteland* 260 B.R. 657 (Bankr. S.D.N.Y. 2001) (denying request to appoint an examiner concluding that the creditor's committee could perform, and was performing, the requisite investigation); *In re TableTalk, Inc*., 22 B.R. at 711-12 (denying motion to appoint examiner when creditors committee had retained competent counsel and financial advisors and debtor was cooperating with committee's professionals).

51.    Accordingly, the appointment of a trustee in this case is inimical to the interests of all parties-in-interest and the Committee has provided no evidence to the contrary.

**II.  No "Cause" Exists Sufficient to Warrant Conversion of the Debtor's Bankruptcy Case**

52. Section 1112(b) of Bankruptcy Code includes a non-exhaustive list of what can constitute "cause" to convert or dismiss a case. Among them are five factors cited by the Committee: (A) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; … (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; and (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief. *See* 11 U.S.C. § 1112(b). When applied to the facts here, none of the factors warrant conversion of this case.[5]

53. As to the filing of tax returns, although the Committee is quick to condone the Debtor and cast suspicion on his ability to manage the estate, the Committee is well aware that over the past three months the Debtor has been working with the Committee and the U.S. Trustee's office to resolve the parties objections to the retention of a tax accountant and strike a balance between the essential need for the proposed retention and the opposing views of the Committee. *See* SILLERMAN DECL. ¶¶ 50-51, 53.

54. Similarly, the Committee's assertion that the Debtor failed to deposit $150,000 for accrued professional fees in violation of an order of this Court is disingenuous considering that the Committee is well aware the Debtor's consent to the entry of the Interim Fee Order was premised upon his assumption that he would be receiving his portion of a New York State income tax refund. *See* SILLERMAN DECL. ¶ 52. Only subsequent to the Debtor's consent to

---

[5] Regarding the gross mismanagement factor, the Debtor incorporates the discussion above concerning his demonstrated competence and ability to manage the affairs of the estate. *See supra* ¶¶ 29-43.

16

the entry of the Interim Fee Order did he learn that the refund will not be remitted by the state until the tax returns for years ending December 31, 2017 and 2018 have been filed and assessed. *Id.*

55. With respect to the Debtor's compliance with Bankruptcy Rule 2015.3, as asserted in the Sillerman Declaration, the Debtor was instructed during the initial debtor interview to include all financial statements with respect to affiliates that engaged in activity for the respective reporting period to the Debtor's monthly operating reports, and the Debtor has complied with such request. *See id.* ¶ 60. The Debtor submits that, because no other entities have engaged in any activity, there is no need to file periodic reports pursuant to Bankruptcy Rule 2015.3. *See id*.

56. Finally, the Committee argues that the Debtor has not generated any substantial income during this proceeding, and together with the Debtor's track record, demonstrate the absence of a reasonable likelihood of rehabilitation. *See* MOT. ¶ 66. However, the mere fact that a debtor lacks an ongoing business and stream of revenue, does not mean that the debtor lacks a reasonable likelihood of rehabilitation. *See Toibb v. Radloff,* 501 U.S. 157 (1991). Courts examining section 1112(b)(2) require a showing that "a debtor lacks all ability to formulate or carry out a plan." *In re Dark Horse Tavern,* 189 B.R. 576, 582 (Bankr. N.D.N.Y. 1995). Courts have usually limited application of this ground to cases where a debtor was little other than a corporate shell lacking any discernible economic activity. *See In re Court Living Corp.,* 1996 WL 527333, at *3 (S.D.N.Y. 1996); *see also In re Hempstead Realty Assoc.,* 38 B.R. 287, 290 (Bankr. S.D.N.Y. 1984) (rejecting creditors' argument that debtor could not confirm a plan due to "various possibilities might occur between now and any proposed confirmation.").

57. "Generally, courts should conclude that a debtor has no demonstrable intent to reorganize only if, upon considering the totality of the circumstances, there is substantial evidence to indicate that the debtor made a bad faith filing." *In re Syndicom Corp.,* 268 B.R. 26,

54 (Bankr. S.D.N.Y. 2001) (*citing Cohoes Industrial Terminal, Inc.,* 931 F.2d 222, 227 (2d Cir. 1991)).

58. Here, the Debtor has undeniably seized every opportunity possible in order to maximize the value of the estate for the benefit of all creditor constituents. Moreover, although the Committee characterizes the Debtor's prior iterations to secure financing as failed attempts at confirming a plan. In truth, far from suggesting dysfunction and failure, the Debtor's prior attempts mark the evolution of material progress in this case and highlight the Debtor's good faith efforts to effectuate a confirmable plan of reorganization. In light of the DIP Loan that is now before the Court, the Debtor's plan cannot be characterized as a futile effort that warrants conversion.

59. Accordingly, given the extensive loss of value and additional costs associated with converting this case, denying the Committee's request to convert this case is undeniably in the best interests of the estate.

## CONCLUSION

60. For the reasons set forth above, the Debtor requests the Motion be denied in its entirety.

Dated: New York, New York
August 29, 2019

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and Debtor
    in Possession*

By:  */s/ Sanford P. Rosen*
        Sanford P. Rosen
        Paris Gyparakis

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100