*Hearing Date: September 25, 2019*
*Time: 10:00 a.m.*

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and Debtor
  in Possession*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Robert Francis Xavier Sillerman<br>*aka* Robert F.X. Sillerman,<br>*aka* Robert F. Sillerman,<br>*aka* Robert X. Sillerman,<br><br>                              Debtor. | Chapter 11<br><br>Case No. 17-13633 (MKV) |

**DEBTOR'S REPLY TO OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS' TO DEBTOR'S MOTION FOR PAYMENT OF EXPENSE DEPOSIT**

TO THE HONORABLE MARY KAY VYSKOCIL,
UNITED STATES BANKRUPTCY JUDGE:

Robert F.X. Sillerman aka Robert F. Sillerman, aka Robert X. Sillerman, improperly named in the involuntary petition commencing this case as Robert Francis Xavier Sillerman,[1] the above-captioned debtor and debtor-in-possession ("**Mr. Sillerman**" or the "**Debtor**"), through his counsel, Rosen & Associates, P.C., respectfully submits this reply ("**Reply**") to the *Official Committee of Unsecured Creditors' Objection to Debtor's Motion for an Order Authorizing (A) Debtor to Incur Debt Pursuant to 11 U.S.C. § 364 Secured by a Senior Lien on Certain Estate Property and With Priority Over All Administrative Expenses of the Kind Specified in 11 U.S.C. § 503(B) or 507(D); and (B) Payment of Expense Deposit to Proposed*

---

[1] Mr. Sillerman has never been known as Robert Francis Xavier Sillerman.

*Lender* [Doc. No. 420] (the "**Objection**"), and in further support of the *Debtor's Motion for an Order Authorizing (A) Debtor to Incur Debt Pursuant to 11 U.S.C. Section 364 Secured by a Senior Lien on Certain Estate Property and with Priority over All Administrative Expenses of the Kind Specified in 11 U.S.C. Section 503(b) or 507(d); and (B) Payment of Expense Deposit to Proposed Lender* [Doc. No. 394] (the "**Expense Motion**").[2] In support of this Reply, the Debtor submits a declaration (the "**Sillerman Declaration**"), filed contemporaneously herewith, and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The arguments advanced by the Official Committee of Unsecured Creditors (the "**Committee**") in its Objection rest on three contentions: (i) that the Expense Deposit is unreasonable; (ii) that the terms and conditions of the underlying DIP Loan are excessive; and (iii) that the DIP Loan would benefit the Debtor to the detriment of the estate. Permeating each contention are unsubstantiated and reckless allegations about the motives and conduct of the parties.

2. Indeed, as evidenced by the Expense Motion, the DIP Loan provides the necessary liquidity to facilitate a value-maximizing liquidation process, and preserves substantial value for the estate in two main respects. First, it provides for a substantial increase of estate net asset value, as it not only allows for the reduction of $15,700,000 of secured debt, but also captures $13,000,000 by allowing certain illiquid assets to be sold in the ordinary course, as opposed to the substantial discount that would accompany forced liquidation. *See* SILLERMAN DECL. ¶¶ 5-8. In addition, it avoids an additional $13,700,000 of unsecured deficiency claims that would otherwise result if ESFX, Iliad and OPW were to foreclose on their collateral. *See id.* ¶¶ 8-10.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Expense Motion.

2

3. In light of the substantial savings to the estate and for the reasons outlined below, the Committee's Objection is unwarranted and should be overruled.

## REPLY TO OBJECTION

### I. The Entry into the Indication of Interest was an Exercise of the Debtor's Sound Business Judgment

4. The Committee's overly broad assertions that the proposed terms of the DIP Loan terms are "excessive" and "so [r]isky that the Debtor likely would default," are not only misplaced, but devoid of any factual or legal support. Indeed, as discussed above, the terms of the DIP Loan are not only profoundly beneficial to the estate, but the decision to enter into the *Indication of Interest* and incur the Expense Deposit was a valid exercise of the Debtor's sound business judgment.

5. It is well settled that a debtor's business judgment in obtaining post-petition financing is entitled to considerable deference. *See, e.g., In re Republic Airways Holdings*, Case No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 3, 2016) ("In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment."); *In re YL West 87th Holdings I, LLC*, 423 B.R. 421, 444 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing.").

6. Courts in this district have consistently recognized the need to defer to a debtor's business judgment, "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest." *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (quoting *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)).

7. Under section 1107(a) of the Bankruptcy Code, a debtor-in-possession has, among other things, an implied duty to "protect and preserve the estate, including an operating business' going-concern value." *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004). "A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." *In re 160 Royal Palm, LLC*, No. 9:19-CV-80343, 2019 WL 1560113, at *5 (S.D. Fla. Apr. 10, 2019); *Chaney v. Official Committee of Unsecured Creditors* (*In re Crystal Apparel, Inc., et al.*), 207 B.R. 406, 409 (Bankr. S.D. N.Y. 1997) (citing *In re Roth American, Inc.,* 975 F.2d 949, 952 (3d Cir. 1992)).

8. Here, the Debtor has shown that the terms of the DIP Loan are extremely favorable to the estate and the result of multiple rounds of good faith, arm's-length negotiations with Metropolitan. *See* EXPENSE MOT. ¶¶ 41-43. The Committee's conclusory opinions regarding the terms of the DIP Loan is an improper attempt to substitute the business judgment of creditors, for the business judgment of the Debtor. However, a committee's mere desire that a debtor manage its affairs differently is insufficient to override the debtor's business judgment. *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 41 (Bankr. S.D.N.Y. 1990); *Republic Airways,* 2016 WL 2616717, at *8 ("[T]he Ad Hocs' objection repeatedly seeks to micromanage the debtors' business judgment on issues crucial to the debtors' reorganization. This approach is at odds with applicable law. . . . In seeking to replace the debtors' business judgment with its own views, the Ad Hocs' objection improperly seeks to turn . . . the business judgment rule … on [its] head[.]"); *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) ("It is not appropriate to substitute the judgment of the objecting creditors over the business judgment of the Debtors…").

9. The Committee also raises several specific concerns with the terms of DIP Loan in cursory fashion, which the Debtor will address in turn.

4

## II. The Terms and Conditions of the DIP Loan are Fair and Reasonable

10. The bulk of the Committee's Objection with respect to the DIP Loan involves the alleged inevitable default that would result if several assets were not monetized prior to the Maturity Date. Contrary to the Committee's unsupported assertions, the timing of the DIP Loan and repayment schedule do not evidence any ulterior motive; rather, the proposed timeline was specifically tailored to allow the Debtor to run a robust value-maximizing liquidation process and minimize accrued interest and administrative costs of bankruptcy. Indeed, these laudable motives are consistent with the fundamental policies of the Bankruptcy Code. *See* H.R. Rep. No. 595, at 220 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6138-39 (primary policy goal of the Bankruptcy Code is to protect distressed firms against efforts to force their liquidation); *see also Bittner v. Borne Chem. Co., Inc.*, 691 F.2d 134, 137 (3d Cir. 1982) ("[t]o realize the goals of Chapter 11, a reorganization must be accomplished quickly and efficiently."); *Nassau Smelting & Ref. Works v. Brightwood Bronze Foundry Co.*, 265 U.S. 269, 272 (1924) ("[t]he bankrupt is impelled by vital interests, not only to make the offer promptly, but to expedite confirmation.").

11. The Committee also suggests that the "high rate of interest and large fees that the Debtor is willing to accept" are so unfavorable to the estate, "as to cause it great harm." *See* OBJ. ¶¶ 2, 9-10. To the contrary, the fees, expenses and interest charges incident to the DIP Loan—including the Expense Deposit—represent nothing more than the cost of capital to incentivize the lender to lend to a chapter 11 debtor, and are customary in DIP financing transactions, especially in cases when, as here, the lender is a post-petition "new money" lender. *See In re BH S&B Holdings LLC*, No. 08-14604 (MG) (Bankr. S.D.N.Y. Nov. 24, 2008) (authorizing payment of post-petition lender professional fees without further application to the court); *In re Metaldyne Corp. et al.,* No. 09-13412 (MG) (Bankr. S.D.N.Y. June 23, 2009); *see*

5

*also* Kohn, R., A. Solow & D. Taber, *Pure Debtor-in-Possession Financing*, THE SECURED LENDER, 51, 6-10 (1995).

12. The Committee also surmises that because the Expense Deposit "jumped" from $100,000 to $250,000 over the course of negotiations, "it is [likely] a red flag that the Lender ha[d] new concerns about consummating the transaction." *See* OBJ. ¶ 16 (citing emails). The Committee's reliance on email traffic among professionals during the heat of negotiations is not only inappropriate, but legally insignificant. What is relevant to this case, of course, are the terms of the DIP Loan, and not what sophisticated adverse parties may have expressed during negotiations. Indeed, courts in this circuit have repeatedly noted that positions taken "during sophisticated, high-stakes negotiations" are often, "punctuated with numerous instances of puffing and posturing," and thus, come "with no guarantee of veracity." *In re M&G USA Corp.* No. 17-12307 (BLS) (Bankr. D. De. December 8, 2017) (quoting *U.S. v. Visa U.S.A, Inc.,* No. 98 Civ. 7076 (BSJ) (S.D.N.Y. June 7, 2007)); *U.S. v. Contra Costa Cnty. Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982).

13. Moreover, the Committee's assertion that the terms of the DIP Loan "would permit the Lender to foreclose on its collateral without seeking relief from stay," is simply incorrect. *See* OBJ. n 4. To the contrary, the *Indication of Interest* specifies that the definitive documents will include "***typical*** bankruptcy provisions [with respect to] relief from automatic stay" for a transaction of this nature. *See* EXPENSE MOT. EX. C (*Indication of Interest*), at 6 (emphasis added). Indeed, both the Debtor and Metropolitan's counsel are keenly aware of the guidance promulgated by this Court with respect to the necessary notice required before termination of the automatic stay and enforcement of the lender's remedies. *Cf. Guidelines for Financing Requests*, General Order No. M-274 (Berstein, S).

14. Similarly unfounded, is the Committee objection to the DIP Lien on Avoidance Actions and superpriority claim from Avoidance Action proceeds. Courts in this district regularly permit collateralization of avoidance actions and the proceeds thereof for purposes of post-petition financing. *See, e.g.*, *In re Avaya Inc.,* Case No. 17- 100089 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2017) (collateralizing proceeds from avoidance actions); *In re Republic Airways Holdings Inc.,* Case No 16-10429 (SHL) (Bankr. S.D.N.Y. May 3, 2016) (same); *In re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Aug. 27, 2015); *In re Chassix Holdings, Inc.,* Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Apr. 10, 2015).

15. With respect to the timing of the PE Funds' liquidation, although the Committee is correct that the Debtor cannot unilaterally determine when the PE Fund assets will be liquidated, the Debtor reiterates that although the PE Funds are illiquid, they are currently in the divestment/harvest period and are expected to be fully liquidated prior to the Maturity Date. Indeed, courts have consistently found that similar or often much shorter repayment timelines were appropriate under the circumstances. *See, e.g.*, *In re Nirvanix, Inc. (f/k/a Streamload, Inc.)*, No. 13-12595 (BLS) (Bankr. D. Del. Oct. 23, 2013) (approving DIP facility requiring approval of a sale transaction within 48 days); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS) (Bankr. D. Del. May 28, 2013) (approving DIP facility requiring approval of a sale transaction within 75 days of the petition date); *In re Deel, LLC (f/k/a Magic Brands, LLC)*, No.10-11310 (BLS) (Bankr. D. Del. May 17, 2010) (approving DIP facility requiring approval of a sale transaction within 72 days of the petition date); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. June 5, 2009) (approving DIP facility requiring plan confirmation or a sale transaction to occur within 155 days of the petition date).

**III.     The Expense Deposit with Respect to the DIP Loan is Warranted**

16.     The Committee's objections to the Expense Deposit offer nothing beyond speculation, as the Committee has provided no evidence or any legal basis for denying it. In fact, expense deposits of this nature are routinely requested in similar transactions and are especially warranted in the context of "pure debtor-in-possession financing," such as this. *See* Kohn, R., A. Solow & D. Taber, *Pure Debtor-in-Possession Financing*, THE SECURED LENDER, 51, at 10 (1995) (the expense deposit should be large enough to cover all costs and expenses likely to be incurred through the date of the entry of the final financing order); *see also* EXPENSE MOT. ¶ 58 (citing *Resolution Trust Corp. v. Official Unsecured Creditors' Comm.* (*In re Defender Drug Stores, Inc.*), 145 B.R. 312, 316-19 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee")). It would be difficult to image that any lender would agree to make a loan without some protection against legal and administrative costs. Indeed, "walk-away leverage" of this kind is consistent with and common for post-petition debtor-in-possession financings in a chapter 11 case. *See* Kohn et al., *Pure Debtor-in-Possession Financing*, THE SECURED LENDER, 51, at 10 (1995).

17.     The Committee's remarkable assertion that the Debtor's sole motivation to obtain the proceeds of the DIP Loan is to fund his "lavish living expenses," is simply inappropriate. Disturbingly, the Committee fails to consider that, under the terms of the DIP Loan, the Debtor will be required to use the proceeds in accordance with the Court-approved budget, which ***includes*** administrative expenses ***for estate professionals***. *See* EXPENSE MOT. EX. C (*Indication of Interest*), at 4.

18.     In addition, although the Committee seems to believe that Metropolitan has no interest in ensuring that the loan proceeds be used appropriately, common sense and the terms of the *Indication of Interest* belie this belief. The Committee's unfounded assumption ignores the

8

fact that, even if the Debtor lacks independent judgment, as the Committee suggests, Metropolitan shares an interest with the Committee in restricting the Debtor from dissipating estate assets and loan proceeds with improvident personal expenditures. Accordingly, Metropolitan has every incentive to enforce any breach of the use of proceeds provisions.

### IV.    Neither the DIP Loan Nor the Expense Deposit Unduly Favor the Debtor at the Expense of the Estate.

19.    The Committee's contention that the DIP Loan unduly favors the Debtor at the expense of creditors who bear all the risk and reap none of the benefits, is simply specious. *See* OBJ. ¶ 5. To the contrary, neither the DIP Loan nor the Expense Deposit provide any direct benefit to the Debtor. Rather, the DIP Loan is designed with adequate repayment protections which inure to the benefit of the Debtor's estate, and effectively prevents any value from flowing to the Debtor before the DIP Loan is fully repaid.

20.    In any event, the proposed DIP Loan creates no incremental risk to creditors beyond that they assuredly would confront in any alternative scenario. As discussed, without immediate access to financing, the ability of certain of the Debtor's assets to be monetized would be unnecessarily jeopardized. The Committee even concedes this fact. *See* OBJ. ¶ 25.

21.    The DIP Loan alleviates all such concerns and preserves the value of the Debtor's assets by avoiding forced liquidation, which is especially beneficial to the Committee's constituents.

### CONCLUSION

22.    The Committee, well-aware that absent the DIP Loan, the value of estate assets would not exceed the Debtor's obligations, has nevertheless employed a campaign against the DIP Loan and in support of a plan of forced liquidation. However, the Committee's unjustified strategy indicates that it has a complete disregard for its constituency, as its willing to impair the

9

Debtor's ability to access much-needed financing, drive up costs through frivolous and unnecessary motion practice and continue to tarnish the Debtor's perception with respect to his ability to reorganize. Similarly, the Committee's Objection, replete with hyperbolic assertions regarding the Debtor's integrity without any legal authority, should not be countenanced by this Court.

**WHEREFORE**, the Debtor respectfully requests that the Objection be overruled and the Expense Motion be granted.

Dated:  New York, New York
September 23, 2019

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor*

By: _____
Paris Gyparakis
Sanford P. Rosen

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100