Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
Elizabeth Aboulafia, Esq.
CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
Telephone: (516) 357-3700
tslome@cullenanddykman.com
jmazermarino@cullenanddykman.com
eaboulafia@cullenanddykman.com

*Counsel to the Official Committee
 of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

                                                        Chapter 11

Robert Francis Xavier Sillerman,
aka Robert F.X. Sillerman,                              Case No. 17-13633 (MKV)
aka Robert F. Sillerman,
aka Robert X. Sillerman,

                              Debtor.
-------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR THE DEBTOR PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDTORS

                    CULLEN AND DYKMAN LLP
                    100 Quentin Roosevelt Blvd.
                    Garden City, New York 11530
                    Telephone: (516) 357-3700
                    Thomas R. Slome, Esq.
                    Jil Mazer-Marino, Esq.
                    Elizabeth Aboulafia, Esq.
                    tslome@cullenanddykman.com
                    jmazermarino@cullenanddykman.com
                    eaboulafia@cullenanddykman.com

                    *Counsel for The Official Committee of
                    Unsecured Creditors*

                    Dated:  August 30, 2019
                            Garden City, New York

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE **"DISCLOSURE STATEMENT"**) IS INCLUDED FOR THE PURPOSES OF SOLICITING ACCEPTANCES OF THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR THE DEBTOR PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED OCTOBER ___, 2019 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE **"PLAN"**), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[2] A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

**ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH IN SECTION IV. "CERTAIN RISK FACTORS CONCERNING THE PLAN" OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF AND THE EXHIBITS ATTACHED TO BOTH THE PLAN AND THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY CONFLICT BETWEEN ANY DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN GOVERN.**

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH NON-BANKRUPTCY LAW.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBE HEREIN.

AS TO CONTESTED MATTERS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST THE DEBTOR IN THE CHAPTER 11 CASE. THE COMMITTEE URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

## <u>IMPORTANT DATES</u>

DATE BY WHICH BALLOTS MUST BE RECEIVED: **NOVEMBER __, 2019 AT 4:00 P.M. EASTERN TIME**

DATE BY WHICH OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED: **NOVEMBER __, 2019 AT __:00 P.M. EASTERN TIME**

HEARING ON CONFIRMATION OF THE PLAN: **NOVEMBER __, 2019 AT __:00 _.M. EASTERN TIME**

# TABLE OF CONTENTS

I. INTRODUCTION ...........................................................................................................1

  **A.** Brief Overview Of Plan .........................................................................................1

  **B.** Summary Of Distributions And Voting Eligibility.................................................2

  **C.** Voting Procedures..................................................................................................3

  **D.** Confirmation Hearing ...........................................................................................4

II.    GENERAL INFORMATION REGARDING THE DEBTOR AND THE BANKRUPTCY
CASE ..............................................................................................................................5

  **A.** The Debtor ............................................................................................................5

  **B.** The Commencement of the Bankruptcy Case ........................................................6

  **C.** Formation of Creditors' Committee........................................................................6

  **D.** Significant Events in the Bankruptcy Case.............................................................6

  **E.** The Assets of the Estate .......................................................................................12

  **F.** Avoidance Actions and Other Causes of Action. ..................................................16

  **G.** The Debtor's Liabilities. ......................................................................................17

III.    PLAN ......................................................................................................................19

  **A.** Introduction.........................................................................................................19

  **B.** Classification And Treatment Of Claims And Interests Under Plan ......................20

      SECTION 1.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.................20

      SECTION 2.    CLASSIFICATION OF CLAIMS.............................................................21

      SECTION 3.    TREATMENT OF CLAIMS ....................................................................22

      SECTION 4.    MEANS FOR IMPLEMENTATION .......................................................24

      SECTION 5.    DISTRIBUTIONS ..................................................................................32

      SECTION 6.    PROCEDURES FOR DISPUTED CLAIMS .............................................34

      SECTION 7.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................36

      SECTION 8.    CREDITOR RECOVERY TRUST. ........................................................38

      SECTION 9.    CONDITIONS PRECEDENT TO EFFECTIVE DATE ...........................45

      SECTION 10.    EFFECT OF CONFIRMATION .............................................................46

      SECTION 11.    RETENTION OF JURISDICTION.........................................................52

IV. CERTAIN RISK FACTORS CONCERNING THE PLAN ...........................................54

V. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES...........................................55

  **A.** U.S. Federal Income Tax Consequences of the Liquidating Trust................................56

  **B.** U.S. Federal Income Tax Consequences to the Holders of Claims .......................56

  **C.** Information Reporting and Backup Withholding ..................................................58

**D.** Importance of Obtaining Your Own Professional Tax Assistance .......................................58

VI. CONFIRMATION OF PLAN ..............................................................................................58

**A.** Confirmation Hearing ......................................................................................................58

**B.** Objections .........................................................................................................................59

**C.** General Requirements for Confirmation Of Plan ............................................................59

VII. CONCLUSION ...................................................................................................................62

**EXHIBITS**

Amended Chapter 11 Plan of Liquidation for the Debtor Proposed
by the Official Committee of Unsecured Creditors   ……………………………………Exhibit A

Liquidation Analysis ……………………………………………………………………Exhibit B

# I.

## INTRODUCTION

The Official Committee of Unsecured Creditors (the "**Creditors' Committee**" or "**Committee**") submits this Disclosure Statement in connection with the solicitation of votes on the Plan attached hereto as Exhibit A.  To the extent of inconsistencies between this Disclosure Statement and the Plan, the Plan will govern.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the assets of the Estate, (ii) the Chapter 11 Case, (iii) the Plan, (iv) the rights of holders of Claims under the Plan, and (v) other information necessary to enable each holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan.

Pursuant to section 1125 of the Bankruptcy Code, the Committee submits this Disclosure Statement to all holders of Claims against the Debtor entitled to vote on the Plan to provide information in connection with the solicitation of votes to accept or reject the Plan. This Disclosure Statement is also available to all holders of Claims against the Debtor for informational purposes, including the impact the Plan will have on such holders' Claims.

### A.    Brief Overview Of Plan[3]

The Plan provides for the assets of the Debtor's Estate, including Avoidance Actions and other Causes of Action, to be transferred automatically on the Plan's Effective Date to a Creditor Recovery Trust.  A Plan Agent, appointed by the Committee, will be authorized to execute and deliver documents further effectuating the transfer of Estate assets to the Creditor Recovery Trust.  The Trustee of the Creditor Recovery Trust will monetize the assets, investigate and pursue any Causes of Action not otherwise released under the Plan, and reconcile and fix any outstanding Claims that have been asserted against the Debtor's Estate.

Under the Plan, the Creditor Recovery Trustee will distribute the net proceeds of the Trust assets in conformity with the distribution scheme provided by the Bankruptcy Code and any prior order of the Bankruptcy Court.  The holders of Allowed General Unsecured Claims will receive uncertificated Creditor Recovery Trust Interests and distributions of cash based on their Pro Rata share of Available Cash.  Holders of Allowed Administrative Expense Claims and Allowed Other Priority Claims shall be paid by the Creditor Recovery Trustee in full in Cash on or as soon as reasonably practicable after the Effective Date.

The Creditors' Committee believes that the orderly liquidation of the assets of the Debtor's Estate by the Creditor Recovery Trustee will provide the best result to holders of Allowed Claims.  The only class of Claims that is "impaired" under the Plan and thus entitled to

---

[3] This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims under the Plan are not intended to, and will not waive, compromise or limit any rights, claims, defenses, or causes of action in the event that any objections to classification or treatment are filed or the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject it.

vote to accept or reject the Plan, is the Class of General Unsecured Claims and the Creditors' Committee urges the holders of Allowed General Unsecured Claims to vote to accept the Plan.

## B.    Summary Of Distributions And Voting Eligibility

The following summary table briefly outlines the classification and treatment of Claims against the Debtor under the Plan and the voting eligibility of the holders of such Claims.  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment | Approximate Percentage Recovery | Entitled to Vote |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired<br>Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable as soon as reasonably practical on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim. | 100% | No (presumed to accept) |
| 2 | Secured Claims | Unimpaired<br>Except to the extent that a holder of an Allowed Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive, at the option of the Creditors Recovery Trustee, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code; provided, however, that Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto. Nothing in the Plan shall preclude the Creditors' Committee or the Creditor Recovery Trustee, as applicable, from challenging the validity of any alleged Secured Claim, Lien or the value of the property that secures any alleged Lien allegedly securing an Allowed Secured Claim. | 100% | No (presumed to accept) |

2

| Class | Designation | Treatment | Approximate Percentage Recovery | Entitled to Vote |
|---|---|---|---|---|
| 3 | General Unsecured Claims | Impaired<br>On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of (i) Available Cash and (ii) the Creditor Recovery Trust Interests, in an aggregate amount equal to (a) such holder's Allowed General Unsecured Claim, and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim, in each case as reduced by prior distributions of Available Cash on each such Allowed General Unsecured Claim.  In no event shall the holder of a General Unsecured Claim receive distributions on account of such Claim in excess of the Allowed amount of such General Unsecured Claim and Postpetition Interest Claim. | 4% to 22%[4] | Yes |

### C.    Voting Procedures

Pursuant to Bankruptcy Code section 1126, only those holders of claims in classes that are impaired under a chapter 11 plan and that are not deemed to have rejected the plan are entitled to vote to accept or reject the proposed plan.  Classes of claims or in which the holders of claims are unimpaired under a proposed plan are deemed to have accepted the proposed plan and are not entitled to vote to accept or reject it. Classes of claims or interests in which the holders of claims or interests receive no distribution under a proposed plan are deemed to have rejected the proposed plan and are not entitled to vote to accept or reject it.

As set forth in more detail in Section V.B of this Disclosure Statement, holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.  For each holder of a Claim entitled to vote, the Committee has enclosed, along with a copy of this Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote on the Plan.  Holders of more than one Claim will receive an individual ballot for each Claim. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement.

---

[4] Based on gross liquidation proceeds before enforcement and liquidation costs.  *See* Liquidation Analysis attached hereto as Exhibit B.

All completed ballots must be actually received by the Creditors' Committee's counsel at the below address no later than **4:00 p.m. (Eastern Time)** on October __, 2019 (the **"Voting Deadline"**).

Via Regular Mail, Overnight Courier or Hand Delivery:

> **Cullen and Dykman LLP**
> **100 Quentin Roosevelt Boulevard**
> **Garden City, New York 11530**
> **Attn.:** _____

If you are a holder of a General Unsecured Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact _____, **(516)** ___-_____, _____@cullenanddykman.com.

---

**BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED**.

---

    **D.**    **Confirmation Hearing**

Pursuant to Bankruptcy Code section 1128, the Confirmation Hearing will be held on _____ **at __ _.m. (Eastern Time)** before the Honorable Mary Kay Vyskocil, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408.

At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained from the Class of General Unsecured Creditors, (ii) hear and determine objections, if any, to confirmation of the Plan that have not been previously resolved, (iii) determine whether the Plan meets the Bankruptcy Code requirements for confirmation of a plan of reorganization, and (v) grant such other and further relief as the Bankruptcy Court deems reasonable and appropriate.

Objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the Confirmation Objection Deadline, _____ **at 12:00 p.m. (Eastern Time)**, in the manner described in the order approving this Disclosure Statement (the **"Disclosure Statement Order"**) and Section VIII.B of this Disclosure Statement.

The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.

## GENERAL INFORMATION REGARDING
## THE DEBTOR AND THE BANKRUPTCY CASE

### A.    **The Debtor**

*i.    Committee Overview of Debtor*

The Debtor is an individual that historically engaged in a variety of media enterprises, including owning in whole or in part entities which in turn owned television and radio stations and stage performance promotion companies.  Most recently, the Debtor was best known for his roles in SFX Entertainment, Inc. and Function(x), Inc.

The Debtor was the chairman, CEO and 40% shareholder of SFX Entertainment, Inc., which produced live events and digital entertainment content focused on electronic music culture and music festivals.  SFX Entertainment, Inc. went public in 2013; however, within two years, SFX Entertainment, Inc. was in financial distress.  On December 23, 2015, the Debtor and other officers and directors of SFX Entertainment, Inc. were named as defendants in a federal class action suit alleging various securities law violations through market manipulation and issuance of false and misleading statements in connection with proposals to purchase stock of SFX Entertainment, Inc.  On February 1, 2016, SFX Entertainment Inc. and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  One month later, on March 2, 2016, a New York State class action was commenced against the Debtor and certain officers and directors of SFX Entertainment, Inc. asserting claims for fraud and negligent misrepresentation for allegedly materially false and misleading statements made in connection with the future prospects of SFX Entertainment Inc., its financial condition and solvency and the proposed acquisition of the company by an entity owned and controlled by the Debtor.  SFX Entertainment, Inc.'s assets were sold as part of its chapter 11 case.  The litigation trustee for the SFX Entertainment, Inc. litigation trust asserted claims against the Debtor in this Chapter 11 Case in excess of $160 million.

The Debtor also was an officer and director of Function(x) Inc. (formerly known as DraftDay Gaming Group, Viggle, and Gateway).  Function(x) operated Wetpaint.com, a website that provided entertainment news, and Choose Digital, an electronic platform for companies to incorporate digital content into rewards and loyalty programs.  Function(x) also owned DraftDay Gaming Group, that engaged in the fantasy sports market and Rant, Inc., a digital publisher of original sports and entertainment content.  In June of 2015, the Securities and Exchange Commission opened a formal order of investigation regarding certain securities transactions involving Function(x) and asserted claims against the Debtor for his role in the Function (x) transactions.  The outcome of that investigation, including the entry of a judgment against the Debtor, is described in detail in Section II.D.vii. below.

On September 21, 2016, the Debtor, along with other officers and directors were sued in a New York State class action suit that asserted breach of fiduciary duty claims against the Debtor as an officer and director of Function (x), Inc. relating to the terms of a proposed

conversion of debt and preferred shares into common equity by the Debtor and or his affiliates. Function(x) no longer operates.

The Debtor was also named as a defendant in other lawsuits and collection actions, which, as set forth more fully below, led to the commencement of this Chapter 11 Case.

ii.     *The Debtor's Position Respecting the Committee's Views of His Conduct*

This Disclosure Statement contains statements that are unfavorable to the Debtor.   The Committee believes such statements are correct and supported by documentary or other evidence.   However, the Debtor believes this Disclosure Statement paints an unfair picture of him, denies many of the allegations, and disagrees with the Committee's conclusions respecting the Debtor's behavior prior to and during this chapter 11 case.

B.     **The Commencement of the Bankruptcy Case**

On December 27, 2017 (the "**Petition Date**"), creditors React Presents, Inc., Clubtix, Inc., Lucas King, and Jeffrey Callahan filed an involuntary petition under chapter 7 of the Bankruptcy Code against the Debtor.  The Debtor consented to entry of an order for relief and moved to convert his case to one under chapter 11.  On March 1, 2018, the Court entered an order for relief and converted this case to one under chapter 11.

Since conversion of the case to chapter 11, the Debtor has been legally entitled to operate his business and manage his properties and affairs as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, provided, that the Bankruptcy Court entered an order restricting the Debtor's use of cash and assets. See Section II.D.iv below.  To date, no trustee or examiner has been appointed.

C.     **Formation of Creditors' Committee**

On January 11, 2019, the U.S. Trustee appointed the Creditors' Committee, consisting of two members, VistaJet US, Inc. and ID Wheel (FL) LLC (collectively, the "**Members**").  (ECF No. 177).  Meyer Suozzi, English & Klein, P.C. was retained as the Creditors' Committee's counsel pursuant to an order entered on February 20, 2019 (ECF No. 226).  RSR Consulting, LLC ("**RSR**") was retained as the Creditors' Committee's financial consultant pursuant to an Order entered on February 27, 2019 (ECF No. 236).   When the Meyer Suozzi attorneys responsible for the matter moved to Cullen and Dykman LLP, it was retained as the Creditors' Committee's substitute counsel pursuant to an Order entered on August 7, 2019 (ECF No. 403).

D.     **Significant Events in the Bankruptcy Case**

i.     *Schedules and Bar Dates*

On March 16, 2018, the Debtor filed his Schedules of Assets and Liabilities and Schedules of Executory Contracts and Unexpired Leases (ECF No. 29) and his Statement of Financial Affairs (ECF No. 30).  An Amended Schedule D (Schedule of Secured Claims) was filed on March 20, 2018 (ECF No. 36).

On August 24, 2018, the Bankruptcy Court entered an order (ECF No. 107) (the "Bar Date Order"), establishing October 1, 2018 as the deadline for each person or entity to file proofs of claim in respect of any prepetition Claims against the Debtor.

    ii.     *Motions to Extend Exclusivity and The Debtor's Plan and Disclosure Statement.*

The Debtor sought and obtained three extensions of the exclusive periods to file a plan of reorganization and solicit acceptances thereto (ECF Nos. 98,121, 224). The Debtor's exclusive periods terminated on March 11, 2019.

On October 31, 2018, the Debtor filed his *Debtor's Plan of Reorganization* (ECF No. 132). On December 31, 2019, the Debtor filed his *Disclosure Statement* (ECF No. 169) respecting the Debtor's plan of reorganization and, on January 9, 2019, the Debtor filed his *First Amended Disclosure Statement* (ECF No. 173).

The Debtor's proposed chapter 11 plan was premised on the Debtor obtaining a $30 million debtor in possession loan facility from Silver Point Capital. The collateral securing the facility would be monetized and the proceeds would be remitted to Silver Point in partial repayment of its loan. Additional proceeds from the liquidation of the collateral would be split between Silver Point Capital and the Debtor until Silver Point Capital's loan was repaid in full. The Debtor's portion of asset sale proceeds were to fund investments in Digital Media Investors, LLC and LBSX, LLC, entities that are owned by the Debtor. The Debtor ascribed values of approximately $228 million and $171 million to his interests in Digital Media Investors, LLC and LBSX, LLC, respectively. The Debtor represented in his disclosure statement that the investments would provide sufficient liquidity to pay holders of all reasonably anticipated allowed claims in full by third-quarter 2019.

Over eight months have passed since the Debtor filed his plan and the Debtor has not obtained any financing nor obtained Bankruptcy Court approval of his disclosure statement. After the Creditors' Committee was appointed and commenced its investigation (described below in Section II.D.iv.), the Debtor abandoned his plan to invest in Digital Media Investors, LLC and LBSX, LLC and advised the Creditors' Committee that those investments had no value, in stark contrast to his previous representations that their value aggregated nearly $400 million. The Debtor has adjourned the hearing on his Disclosure statement from time to time, but has not otherwise taken steps to obtain confirmation of his plan.

    iii.     *The Creditors' Committee's Investigation*

Following the Creditor's Committee's appointment, which did not occur until ten months after the Order for Relief Date, and retention of counsel, the Committee undertook an investigation of the Debtor, his chapter 11 plan, the financing initiative on which it was based, his assets, and uses of Estate assets. The investigation was critical because the Debtor holds substantially all his assets indirectly, through a web of limited liability companies and other entities, and the Debtor has failed throughout this Chapter 11 Case to provide the financial reporting on those entities as required under the Bankruptcy Rules. Further, the Committee believed the Debtor had made large, unauthorized transfers of the Estate's cash to his wife and

entities before and during his Chapter 11 Case and was using Estate assets to fund a lavish lifestyle.

Initially, the Committee informally requested documents and information from the Debtor. When the Debtor failed to respond fully to those requests, the Committee obtained a Court order pursuant to Bankruptcy Rule 2004 (a) directing the Debtor to produce documents and information and to appear for oral examination (ECF No. 253) and for authority to issue subpoenas to obtain documents from, and take depositions of, certain persons and entities with whom the Debtor had business or personal relationships including the Debtor's wife, the entities in which the Debtor or his wife have interests, the banks and financial institutions in which the Debtor or his wife have or had deposit or investment accounts, and other persons or entities believed to have documents or information concerning the Debtor's assets, liabilities or financial condition. Thereafter, the Committee obtained a second order pursuant to Bankruptcy Rule 2004(a) (ECF No. 313) for authority to serve subpoenas for the production of documents and examination upon certain of the Debtor's secured creditors and additional banks. The Creditors' Committee has served subpoenas for the production of documents on the Debtor's spouse, Laura Baudo Sillerman, the Debtor's accountant, certain secured creditors, and certain banks and financial institutions believed to be holding financial information concerning the Debtor's assets. The Committee's professionals are analyzing the thousands of pages of documents produced to identify all of the Debtor's assets, including potential Avoidance Actions and other Causes of Action. The Committee may continue its investigation pending confirmation of the Plan and intends to provide the documents obtained and analysis to the Creditor Recovery Trustee.

iv.    *Committee's Motion to Restrict Debtor's Use of Estate Property and Requiring Financial Disclosure*

The Committee's investigation confirmed the Debtor made unauthorized transfers of Estate funds to his wife (consisting of transfers of at least $564,384 to or for the benefit of his wife and the relinquishment of the Estate's interest in $588,231 on deposit in bank accounts held jointly by the Debtor and his wife) and made additional unauthorized transfers to the entities that he owns or controls (consisting of transfers in excess of $822,519). Further, the Debtor failed to file reports disclosing the finances of the entities he controls, as required by Bankruptcy Rules, was making payments to accountants and attorneys that had not been retained by the Estate in violation of the Bankruptcy Code, and was continuing to spend lavishly on his lifestyle (including expenditures for private staff, two homes and an apartment, and the use of a private helicopter). Those circumstances and others prompted the Committee to seek an order that, among other things, would prohibit the Debtor from transferring money or assets to his wife or entities that he controls or in which he has a substantial interest without prior Bankruptcy Court approval; restrict the Debtor's spending on personal living expenses to ordinary and reasonable amounts; restrict affiliated entities from engaging in significant transactions without prior Bankruptcy Court approval; restrict the Debtor from making any investments that do not comply with Bankruptcy Code section 345 without prior Bankruptcy Court approval; prohibit compensation of professionals by the Debtor without prior Bankruptcy Court approval; and require the Debtor to file reports required by Bankruptcy Rule 2015.3 (ECF No. 246).

On April 12, 2019, the Court entered a stipulation and order under which the Debtor agreed to the relief requested in the motion. The Debtor is in default of that stipulation and order

in several respects. Among other things, the Debtor entered into a purportedly binding agreement to transfer his interest in certain real property in Anguilla without bankruptcy court approval or even prior notice to the Committee. The Debtor represented in his Schedules that the Anguilla property was worth $37 million, albeit the Debtor has since informed the Committee that he believes the value of his interests in the property is worth $2 million. Also, the Debtor still has not filed financial reports for the entities he controls as required under the Bankruptcy Rules.

### v.    Retention of Real Estate Brokers

Even though the Estate has no equity in his New York town house and the carrying costs for that town house and the Debtor's Southampton, New York properties exceed $170,000 per month in the aggregate), the Debtor did not retain brokers to sell those properties until more than one year after the entry of the Order for Relief Date. On February 22, 2019, the Debtor filed an application to retain Keen-Summit Capital Partners LLC, Douglas Elliman Real Estate and The Corcoran Group as Real Estate Broker to market and sell the New York town house owned by the Debtor and his wife (ECF No. 228). On May 17, 2019, the Debtor moved to retain the Corcoran Group to sell real property located in Southampton, New York that is directly or indirectly owned by Elderberry X, LLC (a limited liability company purportedly owned by the Debtor and his wife) (ECF No. 325). On July 1, 2019 and July 22, 2019, the Bankruptcy Court entered orders authorizing the Debtor to retain the Corcoran Group as real estate brokers for the New York town house and the Southampton properties. (ECF Nos. 359 and 379, as amended).

### vi.    Settlement of Securities Violation Claims Concerning SFX

On June 26, 2019, the Bankruptcy Court entered an order (ECF No. 357) authorizing the Debtor to settle certain Claims against the Debtor related to alleged violations of securities law in connection with the Debtor's role as an officer and director of SXF Entertainment, Inc, which as noted above filed its own chapter 11 case on February 1, 2016. The settlement is subject to approval by the district court overseeing the federal class action described below. The Committee is advised that a hearing on final approval is scheduled for December 2019. The Committee believes there is a low probability that the settlement will not be approved; however, if approval is not obtained the amount of General Unsecured Claims will exceed the Committee's estimate. Under the settlement, each of the following holders of those Claims agreed to resolve their Claims for a portion of the proceeds of certain insurance policies and an Allowed General Unsecured Claim against the Debtor's Estate, subject to the terms of the settlement:

(a)    *Dean Ziehl, not individually but in his capacity as the Litigation Trustee of the SFX Litigation Trust.* The SFX Litigation Trustee filed a proof of claim against the Debtor (identified in the claims register as proof of claim number 38) in the amount of $160 million. Under the settlement, the SXF Litigation Trustee is to receive $5,250,000 of insurance proceeds and his proof of claim will be reduced and allowed in the amount of $750,000.

(b)    *Guevoura Fund, Ltd. On behalf of itself and the putative class members.* The Guevoura Fund Ltd., as lead plaintiff in a federal class action, filed a proof of claim against the Debtor in an unliquidated amount (identified in the claims register as proof of claim number

35) and commenced an action to declare the debt owed to it by the Debtor as nondischargeable. Under the settlement, the Guevoura Fund, Ltd. and the putative class will share $6.5 million of insurance proceeds, its proof of claim will be allowed in the amount of $750,000 and the non dischargeability action will be dismissed.

(c)    *Altimeo Investissement, et al v. Robert F.X. Sillerman et al,* Index No. 651084/2016 pending in the New York Supreme Court, New York County. The plaintiffs in this action filed proofs of clam against the Debtor (identified in the claims register as proofs of claim numbers 48 through 54, inclusive) asserting claims of approximately $18 million in the aggregate. Under the settlement, the Altimeo plaintiffs will share $1,500,000 of insurance proceeds and the claims of the *Altimio* plaintiffs will be reduced and allowed in the amount of $1 million in the aggregate.

*vii.    SEC and Other Securities Claims Related to Function(x), Inc.*

The United States Securities and Exchange Commission (the "**SEC**"), conducted an investigation into certain pre-bankruptcy transactions and practices involving Function(x) and the Debtor, the former CEO of Function (x). Function(x) has ceased operating. On November 15, 2018, the SEC issued an Order Instituting Proceeding pursuant to Section 12(j) of the Securities and Exchange Act of 1934, Making Findings, and Revoking the Registration of the securities of Function(x), effective as of November 16, 2018.

The Debtor made an offer of settlement to the SEC Staff with respect to certain pre-bankruptcy transactions and practices involving Function(x) and him. The SEC accepted the Debtor's offer of settlement, which is in his consent to the Final Judgment and filed with the SEC's Complaint and Proposed Final Judgment in the U.S. District Court for the Southern District of New York (the "**District Court**") on June 28, 2019, SEC v. Sillerman, case no. 19-cv-6052 (S.D.N.Y.). On July 2, 2019, the District Court entered the Final Judgment in SEC v. Sillerman.

The Final Judgment provides that the Debtor is permanently restrained and enjoined from violating the antifraud provisions, books and records and internal accounting control provisions of the federal securities laws, which includes Section 10(b) of the Securities and Exchange Act of 1934 (the Exchange Act) and Rule 10b-5 promulgated thereunder; Section 17(a) of the Securities Act of 1933 (the Securities Act), and Section 13(b)(5) of the Exchange Act as described in Section 13(b)(2)(A) of the Exchange Act and Rule 13b2-1 promulgated thereunder. The Debtor is also permanently restrained and enjoined from aiding and abetting any violation of a company's reporting obligations under Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. Further, the Debtor is prohibited permanently from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

The Final Judgment also provides for payment of $179,000 to the SEC pursuant to a confirmed Chapter 11 plan in the Debtor's Chapter 11 case. An SEC investigation and litigation to judgment is not stayed by the bankruptcy filing and continues pursuant to the police and regulatory exception to the automatic stay. See 11 U.S.C. § 362(b)(4). In addition, the SEC's claim is non-dischargeable in the pending bankruptcy case. Under Section 523(a)(19), a

discharge in an individual Chapter 11 or 7 bankruptcy case does not discharge the debtor from any debt arising from a judgment or settlement concerning a violation of the federal securities laws. See 11 U.S.C. § 523(a)(19); § 1141(d)(2). Therefore, the SEC is seeking a distribution through any chapter 11 plan based on its amended proof of claim filed in Sillerman's bankruptcy case. On July 24, 2019, the SEC filed an amended proof of claim for $179,000 based on the Final Judgment entered by the District Court on July 2, 2019. The SEC can also seek payment of any amounts not paid to the SEC pursuant to the chapter 11 plan post-bankruptcy or if the automatic stay is lifted or terminated.

The Debtor is also being sued for breach of fiduciary duty and other claims in connection with his actions as a director of Function(x) Inc.in the action captioned *Mule v. Sillerman, et al.,* Index No. 654984/2016 pending in the Supreme Court of the State of New York, County of New York. The plaintiff in the *Mule* action filed a proof of claim in an unliquidated amount, identified in the claims register as proof of claim number 55. By order dated June 27, 2019, the Bankruptcy Court granted the Debtor's motion for relief from the automatic stay to permit the *Mule* litigation to proceed to judgment. The Debtor is represented in that action by the law firm Greenberg Traurig, whose fees and expenses are reportedly being paid by AIG, the insurance carrier under Function(x) Inc.'s director's and officer's insurance policy.

> viii.    *The Committee's Motion for the Appointment of a Chapter 11 Trustee or Conversion of the Case to Chapter 7*

On August 8, 2019, the Committee filed its motion seeking the appointment of a chapter 11 trustee for the Debtor or the conversion of the case to chapter 7 (ECF No. 404) (the "**Trustee Motion**"). The Trustee Motion sets forth numerous reasons why the Debtor should not be permitted to continue to manage and control the Estate assets and why a trustee is needed. Those reasons include the following:

- The Debtor has shown no willingness or ability to act as a fiduciary for his Estate. Instead, he has acted solely for his and his wife's benefit. The Debtor transferred $866,000 to his wife, representing one-half of a tax refund received by the Estate, without Court authorization or evidence that the Debtor's wife was entitled to any portion of the tax refund. The Debtor transferred over $500,000 to his wife for living expenses for the last year while he has been in chapter 11. Without Bankruptcy Court approval, the Debtor equitized the indebtedness owed to him by Elderberry X, LLC (which is owned by the Debtor and his wife), which resulted in the loss of a structurally senior right to recovery from the liquidation of Elderberry X, LLC's assets for the sole benefit of the Debtor's wife.

- The Debtor made gross misstatements concerning the value of Digital Media Investors, LLC and LBSX, LLC. As noted above, the Debtor represented in his Schedules and disclosure statement that his interests in those entities are worth hundreds of millions of dollars. The Debtor wasted fifteen months in chapter 11 focusing on those initiatives and proposed a Chapter 11 plan, purportedly that would get holders of all Allowed Claims paid in full in a relatively short period of time, based solely on those initiatives. Only after the Committee commenced its investigation did the Debtor reveal that those initiatives are worthless.

11

- The Debtor made gross misstatements concerning the value of certain owned and leased real property on the island of Anguilla (the "**Anguilla Property**") – claiming in his Schedules that the property is worth $37 million, but now acknowledging it has minimal value.  Further, the Debtor entered into an agreement to transfer his interest in the Anguilla Property without Bankruptcy Court approval.   Moreover, the Debtor interfered with the Committee's investigation of the Estate's interest in the Anguilla property by refusing to produce documents and information related to the ownership of the Anguilla Property and the purported liens on the Debtor's interest in the Anguilla Property.

- The Debtor maintained an extravagant lifestyle during this case, including keeping three owned homes, a leased apartment, two helicopters, three golf memberships and an extensive personal staff.  The Debtor dissipated well over $3.3 million of Estate cash, of which over $850,000 was disbursed to the Debtor's wife.

- The Debtor failed, for over 18 months while in bankruptcy, to abandon or attempt to sell his New York City townhouse, which has cost the Estate hundreds of thousands of dollars in carrying costs despite the Estate apparently having no equity in such property and obtaining no benefit from it. Also, the Debtor failed for over 18 months to attempt to sell or otherwise dispose of his Southampton properties, which cost the Estate over $70,000 per month in upkeep.

- The Debtor failed to fulfill his obligations as a debtor in possession, including failing to file financial reports for his entities, in violation of Bankruptcy Rule 2015.3 and a Bankruptcy Court order specifically requiring the Debtor to comply with such reporting requirements, failing to file tax returns for the Estate for two years, failing to obtain court authorization to retain accountants and lawyers and paying them notwithstanding that they have not been retained.

Further, a trustee is required to control the Estate assets and prevent the Debtor from further dissipating assets so that those assets can be monetized and distributed for the benefit of holders of Allowed Claims, whether under the Plan or by a chapter 7 trustee.

The Trustee motion is pending before the Bankruptcy Court.

### E.    **The Assets of the Estate**

Below is a description of the Debtor's significant assets known to the Committee.  The description is based on the Debtor's Schedules or other information provided by the Debtor or others to the Committee or its professionals.  The Plan contemplates that the Estate assets, including the assets described below, will be transferred to the Creditor Recovery Trust.  The Creditor Recovery Trustee would liquidate the Estate's assets for the benefit of holders of Allowed Claims and, if such claims were paid in full, including with any Postpetition Interest Claims, any proceeds of the liquidation or unliquidated assets would be transferred to or revert to the Debtor.

Although it is impossible to predict with certainty the value of the Estate's assets individually or in the aggregate, the Committee's financial advisor, RSR, estimates that gross recoveries from the liquidation of the Debtor's assets (net of liens but before the costs of enforcement and recovery) likely would range from $4.21 million to $19.38 million. The analysis is attached hereto as part of **Exhibit B**. The analysis excludes potential recoveries from Avoidance Actions and other Causes of Action, which are described below in Section II.F.

(a)    Elderberry X, LLC.    The Debtor and his wife each hold a 50% interest in this limited liability company that directly and indirectly owns several parcels of improved and unimproved real property in Southampton, New York. Elderberry X, LLC's assets consist of: (i) a 100% interest in Elderberry 5, LLC, which owns vacant land at 5 Montauk Hwy, Southampton, NY, valued by the Debtor at $225,000, which is unencumbered; (ii) a 100% interest in Elderberry 7, LLC, which owns an unfinished home at 7 Southway Drive, Southampton, NY, valued by the Debtor at $535,000; (iii) a single family home under construction at 520 Montauk Hwy, Southampton, NY, valued by the Debtor at $17,250,000; and (iv) a single family home located at 52 Westway, Southampton, NY, valued by the Debtor at $6,500,000. Deutsche Bank holds a note in the principal face amount of $6,300,000 secured by first priority mortgages on the 520 Montauk Hwy and 52 Westway properties. C. Barton Gullong holds a mortgage note in the principal face amount of $4,000,000 that is secured by a first priority mortgage on 7 Southway and second priority mortgages on 520 Montauk Hwy and 52 Westway. By order dated July 22, 2019, Elderberry X, LLC retained the Corcoran Group as real estate broker to sell the real properties directly and indirectly owned by Elderberry X, LLC.

(b)    MJX LLC.    The Debtor allegedly owns 100% of MJX LLC. The Debtor's interests in MJX LLC are encumbered by a lien that secures a claim in the approximate amount of $7.2 million owed by the Debtor to Iliad Research and Trading, LLC. MJX LLC holds investments in the following private equity funds: Huff Alternative Parallel Fund; Huff Energy Fund; WI Harper Inc. Fund VII; Formation 8 Partners; White Oak Discovery Holdings; TPATL and POACH.IT. As of December 31, 2017, the Debtor believed the aggregate value of those funds to be $22,371,452. ESFX Holdings, LLC's approximately $20 million claim (inclusive of interest that continues to accrue) is secured by a perfected lien on MJX LLC's interests in The Huff Alternative Parallel Fund and The Huff Energy Fund, L.P. and other assets indirectly owned by the Debtor and described below. MJX LLC is also jointly and severally liable for a $17.2M (plus interest) judgment entered prepetition in favor of ESFX Holdings LLC. Also, MJX LLC is the payee on a note receivable of approximately $680,000. The Debtor claims the obligor on the note is in default and the collectability of the note in question. Further, MJX LLC owns interests in DBFX, LLC, MJX Capital Advisors, LLC and MJX Tour, LLC. The Debtor believes those entities have no significant value.

(c)    MJX Ventures, LLC.    The Debtor allegedly holds between fifty and 100% of the interests in MJX Ventures, LLC. The Debtor's wife, Laura Sillerman, allegedly holds any interests in MJX Ventures, LLC not held by the Debtor. The uncertainty as to ownership results from inconsistencies between the Debtor's Schedules and documents produced by the Debtor.

MJX Ventures, LLC owns a single-family home located at 351 Plain Road, Parcel 74, Hinsdale, NH 03451, valued by the Debtor at $423,000, which is subject to a $140,828 first mortgage held by FXM Investment Corp. (an affiliate of the Debtor). MJX

Ventures, LLC might also own vacant land located at 352 Plain Road, Parcel 79, Hinsdale NH 03451, valued by the Debtor at $305,500, which is subject to a $103,302 first mortgage held by FXM Investment Corp. Certain property records indicate Parcel 79 may be owned by Sillerman Commercial Holdings Partnership, LP, an entity controlled by the Debtor and further described below. The Committee is investigating the ownership of MJX Ventures, LLC and Parcel 79 and the enforceability of the mortgages granted in favor of FXM Investment Corp.

MJX Ventures, LLC, through several layers of limited liability companies, has a fee interest in two acres of land in Anguilla and a leasehold interest for another nine acres (collectively referred to above as the Anguilla Property). MJX Ventures, LLC allegedly holds 75% or 100% of the interests in the entities that hold the fee owned and leased Anguilla Property. The Debtor's wife, Laura Sillerman, allegedly owns the interests not held by the Debtor. The uncertainty as to ownership is the result of inconsistencies between statements made by the Debtor and documents produced by the Debtor. The Debtor, in his Schedules, valued the Anguilla Property at $37,500,000 but the Debtor recently represented to the Committee that the fair market value of the Estate's interest is only approximately $2 million. An entity called OPW, LLC, claims to hold a pledge of the interests in the companies that directly or indirectly own or lease Anguilla Property as security for claims it holds against the Debtor (alleged to approximate $4.5 million as of the Petition Date) and the Debtor's wife (alleged to approximate $5 million as of the Petition Date). The Committee is investigating the amount of indebtedness and the enforceability of the security interests granted to OPW, LLC in the entities purporting to own, directly or indirectly, the Anguilla Property.

After abandoning his scheme to fully and quickly repay creditors through investments in Digital Media Investors, LLC and LBSX, LLC, the Debtor advised the Committee of his intent to fund a chapter 11 plan through investment in the Anguilla Property. The Debtor has not filed such plan or explained satisfactorily to the Committee how the Debtor's investment in that property would result in cash or property being available to pay Creditors, particularly in view of the Debtor's track record, both pre-Petition Date and post-Petition Date, with failing to repay investors and lenders and allegations and settlement of a myriad of fraud claims against him.

(d)    Sillerman Sports Holdings, LLC. The Debtor holds a 100% interest in this entity that indirectly owns an approximate 0.4% interest in the New York Yankees Major League Baseball team. Specifically, Sillerman Sports Holdings, LLC holds interests in Yankees Global Enterprises, LLC, which owns interests in the New York Yankees and other related entities. The Debtor values his equity interest in Sillerman Sports Holdings, LLC at $8,955,960. ESFX Holdings, LLC's approximately $20 million claim (inclusive of interest that continues to accrue) is secured by a perfected lien on Sillerman Sports Holdings, LLC's interest in the New York Yankees and other assets indirectly owned by the Debtor and described herein. Sillerman Sports Holdings, LLC is also jointly and severally liable for a $17.2M (plus interest) judgment entered prepetition in favor of ESFX Holdings LLC.

(e)    Sillerman Commercial Holding Partnership LP. The Debtor holds an approximate 62% interest in this entity. Upon information and belief, the remaining interests are held by Laura Sillerman, as "Investment Trustee" and "Benefits Trustee" and Alaska Trust Company as "Administrative Trustee" of The 2000 Robert and Laura Sillerman Descendants'

14

Trust dated February 18, 2000. This limited partnership's assets consist of: (i) vacant land at 351 Plain Road, Parcel 51, Hinsdale, NH 03451, valued by the Debtor at $177,500 and subject to a $39,148 first mortgage held by FXM Investment Corp.; and (ii) vacant land at 352 Plain Road, Parcel 77, Hinsdale, NH 03451, valued by the Debtor at $446,500, and subject to a $153,187 first mortgage held by FXM Investment Corp. The Committee continues to investigate the assets held by, and the identity of the owners of this entity.

(f)   FXM Investment Corp. The Debtor owns a 60% interest in this corporation. The Debtor has not identified the owner of the remaining interests in this corporation. The assets of this corporation consist of mortgages on five parcels of land in New Hampshire that are owned by Sillerman Commercial Holding Partnership LP, MJX Ventures, LLC, and the Debtor.

(g)   Sillerman Residential Properties, LP. The Debtor's Schedules represent that the Debtor holds a 99% limited partnership interest in this entity. The Debtor, however, has produced documents indicating that the limited partnership interests in this entity are held by The 2000 Robert and Laura Sillerman Descendants' Trust dated February 18, 2000. The Committee is investigating the ownership of this entity. The entity's assets consist of: (i) nominal cash; and (ii) notes receivable in the amount of $621,433. The Debtor represented that the note receivable is uncollectible, and the Committee is investigating that contention.

(h)   352 Plain Road, Parcel 78, Hinsdale, New Hampshire 03451-0000. The Debtor is the sole owner of this single-family house that he valued at $1,057,500 and is subject to a mortgage in the amount of $360,635 in favor of FXM Investment Corporation, an affiliate of the Debtor.

(i)   Notes Receivable. The Debtor is the payee on certain notes valued at $3,683,986. The collectability of the notes receivable is unknown.

(j)   Tax Refunds. The Debtor and his wife are reportedly owed a tax refund of $740,000 from the New York State Department of Taxation and Finance. The Debtor claims, and the Committee disputes, that the Debtor's wife is entitled to 50% of such refund. Upon information and belief, the refund will not be released until the Debtor and his wife have filed tax returns for the years 2017 and 2018. Although this Chapter 11 Case is over eighteen months old, the Debtor has not yet retained an accountant to prepare tax returns for the Debtor's estate.

(k)   Digital Media Investors, LLC. The Debtor holds a 100% interest in this entity. The entity's assets consist of a 30% interest in each of DGTLX LLC, Subscription Media Investors, and Cryptocurrency Investors. The Debtor's Schedules value Digital Media Investors, LLC's asset between $201 million and $255 million; however, the Debtor recently represented to the Committee that this asset has no value. The Committee is investigating whether this entity has any assets that have meaningful value.

(l)   LBSX, LLC. The Debtor holds a 22 9/10% interest in this entity. This entity's assets consist of a 100% interest in Fintech Co. LLC. The Debtor's Schedules value this interest at $171,750,000; however, the Debtor represented to the Committee that his interest has

no value.  The Committee is investigating whether the Debtor's interests in this entity have value.

(m)    Interests in Other Entities.  The Debtor holds interests in approximately fifty (50) other entities.  The Debtor has represented to the Committee that none of those entities hold assets with any significant value.  Reference is made to the Schedules for a list of those entities.

(n)    121 East 72nd Street, New York, New York (the "**Town House**").  This Town House, owned by the Debtor and his wife as tenants by the entirety, served as the Debtor's residence.  The Town House is believed to have a fair market value between $11 and $13 million.  The town house is encumbered by mortgages and judgment liens exceeding $50 million in the aggregate.

(o)    Miscellaneous Assets. The Debtor's Schedules represent that as of the date of the Order for Relief, the Debtor had other assets, including: (a) deposits of money having an aggregate value of $75,713.00; (b) household goods and furnishings, electronics, sports equipment, jewelry, non-farm animals, and medical equipment, (c) a $3,000 retirement account with Fidelity Investments; (d) deferred income from Fintech Co. LLC; and (f) a $235,310 interest in an insurance policy with Massachusetts Mutual, in which his wife is the beneficiary. The Committee is investigating the extent and value of the Debtor's assets.

The Debtor claims the equity in certain Estate property, including the Town House and certain miscellaneous assets may be exempt property pursuant to Bankruptcy Code section 522.  Property that is exempt property would not be available to the Creditor Recovery Trustee to monetize for the benefit of creditors.  The Committee reserves all rights concerning any property claimed as exempt property.

In addition to the assets set forth above, the Estate has interests in certain Causes of Action described in below.

F.    **Avoidance Actions and Other Causes of Action.**

The Plan provides for the Creditor Recovery Trustee, in consultation with his professionals, will seek to avoid and recover transfers made by the Debtor that are preferential transfers, fraudulent conveyances, unauthorized post-Petition Date transfers or otherwise avoidable and recoverable under applicable law.  RSR Consulting, LLC ("RSR") is performing an analysis of transfers made by the Debtor during certain pre-petition and post-petition periods in an attempt to determine what transfers of cash or property of the Estate made by the Debtor may be potentially avoided and recovered for the benefit of the Debtor's Estate to fund distributions to unsecured creditors under the Plan or under a liquidation scenario by a chapter 7 trustee.  This analysis is ongoing.

There is no assurance that the Creditor Recovery Trustee will be successful in avoiding and recovering any transfers.  Further, the process to recover these transfers will likely involve litigation, which could be lengthy and expensive.  Therefore, the Committee makes no representations concerning the amounts the Creditor Recovery Trustee would realize from avoidance or other causes of action.

G.    **The Debtor's Liabilities.**

Except where noted, the following description of Claims is based on the Debtor's Schedules or other information provided by the Debtor, contained in proofs of clam filed in the Debtor's Chapter 11 Case, or otherwise provided by the holders of such Claims. RSR has analyzed this information but cannot confirm the estimates of the Claims set forth below are substantially correct. The Claims may be allowed in greater or lesser amounts. The allowance of Claims in amounts that are significantly greater than the amounts set forth below would negatively impact recoveries of holders of Allowed General Unsecured Claims.

i.    *Secured Debt*

The Claims secured by mortgage liens, judgment liens, pledges, security interests or other encumbrances include the Claims set forth below. Except as set forth below, the Claim amounts referred to below are as set forth in the relevant proofs of claim. The Committee's professionals have reviewed the proofs of claim asserting Secured Claims and information related to each Claim and the collateral securing such Claim; however, the Committee cannot ascertain with certainty whether such Secured Claims will be allowed in the amounts asserted by such Creditors or in some other amounts. Further, the Committee's professionals cannot ascertain with certainty the value of collateral securing such Claims and whether the value of such collateral is greater or less than the amount of such Claims. The Committee reserves all rights to object to the validity and priority of liens on and security interests in property in which the Estate has an interest and to seek to avoid and recover such liens and security interests for the benefit of the Estate and Creditors.

(a)    Deutsche Bank asserts a Claim in excess of $6 million that is secured by a first priority mortgage on the Town House, a Claim in excess of $5.9 million secured by a second priority mortgage on the Town House and a Claim in excess of $17.4 million secured by a judgment lien on the Town House. As set forth above, the Town House is believed to have a fair market value between $11 and $13 million.

(b)    ESFX Holdings, LLC asserts a Claim in excess of $17.2 million, which has continually been accruing interest, and now exceeds $20 million. ESFX Holdings, LLC's claim is secured by a judgment lien on the Town House that is junior to Deutsch Bank's second mortgage and senior to Deutsche Bank's judgment lien. As described above, the ESFX Holdings, LLC Claim is also secured by a judgment against the Debtor, MJX LLC, Sillerman Sports Holdings, LLC and another wholly owned LLC of the Debtor, jointly and severally. Additionally, ESFX Holdings, LLC has a perfected lien on Sillerman Sports Holdings, LLC's interest in the New York Yankees and a perfected lien on MJX LLC's interests in The Huff Alternative Parallel Fund and The Huff Energy Fund, L.P. The value of the collateral cannot be determined with certainty at this time and the Committee and its professionals are continuing to investigate value.

(c)    FXM Investment Corp., a company that is 60% owned by the Debtor, did not file a proof of claim, but was scheduled by the Debtor as having a $360,635 Claim secured by a mortgage on the Debtor's real property located at 352 Plain Road, Parcel 78, Hinsdale, NH 03461. The Debtor values the property as being worth approximately $1 million; however, the

fair market value may be between $209,000 and $441,480 based on various real estate marketing websites.  The Committee is investigating the enforceability of the mortgages.

(d)     Iliad Research and Trading L.P. asserts a Claim in excess of $7.2 million secured by the Debtor's interests in MJX LLC. The value of the Debtor's interests in MJX LLC ranges from $0.00 to $7,200,000. The range of values reflects the fact that ESFX Holdings, LLC has an over $20 million Claim secured by a perfected lien on certain of MJX LLC's assets and other assets, as well as a prepetition judgment against MJX LLC. Therefore, the value of the MJX LLC interests will decline to the extent that ESFX Holdings, LLC satisfies its Claims out of the assets held by MJX LLC as opposed to other collateral.

(e)     MassMutual did not file a proof of claim, but was scheduled by the Debtor as having a $225,000 Claim secured by an insurance policy.  Based on a MassMutual May 26, 2018 annual statement, this creditor is owed $228,595.50 and the claim is secured by a lien on a whole life insurance policy owned by the Debtor.  The whole life insurance policy appears to have a cash surrender value of $28,053.30 in excess of MassMutual's secured claim.

(f)     React Presents, Inc., asserts a claim in excess of $7.5 million secured by a judgment lien on the Town House that is junior and subordinate to Deutsche Bank's and ESFX's liens on the Town House.  The underlying judgment was in favor of React Presents, Inc., Clubtix, Inc., Lucas King and Jeffery Callahan (the four creditors that filed the involuntary bankruptcy petition against the Debtor); however, React Presents, Inc. is the only petitioning creditor that filed a proof of claim.

In addition to the liens and encumbrances set forth above, assets that are indirectly owned by the Debtor (*i.e.*, assets held by entities in which the Debtor has an interest) may be subject to additional liens and encumbrances.

ii.     *Priority Claims*

Priority Tax Claims consist of the New York State Department of Taxation and Finance, which filed a proof of claim asserting a claim of $5,390,633 for unpaid 2014 income taxes including interest.  The New York State Department of Taxation and Finance has also asserted that approximately $1,400,000 is due as a non-priority general unsecured claim on account of related penalties.

iii.    *General Unsecured Claims*

The Debtor scheduled $60,940,882.99 of General Unsecured Claims.  The Committee's Professionals believe that the Allowed Amount of General Unsecured Claims will range from $42 million to $88 million, exclusive of unliquidated Claims that were scheduled by the Debtor or asserted in proofs of claim.

## III.

## PLAN

### A.    Introduction

This section of the Disclosure Statement summarizes the Plan, a copy of which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the provisions of the Plan; thus, the provisions of the Plan will control in the event of any discrepancy between this Disclosure Statement and the Plan.

**THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN. STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BASED ON AVAILABLE INFORMATION AND ARE NOT A REPRESENTATION AS TO THE ACCURACY OF THESE AMOUNTS.**

Chapter 11 of the Bankruptcy Code is primarily used for entity business reorganizations but can be used for individual debtors as well.  A debtor or trustee may use chapter 11 to liquidate assets, including all a debtor's assets, to maximize recoveries for creditors.

Formulating an appropriate plan of reorganization or liquidation is the primary purpose of a chapter 11 case.  A plan will set forth and govern the treatment and rights to be afforded to creditors with respect to their claims against a debtor.  A plan may be proposed by a debtor, an official committee of creditors or any other creditor or party in interest, provided that the debtor no longer has the exclusive right to file a plan.  In this Chapter 11 Case, the Debtor no longer has that exclusive right.

A plan may only be confirmed by the Bankruptcy Court if creditors who are entitled to vote, vote to accept the plan in the requisite numbers of creditors and amounts of claims, and the Bankruptcy Court finds that the plan meets the statutory criteria.  These requirements are explained in greater detail below.  The votes of creditors may be solicited by a proponent of a plan, only after a written disclosure statement has been provided to each creditor who is entitled to vote on the plan. The Bankruptcy Court has approved this Disclosure Statement for use to solicit votes on the Plan.

The Plan is a plan of liquidation.  The Plan contemplates the appointment of a Creditor Recovery Trustee to liquidate the Debtor's assets and distribute them to various classes of creditors in the order of priority as set forth in the Bankruptcy Code.  The Plan divides the creditors into separate classes, specifies which classes of holders of Claims are entitled to vote, and specifies what property each class is to receive under the Plan and in what order, as more fully set forth below.

### B.    Classification And Treatment Of Claims And Interests Under Plan

Bankruptcy Code section 1122 requires plans of reorganization to classify the claims and interests of a debtor's creditors.  In accordance with that Bankruptcy Code section, the Plan divides the Clams against the Debtor into Classes and sets forth the treatment for each Class (other than Administrative Expense Claims and Priority Tax Claims, which pursuant to Bankruptcy Code section 1123(a)(1), do not need to be classified).  The Committee believes that the Plan has classified all Claims in compliance with Bankruptcy Code section 1122 and applicable law.

The amount of any Impaired Claim that ultimately is Allowed by the Bankruptcy Court may vary from any estimated Allowed amount of such Claim and accordingly, the total Claims ultimately Allowed may vary from any estimates contained herein or in the Plan.  Thus, the distributions ultimately received by a Claim holder may be affected (adversely or favorably) by the aggregate amount of Claims ultimately Allowed in the applicable Class.

SECTION 1.   **ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.**

1.1.    Administrative Expense Claims.

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Creditors' Committee or the Creditor Recovery Trustee  agree to different treatment, the Creditor Recovery Trustee shall pay to each holder of an Allowed Administrative Expense Claim, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Administrative Expense Claim, Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the Administrative Expense Claim Bar Date; *provided* that Fee Claims shall receive the treatment provided in Section 2.2 of the Plan; *provided further* that Allowed Administrative Expense Claims representing liabilities incurred prior to the Effective Date by the Debtor in the ordinary course of business and not in violation of any Bankruptcy Court order, the Bankruptcy Code or Bankruptcy Rules, shall be paid by the Creditor Recovery Trustee in the ordinary course of business, consistent with any Final Order of the Bankruptcy Court in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, except that any Administrative Expense Claim representing a liability incurred in the ordinary course of business shall be barred and the holder thereof shall not be entitled to a distribution under the Plan if such ordinary course liability is not billed, or a request for payment is not made, on or before the Administrative Expense Claims Bar Date.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Creditor Recovery Trustee no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and/or the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Estate and its property, and such Administrative Expense Claims shall be deemed released as against the Estate as of the Effective Date. The Creditor Recovery Trustee must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

1.2.    Fee Claims.

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or as soon thereafter as is reasonably practicable or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Creditor Recovery Trustee. The Creditor Recovery Trustee is authorized to pay compensation for professional services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.  Any dispute over such compensation or reimbursement shall be determined by the Bankruptcy Court upon notice and motion.

1.3.    Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment or a different treatment is expressly provided for under the Bankruptcy Code which the Creditor Recovery Trustee determines is in the best interest of the Creditor Recovery Trust, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Priority Tax Claim, Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is 30 calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

SECTION 2.  **CLASSIFICATION OF CLAIMS.**

1.4.    Classification in General.

A Claim is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under Bankruptcy Code sections 1122 and 1123(a)(1); *provided* that, a Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been satisfied, released, or otherwise settled prior to the Effective Date.

1.5.    Summary of Classification.

The following table designates the Classes of Claims against the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1126 and (iii) deemed to reject the Plan. In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims set forth in Section 3 of the Plan. All potential Classes for the Debtor are set forth in the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |

1.6.    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Creditors' Committee or the Creditor Recovery Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

1.7.    Elimination of Vacant Classes.

Any Class of Claims that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Bankruptcy Code section 1129(a)(8) with respect to that Class.

1.8.    Voting Classes; Presumed Acceptance by Non-Voting Classes.

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Creditors' Committee shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

SECTION 3.    **TREATMENT OF CLAIMS.**

1.9.    Other Priority Claims (Class 1).

(a)    *Classification*:  Class 1 consists of Allowed Other Priority Claims against the Debtor.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable as soon as reasonably practical on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

(c)     *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

1.10.   Secured Claims (Class 2).

(a)     *Classification*:  Class 2 consists of Secured Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive, at the option of the Creditors Recovery Trustee, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under Bankruptcy Code section 506(b), or (iii) such other treatment necessary to satisfy Bankruptcy Code section 1129; *provided, however*, that Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto. Nothing in the Plan shall preclude the Creditors' Committee or the Creditor Recovery Trustee, as applicable, from challenging the validity of any alleged Secured Claim, Lien or the value of the property that secures any alleged Lien allegedly securing an Allowed Secured Claim.

(c)     Voting: Class 2 is Unimpaired, and the holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan.

1.11.   General Unsecured Claims (Class 3).

(a)     *Classification*:  Class 3 consists of General Unsecured Claims against the Debtor.

(b)     *Treatment*:  On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of (i) Available Cash and (ii) the Creditor Recovery Trust Interests, in an aggregate amount equal to (a) such holder's Allowed General Unsecured Claim, and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim, in each case as reduced by prior distributions of Available Cash on each such Allowed General Unsecured Claim.  In no event shall the holder of a General

23

Unsecured Claim receive distributions on account of such Claim in excess of the Allowed amount of such General Unsecured Claim and Postpetition Interest Claim. Although the Committee professionals cannot predict the amount of the distribution that will be made on account of General Unsecured Claims, the Committee Professionals believe, based on their analysis of information received from the Debtor and other sources, that gross liquidation proceeds before costs of enforcement and recovery suggest a range of recovery to holders of General Unsecured Claims of 4% to 22%. The costs of enforcement and recovery cannot be accurately predicted but given that many assets are owned through at least one and in many cases multiple levels of entities, those costs could be substantial. As a result, distributions to holders of General Unsecured Claims may be substantially less.

(c)     *Voting*: Class 3 is Impaired, and holders of Allowed General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

SECTION 4.   **MEANS FOR IMPLEMENTATION.**

1.12.   Vesting of Estate Property in Creditor Recovery Trust

On the Effective Date, except as otherwise set forth herein, all Estate property (including Causes of Action) shall be deemed to have been transferred to the Creditor Recovery Trust automatically and without further action (but the Plan Agent may take any and all necessary and/or advisable action to effectuate such transfer), which transfer shall be, and shall be deemed to be, free and clear of any and all liens, claims, Claims, interests and encumbrances; provided that any Creditor Recovery Trust Asset that serves as collateral for an Allowed Secured Claim shall be transferred subject to such lien or encumbrance and any Creditor Recovery Trust Asset that serves as collateral for a Disputed Secured Claim shall be transferred subject to such lien or encumbrance pending the determination of the Allowance of such Claim by Final Order. The transfer of Estate property shall be deemed to have occurred on the Effective Date, without any requirement to execute any documents or agreements, and whether or not such Estate property has been actually and physically transferred to the Plan Agent or Creditor Recovery Trust's possession. Upon such transfer, the Debtor shall be divested of all right, title and interest in and to such Estate property, which property shall be treated as Creditor Recovery Trust Assets and shall no longer be authorized to exercise control over any such property.

The Creditor Recovery Trustee may determine in its sole discretion not to accept delivery or ownership of certain assets of the Estate as Creditor Recovery Trust Assets, which assets shall be deemed not transferred to and shall otherwise not be transferred to the Creditor Recovery Trust and shall not become Creditor Recovery Trust Assets. In the event the Creditor Recovery Trustee determines not to accept delivery of certain assets as Creditor Recovery Trust Assets, the Creditor Recovery Trustee shall use best efforts to provide written notice to the Plan Oversight Committee, the Plan Agent, the Debtor and any other Person or Entity known to the Creditor Recovery Trustee to have an interest in such assets.

1.13.   Plan Agent

(a)     Appointment. The Creditors' Committee shall appoint the Plan Agent no later than five days before the Voting Deadline. The Plan Agent's retention shall commence on

the Effective Date and shall continue until the earlier of: (i) entry of a Bankruptcy Court order closing the Chapter 11 Case; (ii) entry of a Bankruptcy Court order removing the Plan Agent for cause (as defined below); (iii) the Plan Agent's voluntary resignation upon notice to the Plan Oversight Committee and the filing of such notice with the Bankruptcy Court, and the Plan Oversight Committee appointment of a successor; or (iv) as otherwise ordered by Bankruptcy Court.

(b)     Authority.  The Plan Agent shall have the authority and right on behalf the Debtor and the Estate, without the need for Bankruptcy Court approval (unless otherwise specified in the Plan or Plan Agent Agreement), to carry out and implement all provisions of the Plan in accordance with the Plan Agent Agreement other than those assigned to the Creditor Recovery Trustee, including, without limitation, to:

(i)     take all necessary or advisable actions to cause the Creditor Recovery Trust Assets and the Available Cash to be transferred to the Creditor Recovery Trust as of the Effective Date, including the execution and delivery of any necessary or appropriate document transferring title of any asset from the name of the Debtor to the Creditor Recovery Trustee, which transfer shall be, and shall be deemed to be, free and clear of any and all liens, claims, Claims, interests and encumbrances provided that any Creditor Recovery Trust Asset that serves as collateral for an Allowed Secured Claim shall be transferred subject to such lien or encumbrance and any Creditor Recovery Trust Asset that serves as collateral for a Disputed Secured Claim shall be transferred subject to such lien or encumbrance pending the determination of the Allowance of such Claim by Final Order.

(ii)     provide to the Creditor Recovery Trustee all documents and other information owned, controlled or available to the Debtor that may be necessary, appropriate or advisable to aid the Creditor Recovery Trustee in liquidating Estate assets or pursuing Causes of Action;

(iii)     assist the Creditor Recovery Trustee in obtaining possession and control of such books and records of the Debtor as may be necessary, appropriate or advisable to aid in the implementation of the Plan or the Creditor Recovery Trust;

(iv)     notify financial institutions and Persons which owe money or hold property belonging to the Debtor that the Plan Agent is vested with complete control over and rights to such accounts, debts owed to the Debtor, and money and property belonging to the Debtor and has the right and obligation to convey such accounts, debts, money and property to the Creditor Recovery Trustee, including without limitation to endorse the payment of notes or other obligations of any Person;

(v)     take and exercise control over any and all bank and other accounts in which the Debtor holds any interest, to the exclusion of the Debtor, including without limitation, acting as sole signatory respecting such accounts;

(vi)     act as sole signatory for all checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Debtor;

(vii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Agent;

(viii)    take any and all necessary and/or advisable actions, including if necessary, with the aid of the Bankruptcy Court, to transfer to the Creditor Recovery Trust Assets to the Creditor Recovery Trust; and

(ix)    cooperate with the Creditor Recovery Trustee and Plan Oversight Committee and perform other duties and functions that are consistent with the implementation of the Plan to the extent not a duty or function of the Creditor Recovery Trustee.

(c)    Compensation/Reimbursement of Expenses.  As more fully set forth in and subject to the Plan Agent Agreement, the Plan Agent shall be entitled to compensation and reimbursement for reasonable expenses incurred in the course of rendering services under the Plan, including without limitation reasonable fees and expenses of its retained professionals, which compensation and reimbursement shall be subject to review by the Plan Oversight Committee on the terms set forth in the Plan Agent Agreement.

## 1.14.    Debtor's Obligations

The Debtor shall cooperate with the Plan Agent to effectuate the automatic transfer of all Estate property to the Creditor Recovery Trust and shall execute any and all documents that may be necessary, appropriate or advisable, in the discretion of the Plan Agent, to cause such transfer to be effective and/or reflected on any applicable public record.  To the extent necessary or desirable, the Plan Agent shall have the authority, right and power to execute any document necessary, appropriate or advisable, in the name of the Debtor as the Debtor's attorney in fact, to effectuate such transfer.  No person dealing with the Plan Agent shall be obligated to inquire into the authority of the Plan Agent in connection with the transfer of Estate property to the Creditor Recovery Trust.  After the Confirmation Date and before the Effective Date, the Debtor shall turn over to the Creditors' Committee for further turnover to the Creditor Recovery Trust when it is established, all books and records deemed necessary, appropriate or advisable to aid in the implementation of the Plan and its provisions. Upon the Effective Date, and from time to time thereafter upon request of the Creditor Recovery Trustee, the Debtor shall turn over to the Creditor Recovery Trust all books and records deemed necessary, appropriate or advisable by the Creditor Recovery Trustee, the Plan Agent, and/or Plan Oversight Committee to effectuate the terms of the Plan and implement its provisions.

## 1.15.    Plan Oversight Committee

The Creditors' Committee shall appoint the Plan Oversight Committee, which shall initially be comprised of one or more members willing to serve, which may include one or more members of the Creditors' Committee, no later than five days before the Voting Deadline.  In the event that the Creditors' Committee for any reason does not make such appointment, the Plan Oversight Committee may be appointed by any chapter 11 operating trustee appointed in the Chapter 11 Case or by the Bankruptcy Court, on motion of any creditor or the U.S. Trustee.  The Plan Oversight Committee's existence shall commence on the Effective Date and shall continue

until the earlier of it not having at least one member and the making of all payments that will be made to holders of Allowed Claims under the Plan. In the event of the death or resignation of any member of the Plan Oversight Committee, such Plan Oversight Committee's remaining member(s) shall be entitled to designate a successor member from among the holders of Allowed Claims. If a Plan Oversight Committee member assigns its Claim in full or releases the Debtor, the Estate or the Trust from payment of the balance of its Claim, such act shall constitute a resignation from the Plan Oversight Committee. Until a vacancy on the Plan Oversight Committee is filled, such Plan Oversight Committee shall function in its reduced number. In the event that there is no Plan Oversight Committee, the Plan shall continue to be implemented, subject to any oversight that the Bankruptcy Court may order on motion of any creditor or the U.S. Trustee, that may be necessary or appropriate.

Promptly following the establishment of the Plan Oversight Committee, the Plan Oversight Committee shall enact bylaws governing its operating procedures and related matters, as deemed appropriate in the Plan Oversight Committee's sole discretion. While decision making authority will reside with the Plan Agent and the Creditor Recovery Trustee as set forth in the Plan and Plan Supplement, each will meet and/or consult with the Plan Oversight Committee periodically and the Plan Oversight Committee will have standing to seek the removal of the Plan Agent and/or the Creditor Recovery Trustee and appoint its successor for "cause" as that term is defined in the Plan Agent Agreement or Creditor Recovery Trust Agreement, as applicable.

Members of the Plan Oversight Committee shall be entitled to reimbursement of reasonable and necessary expenses, exclusive of legal fees and disbursements of any professionals retained by such individual members, incurred in carrying out their duties as members of the Plan Oversight Committee, all of which shall be paid by the Creditor Recovery Trustee from Available Cash. The Plan Oversight Committee may retain professionals, and the Creditor Recovery Trustee shall pay such professionals reasonable compensation for services rendered and expenses incurred on behalf of the Plan Oversight Committee in accordance with the procedures set forth herein. Any professional(s) retained by the Plan Oversight Committee shall be paid by the Creditor Recovery Trustee within 10 days following the delivery of an invoice to the Creditor Recovery Trustee (with copy to the Plan Oversight Committee) reasonably describing the services rendered and expenses incurred on behalf of the Plan Oversight Committee, or as soon thereafter as is reasonably practicable, absent an objection by the Creditor Recovery Trustee to all or part of such invoice served upon such professional(s) (with copy to the Plan Oversight Committee) prior to the expiration of such 10-day period. In the event of an objection to any invoice presented by the professional(s) retained by the Plan Oversight Committee, such professional(s) may be paid any part of the invoice which was not objected to, and absent a consensual resolution of the objection, the professionals(s) may be paid any part of the invoice approved by the Bankruptcy Court after motion on notice to the Creditor Recovery Trustee and the Plan Oversight Committee, describing the dispute over payment of the invoice.

The Plan Oversight Committee shall review the fees and expenses of the Plan Agent, the Creditor Recovery Trustee, and each of their respective retained professionals on the terms set forth in the Plan Agent Agreement or the Creditor Recovery Trust Agreement, as applicable. Following all payments being made to holders of Allowed Claims under the Plan, the Plan

Oversight Committee shall be dissolved and the members thereof shall be released from any and all further authority, duties, responsibilities, and obligations related to their service as Plan Oversight Committee members.

1.16.   Wind Down.

The wind-down, sale and liquidation of such assets (as determined for federal income tax purposes) shall occur over a period of no more than three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to the Creditor Recovery Trust within the meaning of Treas. Reg. § 301.7701-4 and in accordance with Section 10 of the Plan); provided that, the wind-down and liquidation may extend over a longer period of time if the Creditor Recovery Trustee receives a private letter ruling or other equivalent guidance from the IRS from which the Creditor Recovery Trustee reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtor's tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

1.17.   No Liability.

Except to the extent of any bond provided by the Creditor Recovery Trustee, if any, or as otherwise provided in this Plan, the Plan Agent Agreement or the Creditor Recovery Trust Agreement, no recourse shall ever be had, directly or indirectly, against the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by the Creditor Recovery Trustee, the Plan Agent, or the Plan Oversight Committee under the Plan or by reason of the creation of any indebtedness by the Creditor Recovery Trustee, the Plan Agent, or the Plan Oversight Committee under the Plan for any purpose authorized by the Plan. All such liabilities, covenants, and agreements of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, and their respective representatives, agents, employees, professionals, successors, or assigns, whether in writing or otherwise, under the Plan shall be enforceable only against, and shall be satisfied only out of such bond, if any, in favor of the Creditor Recovery Trustee, and the Creditor Recovery Trust Assets or such part thereof as shall, under the terms of any such agreement, be liable therefor, or shall be evidence only of a right of payment out of the income and proceeds from the liquidation of the Creditor Recovery Trust Assets, as the case may be. Every undertaking, contract, covenant, or agreement entered into in writing by the Creditor Recovery Trustee, Plan Agent, or Plan Oversight Committee shall provide expressly against the personal liability of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, and the Plan Oversight Committee's members.  The foregoing limitations on liability shall not apply in the event of willful misconduct, gross negligence or fraud on the part of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns.  The Creditor Recovery Trustee, the Plan Agent and/or the Plan Oversight Committee and any other Exculpated Parties shall be entitled to rely on the injunction and exculpation provisions set forth in this Plan.

Neither the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns shall be liable for any act or omission of one another, nor shall the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns be liable for any act or omission taken or not taken in such capacity other than for specific acts or omissions resulting from Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns willful misconduct, gross negligence, or fraud. The Creditor Recovery Trustee, the Plan Agent and the Plan Oversight Committee may, in connection with the performance of their respective functions, and in their sole and absolute discretion, consult with professionals, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons or entities, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Creditor Recovery Trustee, the Plan Agent and the Plan Oversight Committee shall not be under any obligation to consult with professionals, and the determination not to do so shall not result in the imposition of liability on the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, or any of their respective representatives, agents, employees, professionals, successors, or assigns, unless such determination is based on willful misconduct, gross negligence, or fraud.

No action shall be maintained against any of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee or the Plan Oversight Committee's members, in connection with the performance of their respective functions under the Plan, the Creditor Recovery Trust Agreement and/or the Plan Agent Agreement, as applicable, absent leave of the Bankruptcy Court.

### 1.18.    Indemnification

The Estate, to the extent still in existence, and the Creditor Recovery Trust shall indemnify and hold harmless the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors or assigns, from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses, which such Persons may incur or to which such Persons may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Persons arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Plan, the Plan Agent Agreement or the Creditor Recovery Trust, or the discharge of their duties thereunder, to the extent such losses are not covered by a bond, if any, or other applicable insurance; *provided, however*, that no such indemnification shall be made to such Persons for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

1.19.    Other Transactions

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Agent and the Creditor Recovery Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims, the Debtor, or any other Entity or Person. All matters provided for in the Plan involving the transfer of the assets of the Estate to the Creditor Recovery Trust, and any corporate or other Entity action that might be required by or of the Debtor or any Entity in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtor or the Estate; *provided, however*, that to the extent any action may be necessary, appropriate or advisable, without further authority, to transfer or document the transfer of Estate property to the Creditor Recovery Trust, the Plan Agent may execute any and all documents necessary, appropriate or advisable in the name of or as the authorized agent for the Debtor, including, without limitation for the transfer of ownership interests in Entities owned by the Debtor, in whole or in part, or the exercise of all control and other indicia of ownership which such ownership afforded the Debtor.

1.20.    Withholding and Reporting Requirements.

(a)    *Withholding Rights*. In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Creditor Trustee or such other Person designated by the Creditor Recovery Trustee (which entity shall subsequently deliver such forms to the Creditor Recovery Trustee) an appropriate Form W-9 or if the payee is a foreign Person Form W-8 (or any such other form as may be required by the IRS or other Governmental Unit related to income, withholding and other taxes on account of a distribution under the Plan), unless such Person is exempt under the tax code and so notifies the Creditor Recovery Trustee or such other Person.  If a request for a Form W-9, Form W-8 or other applicable form is made by the Creditor Recovery Trustee or such other Person designated by the Creditor Recovery Trustee and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Estate or Trust and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtor, Estate or Trust and its respective property. Alternatively, the Creditor Recovery Trustee, in its sole discretion, may make distributions to a creditor that has failed to return (or return timely), a  Form W-8 or Form W-9, or other applicable form. In such

case, the distribution shall be net the maximum amount of all applicable withholding taxes or such other amount as the Creditor Recovery Trustee deems necessary or appropriate.

## 1.21. Exemption from Certain Transfer Taxes.

To the maximum extent provided by Bankruptcy Code section 1146(a), any post-Confirmation sale or transfer of any Estate assets to or Creditor Recovery Trust Assets from the Creditor Recovery Trust, or any sale or transfer of, from or by any Entity in which the Debtor had as of the Effective Date an interest, pursuant to, in contemplation of, or in connection with the Plan or pursuant to the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 1.22. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Plan Agent is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such other similar actions as may be necessary or appropriate to effectuate and/or implement  the transfer of Estate assets to the Creditor Recovery Trustee and further evidence such transfer, on behalf the Debtor and without the need for any approvals, authorization, or consents.

## 1.23. Preservation of Rights of Action.

Other than specific, identified Causes of Action against an Entity that are expressly and specifically waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order of the Bankruptcy Court, the Creditors' Committee and the Estate reserve any and all Causes of Action including, without limitation, any challenge concerning any property claimed by the Debtor to be exempt property pursuant to Bankruptcy Code section 523. On and after the Effective Date, the Creditor Recovery Trustee may pursue such Causes of Action in its sole discretion, in the name of the Creditor Recovery Trustee on behalf of the Creditor Recovery Trust.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Creditor Recovery Trustee will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Creditors' Committee, the Estate, and on and after the Effective Date, the Creditor Recovery Trustee, shall retain and shall have, including through its authorized

agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained in the Plan to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

1.24.    Closing of the Chapter 11 Case.

After the Chapter 11 Case of the Debtor has been fully administered, the Creditor Recovery Trustee shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

SECTION 5.    **DISTRIBUTIONS.**

1.25.    Distribution Record Date.

As of the close of business on the Distribution Record Date, there shall be no further changes in the record of holders of any of the Claims. Neither the Creditor Recovery Trustee, nor any other Person or Entity, shall have any obligation to recognize any transfer of a Claim occurring on or after the Distribution Record Date.

1.26.    Date of Distributions.

Except as otherwise provided in the Plan, the Creditor Recovery Trustee shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date or as soon as reasonably practical and, thereafter, the Creditor Recovery Trustee shall from time to time determine the subsequent Distribution Dates. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Effective Date, Initial Distribution Date and subsequent Distribution Dates will depend on the Creditor Recovery Trustee's ability to monetize Estate assets, the timing of which may be uncertain.  There is no ready market for many Estate assets, including the Yankees Interest. Similarly, private equity funds, in which the Estate has an interest, will be liquidated by the managers for such fund.  Neither the Debtor nor the Creditor Recovery Trustee will control when those funds are liquidated.

The Debtor has assets that can be liquidated to generate cash for payments required to be made on the Effective Date, the Initial Distribution Date, and other Distribution Dates, including a golf membership, notes receivable, and New Hampshire real property.The Committee has moved for the appointment of a chapter 11 trustee, who  if appointed, would be able to sell such assets.

The Creditor Recovery Trustee shall, from time to time, maintain a reserve in an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Creditor Recovery Trustee shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any Postpetition Interest Claim that is actually payable in accordance with the Plan.

### 1.27.    Delivery of Distributions.

In the event that any distribution to any holder  is returned as undeliverable no distribution to such holder shall be made unless and until the Creditor Recovery Trustee has been able to determine through reasonable efforts the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that, such distributions shall be deemed unclaimed property at the expiration of six months from the date the applicable distribution is made if the Creditor Recovery Trustee is unable to determine the then current address for such holder.  Distribution checks that remain uncashed on the date that is six months after the date of mailing also shall be deemed unclaimed property.  All unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Creditor Recovery Trust automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any such holder to such distribution and all future distributions shall be released, settled, compromised, and forever barred.

### 1.28.    Manner of Payment Under Plan.

At the option of the Creditor Recovery Trustee, any Cash payment to be made under the Plan may be made by a check or wire transfer.

### 1.29.    Minimum Cash Distributions.

The Creditor Recovery Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; *provided* that, if any distribution is not made pursuant to Section 6.5 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim. The Creditor Recovery Trustee shall not be required to make any final distributions of Cash less than $50 to any holder of an Allowed Claim.  If all Allowed Claims (other than those whose distributions are deemed undeliverable under the Plan) have been paid in full, any surplus Cash shall revert to the Debtor to the extent provided in Section 9.11(b) of the Plan.  If the amount of any final distributions to holders of Allowed Claims would be $50 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $5,000, then the Creditor Recovery Trustee, in its sole discretion, may opt to make no further

distributions and, in such case, and any surplus Cash shall revert to the Debtor to the extent provided in Section 9.11(b) of the Plan.

1.30.    Setoffs.

The Creditor Recovery Trustee may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtor, the Estate or the Creditor Recovery Trustee may have against the holder of such Claim; provided that, neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate or the Creditor Recovery Trustee of any such Claim that such party may have against the holder of such Claim.

1.31.    Distributions After Effective Date.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

1.32.    Allocation of Distributions Between Principal and Interest.

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

1.33.    Payment of Disputed Claims.

As Disputed Claims are resolved pursuant to Section 7 of the Plan, the Creditor Recovery Trustee shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Distribution Date that is at least 45 days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Creditor Recovery Trustee in Creditor Recovery Trustee's sole discretion.

SECTION 6.    **PROCEDURES FOR DISPUTED CLAIMS.**

1.34.    Allowance of Claims.

After the Effective Date, the Creditor Recovery Trustee shall have and shall retain any and all rights and defenses that the Debtor or the Estate had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

1.35.    Objections to Claims.

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtor or the Estate may be interposed and prosecuted only by the Creditor Recovery Trustee. Such objections and requests for estimation shall be served and filed (i) on or before the 120th day following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or (ii) such later date as ordered by the Bankruptcy Court upon motion filed by the Creditor Recovery Trustee.

1.36.    Estimation of Claims.

The Creditor Recovery Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code section 502(c) regardless of whether the Debtor, the Creditors' Committee or the Creditor Recovery Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Creditor Recovery Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

1.37.    No Distributions Pending Allowance.

If an objection to a Claim is filed as set forth in Section 7 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

1.38.    Resolution of Claims.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Creditor Recovery Trustee shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan; provided, that the Creditor Trustee may seek such approval in its sole discretion or if requested by the Plan Oversight Committee. The Creditor Recovery Trustee or its successor may pursue

35

such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with its business judgment.

1.39.    Disallowed Claims.

All Claims held by persons or entities against whom or which the Debtor, Creditors' Committee or the Creditor Recovery Trustee  has commenced a proceeding asserting a Cause of Action under Bankruptcy Code sections 542, 543, 544, 545, 547, 548, 549 and/or 550 shall be deemed "disallowed" Claims pursuant to Bankruptcy Code section 502(d) and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtor, the Estate or the Creditor Recovery Trustee from such party have been paid.

SECTION 7.  **EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

1.40.    Assumption and Assignment of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to Bankruptcy Code sections 365 and 1123, unless such Executory Contract or Unexpired Lease: (i) is specifically designated on the Schedule of Assumed Contracts and Leases filed with the Plan Supplement; or (ii) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

1.41.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment in Cash on the Effective Date, subject to the limitation described below, as an Administrative Expense Claim, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Estate or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the Cure Obligations required by Bankruptcy Code section 365(b)(1) shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption; provided that, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least 14 days before the Confirmation Hearing, the Creditors' Committee shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Creditors' Committee not later than 10 days after service of notice of the Debtor's proposed assumption and associated Cure Obligation. Any counterparty to an

36

Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

1.42.    Claims Based on Rejection of Executory Contracts and Unexpired Leases.

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Creditor Recovery Trustee no later than 14 days after the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Creditors' Committee, no later than 14 days after notice of the proposed rejection of such Executory Contract or Unexpired Lease.

Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, (ii) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (iii) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, Creditor Recovery Trustee, the Estate, or the property of any of the foregoing, without the need for any objection by the Creditor Recovery Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

1.43.    Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities,

options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

1.44.    Reservation of Rights.

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Estate has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, Creditors' Committee or the Creditor Recovery Trustee, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

SECTION 8.    **CREDITOR RECOVERY TRUST.**

1.45.    Execution of Creditor Recovery Trust Agreement.

On the Effective Date, the Plan Agent and the Creditor Recovery Trustee shall execute the Creditor Recovery Trust Agreement and shall take all other necessary steps to establish the Creditor Recovery Trust and Creditor Recovery Trust Interests therein, which shall be for the benefit of Creditor Recovery Trust Beneficiaries. The Creditor Recovery Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not affect the status of the Creditor Recovery Trust as a "liquidating trust" for United States federal income tax purposes.

1.46.    Purpose of Creditor Recovery Trust.

The Creditor Recovery Trust shall be established for the sole purpose of taking title to and liquidating and distributing the assets of the Estate contributed to such Creditor Recovery Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Creditor Recovery Trustee shall exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the Creditor Recovery Trust Assets in accordance with applicable law as necessary to maximize distributions to Creditor Recovery Trust Beneficiaries. The Creditor Recovery Trustee shall also prosecute all Causes of Action transferred to the Creditor Recovery Trust, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Creditor Recovery Trustee may determine is in the best interests of the Creditor Recovery Trust Beneficiaries.

1.47.    Creditor Recovery Trust Assets.

The Creditor Recovery Trust shall consist of Creditor Recovery Trust Assets. After the creation of the Creditor Recovery Trust pursuant to Section 9 of the Plan, all of the Creditor Recovery Trust Assets shall be deemed transferred to the Creditor Recovery Trust, and the Plan Agent shall take any necessary or advisable actions to transfer more effectively and/or cause to be transferred more effectively, all such assets to the Creditor Recovery Trust. No Estate or Creditor Recovery Trust Assets shall vest in the Debtor, except as may be expressly set forth in the Plan. To the extent expressly required by the Plan, and in all other cases in the sole discretion of the Creditor Recovery Trustee, any Creditor Recovery Trust Assets may be transferred to the Creditor Recovery Trust and out of the Creditor Recovery Trust, including through abandonment, subject to certain liabilities as declared by the Creditor Recovery Trustee. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies. The Debtor shall cooperate in all respects with the transfer of the Estate's assets to the Creditor Recovery Trust.

1.48.   Administration of Creditor Recovery Trust.

The Creditor Recovery Trust shall be administered by the Creditor Recovery Trustee pursuant to the Creditor Recovery Trust Agreement and the Plan.

(a)   Appointment. The Creditors' Committee shall appoint the Creditor Recovery Trustee no later than five days before the Voting Deadline. The Creditor Recovery Trustee's retention shall commence on the Effective Date and shall continue until the earlier of: (i) the Creditor Recovery Trust is dissolved under applicable state law; (ii) the Bankruptcy Court enters an order removing the Creditor Recovery Trustee for cause; (iii) the Creditor Recovery Trustee voluntarily resigns, upon notice to the Plan Oversight Committee and filed with the Bankruptcy Court, and the Plan Oversight Committee appoints a successor; or (vi) as otherwise ordered by the Bankruptcy Court.

(b)   Authority. The Creditor Recovery Trustee shall have the authority without the need for Bankruptcy Court approval (unless otherwise specified in the Plan or Creditor Recovery Trust Agreement), to carry out and implement all provisions of the Plan in accordance with the Creditor Recovery Trust Agreement other than those assigned to the Plan Agent, including, without limitation, to:

(i)   make distributions to holders of Allowed Claims in accordance with the Plan from Available Cash, net of expenses permitted under the Plan to be paid therefrom;

(ii)   exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of assets of the Estate transferred to the Creditor Recovery Trust, in accordance with applicable law as necessary or appropriate to maximize distributions to holders of Allowed Claims, including to the extent feasible or desirable by minimizing expenses to the Estate and the Creditor Recovery Trust;

(iii)    make payments in the ordinary course and without further Court order to professionals retained by the Creditors' Committee, which continue to perform in their current capacities on and after the Confirmation Date through the Effective Date;

(iv)    administer the Estate's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of the Debtor or his Estate under Bankruptcy Code section 505(b) for all taxable periods of the Debtor ending after the Involuntary Petition Date through the liquidation of the Debtor as determined under applicable tax laws, and (c) representing the interest and account of the Debtor's Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(v)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtor that are required under the Plan, by any Governmental Unit or applicable law;

(vi)    pay statutory fees in accordance with Section 13.1 of the Plan;

(vii)    pay all Allowed Administrative Expenses as expenses of the Creditor Recovery Trust; pay all other expenses of the Creditor Recovery Trust; and subject to applicable state law, exercise such rights as the Debtor would have as the holder of interests in limited liability companies, corporations, or partnerships, including commencing bankruptcy cases for such entities or selling or otherwise disposing of such entities' assets;

(viii)    cooperate with the Plan Agent and Plan Oversight Committee and perform other duties and functions that are consistent with the implementation of the Plan to the extent not a duty or function of the Plan Agent; and

(ix)    to make demand, prosecute and settle all Causes of Action that are property of the Estate, including but not limited to Causes of Action under chapter 5 of the Bankruptcy Code.

(c)    Power of Attorney.    To the extent necessary or desirable, the Creditor Recovery Trustee shall have the authority, right and power to execute any document necessary, appropriate or advisable, in the name of the Debtor as the Debtor's attorney in fact, to carry out and implement the provisions of the Plan, liquidate Creditor Recovery Trust Assets, distribute the proceeds thereof and otherwise administer the Creditor Recovery Trust.

(d)    Preservation of Privilege and Defenses.    No action taken by the Debtor, the Creditors' Committee, the Plan Agent or the Creditor Recovery Trustee shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).    Notwithstanding the Debtor, the Creditors' Committee or the Plan Agent providing privileged information (if any) to the Creditor Recovery Trustee, the Creditor Recovery Trust, or any party or person associated with the Creditor Recovery Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estate and shall remain

40

privileged.  The Creditor Recovery Trustee shall seek to preserve and protect all applicable privileges and work-product relating to the claims reconciliation process and the Creditor Recovery Trust Assets, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).  The Creditor Recovery Trustee's receipt of such information shall not waive any privileges and all such privileges are preserved.

1.49.   Creditor Recovery Trustee's Tax Power.

(a)   The Creditor Recovery Trustee of the Creditor Recovery Trust shall be designated as the representative of the Debtor and the Estate for all of the Creditor Recovery Trust Assets and shall have the same authority in respect of all taxes of the Debtor, and to the same extent, as if the Creditor Recovery Trustee were a trustee of the Debtor under Bankruptcy Code section 1106. Accordingly, subject to the Creditor Recovery Trust Agreement, the Creditor Recovery Trustee shall prepare and file (or cause to be prepared and filed) on behalf of Debtor, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "Tax Returns") required to be filed by the Debtor or that the Creditor Recovery Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date (to the extent otherwise permitted by applicable law).

(b)   The Debtor shall cooperate fully with the Creditor Recovery Trustee regarding the implementation of Section 9.5 of the Plan and shall make available to the Creditor Recovery Trustee all reasonably requested information, records, and documents relating to taxes governed by Section 9.5 of the Plan until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, to the extent necessary or desirable, the Creditor Recovery Trustee shall have the authority, right and power to execute any document necessary, appropriate or advisable, in the name of the Debtor as the Debtor's attorney in fact, authorizing the Creditor Recovery Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and tax returns for the taxable periods described in Section 9.5(a) of the Plan.

(c)   The Creditor Recovery Trustee shall have the right to request an expedited determination of the tax liability, if any, under Bankruptcy Code section 505(b) with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date.

1.50.   Cash Investments.

The Creditor Recovery Trustee may invest Cash (including any earnings thereon or proceeds therefrom) transferred to the Creditor Recovery Trust; provided that, such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.77014(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

1.51.   Distribution of Creditor Recovery Trust Interests.

41

The Creditor Recovery Trustee is required to distribute to the holders of Creditor Recovery Trust Interests, as often as the Creditor Recovery Trustee in its reasonable discretion and judgment deems appropriate, after consultation with the Plan Oversight Committee, all Available Cash, less such amounts that may be reasonably necessary to (i) meet contingent liabilities and to maintain the value of the Creditor Recovery Trust Assets during liquidation, (ii) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtor or Creditor Recovery Trust or in respect of the Creditor Recovery Trust Assets), (iii) pay the fees and expenses of the Plan Agent, or (iv) satisfy other liabilities incurred or anticipated by such Creditor Recovery Trust in accordance with the Plan or Creditor Recovery Trust Agreement; provided that, such Creditor Recovery Trustee shall not be required to make a distribution pursuant to Section 9.7 of the Plan if such Creditor Recovery Trustee determines that the expense associated with making the distribution would likely utilize a substantial portion of the amount to be distributed, thus making the distribution impracticable.

1.52.    Federal Income Tax Treatment of Creditor Recovery Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Creditor Recovery Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtor, the Creditor Recovery Trustee and Creditor Recovery Trust Beneficiaries) shall treat the transfer of Creditor Recovery Trust Assets to the Creditor Recovery Trust as (i) a transfer of Creditor Recovery Trust Assets (subject to any obligations relating to those assets) directly to Creditor Recovery Trust Beneficiaries (other than to the extent Creditor Recovery Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to the Creditor Recovery Trust of Creditor Recovery Trust Assets in exchange for the related Creditor Recovery Trust Interests. Accordingly, except in the event of contrary definitive guidance, Creditor Recovery Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Creditor Recovery Trust Assets (other than such Creditor Recovery Trust Assets as are allocable to Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For the purpose of Section 9.8 of the Plan, the terms "party" and "Creditor Recovery Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

1.53.    Tax Reporting.

(a)    The Creditor Recovery Trustee shall file tax returns for the Creditor Recovery Trust treating such Creditor Recovery Trust as a grantor trust pursuant to Treas. Reg. § 1.6714(a) and in accordance with Section 9.9 of the Plan. The Creditor Recovery Trustee also shall annually send to each holder of a Creditor Recovery Trust Interest a separate statement regarding the receipts and expenditures of the Creditor Recovery Trust as relevant for U.S. federal income tax purposes.

(b)    Allocations of Creditor Recovery Trust taxable income among Creditor Recovery Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Creditor

Recovery Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Creditor Recovery Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the holders of Creditor Recovery Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Creditor Recovery Trust. Similarly, taxable loss of the Creditor Recovery Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Creditor Recovery Trust Assets. The tax book value of Creditor Recovery Trust Assets for purpose of this paragraph shall equal their fair market value on the date Creditor Recovery Trust Assets are transferred to the Creditor Recovery Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code of 1986, as amended (the "IRC"), the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)     As soon as reasonably practicable after Creditor Recovery Trust Assets are transferred to the Creditor Recovery Trust, the Creditor Recovery Trustee shall make a good faith valuation of Creditor Recovery Trust Assets. Such valuation shall be made available from time to time to all parties to the Creditor Recovery Trust (including, without limitation, the Debtor, Plan Agent and Creditor Recovery Trust Beneficiaries), to the extent relevant to such parties for tax purposes and shall be used consistently by such parties for all United States federal income tax purposes.

(d)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Creditor Recovery Trustee of a private letter ruling if such Creditor Recovery Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Creditor Recovery Trustee), such Creditor Recovery Trustee (i) may timely elect to treat any Creditor Recovery Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including such Creditor Recovery Trustee, the Debtor and Creditor Recovery Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e)     The Creditor Recovery Trustee shall be responsible for payment, out of the respective Creditor Recovery Trust Assets, of any taxes imposed on the respective Creditor Recovery Trust or its assets.

(f)     The Creditor Recovery Trustee may request an expedited determination of taxes of the Creditor Recovery Trust, including any reserve for Disputed Claims, or of the Debtor as to whom the Creditor Recovery Trust was established, under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, such Creditor Recovery Trust or the Debtor for all taxable periods through the dissolution of such Creditor Recovery Trust.

1.54.   Costs and Expenses of Creditor Recovery Trust.

As more fully set forth in and subject to the Creditor Recovery Trust Agreement and the review of the Plan Oversight Committee as set forth in Section 5.4 above, the costs and expenses of the Creditor Recovery Trust, including, without limitation, the reasonable fees and expenses of the Creditor Recovery Trustee and its retained professionals, and the fees and expenses incurred in connection with the prosecution and settlement of any Claims or Causes of Action, shall be paid out of the Creditor Recovery Trust Assets.

1.55.   Dissolution.

(a)   The Creditor Recovery Trustee and Creditor Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Creditor Recovery Trust Assets have been distributed pursuant to the Plan and the Creditor Recovery Trust Agreement, (ii) the Creditor Recovery Trustee determines, in its sole discretion, that the administration of any remaining Creditor Recovery Trust Assets is not likely to yield sufficient additional Creditor Recovery Trust proceeds to justify further pursuit and elects not to administer such Creditor Recovery Trust Assets, or (iii) all distributions required to be made by the Creditor Recovery Trustee under the Plan and the Creditor Recovery Trust Agreement have been made; provided that, in no event shall the Creditor Recovery Trust be dissolved later than three years from the creation of such Creditor Recovery Trust pursuant to Section 9 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the Creditor Recovery Trust's third anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Creditor Recovery Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Creditor Recovery Trust Assets.

(b)   If at any time the Creditor Recovery Trustee determines, in its sole discretion, that the administration of any remaining Creditor Recovery Trust Assets is not likely to yield sufficient additional Creditor Recovery Trust proceeds to justify further pursuit and elects not to administer such Creditor Recovery Trust Assets, or if all distributions required to be made by the Creditor Recovery Trustee under the Plan and the Creditor Recovery Trust Agreement, including without limitation distributions on account of Post-Petition Interest on General Unsecured Claims, have been made, then the Creditor Recovery Trustee may reserve any amount necessary to dissolve such Creditor Recovery Trust and thereafter dissolve such Creditor Recovery Trust.   Any Creditor Recovery Trust Assets not liquidated or otherwise administered by the Creditor Recovery Trustee, and any excess Creditor Recovery Trust Assets remaining after all distributions have been made, including without limitation distributions of Post-Petition Interest on Claims, shall revert to the Debtor.

SECTION 9.   **CONDITIONS PRECEDENT TO EFFECTIVE DATE.**

1.56.   Conditions Precedent to Effective Date.

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)   the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)   The Plan Agent Agreement shall have been signed and delivered;

(c)   The Creditor Recovery Trust shall have been formed and the Creditor Recovery Trust Agreement signed and delivered;

(d)   all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement, and the transactions and other matters contemplated thereby, shall have been effected or executed; and

(e)   all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

1.57.   Waiver of Conditions Precedent.

Each of the conditions precedent in Section 10.1 of the Plan other than the condition set forth in Sections 10.1(b) and (c) of the Plan may be waived in writing by the Creditors' Committee.

    1.58.    Effect of Failure of Conditions to Effective Date.

Unless otherwise extended by the Creditors' Committee, if the Effective Date does not occur on or before _____2019 or if the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Creditors' Committee and all holders of Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all obligations with respect to the Claims shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Creditors' Committee or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor or otherwise.

## SECTION 10. **EFFECT OF CONFIRMATION.**

    1.59.    Vesting of Assets.

On the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and (c), all property of the Estate shall vest in the Creditor Recovery Trust free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to the Plan and the Confirmation Order; no Estate assets shall vest in the Debtor, except for any assets that the Creditor Recovery Trustee elects not to accept as Creditor Recovery Trust Assets as set forth more fully in Section 5.1 of the Plan.

    1.60.    Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be deemed conveyed to the Creditor Recovery Trust.

    1.61.    Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, Bankruptcy Code section 510(b), or otherwise. Pursuant to Bankruptcy Code section 510, the Creditors' Committee reserves the right for the Creditor Recovery Trustee to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

    1.62.    Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the

Plan shall bind the Debtor and any holder of a Claim against the Debtor, and such holder's respective successors and assigns, whether or not the Claim of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

    1.63.    Discharge of Claims.

    Except as otherwise provided in the Plan, effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of his assets, property or Estate; (ii) all Claims shall be satisfied, discharged and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Bankruptcy Code section 502(g); and (iii) except as otherwise provided in the Plan or any judgment or order of the Bankruptcy Court, all Entities shall be precluded from asserting against the Debtor, the Estate, the Plan Agent or the Creditor Recovery Trustee, their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.  Notwithstanding any of the foregoing, in accordance with Bankruptcy Code section 1141: (i) the Debtor shall not be discharged and released from any Claims until the Court grants a discharge on completion of all payments under the Plan; and (b) the Debtor shall not be discharged from Claims that are nondischargable under Bankruptcy Code section 523.

    The SEC's claim is non-dischargeable in the Debtor's bankruptcy case.  Under Section 523(a)(19), confirmation of the Plan will not discharge the Debtor from any debt arising from a judgment or settlement concerning a violation of the federal securities laws.  Therefore, the SEC's claim is not subject to discharge, release or injunction and is excepted from the discharge, release or injunction provisions in the Plan pursuant to Sections 523(a)(19) and 1141(d)(2).  To the extent the SEC claim is not paid in full pursuant to a confirmed Plan it will not be discharged, released or enjoined and will continue to be owed by the Debtor.

    1.64.    Term of Injunctions or Stays.

    Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date, if any, indicated in the order providing for such injunction or stay.

    1.65.    Reservation of Causes of Action/Reservation of Rights.

    (a)    Except as provided in Sections 11.9 and 11.11 of the Plan, nothing contained in the Plan (including in Section 6.6 of the Plan or in the Confirmation Order) shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action of the Creditors' Committee, the Debtor or the Estate under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtor, the Estate or the Creditor

Recovery Trust, (ii) any rights to seek substantive consolidation of the Debtor and/or the Estate with any other Person or Entity, and (iii) the turnover of any property of the Debtor's Estate.

(b)     Except as set forth in Sections 11.9 and 11.11 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any right, Claim or Cause of Action, which the Creditors' Committee, Debtor or the Debtor's Estate had immediately prior to the Effective Date. The Creditor Recovery Trust, to the extent established, shall retain, reserve, and be entitled to assert all rights, Claims and Causes of Action, and all of the legal and equitable rights of the Debtor or the Debtor's Estate respecting any Claim left Unimpaired by the Plan that may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

1.66.    Causes of Action/Avoidance Actions/Objections

Other than any releases granted herein, in the Confirmation Order or in a Final Order of the Bankruptcy Court from and after the Effective Date, the Creditor Recovery Trustee shall have the right to prosecute any and all Causes of Action and objections to Claims under Bankruptcy Code sections 105, 502, 510, 542 through 551, and 553 or other applicable law that belong to the Debtor or the Debtor's Estate.

1.67.    Release by Debtor.

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AS OF THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, HIS ESTATE AND ANY PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE DEBTOR OR HIS ESTATE AND THEIR RESPECTIVE PROPERTY (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY THE DEBTOR AND HIS ESTATE AND THEIR RESPECTIVE PROPERTY) FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, HIS ESTATE OR AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR**

OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, OR THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND HIS AFFILIATES, ON THE ONE HAND, AND ANY RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED THAT, TO THE EXTENT THAT A CLAIM OR CAUSE OF ACTION IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM OR CAUSE OF ACTION SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY; PROVIDED FURTHER THAT, THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTOR OR THE CHAPTER 11 ESTATE AGAINST A RELEASED PARTY (OR OF A RELEASED PARTY AGAINST THE DEBTOR AND HIS ESTATE) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTOR THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN.

1.68.    Releases by Holders of Claims.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, HIS ESTATE OR HIS AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION

49

**OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE RELEASING PARTIES, ON THE ONE HAND, AND ANY RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED THAT, TO THE EXTENT THAT A CLAIM OR CAUSE OF ACTION IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM OR CAUSE OF ACTION SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY.**

      1.69.   Exculpation.

The Exculpated Parties shall neither have, nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Case, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtor; provided that, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement. Without limiting the foregoing "Exculpation" provided under Section 11.11 of the Plan, the rights of any holder of a Claim to enforce rights arising under the Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan.

      1.70.   Injunction.

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR CAUSES OF ACTION AGAINST THE DEBTOR AND HIS ESTATE ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ANY SUCH CLAIM AGAINST THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES, (II) THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES WITH RESPECT TO SUCH CLAIM, (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES WITH RESPECT TO SUCH CLAIM, (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO THE DEBTOR OR THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE**

**DEBTOR OR THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES WITH RESPECT TO SUCH CLAIM, EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, (VI) COMMENCING, CONTINUING, OR ASSERTING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CLAIMS WHICH ARE EXTINGUISHED OR RELEASED PURSUANT TO THE PLAN, AND (VII) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN. SUCH INJUNCTION SHALL EXTEND TO ALL PERSONS PROTECTED BY THE DISCHARGE, RELEASE AND EXCULPATION PROVISIONS OF THE PLAN AND THE CONFIRMATION ORDER, AS WELL AS TO THE SUCCESSORS OF SUCH PERSONS AND TO THE RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY OF SUCH PERSONS.**

1.71.    Waiver of Statutory Limitation on Releases.

**EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER SECTION 11 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN ITS OR THEIR FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, SUCH RELEASING PARTY HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY.  THE RELEASES CONTAINED IN SECTION 11 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.**

1.72.    Solicitation of Plan.

As of and subject to the occurrence of the Confirmation Date: (i) the Creditors' Committee shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 1125(a) and (e), and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Creditors' Committee and each member of the Creditors' Committee and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and

in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan (if any), and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan (in each case, if applicable).

1.73.    Plan Supplement.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than five days before the Voting Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

1.74.    Securities and Exchange Commission Carve Out.

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any person or entity in any forum.

SECTION 11. **RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     to hear and determine any application to modify the Plan in accordance with Bankruptcy Code section 1127, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     to hear and determine all applications under Bankruptcy Code sections 330, 331, and 503(b) for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan, the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing, or to maintain the integrity of the Plan and such documents following Consummation;

(k)     to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claim pursuant to Bankruptcy Code section 105(a);

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146 (including any requests for expedited determinations under Bankruptcy Code section 505(b));

(n)     to adjudicate, decide or resolve any and all matters related to Bankruptcy Code section 1141;

(o)     to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(p)     to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)     to enter a final decree closing the Chapter 11 Case;

(r)     to enforce all orders previously entered by the Bankruptcy Court;

(s)     to recover all assets of the Debtor and property of the Estate, and Creditor Recovery Trust Assets wherever located;

(t)     to aid the Creditors' Committee, the Plan Agent, the Creditor Recovery Trustee and/or the Plan Oversight Committee, as the case may be, in obtaining turnover by the

Debtor of all assets of the Estate and all books and records required to be turned over under the Plan; and

(u)    to hear and determine any rights, Claims or Causes of Action held by or accruing to the Creditors' Committee, Debtor or the Estate or the Creditor Recovery Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

# IV.

## CERTAIN RISK FACTORS CONCERNING THE PLAN

*Risk of Non-Confirmation of Plan*.  Although the Committee believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

*Risks that Conditions to Effectiveness will not be Satisfied*.  Section 10 of the Plan contains certain conditions precedent to the effectiveness of the Plan.  There can be no assurances that those conditions will be satisfied.

*Actual Plan Distributions may be less than Estimated for Purposes of this Disclosure Statement*.  The Committee projects that certain Claims asserted against the Debtor will be reduced to an amount that approximates the estimates set forth herein.  Also, the Committee has made estimates concerning the value of the Creditor Recovery Trust Assets.  There can be no assurance that the Allowed Claims or recoveries from Creditor Recovery Trust Assets be as projected.  If Allowed Claims are higher or Creditor Recovery Trust Asset recoveries are lower than projected, actual distributions to holders of Allowed Claims could be materially less than estimated in this Disclosure Statement.

*Objections to Claim Classifications for Plan Purposes*.  Bankruptcy Code Section 1122 provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class.  The Committee believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, parties in interest may object to the classification of a Claim and the Bankruptcy Court may determine that such Claim should be reclassified.

*Objections to Claims for Distribution Purposes*.  The Committee, Plan Agent, and Creditor Recovery Trustee each reserve the right to objection to the amount and classification of any Claim, except as provided in the Plan.  The estimates of Allowed Claims set forth herein cannot be relied on by any holder of a Claim.  Any such Claim holder may not receive its specified share of estimated distributions described in this Disclosure Statement.

*Committee Has No Duty to Update*.  The statements contained in this Disclosure Statement are made by the Committee as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Committee has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

*No Representations Outside Disclosure Statement Are Authorized.*  No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

*No Legal or Tax Advice Is Provided to You by Disclosure Statement.*  The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice. Each holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

*No Admission Made.* Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of Claims or Interests.

*Failure to Identify Litigation Claims or Projected Objections.*  No reliance should be placed on the fact that a particular Cause of Action or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Creditor Recovery Trustee may seek to investigate, file, and prosecute Causes of Action and may object to Claims after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Causes of Action or objections to such Claims.

*No Waiver of Right to Object or Right to Recover Transfers and Assets.*  The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtor's Estate or the Creditor Recovery Trustee (or any entity, as the case may be) to object to that holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtor's Estate are specifically or generally identified in this Disclosure Statement.

*Information Was Provided by Debtor and Relied Upon by the Committee's Advisors.*  The Committee's advisors have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. Although the Committee's advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

## V.

## <u>CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES</u>

The following summary is provided for information purposes only and is based on the IRC, Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practice, all as in effect as of the date hereof, and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of such holder's particular facts and circumstances (including whether a holder is a non-U.S. taxpayer, financial institution, broker-dealer, tax-exempt organization, or regulated investment company). In addition, this summary does not discuss any aspects of state, local, estate and gift or non-U.S. taxation.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below. No ruling will be sought from the IRS respecting any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Committee with respect thereto.

This summary is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim. All holders of Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

## A.    U.S. Federal Income Tax Consequences of the Liquidating Trust

The Creditor Recovery Trust is a grantor trust and as such, it is not subject to tax, but rather the grantors of the trust recognize the income of the trust as their interests appear. The contributions of the Claims to the Creditor Recovery Trust in exchange for the Creditor Recover Trust units is a taxable exchange measured by the value of the interest received reduced by the basis of the Claim contributed. Typically, accrual basis taxpayers recognized the income when they rendered their services, and the recognition gives them a basis equal to their Claim, thus the receipt of the Creditor Recovery Trust interest or the redemption of the unit is not taxable. If the Claim holder had written off the Claim as a bad debt or is a cash basis taxpayer, the receipt of the Creditor Recovery Trust unit will be taxable to the amount of the Claim and the receipt of cash on liquidation of the unit will not be taxable.

## B.    U.S. Federal Income Tax Consequences to the Holders of Claims

The U.S. federal income tax consequences to holders of Allowed Claims from the Distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the holder of a Claim in exchange for such Claim; (b) the nature of such Claim; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of such Claim; (d) whether such Claim constitutes a security; (e) whether the holder of such Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of such Claim reports income on the accrual or cash basis; and (g) whether the holder of such Claim receives Distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain

or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying Claim. A holder who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC, as described below.

### i.    *Accrued but Unpaid Interest*

In general, to the extent a holder of a Claim receives property in satisfaction of interest accrued during the holding period of such instrument, if any, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such a holder generally recognizes a deductible loss to the extent that any accrued interest claimed was previously included in its gross income and is not paid in full.

The extent to which property received by a holder of a Claim will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all Distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a chapter 11 plan is binding for U.S. federal income tax purposes. There is no assurance, however, that such allocation will be respected by the IRS for U.S. federal income tax purposes. If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the holder's gross income.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of previously included unpaid interest and OID for tax purposes.

### ii.    *Market Discount*

Holders of Claims who receive consideration in exchange for their claims may be affected by the "market discount" provisions of Sections 1276 through 1278 of the IRC. Under these provisions, some or all the gain realized by a holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in Section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the

case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued).

## C.    **Information Reporting and Backup Withholding**

Certain payments, including certain payments of Claims pursuant to the Plan, payments of interest, and the proceeds from the sale or other taxable disposition of the Claims may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories (which generally include corporations) or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions.    In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## D.    **Importance of Obtaining Your Own Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## VI.
## CONFIRMATION OF PLAN

## A.    **Confirmation Hearing**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Court has scheduled the

Confirmation Hearing to commence on _____ __, 2019 at __ _.m. (Eastern Time). The Confirmation Hearing may be adjourned from time-to-time by the Committee or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    Objections

Bankruptcy Code section 1128 provides that any party in interest may object to the confirmation of a plan. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtor's Estate or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of the Honorable Mary Kay Vyskocil, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Confirmation Objection Deadline of _____ __, 2019 at __:00 _.m. (Eastern Time):

*Counsel to Creditors' Committee*

CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
Elizabeth Aboulafia, Esq.

*Office of United States Trustee*

201 Varick Street
Suite 1006
New York, NY 10014
Attn: Richard Morrissey

*Counsel to the Debtor*

Rosen and Associates, P.C.
747 3rd Avenue, 20th Floor
New York, New York 10017
Attn: Sanford P. Rosen, Esq.

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

### C.    General Requirements for Confirmation Of Plan

(i)    *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Court will determine whether the requirements of Bankruptcy Code section 1129(a) have been satisfied with respect to the Plan.  Bankruptcy Code section 1129(a) requires that, among other things, for a plan to be confirmed:

(a)     The plan complies with the applicable provisions of the Bankruptcy Code.

(b)     The proponents of the plan have complied with the applicable provisions of the Bankruptcy Code.

(c)     The plan has been proposed in good faith and not by any means forbidden by law.

(d)     Any payment made or to be made by the proponents under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(e)     The proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponents must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider.

(f)     With respect to each class of impaired claims, either each holder of a claim of such class has accepted the plan, or will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

(g)     Each class of claims has either accepted the plan or is not impaired under the plan.

(h)     Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the order for relief in a case, of a value, as of the effective date, equal to the allowed amount of such claim.

(i)     If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

60

(j)     Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan (unless, as here, such liquidation or reorganization is proposed in the plan).

Subject to receiving the requisite votes in accordance with Bankruptcy Code section 1129(a)(8), the Committee believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Committee has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

(ii)     *Best Interests Test*

The best interests test requires the Bankruptcy Court to determine what the holders of allowed claims interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims under the plan.

The Committee believes that under the Plan all holders of Impaired Claims will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. A "Liquidation Analysis" prepared by the Committee's financial advisor, RSR, is attached hereto as **Exhibit B**.

The Liquidation Analysis is based upon several significant assumptions described therein. There can be no assurance as to values that would be realized in a liquidation nor can there be any assurance that the Bankruptcy Court will accept the Committee's conclusions or concur with such assumptions in making its determinations under Bankruptcy Code section 1129(a)(7).

The Debtor incorrectly asserts Creditors will receive more in a chapter 7 case than under the Plan due to redundancies in having a Plan Agent, Creditor Recovery Trustee and Plan Oversight Committee. The three roles are separate, distinct and will improve--not diminish recoveries. First, the Plan Agent's role is limited to executing documents (such as real property deeds, assignments, and bank account signature cards) and taking other action necessary to transition Estate assets to the Creditor Recovery Trust. There is no assurance the Debtor would timely and voluntarily perform those tasks; however, to the extent he does, it will reduce the Plan Agent's services. Second, the Committee believes that the Plan Agent will be the same person whot will be appointed as Creditor Recovery Trustee and use the same professionals. Accordingly, there will be no duplication of effortsbetween the Plan Agent and Creditor Recovery Trustee or their professionals. Third, the Committee anticipates the Plan Agent and Creditor Recovery Trustee will retain the Committee's professionals to further avoid duplication of efforts. Fourth, the Plan Oversight Committee's role primarily is to provide oversight for the Creditor Recovery Trustee and Plan Agent and to review their fees. The Plan Oversight

Committee would likely retain counsel only if fee disputes arise and could not be resolved consensually.

The Plan would also be more cost effective than converting this case to chapter 7 due to the tax advantages of the liquidating assets pursuant to a chapter 11 plan.  Bankruptcy Code section 1146(a) states, in relevant part, "the making or delivery of an instrument of transfer under a plan confirmed under section 1129 or 1191 of this title, may not be taxed under any law imposing a stamp tax or similar tax."  Accordingly, Creditors may do better under the Plan rather than under chapter 7 because sales of Estate assets by a chapter 7 trustee may be subject to stamp or transfer tax and such taxes would not apply to Estate assets sold under the Plan.

(iii)    *Feasibility Analysis*

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to Bankruptcy Code section 1129(a)(11), which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless the Plan provides for the liquidation of the Debtor's assets. The Plan provides for the liquidation of the Debtor's assets.  Accordingly, the Bankruptcy Court will find that the Plan is feasible if it determines that the Committee will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Creditor Recovery Trust to liquidate the Debtor's remaining assets. The Committee believe the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

(iv)    *Alternative to Confirmation and Consummation of Plan: Liquidation Under Chapter 7*

If the requisite acceptances to confirm the Plan are not received from the holders entitled to vote to accept or reject the Plan, or if the Plan is not confirmed by the Bankruptcy Court, the Committee could formulate and propose a different plan of liquidation.

If no plan of liquidation, including the Plan, is confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Assets for distribution in accordance with the priorities established by the Bankruptcy Code.   The Committee believes that a liquidation under chapter 7 will result in additional administrative expenses due to the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees. The assets available for distribution to Creditors would be reduced by such additional expenses.

# VII.

## CONCLUSION

The Committee believes that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of impaired Claims in Class 3 (General Unsecured Claims) to vote to accept the Plan and to evidence such acceptance by returning their ballots so

that they will be received no later than the Voting Deadline, _____ __, 2019 at __:00 p.m. (Eastern Time).

Dated:  October 7, 2019

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

ID Wheel (FL) LLC, solely in its capacity as
Member of the Committee and not in
any individual capacity

By:    */s/ Chris Hayes*
     Name: Chris Hayes
     Title: Executive Director

VistaJet US, Inc., solely in its capacity as
Member of the Committee and not in
any individual capacity

By:    */s/ Lauren Amato*
     Name: Lauren Amato
     Title: Billing Coordinator

**CULLEN AND DYKMAN LLP**

By:    */s/ Thomas R. Slome*
     Thomas R. Slome
     Jil Mazer-Marino
     Elizabeth Aboulafia
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
(516) 357-3700

*Counsel to the Official Committee of Unsecured Creditors*

1772463

## EXHIBIT A TO DISCLOSURE STATEMENT

Amended Chapter 11 Plan of Liquidation for the Debtor
Proposed by the Official Committee of Unsecured Creditors

Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
Elizabeth Aboulafia, Esq.
CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
Telephone: (516) 357-3700
tslome@cullenanddykman.com
jmazermarino@cullenanddykman.com
eaboulafia@cullenanddykman.com

*Counsel to the Official Committee*
*of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re:                                                      Chapter 11

Robert Francis Xavier Sillerman,
aka Robert F.X. Sillerman,                                  Case No. 17-13633 (MKV)
aka Robert F. Sillerman,
aka Robert X. Sillerman,

                              Debtor.
------------------------------------------------------------x

## AMENDED CHAPTER 11 PLAN OF LIQUIDATION FOR THE DEBTOR PROPOSED BY THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
Telephone: (516) 357-3700
Thomas R. Slome, Esq.
Jil Mazer-Marino, Esq.
Elizabeth Aboulafia, Esq.
tslome@cullenanddykman.com
jmazermarino@cullenanddykman.com
eaboulafia@cullenanddykman.com

*Counsel for The Official Committee of*
*Unsecured Creditors*

Dated:  October 7, 2019
        Garden City, New York

The Official Committee of Unsecured Creditors for the chapter 11 case of Robert F.X. Sillerman, the above-captioned debtor and debtor-in-possession proposes the following chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in <u>Section 1.A.</u> below.

SECTION 1.   **DEFINITIONS AND INTERPRETATION.**

A.   **Definitions.**

1.1.   ***Administrative Expense Claim*** means any Claim for costs and expenses of administration incurred during the Chapter 11 Case pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code and arising during the period up to and including the Effective Date, including, (i) the actual and necessary costs and expenses incurred after the Order for Relief Date through the Effective Date, of preserving the Estate; (ii) Fee Claims; and (iii) all fees and charges assessed against the Estate pursuant to section 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1-1401.

1.2.   ***Administrative Expense Claims Bar Date*** means the first Business Day that is 30 days following the Effective Date, except as otherwise specifically set forth in the Plan.

1.3.   ***Administrative Expense Claims Objection Bar Date*** means the first Business Day that is 60 days following the Administrative Expense Claims Bar Date, except as otherwise specifically set forth in the Plan; provided that, the Administrative Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Creditor Recovery Trustee after notice and a hearing.

1.4.   ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.5.   ***Allowed*** means, (i) with respect to any Claim, (a) any Claim arising on or before the Effective Date (1) that is not Disputed, or (2) as to which all such challenges have been determined by a Final Order to the extent such challenges are determined in favor of the respective holder, (b) any Claim that is compromised, settled, or otherwise resolved pursuant to a Final Order of the Bankruptcy Court, (c) any Claim expressly allowed by Final Order of the Bankruptcy Court, (d) any Claim expressly allowed under the Plan, (e) any Claim that is listed in the Schedules as liquidated, non-contingent and undisputed, and (f) any Administrative Expense Claim (1) that was incurred by a Debtor in the ordinary course of business before the Effective Date to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (2) that is not otherwise Disputed; provided that no Claim shall be "Allowed" if it is subject to disallowance in accordance with section 502(d) of the Bankruptcy Code. If a Claim is Allowed only in part, any provisions under the Plan with respect to Allowed Claims are applicable solely to the Allowed portion of such Claim.

1.6.   ***Available Cash*** means all Cash of the Debtor, including without limitation Cash realized from his business operations prior to the Effective Date and, at any time,

from the sale or other disposition of Estate assets, the interest earned on Estate invested funds, recoveries from Causes of Action or from any other source or otherwise, less (ii) the amount of Cash (a) necessary to pay holders of Allowed Administrative Expense Claims and Priority Tax Claims in accordance with the Plan, and (b) estimated and reserved by the Creditor Recovery Trustee to (1) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan on and after the Effective Date, including, without limitation, any costs and fees associated with administrating the Plan and Creditor Recovery Trust, and (2) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code. Available Cash shall include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with Section 6.2 and 6.9 of the Plan, or (ii) amounts represented by undeliverable distributions in accordance with Section 6.3 of the Plan.

1.7.    ***Avoidance Action*** means any avoiding power actions under the Bankruptcy Code and applicable non-bankruptcy law, including under Sections 502(d), 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code.

1.8.    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended from time to time, as applicable to the Chapter 11 Case.

1.9.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Case under section 151 of title 28 of the United States Code.

1.10.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Case, and any Local Rules of the Bankruptcy Court.

1.11.    ***Bar Date*** means October 1, 2018, which was the date fixed in the Bar Date Order as the deadline to file a proof of Claim in the Chapter 11 Case.

1.12.    ***Bar Date Order*** means the Order Establishing October 1, 2018 as the Deadline for Filing Proofs of Claims and Approving the Form and Manner of Notice Thereof, entered by the Bankruptcy Court on August 24, 2018.

1.13.    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14.    ***Cash*** means legal tender of the United States of America.

1.15.    ***Causes of Action*** means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured,

suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Causes of Action also include: (i) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) the right to object to Claims; (iii) any Avoidance Action; (iv) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (v) any state law fraudulent transfer claim.

1.16.    ***Chapter 11 Case*** means the case under chapter 11 of the Bankruptcy Code commenced against the Debtor, bearing the caption In re: Robert Francis Xavier Sillerman aka Robert F.X. Sillerman, aka Robert F. Sillerman, aka Robert X. Sillerman, Case No. 17-13633 – MKV and pending before the Bankruptcy Court.

1.17.    ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code.

1.18.    ***Claims Objection Bar Date*** means the first Business Day that is 120 days after the Effective Date; provided that, the Claims Objection Bar Date may be extended pursuant to an order of the Bankruptcy Court upon a motion filed by the Creditor Recovery Trustee.

1.19.    ***Class*** means any group of Claims classified pursuant to Section 3.1 of the Plan.

1.20.    ***Confirmation*** means the entry on the docket of the Chapter 11 Case of the Confirmation Order.

1.21.    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.22.    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.23.    ***Confirmation Order*** means the order of the Bankruptcy Court, together with all exhibits, appendices, supplements, and related documents, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.24.    ***Consummation*** means the occurrence of the Effective Date of the Plan.

1.25.    ***Creditor Recovery Trust or Trust*** means a trust to be created on or after the Effective Date in accordance with the provisions of Section 9 of the Plan and the Creditor Recovery Trust Agreement, for the benefit of Creditor Recovery Trust Beneficiaries.

1.26.    ***Creditor Recovery Trust Agreement*** means an agreement evidencing the terms and provisions governing the Creditor Recovery Trust that shall be filed with the Bankruptcy Court in the Plan Supplement and entered into prior to the establishment of

such Creditor Recovery Trust, and pursuant to which the Creditor Recovery Trustee shall manage and administer Creditor Recovery Trust Assets.

1.27.   ***Creditor Recovery Trust Assets*** means the assets of the Estate including, without limitation, all interests of the Debtor in any Entity and all Causes of Action, which are to be deemed transferred under the Plan and/or transferred by the Plan Agent to the Creditor Recovery Trust as of the Effective Date.

1.28.   ***Creditor Recovery Trust Beneficiaries*** means those holders of Allowed General Unsecured Claims who receive Creditor Recovery Trust Interests.

1.29.   ***Creditor Recovery Trust Interest*** means a non-certificated beneficial interest of the Creditor Recovery Trust allocable to holders of Allowed Claims in accordance with the terms and conditions of the Creditor Recovery Trust Agreement, which interests will not be transferable.

1.30.   ***Creditor Recovery Trustee*** means the person or entity appointed by the Creditors' Committee prior to the creation of the Creditor Recovery Trust, to administer such Creditor Recovery Trust in accordance with the provisions of Section 9 of the Plan and the Creditor Recovery Trust Agreement.  The Creditor Recovery Trustee may be the same person or entity as the Plan Agent.  The identity of the Creditor Recovery Trustee shall be filed with the Court with the Plan Supplement by no later than five days before the Voting Deadline.

1.31.   ***Creditors' Committee*** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, as the same may be constituted from time to time.

1.32.   ***Cure Obligation*** means all (i) amounts (or such other amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults; and (ii) other obligations required to cure any non-monetary defaults under any Executory Contract or Unexpired Lease that is to be assumed by the Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

1.33.   ***Debtor*** means the captioned individual who is the debtor in this Chapter 11 Case.

1.34.   ***Disclosure Statement*** means the Disclosure Statement for the Plan, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and/or other applicable law.

1.35.   ***Disputed*** means, with respect to a Claim, any such Claim (i) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code or (ii) for which a Proof of Claim has been filed, to the extent the Debtor, the Creditors' Committee, or any party in interest has interposed a timely objection or request for estimation before the Claims Objection Bar Date in accordance with the Plan, which objection or request for estimation has not been withdrawn or determined by a Final Order.

1.36.    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Creditor Recovery Trustee in accordance with the terms of the Plan, on which the Creditor Recovery Trustee makes a distribution to holders of Allowed Claims.

1.37.    ***Distribution Record Date*** means the Effective Date of the Plan.

1.38.    ***Effective Date*** means the date on which all conditions to the effectiveness of the Plan set forth in Section 10 of the Plan have been satisfied or waived in accordance with the terms of the Plan and counsel to the Creditors' Committee files a notice of occurrence of Effective Date with the Bankruptcy Court.

1.39.    ***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

1.40.    ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code and the property described in section 1115(a) of the Bankruptcy Code.

1.41.    ***Exculpated Parties*** means collectively the Creditors' Committee and each of their respective members, official or *ex officio*, the Plan Agent, and the Creditor Recovery Trustee, each solely in their capacities as such, and not individually, predecessors, successors and assigns, subsidiaries, and Affiliates, and their current and former officers, directors, principals, shareholders and their Affiliates, members, managers, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.42.    ***Executory Contract*** means a contract or lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.43.    ***Fee Claim*** means any Claim for professional services rendered or costs incurred on or after the Involuntary Petition Date through the Effective Date by professional persons retained by the Debtor or the Creditors' Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Case.

1.44.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided

that, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.45.    ***General Unsecured Claim*** means any unsecured Claim against the Debtor, which is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.46.    ***Governmental Unit*** has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.47.    ***Impaired***, with respect to a Claim or Class of Claims, has the meaning set forth in section 1124 of the Bankruptcy Code.

1.48.    ***Initial Distribution*** means the first distribution that the Creditor Recovery Trustee makes to any holders of any Allowed Claims.

1.49.    ***Initial Distribution Date*** means the date selected by the Creditor Recovery Trustee as soon as reasonably practicable after the Effective Date.

1.50.    ***Involuntary Petition*** means the petition under chapter 7 of the Bankruptcy Code that was filed against the Debtor by the Petitioning Creditors.

1.51.    ***Involuntary Petition Date*** means December 27, 2017, the date the Involuntary Petition was filed against the Debtor.

1.52.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.53.    ***Order For Relief Date*** means March 1, 2018, the date the order for relief in the Chapter 11 Case was entered.

1.54.    ***Other Priority Claim*** means any Claim against the Debtor entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

1.55.    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit or other entity.

1.56.    ***Plan*** means this chapter 11 plan of liquidation, including the exhibits hereto and the Plan Supplement, as the same may be amended or modified from time to time in accordance with Section 13.4 of the Plan.

1.57.    ***Plan Agent*** means the person or entity selected by the Creditors' Committee, charged with overseeing the tasks outlined in Section 5.2(b) of the Plan. The identity of the Plan Agent shall be filed with the Court with the Plan Supplement by no

later than five days before the Voting Deadline.  The Plan Agent may be the same person or entity as the Creditor Recovery Trustee.

1.58.   ***Plan Agent Agreement*** means an agreement evidencing the terms and provisions governing the Plan Agent that shall be filed with the Court in the Plan Supplement no later than five days before the Voting Deadline and entered into by and between the Plan Agent and the Creditors' Committee prior to the Effective Date of the Plan, and pursuant to which the Plan Agent shall administer certain aspects of the Plan.

1.59.   ***Plan Oversight Committee*** means a committee consisting initially of one or more members selected by the Creditors' Committee, established pursuant to Section 5.4 of the Plan to advise and assist the Plan Agent and/or Creditor Recovery Trustee in the implementation and administration of the Plan and Creditor Recovery Trust. A list of the members of the Plan Oversight Committee shall be filed by the Creditors' Committee with the Bankruptcy Court with the Plan Supplement by no later than five days before the Voting Deadline.

1.60.   ***Plan Supplement*** means the compilation of documents containing information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that, through the Effective Date, the Creditors' Committee shall have the right to amend any documents contained in, and exhibits to, the Plan Supplement.

1.61.   ***Postpetition Interest Claim*** means a Claim against the Debtor's Estate for interest accrued in respect of an outstanding obligation or liability that is the subject of an Allowed General Unsecured Claim during the period from the Petition Date up to and including the date of final payment in full of such Allowed General Unsecured Claim, calculated at the federal judgment rate of [___]%, the rate as in effect on the Petition Date, provided that interest shall continue to accrue only on the then outstanding and unpaid obligation or liability that is the subject of an Allowed General Unsecured Claim.

1.62.   ***Priority Tax Claim*** means any secured or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.63.   ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims within such Class.

1.64.   ***Proof of Claim*** means a proof of Claim filed against the Debtor in the Chapter 11 Case.

1.65.   ***Released Parties*** means collectively and in each case in their capacity as such: the Creditors' Committee and each of its official and *ex officio* members, the Plan Agent, the Creditor Recovery Trustee, but each solely in their capacities as such, and not individually; such entities' predecessors, successors and assigns, subsidiaries, and Affiliates, and its and their current and former officers, directors, principals, shareholders and their Affiliates, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants,

7

representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.66.  **Releasing Parties** means collectively and in each case in their capacity as such: (i) each holder of a Claim who votes to accept the Plan; (ii) each holder of a Claim who votes to reject the Plan but does not opt out of granting the releases set forth in the Plan; and with respect to each of the foregoing entities, such entities' predecessors, successors and assigns, subsidiaries, and Affiliates, and its and their current and former officers, directors, principals, shareholders, members, managers, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.67.  **Schedule of Assumed Contracts and Leases** means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtor, if any, to be filed with the Plan Supplement.

1.68.  **Schedules** means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended from time to time.

1.69.  **Secured Claim** means any Claim to the extent (i) secured by property of the Estate, the amount of which is equal to or less than the value of such property (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and the Creditors' Committee or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.70.  **U.S. Trustee** means the Office of the United States Trustee for Region 2, Southern District of New York.

1.71.  **Unexpired Lease** means a lease to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

1.72.  **Unimpaired** means, with respect to a Claim, or Class of Claims, not "impaired" within the meaning of section 1123(a)(4) and 1124 of the Bankruptcy Code.

1.73.  **Voting Deadline** means the deadline established by an Order of the Bankruptcy Court for voting to accept or reject the Plan.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained

therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (iv) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (v) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.    **Controlling Document.**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

## SECTION 2.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.

### 2.1.    *Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim and the Creditors' Committee or the Creditor Recovery Trustee agree to different treatment, the Creditor Recovery Trustee shall pay to each holder of an Allowed Administrative Expense Claim, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Administrative Expense Claim, Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is 30 calendar days after the Administrative Expense Claim Bar Date; *provided* that Fee Claims shall receive the treatment provided in Section 2.2 of the Plan; *provided further* that Allowed Administrative Expense Claims representing liabilities incurred prior to the Effective Date by the Debtor in the ordinary course of business and not in violation of any Bankruptcy Court order, the Bankruptcy Code or Bankruptcy Rules, shall be paid by the Creditor Recovery Trustee in the ordinary course of business, consistent with any Final Order of the Bankruptcy Court in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions, except that any Administrative Expense Claim representing a liability incurred in the ordinary course of business shall be barred and the holder thereof shall not be entitled to a distribution under the Plan if such ordinary course liability is not billed, or a request for payment is not made, on or before the Administrative Expense Claims Bar Date.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court (including the Bar Date Order), requests for payment of Administrative Expense Claims, other than requests for payment of Fee Claims, must be filed and served on the Creditor Recovery Trustee no later than the Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order and/or the notice of entry of the Confirmation Order.

Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Estate and its property, and such Administrative Expense Claims shall be deemed released as against the Estate as of the Effective Date. The Creditor Recovery Trustee must file and serve objections to Administrative Expense Claims on or before the Administrative Expense Claims Objection Bar Date.

2.2. ***Fee Claims.***

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is 30 days after the Effective Date and (ii) shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date upon which the Order relating to any such Allowed Fee Claim is entered, or as soon thereafter as is reasonably practicable, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Creditor Recovery Trustee. The Creditor Recovery Trustee is authorized to pay compensation for professional services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.  Any dispute over such compensation or reimbursement shall be determined by the Bankruptcy Court upon notice and motion.

2.3. ***Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment or a different treatment is expressly provided for under the Bankruptcy Code which the Creditor Recovery Trustee determines is in the best interest of the Creditor Recovery Trust, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such Allowed Priority Tax Claim, Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is 30 calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

SECTION 3.  **CLASSIFICATION OF CLAIMS.**

3.1. ***Classification in General.***

A Claim is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that, a Claim is placed in a particular Class for the purpose of receiving

distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2. *Summary of Classification.*

The following table designates the Classes of Claims against the Debtor and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (iii) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims set forth in Section 3 of the Plan. All of the potential Classes for the Debtor are set forth in the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | General Unsecured Claims | Impaired | Yes |

### 3.3. *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Creditors' Committee or the Creditor Recovery Trustee, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.4. *Elimination of Vacant Classes.*

Any Class of Claims that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 3.5. *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Creditors' Committee shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

SECTION 4.   **TREATMENT OF CLAIMS.**

    4.1.   ***Other Priority Claims (Class 1).***

        (a)   *Classification*: Class 1 consists of Allowed Other Priority Claims against the Debtor.

        (b)   *Treatment*: Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable as soon as reasonably practical on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

        (c)   *Voting*: Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

    4.2.   ***Secured Claims (Class 2).***

        (a)   *Classification*: Class 2 consists of Secured Claims.

        (b)   *Treatment*: Except to the extent that a holder of an Allowed Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Secured Claim shall receive, at the option of the Creditors Recovery Trustee, (i) payment in full in Cash in full and final satisfaction of such Claim, payable on the later of the Effective Date and the date on which such Secured Claim becomes an Allowed Secured Claim, or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code; *provided, however*, that Secured Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto. Nothing in this Plan shall preclude the Creditors' Committee or the Creditor Recovery Trustee, as applicable, from challenging the validity of any alleged Secured Claim, Lien or the value of the property that secures any alleged Lien allegedly securing an Allowed Secured Claim.

        (c)   Voting: Class 2 is Unimpaired, and the holders of Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Secured Claims are not entitled to vote to accept or reject the Plan.

    4.3.   ***General Unsecured Claims (Class 3).***

        (a)   *Classification*: Class 3 consists of General Unsecured Claims against the Debtor.

(b)     *Treatment*: On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Allowed General Unsecured Claim or has been paid before the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of (i) Available Cash and (ii) the Creditor Recovery Trust Interests, in an aggregate amount equal to (a) such holder's Allowed General Unsecured Claim, and (b) in the event that all Allowed Claims are paid in full, such holder's Postpetition Interest Claim, in each case as reduced by prior distributions of Available Cash on each such Allowed General Unsecured Claim.  In no event shall the holder of a General Unsecured Claim receive distributions on account of such Claim in excess of the Allowed amount of such General Unsecured Claim and Postpetition Interest Claim.

(c)     *Voting*: Class 3 is Impaired, and holders of Allowed General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

## SECTION 5.   **MEANS FOR IMPLEMENTATION.**

### 5.1.   *Vesting of Estate Property in Creditor Recovery Trust*

On the Effective Date, except as otherwise set forth herein, all Estate property (including Causes of Action), shall be deemed to have been transferred to the Creditor Recovery Trust automatically and without further action (but the Plan Agent may take any and all necessary and/or advisable action to effectuate such transfer), which transfer shall be, and shall be deemed to be, free and clear of any and all liens, claims, Claims, interests and encumbrances; provided that any Creditor Recovery Trust Asset that serves as collateral for an Allowed Secured Claim shall be transferred subject to such lien or encumbrance and any Creditor Recovery Trust Asset that serves as collateral for a Disputed Secured Claim shall be transferred subject to such lien or encumbrance pending the determination of the Allowance of such Claim by Final Order.  The transfer of Estate property shall be deemed to have occurred on the Effective Date, without any requirement to execute any documents or agreements, and whether or not such Estate property has been actually and physically transferred to the Plan Agent or Creditor Recovery Trust's possession.  Upon such transfer, the Debtor shall be divested of all right, title and interest in and to such Estate property, which property shall be treated as Creditor Recovery Trust Assets, and shall no longer be authorized to exercise control over any such property.

The Creditor Recovery Trustee may determine in its sole discretion not to accept delivery or ownership of certain assets of the Estate as Creditor Recovery Trust Assets, which assets shall be deemed not transferred to and shall otherwise not be transferred to the Creditor Recovery Trust and shall not become Creditor Recovery Trust Assets.  In the event the Creditor Recovery Trustee determines not to accept delivery of certain assets as Creditor Recovery Trust Assets, the Creditor Recovery Trustee shall use best efforts to provide written notice to the Plan Oversight Committee, the Plan Agent, the Debtor and any other Person or Entity known to the Creditor Recovery Trustee to have an interest in such assets.

13

5.2.    *Plan Agent.*

(a)    Appointment. The Creditors' Committee shall appoint the Plan Agent no later than five days before the Voting Deadline. The Plan Agent's retention shall commence on the Effective Date and shall continue until the earlier of: (i) entry of a Bankruptcy Court order closing the Chapter 11 Case; (ii) entry of a Bankruptcy Court order removing the Plan Agent for cause (as defined below); (iii) the Plan Agent's voluntary resignation upon notice to the Plan Oversight Committee and the filing of such notice with the Bankruptcy Court, and the Plan Oversight Committee appointment of a successor; or (iv) as otherwise ordered by Bankruptcy Court.

(b)    Authority. The Plan Agent shall have the authority and right on behalf the Debtor and the Estate, without the need for Bankruptcy Court approval (unless otherwise specified in the Plan or Plan Agent Agreement), to carry out and implement all provisions of the Plan in accordance with the Plan Agent Agreement other than those assigned to the Creditor Recovery Trustee, including, without limitation, to:

(i)    take all necessary or advisable actions to cause the Creditor Recovery Trust Assets and the Available Cash to be transferred to the Creditor Recovery Trust as of the Effective Date, including the execution and delivery of any necessary or appropriate document transferring title of any asset from the name of the Debtor to the Creditor Recovery Trustee, which transfer shall be, and shall be deemed to be, free and clear of any and all liens, claims, Claims, interests and encumbrances provided that any Creditor Recovery Trust Asset that serves as collateral for an Allowed Secured Claim shall be transferred subject to such lien or encumbrance and any Creditor Recovery Trust Asset that serves as collateral for a Disputed Secured Claim shall be transferred subject to such lien or encumbrance pending the determination of the Allowance of such Claim by Final Order.

(ii)    provide to the Creditor Recovery Trustee all documents and other information owned, controlled or available to the Debtor that may be necessary, appropriate or advisable to aid the Creditor Recovery Trustee in liquidating Estate assets or pursuing Causes of Action;

(iii)    assist the Creditor Recovery Trustee in obtaining possession and control of such books and records of the Debtor as may be necessary, appropriate or advisable to aid in the implementation of the Plan or the Creditor Recovery Trust;

(iv)    notify financial institutions and Persons which owe money or hold property belonging to the Debtor that the Plan Agent is vested with complete control over and rights to such accounts, debts owed to the Debtor, and money and property belonging to the Debtor and has the right and obligation to convey such accounts, debts, money and property to the Creditor Recovery Trustee, including without limitation to endorse the payment of notes or other obligations of any Person;

(v)    take and exercise control over any and all bank and other accounts in which the Debtor holds any interest, to the exclusion of the Debtor, including without limitation acting as sole signatory respecting such accounts;

14

(vi)    act as sole signatory for all checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Debtor;

(vii)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Agent;

(viii)    take any and all necessary and/or advisable actions, including if necessary, with the aid of the Bankruptcy Court, to transfer to the Creditor Recovery Trust Assets to the Creditor Recovery Trust; and

(ix)    cooperate with the Creditor Recovery Trustee and Plan Oversight Committee and perform other duties and functions that are consistent with the implementation of the Plan to the extent not a duty or function of the Creditor Recovery Trustee.

(c)    Compensation/Reimbursement of Expenses.  As more fully set forth in and subject to the Plan Agent Agreement, the Plan Agent shall be entitled to compensation and reimbursement for reasonable expenses incurred in the course of rendering services under the Plan, including without limitation reasonable fees and expenses of its retained professionals, which compensation and reimbursement shall be subject to review by the Plan Oversight Committee on the terms set forth in the Plan Agent Agreement.

5.3.    *Debtor's Obligations*

The Debtor shall cooperate with the Plan Agent to effectuate the automatic transfer of all Estate property to the Creditor Recovery Trust and shall execute any and all documents that may be necessary, appropriate or advisable, in the discretion of the Plan Agent, to cause such transfer to be effective and/or reflected on any applicable public record.  To the extent necessary or desirable, the Plan Agent shall have the authority, right and power to execute any document necessary, appropriate or advisable, in the name of the Debtor as the Debtor's attorney in fact, to effectuate such transfer.  No person dealing with the Plan Agent shall be obligated to inquire into the authority of the Plan Agent in connection with the transfer of Estate property to the Creditor Recovery Trust.  After the Confirmation Date and before the Effective Date, the Debtor shall turn over to the Creditors' Committee for further turnover to the Creditor Recovery Trust when it is established, all books and records deemed necessary, appropriate or advisable to aid in the implementation of the Plan and its provisions. Upon the Effective Date, and from time to time thereafter upon request of the Creditor Recovery Trustee, the Debtor shall turn over to the Creditor Recovery Trust all books and records deemed necessary, appropriate or advisable by the Creditor Recovery Trustee, the Plan Agent, and/or Plan Oversight Committee to effectuate the terms of the Plan and implement its provisions.

5.4.    *Plan Oversight Committee*

The Creditors' Committee shall appoint the Plan Oversight Committee, which shall initially be comprised of one or more members willing to serve, which may include one or more members of the Creditors' Committee, no later than five days before the Voting Deadline.  In the event that the Creditors' Committee for any reason does not make such appointment, the Plan

Oversight Committee may be appointed by any chapter 11 operating trustee appointed in the Chapter 11 Case or by the Bankruptcy Court, on motion of any creditor or the U.S. Trustee. The Plan Oversight Committee's existence shall commence on the Effective Date and shall continue until the earlier of it not having at least one member and the making of all payments that will be made to holders of Allowed Claims under this Plan. In the event of the death or resignation of any member of the Plan Oversight Committee, such Plan Oversight Committee's remaining member(s) shall be entitled to designate a successor member from among the holders of Allowed Claims. If a Plan Oversight Committee member assigns its Claim in full or releases the Debtor, the Estate or the Trust from payment of the balance of its Claim, such act shall constitute a resignation from the Plan Oversight Committee. Until a vacancy on the Plan Oversight Committee is filled, such Plan Oversight Committee shall function in its reduced number. In the event that there is no Plan Oversight Committee, the Plan shall continue to be implemented, subject to any oversight that the Bankruptcy Court may order on motion of any creditor or the U.S. Trustee, that may be necessary or appropriate.

Promptly following the establishment of the Plan Oversight Committee, the Plan Oversight Committee shall enact bylaws governing its operating procedures and related matters, as deemed appropriate in the Plan Oversight Committee's sole discretion. While decision making authority will reside with the Plan Agent and the Creditor Recovery Trustee as set forth in the Plan and Plan Supplement, each will meet and/or consult with the Plan Oversight Committee periodically and the Plan Oversight Committee will have standing to seek the removal of the Plan Agent and/or the Creditor Recovery Trustee and appoint its successor for "cause" as that term is defined in the Plan Agent Agreement or Creditor Recovery Trust Agreement, as applicable.

Members of the Plan Oversight Committee shall be entitled to reimbursement of reasonable and necessary expenses, exclusive of legal fees and disbursements of any professionals retained by such individual members, incurred in carrying out their duties as members of the Plan Oversight Committee, all of which shall be paid by the Creditor Recovery Trustee from Available Cash. The Plan Oversight Committee may retain professionals, and the Creditor Recovery Trustee shall pay such professionals reasonable compensation for services rendered and expenses incurred on behalf of the Plan Oversight Committee in accordance with the procedures set forth herein. Any professional(s) retained by the Plan Oversight Committee shall be paid by the Creditor Recovery Trustee within 10 days following the delivery of an invoice to the Creditor Recovery Trustee (with copy to the Plan Oversight Committee) reasonably describing the services rendered and expenses incurred on behalf of the Plan Oversight Committee, or as soon thereafter as is reasonably practicable, absent an objection by the Creditor Recovery Trustee to all or part of such invoice served upon such professional(s) (with copy to the Plan Oversight Committee) prior to the expiration of such 10-day period. In the event of an objection to any invoice presented by the professional(s) retained by the Plan Oversight Committee, such professional(s) may be paid any part of the invoice which was not objected to, and absent a consensual resolution of the objection, the professionals(s) may be paid any part of the invoice approved by the Bankruptcy Court after motion on notice to the Creditor Recovery Trustee and the Plan Oversight Committee, describing the dispute over payment of the invoice.

The Plan Oversight Committee shall review the fees and expenses of the Plan Agent, the Creditor Recovery Trustee, and each of their respective retained professionals on the terms set forth in the Plan Agent Agreement or the Creditor Recovery Trust Agreement, as

applicable. Following all payments being made to holders of Allowed Claims under this Plan, the Plan Oversight Committee shall be dissolved and the members thereof shall be released from any and all further authority, duties, responsibilities, and obligations related to their service as Plan Oversight Committee members.

### 5.5.   *Wind Down.*

The wind-down, sale and liquidation of such assets (as determined for federal income tax purposes) shall occur over a period of no more than three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to the Creditor Recovery Trust within the meaning of Treas. Reg. § 301.7701-4 and in accordance with Section 10 of the Plan); *provided* that, the wind-down and liquidation may extend over a longer period of time if the Creditor Recovery Trustee receives a private letter ruling or other equivalent guidance from the IRS from which the Creditor Recovery Trustee reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtor's tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

### 5.6.   *No Liability*

Except to the extent of any bond provided by the Creditor Recovery Trustee, if any, or as otherwise provided in this Plan, the Plan Agent Agreement or the Creditor Recovery Trust Agreement, no recourse shall ever be had, directly or indirectly, against the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns, by legal or equitable proceedings or by virtue of any statute or otherwise, or any deed of trust, mortgage, pledge, or note, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by the Creditor Recovery Trustee, the Plan Agent, or the Plan Oversight Committee under the Plan or by reason of the creation of any indebtedness by the Creditor Recovery Trustee, the Plan Agent, or the Plan Oversight Committee under the Plan for any purpose authorized by the Plan. All such liabilities, covenants, and agreements of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, and their respective representatives, agents, employees, professionals, successors, or assigns, whether in writing or otherwise, under the Plan shall be enforceable only against, and shall be satisfied only out of such bond, if any, in favor of the Creditor Recovery Trustee, and the Creditor Recovery Trust Assets or such part thereof as shall, under the terms of any such agreement, be liable therefor, or shall be evidence only of a right of payment out of the income and proceeds from the liquidation of the Creditor Recovery Trust Assets, as the case may be. Every undertaking, contract, covenant, or agreement entered into in writing by the Creditor Recovery Trustee, Plan Agent, or Plan Oversight Committee shall provide expressly against the personal liability of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, and the Plan Oversight Committee's members.  The foregoing limitations on liability shall not apply in the event of willful misconduct, gross negligence or fraud on the part of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns.  The Creditor Recovery Trustee, the Plan Agent and/or the Plan Oversight Committee and any other

Exculpated Parties shall be entitled to rely on the injunction and exculpation provisions set forth in this Plan.

Neither the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns shall be liable for any act or omission of one another, nor shall the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns be liable for any act or omission taken or not taken in such capacity other than for specific acts or omissions resulting from Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns willful misconduct, gross negligence, or fraud. The Creditor Recovery Trustee, the Plan Agent and the Plan Oversight Committee may, in connection with the performance of their respective functions, and in their sole and absolute discretion, consult with professionals, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons or entities, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, the Creditor Recovery Trustee, the Plan Agent and the Plan Oversight Committee shall not be under any obligation to consult with professionals, and the determination not to do so shall not result in the imposition of liability on the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, or any of their respective representatives, agents, employees, professionals, successors, or assigns, unless such determination is based on willful misconduct, gross negligence, or fraud.

No action shall be maintained against any of the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee or the Plan Oversight Committee's members, in connection with the performance of their respective functions under the Plan, the Creditor Recovery Trust Agreement and/or the Plan Agent Agreement, as applicable, absent leave of the Bankruptcy Court.

### 5.7.    *Indemnification*

The Estate, to the extent still in existence, and the Creditor Recovery Trust shall indemnify and hold harmless the Creditor Recovery Trustee, the Plan Agent, the Plan Oversight Committee, the Plan Oversight Committee's members, and their respective representatives, agents, employees, professionals, successors, or assigns from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses, which such Persons may incur or to which such Persons may become subject to in connection with any action, suit, proceeding, or investigation brought by or threatened against such Persons arising out of or due to their acts or omissions or consequences of such acts or omissions, with respect to the implementation or administration of the Plan, the Plan Agent Agreement or the Creditor Recovery Trust, or the discharge of their duties thereunder, to the extent such losses are not covered by a bond, if any, or other applicable insurance; *provided, however,* that no such indemnification shall be made to such Persons for actions or omissions as a result of their willful misconduct, gross negligence, or fraud.

### 5.8.    *Other Transactions*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Agent and the Creditor Recovery Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims, the Debtor, or any other Entity or Person. All matters provided for in the Plan involving the transfer of the assets of the Estate to the Creditor Recovery Trust, and any corporate or other Entity action that might be required by or of the Debtor or any Entity in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtor or the Estate; *provided, however*, that to the extent any action may be necessary, appropriate or advisable, without further authority, to transfer or document the transfer of Estate property to the Creditor Recovery Trust, the Plan Agent may execute any and all documents necessary, appropriate or advisable in the name of or as the authorized agent for the Debtor, including, without limitation for the transfer of ownership interests in Entities owned by the Debtor, in whole or in part, or the exercise of all control and other indicia of ownership which such ownership afforded the Debtor.

### 5.9.    *Withholding and Reporting Requirements.*

(a)    *Withholding Rights*. In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Creditor Trustee or such other Person designated by the Creditor Recovery Trustee (which entity shall subsequently deliver such forms to the Creditor Recovery Trustee) an appropriate Form W-9 or if the payee is a foreign Person, Form W-8 (or any such other form as may be required by the IRS or other Governmental Unit related to income, withholding and other taxes on account of a distribution under the Plan), unless such Person is exempt under the tax code and so notifies the Creditor Recovery Trustee or such other Person. If a request for a Form W-9, Form W-8 or other applicable form is made by the Creditor Recovery Trustee or such other Person designated by the Creditor Recovery Trustee and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the Estate or Trust and any Claim in respect of such distribution shall be discharged and forever barred from assertion against the Debtor, Estate or Trust and its respective property. Alternatively, the Creditor Recovery Trustee, in its sole discretion, may make distributions to a creditor that has failed to return (or return timely), a Form W-8 or Form W-9, or other applicable form. In such case, the distribution shall be net the maximum

amount of all applicable withholding taxes or such other amount as the Creditor Recovery Trustee deems necessary or appropriate.

### 5.10.    *Exemption from Certain Transfer Taxes.*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post-Confirmation sale or transfer of any Estate assets to or Creditor Recovery Trust Assets from the Creditor Recovery Trust, or any sale or transfer of, from or by any Entity in which the Debtor had as of the Effective Date an interest, pursuant to, in contemplation of, or in connection with the Plan or pursuant to the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 5.11.    *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Plan Agent is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such other similar actions as may be necessary or appropriate to effectuate and/or implement  the transfer of Estate assets to the Creditor Recovery Trustee and further evidence such transfer, on behalf the Debtor and without the need for any approvals, authorization, or consents.

### 5.12.    *Preservation of Rights of Action.*

Other than specific, identified Causes of Action against an Entity that are expressly and specifically waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order of the Bankruptcy Court, the Creditors' Committee and the Estate reserve any and all Causes of Action including, without limitation, any challenge concerning any property claimed by the Debtor to be exempt property pursuant to section 522 of the Bankruptcy Code. On and after the Effective Date, the Creditor Recovery Trustee may pursue such Causes of Action in its sole discretion, in the name of the Creditor Recovery Trustee on behalf of the Creditor Recovery Trust. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Creditor Recovery Trustee will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Prior to the Effective Date, the Creditors' Committee, the Estate, and on and after the Effective Date, the Creditor Recovery Trustee, shall retain and shall have, including through its authorized agents or representatives, the

exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding anything contained in the Plan to the contrary, the settlement of any Claims and Causes of Action which are expressly to be settled by Confirmation of the Plan itself shall be resolved only by Confirmation of the Plan itself.

5.13.    ***Closing of the Chapter 11 Case.***

After the Chapter 11 Case of the Debtor has been fully administered, the Creditor Recovery Trustee shall promptly seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

SECTION 6.    **DISTRIBUTIONS.**

6.1.    ***Distribution Record Date.***

As of the close of business on the Distribution Record Date, there shall be no further changes in the record of holders of any of the Claims. Neither the Creditor Recovery Trustee, nor any other Person or Entity, shall have any obligation to recognize any transfer of a Claim occurring on or after the Distribution Record Date.

6.2.    ***Date of Distributions.***

Except as otherwise provided in the Plan, the Creditor Recovery Trustee shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date or as soon as reasonably practical and, thereafter, the Creditor Recovery Trustee shall from time to time determine the subsequent Distribution Dates. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Creditor Recovery Trustee shall, from time to time, maintain a reserve in an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Creditor Recovery Trustee shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any Postpetition Interest Claim that is actually payable in accordance with the Plan.

### 6.3.    *Delivery of Distributions.*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Creditor Recovery Trustee has been able to determine through reasonable efforts the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided* that, such distributions shall be deemed unclaimed property at the expiration of six months from the date the applicable distribution is made if the Creditor Recovery Trustee is unable to determine the then current address for such holder. Distribution checks that remain uncashed on the date that is six months after the date of mailing also shall be deemed unclaimed property. All unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Creditor Recovery Trust automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any such holder to such distribution and all future distributions shall be released, settled, compromised, and forever barred.

### 6.4.    *Manner of Payment Under Plan.*

At the option of the Creditor Recovery Trustee, any Cash payment to be made under the Plan may be made by a check or wire transfer.

### 6.5.    *Minimum Cash Distributions.*

The Creditor Recovery Trustee shall not be required to make any payment to any holder of an Allowed Claim on any Distribution Date of Cash less than $100; *provided* that, if any distribution is not made pursuant to this Section 6.5 of the Plan, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim. The Creditor Recovery Trustee shall not be required to make any final distributions of Cash less than $50 to any holder of an Allowed Claim. If all Allowed Claims (other than those whose distributions are deemed undeliverable under the Plan) have been paid in full, any surplus Cash shall revert to the Debtor to the extent provided in Section 9.11(b) of the Plan. If the amount of any final distributions to holders of Allowed Claims would be $50 or less and the aggregate amount of Cash available for distributions to holders of Allowed General Unsecured Claims is less than $5,000, then the Creditor Recovery Trustee, in its sole discretion may opt to make no further distributions and, in such case, any surplus Cash shall revert to the Debtor to the extent provided in Section 9.11(b) of the Plan.

### 6.6.    *Setoffs.*

The Creditor Recovery Trustee may, but shall not be required to, set off against any Claim, any Claims of any nature whatsoever that the Debtor, the Estate or the Creditor Recovery Trustee may have against the holder of such Claim; *provided* that, neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate or the Creditor Recovery Trustee of any such Claim that such party may have against the holder of such Claim.

### 6.7.    *Distributions After Effective Date.*

22

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.8.    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 6.9.    *Payment of Disputed Claims.*

As Disputed Claims are resolved pursuant to Section 7 of the Plan, the Creditor Recovery Trustee shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Distribution Date that is at least 45 days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Creditor Recovery Trustee in Creditor Recovery Trustee's sole discretion.

## SECTION 7.    **PROCEDURES FOR DISPUTED CLAIMS.**

### 7.1.    *Allowance of Claims.*

After the Effective Date, the Creditor Recovery Trustee shall have and shall retain any and all rights and defenses that the Debtor or the Estate had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.

### 7.2.    *Objections to Claims.*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtor or the Estate may be interposed and prosecuted only by the Creditor Recovery Trustee. Such objections and requests for estimation shall be served and filed (i) on or before the 120th day following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or (ii) such later date as ordered by the Bankruptcy Court upon motion filed by the Creditor Recovery Trustee.

### 7.3.    *Estimation of Claims.*

The Creditor Recovery Trustee may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor, the Creditors' Committee or the Creditor

Recovery Trustee previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Creditor Recovery Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 7.4.    *No Distributions Pending Allowance.*

If an objection to a Claim is filed as set forth in Section 7 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7.5.    *Resolution of Claims.*

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Creditor Recovery Trustee shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, without the approval of the Bankruptcy Court, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan; *provided*, that the Creditor Trustee may seek such approval in its sole discretion or if requested by the Plan Oversight Committee. The Creditor Recovery Trustee or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with its business judgment.

### 7.6.    *Disallowed Claims.*

All Claims held by persons or entities against whom or which the Debtor, Creditors' Committee or the Creditor Recovery Trustee  has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtor, the Estate or the Creditor Recovery Trustee from such party have been paid.

SECTION 8.  **EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

8.1.  ***Assumption and Assignment of Executory Contracts and Unexpired Leases.***

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (i) is specifically designated on the Schedule of Assumed Contracts and Leases filed with the Plan Supplement; or (ii) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

8.2.  ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

Any Cure Obligation due under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described below, as an Administrative Expense Claim, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (i) the amount of the Cure Obligation, (ii) the ability of the Estate or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the Cure Obligations required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption; provided that, such party may settle any dispute regarding the amount of any Cure Obligation without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

At least 14 days before the Confirmation Hearing, the Creditors' Committee shall cause notice of proposed Cure Obligations to be sent to applicable counterparties to the Executory Contracts and Unexpired Leases. Any objection by such counterparty must be filed, served, and actually received by the Creditors' Committee not later than 10 days after service of notice of the Debtor's proposed assumption and associated Cure Obligation. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount will be deemed to have assented to such Cure Obligation.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Obligations, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date of assumption and/or assignment. Any prepetition default amount set forth in the Schedules and/or any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

25

8.3.    ***Claims Based on Rejection of Executory Contracts and Unexpired Leases.***

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be filed with Bankruptcy Court and served on the Creditor Recovery Trustee no later than 14 days after the effective date of rejection of such Executory Contract or Unexpired Lease. In addition, any objection to the rejection of an Executory Contract or Unexpired Lease must be filed with the Bankruptcy Court and served on the Creditors' Committee, no later than 14 days after notice of the proposed rejection of such Executory Contract or Unexpired Lease.

**Any holders of Claims arising from the rejection of an Executory Contract or Unexpired Lease for which Proofs of Claims were not timely filed as set forth in the paragraph above shall <u>not</u> (i) be treated as a creditor with respect to such Claim, (ii) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (iii) participate in any distribution in the Chapter 11 Case on account of such Claim, and any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtor, Creditor Recovery Trustee, the Estate, or the property of any of the foregoing, without the need for any objection by the Creditor Recovery Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the prepetition Executory Contracts or prepetition Unexpired Leases shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

8.4.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements.***

Each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

8.5.    ***Reservation of Rights.***

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission that any such contract or lease is

26

in fact an Executory Contract or Unexpired Lease or that the Estate has any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtor, Creditors' Committee or the Creditor Recovery Trustee, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

SECTION 9.   **CREDITOR RECOVERY TRUST.**

### 9.1.   *Execution of Creditor Recovery Trust Agreement.*

On the Effective Date, the Plan Agent and the Creditor Recovery Trustee shall execute the Creditor Recovery Trust Agreement and shall take all other necessary steps to establish the Creditor Recovery Trust and Creditor Recovery Trust Interests therein, which shall be for the benefit of Creditor Recovery Trust Beneficiaries. The Creditor Recovery Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties, and authorities do not affect the status of the Creditor Recovery Trust as a "liquidating trust" for United States federal income tax purposes.

### 9.2.   *Purpose of Creditor Recovery Trust.*

The Creditor Recovery Trust shall be established for the sole purpose of taking title to and liquidating and distributing the assets of the Estate contributed to such Creditor Recovery Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Creditor Recovery Trustee shall exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the Creditor Recovery Trust Assets in accordance with applicable law as necessary to maximize distributions to Creditor Recovery Trust Beneficiaries. The Creditor Recovery Trustee shall also prosecute all Causes of Action transferred to the Creditor Recovery Trust, elect not to pursue any such Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Creditor Recovery Trustee may determine is in the best interests of the Creditor Recovery Trust Beneficiaries.

### 9.3.   *Creditor Recovery Trust Assets.*

The Creditor Recovery Trust shall consist of Creditor Recovery Trust Assets. After the creation of the Creditor Recovery Trust pursuant to Section 9 of the Plan, all of the Creditor Recovery Trust Assets shall be deemed transferred to the Creditor Recovery Trust, and the Plan Agent shall take any necessary or advisable actions to transfer more effectively and/or cause to be transferred more effectively, all such assets to the Creditor Recovery Trust. No Estate or Creditor Recovery Trust Assets shall vest in the Debtor, except as may be expressly set forth in the Plan. To the extent expressly required by the Plan, and in all other cases in the sole discretion of the Creditor Recovery Trustee, any Creditor Recovery Trust Assets may be transferred to the Creditor Recovery Trust and out of the Creditor Recovery Trust, including through abandonment, subject to certain liabilities as declared by the Creditor Recovery Trustee. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.  The Debtor shall cooperate in all respects with the transfer of the Estate's assets to the Creditor Recovery Trust.

### 9.4. *Administration of Creditor Recovery Trust.*

The Creditor Recovery Trust shall be administered by the Creditor Recovery Trustee pursuant to the Creditor Recovery Trust Agreement and the Plan.

(a)     Appointment. The Creditors' Committee shall appoint the Creditor Recovery Trustee no later than five days before the Voting Deadline. The Creditor Recovery Trustee's retention shall commence on the Effective Date and shall continue until the earlier of: (i) the Creditor Recovery Trust is dissolved under applicable state law; (ii) the Bankruptcy Court enters an order removing the Creditor Recovery Trustee for cause; (iii) the Creditor Recovery Trustee voluntarily resigns, upon notice to the Plan Oversight Committee and filed with the Bankruptcy Court, and the Plan Oversight Committee appoints a successor; or (vi) as otherwise ordered by the Bankruptcy Court.

(b)     Authority.  The Creditor Recovery Trustee shall have the authority without the need for Bankruptcy Court approval (unless otherwise specified in the Plan or Creditor Recovery Trust Agreement), to carry out and implement all provisions of the Plan in accordance with the Creditor Recovery Trust Agreement other than those assigned to the Plan Agent, including, without limitation, to:

(i)     make distributions to holders of Allowed Claims in accordance with the Plan from Available Cash, net of expenses permitted under the Plan to be paid therefrom;

(ii)     exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of assets of the Estate transferred to the Creditor Recovery Trust, in accordance with applicable law as necessary or appropriate to maximize distributions to holders of Allowed Claims, including to the extent feasible or desirable by minimizing expenses to the Estate and the Creditor Recovery Trust;

(iii)     make payments in the ordinary course and without further Court order to professionals retained by the Creditors' Committee, which continue to perform in their current capacities on and after the Confirmation Date through the Effective Date;

(iv)     administer the Estate's tax obligations, including (a) filing tax returns and paying tax obligations, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of the Debtor or his Estate under section 505(b) of the Bankruptcy Code for all taxable periods of the Debtor ending after the Involuntary Petition Date through the liquidation of the Debtor as determined under applicable tax laws, and (c) representing the interest and account of the Debtor's Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(v)     prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtor that are required under the Plan, by any Governmental Unit or applicable law;

(vi)     pay statutory fees in accordance with Section 13.1 of the Plan;

(vii)    pay all Allowed Administrative Expenses as expenses of the Creditor Recovery Trust; pay all other expenses of the Creditor Recovery Trust; and subject to applicable state law, exercise such rights as the Debtor would have as the holder of interests in limited liability companies, corporations, or partnerships, including commencing bankruptcy cases for such entities or selling or otherwise disposing of such entities' assets;

(viii)    cooperate with the Plan Agent and Plan Oversight Committee and perform other duties and functions that are consistent with the implementation of the Plan to the extent not a duty or function of the Plan Agent; and

(ix)    to make demand, prosecute and settle all Causes of Action that are property of the Estate, including but not limited to Causes of Action under chapter 5 of the Bankruptcy Code.

(c)    Power of Attorney.  To the extent necessary or desirable, the Creditor Recovery Trustee shall have the authority, right and power to execute any document necessary, appropriate or advisable, in the name of the Debtor as the Debtor's attorney in fact, to carry out and implement the provisions of the Plan, liquidate Creditor Recovery Trust Assets, distribute the proceeds thereof and otherwise administer the Creditor Recovery Trust.

(d)    Preservation of Privilege and Defenses.  No action taken by the Debtor, the Creditors' Committee, the Plan Agent or the Creditor Recovery Trustee shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).  Notwithstanding the Debtor, the Creditors' Committee or the Plan Agent providing privileged information (if any) to the Creditor Recovery Trustee, the Creditor Recovery Trust, or any party or person associated with the Creditor Recovery Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action on behalf of the Estate and shall remain privileged.  The Creditor Recovery Trustee shall seek to preserve and protect all applicable privileges and work-product relating to the claims reconciliation process and the Creditor Recovery Trust Assets, including but not limited to any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral).  The Creditor Recovery Trustee's receipt of such information shall not waive any privileges and all such privileges are preserved.

9.5.    *Creditor Recovery Trustee's Tax Power.*

(a)    The Creditor Recovery Trustee of the Creditor Recovery Trust shall be designated as the representative of the Debtor and the Estate for all of the Creditor Recovery Trust Assets and shall have the same authority in respect of all taxes of the Debtor, and to the same extent, as if the Creditor Recovery Trustee were a trustee of the Debtor under section 1106 of the Bankruptcy Code. Accordingly, subject to the Creditor Recovery Trust Agreement, the Creditor Recovery Trustee shall prepare and file (or cause to be prepared and filed) on behalf of Debtor, all tax returns, reports, certificates, forms, or similar statements or documents (collectively, "Tax Returns") required to be filed by the Debtor or that the Creditor Recovery Trustee otherwise deems appropriate, including the

filing of amended Tax Returns or requests for refunds, for all taxable periods ending on, prior to, or after the Effective Date (to the extent otherwise permitted by applicable law).

(b)    The Debtor shall cooperate fully with the Creditor Recovery Trustee regarding the implementation of Section 9.5 of the Plan and shall make available to the Creditor Recovery Trustee all reasonably requested information, records, and documents relating to taxes governed by Section 9.5 of the Plan until the expiration of the applicable statute of limitations or extension thereof or at the conclusion of all audits, appeals, or litigation with respect to such taxes. Without limiting the generality of the foregoing, to the extent necessary or desirable, the Creditor Recovery Trustee shall have the authority, right and power to execute any document necessary, appropriate or advisable, in the name of the Debtor as the Debtor's attorney in fact, authorizing the Creditor Recovery Trustee to correspond, sign, collect, negotiate, settle, and administer tax payments and tax returns for the taxable periods described in Section 9.5(a) of the Plan.

(c)    The Creditor Recovery Trustee shall have the right to request an expedited determination of the tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date.

9.6.    *Cash Investments.*

The Creditor Recovery Trustee may invest Cash (including any earnings thereon or proceeds therefrom) transferred to the Creditor Recovery Trust; *provided* that, such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.77014(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

9.7.    *Distribution of Creditor Recovery Trust Interests.*

The Creditor Recovery Trustee is required to distribute to the holders of Creditor Recovery Trust Interests, as often as the Creditor Recovery Trustee in its reasonable discretion and judgment deems appropriate, after consultation with the Plan Oversight Committee, all Available Cash, less such amounts that may be reasonably necessary to (i) meet contingent liabilities and to maintain the value of the Creditor Recovery Trust Assets during liquidation, (ii) pay reasonably incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtor or Creditor Recovery Trust or in respect of the Creditor Recovery Trust Assets), (iii) pay the fees and expenses of the Plan Agent, or (iv) satisfy other liabilities incurred or anticipated by such Creditor Recovery Trust in accordance with the Plan or Creditor Recovery Trust Agreement; *provided* that, such Creditor Recovery Trustee shall not be required to make a distribution pursuant to Section 9.7 of the Plan if such Creditor Recovery Trustee determines that the expense associated with making the distribution would likely utilize a substantial portion of the amount to be distributed, thus making the distribution impracticable.

9.8.    *Federal Income Tax Treatment of Creditor Recovery Trust.*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not

contested by such Creditor Recovery Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtor, the Creditor Recovery Trustee and Creditor Recovery Trust Beneficiaries) shall treat the transfer of Creditor Recovery Trust Assets to the Creditor Recovery Trust as (i) a transfer of Creditor Recovery Trust Assets (subject to any obligations relating to those assets) directly to Creditor Recovery Trust Beneficiaries (other than to the extent Creditor Recovery Trust Assets are allocable to Disputed Claims), followed by (ii) the transfer by such beneficiaries to the Creditor Recovery Trust of Creditor Recovery Trust Assets in exchange for the related Creditor Recovery Trust Interests. Accordingly, except in the event of contrary definitive guidance, Creditor Recovery Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Creditor Recovery Trust Assets (other than such Creditor Recovery Trust Assets as are allocable to Disputed Claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. For the purpose of Section 9.8 of the Plan, the terms "party" and "Creditor Recovery Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

9.9.   *Tax Reporting.*

(a)   The Creditor Recovery Trustee shall file tax returns for the Creditor Recovery Trust treating such Creditor Recovery Trust as a grantor trust pursuant to Treas. Reg. § 1.6714(a) and in accordance with Section 9.9 of the Plan. The Creditor Recovery Trustee also shall annually send to each holder of a Creditor Recovery Trust Interest a separate statement regarding the receipts and expenditures of the Creditor Recovery Trust as relevant for U.S. federal income tax purposes.

(b)   Allocations of Creditor Recovery Trust taxable income among Creditor Recovery Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Creditor Recovery Trust) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Creditor Recovery Trust had distributed all its assets (valued at their tax book value, other than, if applicable, assets allocable to Disputed Claims) to the holders of Creditor Recovery Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Creditor Recovery Trust. Similarly, taxable loss of the Creditor Recovery Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Creditor Recovery Trust Assets. The tax book value of Creditor Recovery Trust Assets for purpose of this paragraph shall equal their fair market value on the date Creditor Recovery Trust Assets are transferred to the Creditor Recovery Trust, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code of 1986, as amended (the **"IRC"**), the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)   As soon as reasonably practicable after Creditor Recovery Trust Assets are transferred to the Creditor Recovery Trust, the Creditor Recovery Trustee shall make a good faith valuation of Creditor Recovery Trust Assets. Such valuation shall be

made available from time to time to all parties to the Creditor Recovery Trust (including, without limitation, the Debtor, Plan Agent and Creditor Recovery Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(d)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Creditor Recovery Trustee of a private letter ruling if such Creditor Recovery Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Creditor Recovery Trustee), such Creditor Recovery Trustee (i) may timely elect to treat any Creditor Recovery Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including such Creditor Recovery Trustee, the Debtor and Creditor Recovery Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e)    The Creditor Recovery Trustee shall be responsible for payment, out of the respective Creditor Recovery Trust Assets, of any taxes imposed on the respective Creditor Recovery Trust or its assets.

(f)    The Creditor Recovery Trustee may request an expedited determination of taxes of the Creditor Recovery Trust, including any reserve for Disputed Claims, or of the Debtor as to whom the Creditor Recovery Trust was established, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Creditor Recovery Trust or the Debtor for all taxable periods through the dissolution of such Creditor Recovery Trust.

9.10.    ***Costs and Expenses of Creditor Recovery Trust.***

As more fully set forth in and subject to the Creditor Recovery Trust Agreement and the review of the Plan Oversight Committee as set forth in Section 5.4 above, the costs and expenses of the Creditor Recovery Trust, including, without limitation, the reasonable fees and expenses of the Creditor Recovery Trustee and its retained professionals, and the fees and expenses incurred in connection with the prosecution and settlement of any Claims or Causes of Action, shall be paid out of the Creditor Recovery Trust Assets.

9.11.    ***Dissolution.***

(a)    The Creditor Recovery Trustee and Creditor Recovery Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Creditor Recovery Trust Assets have been distributed pursuant to the Plan and the Creditor Recovery Trust Agreement, (ii) the Creditor Recovery Trustee determines, in its sole discretion, that the administration of any remaining Creditor Recovery Trust Assets is not likely to yield sufficient additional Creditor Recovery Trust proceeds to justify further pursuit and elects not to administer such Creditor Recovery Trust Assets, or (iii) all distributions required to be made by the Creditor Recovery Trustee under the Plan and the Creditor Recovery Trust Agreement have been made;

*provided* that, in no event shall the Creditor Recovery Trust be dissolved later than three years from the creation of such Creditor Recovery Trust pursuant to Section 9 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the Creditor Recovery Trust's third anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Creditor Recovery Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Creditor Recovery Trust Assets.

(b)    If at any time the Creditor Recovery Trustee determines, in its sole discretion, that the administration of any remaining Creditor Recovery Trust Assets is not likely to yield sufficient additional Creditor Recovery Trust proceeds to justify further pursuit and elects not to administer such Creditor Recovery Trust Assets, or if all distributions required to be made by the Creditor Recovery Trustee under the Plan and the Creditor Recovery Trust Agreement, including without limitation distributions on account of Post-Petition Interest on General Unsecured Claims, have been made, then the Creditor Recovery Trustee may reserve any amount necessary to dissolve such Creditor Recovery Trust and thereafter dissolve such Creditor Recovery Trust.  Any Creditor Recovery Trust Assets not liquidated or otherwise administered by the Creditor Recovery Trustee, and any excess Creditor Recovery Trust Assets remaining after all distributions have been made, including without limitation distributions of Post-Petition Interest on Claims, shall revert to the Debtor.

## SECTION 10.  **CONDITIONS PRECEDENT TO EFFECTIVE DATE.**

### 10.1.    *Conditions Precedent to Effective Date.*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not be subject to any stay;

(b)    The Plan Agent Agreement shall have been signed and delivered:

(c)    The Creditor Recovery Trust shall have been formed and the Creditor Recovery Trust Agreement signed and delivered;

(d)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the documents contained in the Plan Supplement, and the transactions and other matters contemplated thereby, shall have been effected or executed; and

(e)    all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery and (ii) been effected or executed by all Entities

party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

### 10.2.    *Waiver of Conditions Precedent.*

Each of the conditions precedent in Section 10.1 of the Plan other than the condition set forth in Sections 10.1(b) and (c) of the Plan may be waived in writing by the Creditors' Committee.

### 10.3.    *Effect of Failure of Conditions to Effective Date.*

Unless otherwise extended by the Creditors' Committee, if the Effective Date does not occur on or before _____2019 or if the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Creditors' Committee and all holders of Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all obligations with respect to the Claims shall remain unchanged and nothing contained in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Creditors' Committee or any other entity or to prejudice in any manner the rights of the Debtor or any other entity in any further proceedings involving the Debtor or otherwise.

## SECTION 11. **EFFECT OF CONFIRMATION.**

### 11.1.    *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estate shall vest in the Creditor Recovery Trust free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided pursuant to the Plan and the Confirmation Order; no Estate assets shall vest in the Debtor, except for any assets that the Creditor Recovery Trustee elects not to accept as Creditor Recovery Trust Assets as set forth more fully in Section 5.1 of this Plan.

### 11.2.    *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be deemed conveyed to the Creditor Recovery Trust.

### 11.3.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of

equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Creditors' Committee reserves the right for the Creditor Recovery Trustee to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.4.   *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Effective Date, the provisions of the Plan shall bind the Debtor and any holder of a Claim against the Debtor, and such holder's respective successors and assigns, whether or not the Claim of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

### 11.5.   *Discharge of Claims.*

Except as otherwise provided in the Plan, effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of his assets, property or Estate; (ii) all Claims shall be satisfied, discharged and released in full, and the Debtor's liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iii) except as otherwise provided in the Plan or any judgment or order of the Bankruptcy Court, all Entities shall be precluded from asserting against the Debtor, the Estate, the Plan Agent or the Creditor Recovery Trustee, their successors and assigns and their assets and properties, any other Claims based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date. Notwithstanding any of the foregoing, in accordance with Bankruptcy Code section 1141: (i) the Debtor shall not be discharged and released from any Claims until the Court grants a discharge on completion of all payments under the Plan; and (b) the Debtor shall not be discharged from Claims that are nondischargable under Bankruptcy Code section 523.

The SEC's claim is non-dischargeable in the Chapter 11 Case or in the event that the Chapter 11 case is converted to one under chapter 7 of the Bankruptcy Code. Under section 523(a)(19) of the Bankruptcy Code, confirmation of the Plan will not discharge the Debtor from any debt arising from a judgment or settlement concerning a violation of the federal securities laws. Therefore, the SEC's claim is not subject to discharge, release or injunction and is excepted from the discharge, release or injunction provisions in the Plan pursuant to Sections 523(a)(19) and 1141(d)(2). To the extent the SEC claim is not paid in full pursuant to a confirmed Plan it will not be discharged, released or enjoined and will continue to be owed by the Debtor.

### 11.6.   *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date, if any, indicated in the order providing for such injunction or stay.

11.7.   ***Reservation of Causes of Action/Reservation of Rights.***

(a)   Except as provided in Sections 11.9 and 11.11 of the Plan, nothing contained in the Plan (including in Section 6.6 of the Plan or in the Confirmation Order) shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action of the Creditors' Committee, the Debtor or the Estate under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtor, the Estate or the Creditor Recovery Trust, (ii) any rights to seek substantive consolidation of the Debtor and/or the Estate with any other Person or Entity, and (iii) the turnover of any property of the Debtor's Estate.

(b)   Except as set forth in Sections 11.9 and 11.11 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any right, Claim or Cause of Action, which the Creditors' Committee, Debtor or the Debtor's Estate had immediately prior to the Effective Date. The Creditor Recovery Trust, to the extent established, shall retain, reserve, and be entitled to assert all rights, Claims and Causes of Action, and all of the legal and equitable rights of the Debtor or the Debtor's Estate respecting any Claim left Unimpaired by the Plan that may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

11.8.   ***Causes of Action/Avoidance Actions/Objections***

Other than any releases granted herein, in the Confirmation Order or in a Final Order of the Bankruptcy Court from and after the Effective Date, the Creditor Recovery Trustee shall have the right to prosecute any and all Causes of Action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor or the Debtor's Estate.

11.9.   ***Release by Debtor.***

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AS OF THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTOR, HIS ESTATE AND ANY PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE DEBTOR OR HIS ESTATE AND THEIR RESPECTIVE PROPERTY (AND EACH SUCH RELEASED PARTY SHALL BE DEEMED RELEASED BY THE DEBTOR AND HIS ESTATE AND THEIR RESPECTIVE PROPERTY) FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD**

POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, HIS ESTATE OR AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, OR THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTOR AND HIS AFFILIATES, ON THE ONE HAND, AND ANY RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED THAT, TO THE EXTENT THAT A CLAIM OR CAUSE OF ACTION IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM OR CAUSE OF ACTION SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY; PROVIDED FURTHER THAT, THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CLAIMS OR CAUSES OF ACTION OF THE DEBTOR OR THE CHAPTER 11 ESTATE AGAINST A RELEASED PARTY (OR OF A RELEASED PARTY AGAINST THE DEBTOR AND HIS ESTATE) ARISING UNDER ANY CONTRACTUAL OBLIGATION OWED TO THE DEBTOR THAT IS ENTERED INTO OR ASSUMED PURSUANT TO THE PLAN.

11.10.   *Releases by Holders of Claims.*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, CAUSES OF ACTION, RIGHTS OF SETOFF, OTHER RIGHTS, AND LIABILITIES WHATSOEVER, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, AVOIDANCE ACTIONS, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED DIRECTLY OR INDIRECTLY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, AND ANY AND ALL CAUSES OF

**ACTION ASSERTED OR THAT COULD POSSIBLY HAVE BEEN ASSERTED, BASED ON OR IN ANY WAY RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTOR, HIS ESTATE OR HIS AFFILIATES, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE RELEASING PARTIES, ON THE ONE HAND, AND ANY RELEASED PARTY, ON THE OTHER HAND, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE; PROVIDED THAT, TO THE EXTENT THAT A CLAIM OR CAUSE OF ACTION IS DETERMINED BY A FINAL ORDER TO HAVE RESULTED FROM FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A RELEASED PARTY, SUCH CLAIM OR CAUSE OF ACTION SHALL NOT BE SO RELEASED AGAINST SUCH RELEASED PARTY.**

### 11.11.  *Exculpation.*

The Exculpated Parties shall neither have, nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with the Chapter 11 Case, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring or liquidation of the Debtor; *provided* that, each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement. Without limiting the foregoing "Exculpation" provided under Section 11.11 of the Plan, the rights of any holder of a Claim to enforce rights arising under the Plan shall be preserved, including the right to compel payment of distributions in accordance with the Plan.

### 11.12.  *Injunction.*

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR CAUSES OF ACTION AGAINST THE DEBTOR AND HIS ESTATE ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ANY SUCH CLAIM AGAINST THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES, (II) THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST**

**THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES WITH RESPECT TO SUCH CLAIM, (III) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES WITH RESPECT TO SUCH CLAIM, (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO THE DEBTOR OR THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR THE CREDITOR RECOVERY TRUST AND/OR THE RELEASED PARTIES WITH RESPECT TO SUCH CLAIM, EXCEPT AS CONTEMPLATED OR ALLOWED BY THE PLAN, (V) ACTING OR PROCEEDING IN ANY MANNER IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN, (VI) COMMENCING, CONTINUING, OR ASSERTING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CLAIMS WHICH ARE EXTINGUISHED OR RELEASED PURSUANT TO THE PLAN, AND (VII) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.  SUCH INJUNCTION SHALL EXTEND TO ALL PERSONS PROTECTED BY THE DISCHARGE, RELEASE AND EXCULPATION PROVISIONS OF THE PLAN AND THE CONFIRMATION ORDER, AS WELL AS TO THE SUCCESSORS OF SUCH PERSONS AND TO THE RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY OF SUCH PERSONS.**

11.13. *Waiver of Statutory Limitation on Releases.*

**EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THIS PLAN (INCLUDING UNDER SECTION 11 OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN ITS OR THEIR FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, SUCH RELEASING PARTY HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY.  THE RELEASES CONTAINED IN <u>SECTION 11</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.**

11.14. *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date: (i) the Creditors' Committee shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Creditors' Committee and each member of the Creditors' Committee and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan (if any), and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan (in each case, if applicable).

11.15. *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than five days before the Voting Deadline. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

11.16. *Securities and Exchange Commission Carve Out*

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any person or entity in any forum.

SECTION 12. **RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(d) to consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e) to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f) to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h) to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(i) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j) to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan, the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing, or to maintain the integrity of the Plan and such documents following Consummation;

(k) to hear any disputes arising out of, and to enforce, any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation and similar Claim pursuant to section 105(a) of the Bankruptcy Code;

(l) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m) to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n) to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

> (o)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

> (p)    to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

> (q)    to enter a final decree closing the Chapter 11 Case;

> (r)    to enforce all orders previously entered by the Bankruptcy Court;

> (s)    to recover all assets of the Debtor and property of the Estate, and Creditor Recovery Trust Assets wherever located;

> (t)    to aid the Creditors' Committee, the Plan Agent, the Creditor Recovery Trustee and/or the Plan Oversight Committee, as the case may be, in obtaining turnover by the Debtor of all assets of the Estate and all books and records required to be turned over under the Plan; and

> (u)    to hear and determine any rights, Claims or Causes of Action held by or accruing to the Creditors' Committee, Debtor or the Estate or the Creditor Recovery Trustee pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 13. **MISCELLANEOUS PROVISIONS.**

### 13.1.    *Payment of Statutory Fees.*

On the Effective Date and thereafter as may be required, the Creditor Recovery Trust shall pay all fees incurred pursuant to § 1930 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case.

### 13.2.    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 13.3.    *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case; provided that, after the Effective Date, the Creditors' Committee shall exist and its professionals shall continue to be retained and shall continue to be entitled to reasonable compensation to be paid by the Creditor Recovery Trust without the need for further application to the Bankruptcy Court with respect to (i) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; (ii) pending appeals of the Confirmation Order; and (iii) the execution and delivery of the Plan Agent Agreement; *provided further* that, the

Bankruptcy Court shall retain jurisdiction with respect to any disputes over the reasonableness of fees.

13.4. ***Post-Confirmation Compensation of the Debtor and Debtor's Professionals.***

On and after the Confirmation Date, except for reasonable fees and expenses incurred in connection with the Debtor's performance of his obligations set forth in Section 5.4 of this Plan to cooperate with the Plan Agent to effectuate the automatic transfer of all Estate property to the Creditor Recovery Trust, neither the Debtor nor the Debtor's professionals shall be entitled to any compensation from the Estate and/or the Creditor Recovery Trust, including without limitation reimbursement for professional fees and expenses.

13.5. ***Amendments.***

(a) *Plan Modifications*. The Creditors' Committee or the Plan Oversight Committee, as the case may be, may amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Creditors' Committee or the Plan Oversight Committee, as the case may be, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Confirmation Order and/or the Plan Supplment, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b) *Other Amendments*. Before the Effective Date, the Creditors' Committee may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

13.6. ***Revocation or Withdrawal of Plan.***

The Creditors' Committee reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Creditors' Committee revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims; (b) prejudice in any manner the rights of the Debtor, the Creditors' Committee, the Estate, or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Creditors' Committee, Debtor, the Estate, or any other Person or Entity.

13.7. ***Severability of Plan Provisions upon Confirmation.***

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the

request of the Creditors' Committee, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Creditors' Committee or the Plan Agent (as the case may be); and (iii) nonseverable and mutually dependent.

### 13.8.  *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 13.9.  *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 13.10.  *Additional Documents.*

On or before the Effective Date, the Creditors' Committee, Plan Agent and Creditor Recovery Trustee, may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Creditors' Committee, Plan Agent and Creditor Recovery Trustee and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 13.11.  *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the Creditors' Committee, the holders of Claims, the Released Parties, the Exculpated

Parties, and each of their respective successors and permitted assigns, including, without limitation, the Plan Agent and the Creditor Recovery Trustee.

### 13.12. *Successor and Assigns.*

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, Agent, successor or permitted assign, if any, of each Person or Entity.

### 13.13. *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

### 13.14. *Notices.*

All notices, requests and demands to or upon the Creditors' Committee to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when sent, addressed as follows:

(i)  if to the Debtor:

> Robert F.X. Sillerman
> 352 Plain Road
> Hinsdale, NH  03451
> Email:  one@rfxs1.com
>
> - and –
>
> Rosen & Associates, P.C.
> 747 Third Avenue
> New York, NY  10017-2803
> Attn:  Sanford Rosen, Esq.
> Email:  srosen@rosenpc.com

(ii)  if to the Creditors' Committee:

CULLEN AND DYKMAN LLP
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
Telephone: (516) 357-3700
Attn:   Thomas R. Slome, Esq.
          Jil Mazer-Marino, Esq.
          Elizabeth Aboulafia, Esq.
tslome@cullenanddykman.com
jmazermarino@cullenanddykman.com
eaboulafia@cullenanddykman.com

(iii)  if to the Plan Agent:

[To be supplied]

(iv) if to the Creditor Recovery Trustee:

[To be supplied]

(v)  if to the Plan Oversight Committee:

[To be supplied]

Any of the foregoing parties may change their respective notice information by providing notice to the other parties in the manner set forth above.

Dated:  October 7, 2019

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

ID Wheel (FL) LLC, solely in its capacity as
Member of the Committee and not in
any individual capacity

By:      */s/ Chris Hayes*
            Name: Chris Hayes
            Title: Executive Director

VistaJet US, Inc., solely in its capacity as
Member of the Committee and not in
any individual capacity

By:      */s/ Lauren Amato*
            Name: Lauren Amato
            Title: Billing Coordinator

**CULLEN AND DYKMAN LLP**

By:    _/s/ Thomas R. Slome_
       Thomas R. Slome
       Jil Mazer-Marino
       Elizabeth Aboulafia
100 Quentin Roosevelt Boulevard
Garden City, New York 11530-4850
(516) 357-3700

_Counsel to the Official Committee of Unsecured Creditors_

1772461

# **EXHIBIT B TO DISCLOSURE STATEMENT**

Liquidation Analysis

**EXHIBIT B TO DISCLOSURE STATEMENT**

**LIQUIDATION ANALYSIS**

| Notes | | Low | High |
|---|---|---|---|
| | **ASSETS** | | |
| 1 | Cash | $ - | $ 314,942 |
| 2 | NYC Townhouse (50% interest) | $ 5,228,563 | $ 6,151,250 |
| 3 | New Hampshire Residence | $ - | $ 76,600 |
| 4 | Notes Receivable | $ 855,750 | $ 3,423,000 |
| 5 | Income Tax Refunds Receivable | $ 370,000 | $ 740,000 |
| 6 | Non-Exempt Personal Property | $ 25,000 | $ 75,000 |
| 7 | Golf Memberships | $ - | $ 400,000 |
| 8 | Aircraft Acquisition Corp. | $ - | $ - |
| 9 | Elderberry X, LLC | $ 1,269,625 | $ 1,302,500 |
| 10 | FXM Investment Corp. | $ 288,000 | $ 480,000 |
| 11 | MJX, LLC | $ - | $ 12,000,000 |
| 12 | MJX Ventures, LLC | $ - | $ - |
| 13 | Sillerman Comm'l Holdings Ptshp., LP | $ - | $ - |
| 14 | Sillerman Sports Holdings, LLC | $ 8,000,000 | $ - |
| 15 | All Other S-Corps, Partnerships and LLCs | $ - | $ 250,000 |
| 16 | Recoveries on Avoidance Actions | TBD | TBD |
| 16 | **Gross Liquidation Proceeds before Enforcement and Liquidation Costs** | $ 16,036,938 | $ 24,906,350 |

| | | High | Low |
|---|---|---|---|
| | **CLAIMS** | | |
| 17 | **Secured Claims** | | |
| | Deutsche Bank, N.A. - NYC Townhouse (50%) | $ 5,228,563 | $ 6,151,250 |
| | Iliad Research and Trading, LLC | $ - | $ 7,200,000 |
| | **Amount available for Administrative, Priority and General Unsecured Claims** | $ 10,808,375 | $ 11,555,100 |
| | **Administrative Claims** | | |
| 18 | Estate Expenses Incurred Through Confirmation | $ 200,000 | $ 250,000 |
| 19 | Professional Fees | $ 1,250,000 | $ 1,750,000 |
| 20 | U.S. Trustee Fees | $ 1,950 | $ 4,875 |
| | **Priority Claims** | | |
| 21 | Priority Tax Claims | $ 5,390,633 | $ - |
| 22 | Other Priority Claims | $ - | $ - |
| | **Available for General unsecured Claims before Enforcement and Liquidation Costs** | $ 3,965,792 | $ 9,550,225 |
| 23 | **Estimated Creditor Claim Pool Range** | $95,200,000 | $42,000,000 |
| | **Estimated Recovery on General Unsecured Claims before Enforcement and Liquidation Costs** | 4% | 23% |

**Notes to Plan Liquidation Analysis**

**General Notes:**

The Plan assumes an orderly liquidation of all Estate assets which will take an unknown period of time and may require a significant amount of expense for legal enforcement actions and costs of liquidation.

This Liquidation Analysis contains estimates of asset values and liabilities based on incomplete information obtained from the Debtor during the pendency of the Chapter 11 Case. In addition, a significant portion of the Debtor's assets are owned through one or more levels of entities, some of which may not be wholly owned by the Debtor. As a result of the above factors and other possibly unknown factors, the actual amounts recovered may differ materially from the estimates.

The estimated values for the assets and claims are expressed in ranges from "Low" to "High". For the purposes of reflecting a possible range of recoveries to holders of General Unsecured Claims (i) for the low range of recoveries to General Unsecured Claim holders, the high range of claims senior to the General Unsecured Claims (Secured, Administrative and Priority) are deducted from the low range of asset values and (ii) for the low range of recoveries to General Unsecured Claim holders, the low range of claims senior to the General Unsecured Claims are deducted from the high range of asset values.

| General Unsecured Creditor Recovery Level | Asset Values | Senior Claim Values |
|---|---|---|
| **Low** | Low | High |
| **High** | High | Low |

1. **Cash:**  High range assumes cash as reported on the Debtor's July Monthly Operating Report.  Low range assumes all available cash is consumed by Debtor and Estate expenses and/or professional fees prior to confirmation.

2. **New York City Townhouse:**  The townhouse is owned by the Debtor and his wife as tenants by the entirety. Upon information and belief, after consulting with the real estate broker retained by the Estate, the Debtor is prepared to list the townhouse for sale at $12.95 million.  Liens on the townhouse, listed in order of priority, include a first mortgage held by Deutsche Bank, N.A. ("Deutsche Bank") in the approximate principal amount of $6.0 million, a second mortgage also held by Deutsche Bank in the approximate principal amount of $5.9 million, a judgment lien held by ESFX Holdings, LLC ("ESFX") in the approximate principal amount of $17.2 million and a judgment lien held by Deutsche Bank in the approximate principal amount of $17.4 million.  Gross values before secured debt reflect the list price, net of the 5% broker commission as the high end and a 15% discount to the listing price, net of the 5% broker fee as the low end.  After accounting for the secured claims against the townhouse, no excess value is expected to be available to the Estate.

3.    **New Hampshire Residence:**   The Debtor is the sole owner of this single-family house that he valued at $1,057,500 and is subject to a mortgage in the amount of $360,635 in favor of FXM Investment Corporation, an affiliate of the Debtor.  A search of the property on various real estate websites indicates a range of estimated fair market value of approximately $210,000 to $442,000 and the current assessed value is $365,400.    The low end of the value assumes the full value is equal to or less than the amount of the mortgage and there will be no equity value to the Estate.  The high range assumes the property value is $442,00, leaving $76,600 in equity value to the Estate after satisfaction of the $365,400 mortgage.

4.    **Notes Receivable:**   The Debtor is the payee on certain notes valued on the Debtor's schedules at approximately $6.8 million, including notes due from Sillerman related entities totaling approximately $4.5 million.  Based upon diligence performed by RSR, a substantial portion of the notes are believed to have been previously paid down, paid off in full or written-off in full as uncollectible.  The write off of the $4.5 million in notes from Sillerman related entities, include a note receivable from Elderberry X, LLC in the approximate amount of $2,173,000 that the Committee believes the Debtor improperly recharacterized as equity after the Order for Relief Date and which may be reinstated.  To the extent reinstated, the Committee believes the excess value after the first and second mortgages on the Southampton, New York property owned by Elderberry X, LLC may be sufficient to repay the note in full.  The collectability of the remaining notes is unknown.  The high end of the value range assumes the remaining balance of notes are collectible in full, (which is questionable) and that the note from Elderberry X, LLC is reinstated and collected in full.  The low range assumes the Elderberry X LLC note is not reinstated and only 25% of the remaining note value is collectible.

5.    **Income Tax Refund Receivable:**   The Debtor and his wife are reportedly owed a tax refund of $740,000 from the New York State Department of Taxation and Finance related to their 2016 New York State joint tax return.  Upon information and belief, the refund will not be released until the Debtor and his wife have filed tax returns for the years 2017 and 2018.  The Debtor claims, and the Committee disputes, that the Debtor's wife is entitled to 50% of such refund.  The Committee believes that the Debtor may be entitled to up to 100% of the 2016 New York State tax refund.  The range of values in the liquidation analysis reflects a low of 50% of the refund to a high of 100% of the refund.

6.    **Non-Exempt Personal Property:**  Non-exempt personal property scheduled by the Debtor includes household furnishings, computer equipment and electronics, golf and exercise equipment, jewelry and watches.  While specific information on the personal property is not available, an estimated range of $25,000 to $75,000 is ascribed to these assets.

7.    **Golf Memberships:**   The Debtor's schedules list four private golf club memberships totaling $2,366,875.  Upon information and belief, three of the four have been redeemed by the Debtor, with the proceeds used to fund Estate expenses.  The one remaining membership was valued at $400,000 on the Debtor's schedules.  It is unknown if this remaining membership is redeemable or saleable for cash.  Accordingly, the range reflects a low of $0 to a high of $400,000.

8. **Aircraft Acquisition Corp.:** The Debtor's schedules list Aircraft Acquisition Corp as owning two helicopters worth approximately $4,000,000, with secured loans of approximately $2,900,000. Upon information and belief, the newer helicopter, a 2011 Augusta SPA model AW 109SP, was foreclosed upon by the secured lender (Element Financial). The other helicopter is a 1981 Aerospatiale AS355 which is being sold for parts. Net proceeds to the Estate after paying past due hangar rental and repair costs are expected to be minimal and, to the extent received, used to pay ongoing expenses of the Estate. Thus, the value of the Estate's interest in this entity is assumed to be zero.

9. **Elderberry X, LLC:** The Debtor and his wife each hold a 50 % interest in this limited liability company that directly and indirectly owns several parcels of improved and unimproved real property in Southampton, New York. After consultation with the real estate broker retained by the Estate, the Debtor listed the property for sale at $15.9 million. First and second mortgages held by Deutsche Bank and Bart Gullong total approximately $10.3 million. The Debtor's schedules reflect a note receivable from Elderberry X, LLC. The current approximate amount of the note is estimated at $2.2 million ($1,900,00 plus accrued interest). The Committee believes the Debtor improperly recharacterized this note as equity after the Order for Relief Date and the note may be reinstated. *See* Notes Receivable Note 4 above. The low value for the Debtor's interest in Elderberry X, LLC assumes the property sells at a 15% discount to the list price, less a 5% broker commission and the high value assumes the property sells at list price, less a 5% broker commission. The high value also assumes the note is not reinstated, and any excess value above the mortgages is shared 50/50 between the Estate and the Debtor's wife. Because the value of the note is reflected in the value of the Debtor's Notes Receivable (*See* Notes Receivable, Note 4 above), to avoid double counting, the value of the note is excluded here and we assume that any value remaining after the note is paid will be equally by the Estate and the Debtor's wife.

10. **FXM Investment Corp.:** The Debtor owns 60% of FXM Investment Corp. Upon information and belief, the Debtor's wife owns the remaining 40%. FXM Investment Corp. holds mortgages totaling $796,730 on the Hinsdale, NH properties owned by the Debtor, Sillerman Commercial Holding Partnership, LP and MJX Ventures, LLC. The value of the mortgages appear to be supported by estimates of the fair market value of the real estate, thus the high end of the value range reflects the Debtor's 60% interest in the face amount of the mortgages. The mortgages are all long term with no amortization and below market "token" interest rates, thus the mortgages are likely not saleable absent a significant discount. The low end of the value range assumes the Debtor's 60% interest in the value of the notes sold at a 40% discount to the face amounts.

11. **MJX, LLC:** MJX, LLC owns a note receivable in the approximate amount of $680,000. The obligor on the note purportedly filed for bankruptcy. MJX, LLC also holds interests in DBFX, LLC, MJX Capital Advisors, LLC and MJX Tour, LLC, which the Debtor believes have no significant value and investments in six private equity funds, valued as follows on the Debtor's June 2019 Monthly Operating Report:

3

| Private Equity Fund | June 2019 MOR Value |
|---|---|
| Huff Alternative Fund | $        2,964,280 |
| Huff Energy Fund | $        9,802,427 |
| WI Harper Inc Fund VII | $        3,695,397 |
| Formation 8 Partners | $        2,647,410 |
| TPATL (Colin Prepscious Investment) | $          250.000 |
| POACHIT | $          250.000 |
| **Total:** | **$      19,609,514** |

A seventh private equity fund (White Oak Discovery Holdings) listed on the Debtor's schedules at approximately $1.0 million had purportedly been written off by the Debtor as having no value. MJX, LLC is an obligor on ESFX Holdings, LLC's judgment claim of approximately $20 million ($17.4 million proof of claim amount plus estimated accrued interest), which is secured by a pledge of the Huff Alternative Parallel Fund and the Huff Energy Fund and other assets indirectly owned by the Debtor and described below. See Sillerman Sports Holdings, LLC, Note 14 below.

The low value of zero assumes ESFX is repaid in full out of the MJX, LLC assets, leaving no value for Iliad Research and Trading, LLC's ("Iliad") or the Estate. The high range assumes ESFX is partially repaid from the liquidation of Sillerman Sports Holding, LLC's assets first (at the approximate $12 million high value for those assets) and the balance of amounts owed to ESFX then out of the MJX, LLC's assets, leaving an estimated $12 million to repay approximately $7.2 million to Iliad and an estimated $4.8 million available to the Estate for its interests in MJX, LLC.

12. **MJX Ventures, LLC:** MJX Ventures, LLC indirectly owns an undetermined interest in fee-owned land and a ground lease in Anguilla. The Debtor, in his Schedules, valued the Anguilla property at $37.5 million, but recently represented to the Committee that the value of the Debtor's interest is only approximately $2 million. OPW, LLC, an entity believed to be wholly owned by purported Creditor Brett Torino, claims to hold pledges of the interests in the companies that directly or indirectly own or lease the Anguilla Property as security for claims it holds against the Debtor (alleged to approximate $4.5 million as of the Petition Date) and the Debtor's wife (alleged to approximate $5 million as of the Petition Date). The Debtor's obligation to OPW, LLC is reportedly in default. As MJX Ventures, LLC is not a Debtor subject to the automatic stay, OPW, LLC may foreclose on its pledges at any time. Given the uncertainty over value, ownership interests and OPW, LLC's security interests, no value is attributed to the Anguilla property.

MJX Ventures, LLC also owns a single family home in Hinsdale, NH valued by the Debtor at $423,000, which is subject to a $140,828 first mortgage held by FXM Investment Corp. (an affiliate of the Debtor). MJX Ventures, LLC may also own vacant land located at 352 Plain Road, Parcel 79, Hinsdale NH 03451, valued by the Debtor at $305,500, which is subject to a $103,302 first mortgage held by FXM Investment Corp. Certain property

records indicate that Parcel 79 may be owned by Sillerman Commercial Holdings Partnership, LP, an entity controlled by the Debtor and further described below. Based upon a review of several online real estate sites, the Committee believes the fair market value of the properties is approximately the same as the mortgage amounts. As such, no value is ascribed to the Hinsdale, NH property.

13. **Sillerman Commercial Holdings Partnership., LP:** The Debtor holds an approximate sixty two percent interest in this entity. Upon information and belief, the remaining interests are held by Laura Sillerman, as "Investment Trustee" and "Benefits Trustee" and Alaska Trust Company as "Administrative Trustee" of The 2000 Robert and Laura Sillerman Descendants' Trust dated February 18, 2000. This limited partnership's assets consist of two parcels of vacant land in Hinsdale, NH contiguous to the single family residences owned by the Debtor and by MJX Ventures, LLC. One parcel, identified as 351 Plain Road, Parcel 51, Hinsdale, NH 03451 is valued by the Debtor at $177,500 and is subject to a $39,148 first mortgage held by FXM Investment Corp. The other parcel, identified as 352 Plain Road, Parcel 77, Hinsdale, NH 03451, is valued by the Debtor at $446,500, and is subject to a $153,187 first mortgage held by FXM Investment Corp. Based on a review of several online real estate sites, the Committee believes the fair market value of the properties is approximately the same as the mortgage amounts. As such, no value is ascribed to the vacant land.

14. **Sillerman Sports Holdings, LLC:** The Debtor holds a one hundred percent interest in this entity that indirectly owns an approximate .4% interest in Yankees Global Enterprises, LLC, which owns interests in the New York Yankees MLB baseball team and several related entities. The Debtor values his equity interest in Sillerman Sports Holdings, LLC at $8,955,960 in the aggregate. ESFX holds a judgment lien against Sillerman Sports Holdings, LLC, which secures its approximately $18 million claim against the Debtor and Sillerman Sports Holdings, LLC. As set forth above, the ESFX claim is also secured by a judgment lien against the Debtor's New York City town house and a pledge of MJX LLC's interest in two private equity funds.

Given that ESFX holds a lien on both the assets of Sillerman Sports Holdings, LLC and MJX, LLC, the recovery values from each entity will be impacted significantly by the order of the liquidation of the assets. The high value scenario for MJX, LLC assumes the ESFX judgment is first repaid from proceeds of its collateral at Sillerman Sports Holdings, LLC. To the contrary, the low value scenario for MJX, LLC assumes that the Huff PE funds are first liquidated and substantially or fully repay the ESFX judgment and, the high value scenario for Sillerman Sports Holdings, LLC reflects the interest in Yankees Global Enterprises, LLC as free and clear of ESFX's lien and available to pay final payments on other claims and expenses. Due to limited available information, it is difficult to value the Yankees Global Enterprises, LLC interest. Based upon anecdotal information, the Committee believes the value could be in the $8-$12 million range. Given the uncertainty regarding the value, the low-end of the range is assumed for the purposes of the liquidation analysis.

15. **All Other S-Corps, Partnerships and LLCs:** Based on the Debtor's schedules and other information, the Debtor is believed to hold interests in approximately 50 additional entities.

While the Debtor ascribes little or no value to his interests in these entities, no significant diligence has been performed on these entities to date. It is possible that some assets do exist in some of these entities. For the purposes of the liquidation analysis, an estimated aggregate value range of $0 to $250,000 is ascribed to the Debtor's interests in these additional entities, which does not have a material impact on the overall recovery estimates.

16. **Gross Liquidation Proceeds Before Collection Costs:** Given that a significant portion of the Estate's value is held by the Debtor through one or more levels of intermediate entities, the liquidation of the ultimate assets held by these entities may require significant time, effort and cost to put the Creditor Trustee in a position to control and sell these assets. Also, given the unclear or unknown balance ownership stake of the Debtor in certain entities, the lack of complete documentation, the possible existence of other possibly structurally senior creditors and/or other parties with interests in the assets or entities, it is impossible to estimate how much time and expense would be required to liquidate all of the Debtor's assets. As a result, the projected liquidation values and recovery estimates do not include any deduction for such costs. The net values recoveries will necessarily be reduced by the amount of such costs.

17. **Secured Claims:** Deutsche Bank's proof of claim with respect to its first and second mortgages on the NYC Townhouse totals $11,992,351. In addition, Deutsche Bank has agreed to fund certain protective advances to cover certain property carrying costs during a six month marketing period. The Debtor has not made any mortgage payments to Deutche Bank since [March 2018]. Accordingly, including protective advances and post-petition interest and expenses, Deutsche Bank's mortgages are assumed to exceed the full amount of the net proceeds of both the high and low value scenarios.

Iliad asserts a secured claim in its proof of claim in the approximate amount of $7.2 million secured by the Debtor's membership interests in MJX, LLC. The collectability of Iliad's secured claim from the Debtor's interest in MJX, LLC could be impacted significantly by ESFX's collection efforts. If ESFX enforces its liens on the private equity funds owned by MJX, LLC, then, MJX LLC may be left with no assets of significant value and the Debtor's interests in MJX, LLC (i.e. Iliad's collateral) may be worthless. *See* MJX, LLC, <Note 11 above.)

18. **Estate Expenses Incurred Through Confirmation:** Assumes continued Debtor/Estate spend for two months (August & September 2019) at the July 2019 actual spending rate.

19. **Professional Fees:** Amount as reflected on the Debtor's July 2019 Monthly Operating Report plus assumed amounts for August and September at a pro-rated amount based upon accrued professional fees to date.

20. **U.S. Trustee Fees:** This amount is based on the U.S. Trustee fee schedule and assumes disbursements in August and September 2019 at July 2019 levels.

21. **Priority Tax Claims:** Priority Tax Claims consist of the New York State Department of Taxation and Finance's claim, which filed a proof of claim asserting that $5,390,633 is due for unpaid 2014 income taxes, including interest. The Debtor has claimed that the claim was

resolved through an audit and no amount is due, however no documentation has been provided and the proof of claim filed by the New York State Department of Taxation and Finance has not been withdrawn.

22. **Other Priority Claims:**  There are no known other priority claims at this time.

23. **Estimated Creditor Claim Pool Range:**  Claims have been identified from the Court's claim register and Debtor's schedules.  If there is both a filed and a scheduled claim, the filed claim is reflected.  No analysis of the validity or allowance of claims by the Court has been performed.  No assessment has been made with respect to the amount of unliquidated claims, which can have a material impact on the size of the unsecured claim pool and this analysis.    Claims repaid from collateral or non-Debtor entities assume the collateral is liquidated and proceeds are sufficient to repay claims in full, except for the $7.2 million owed to Iliad which is not repaid from collateral proceeds in the "low case" and is added to the unsecured claim pool as a deficiency claim for the full amount owed.  Contingent and disputed claims reflect such designations as set forth in the Debtor's schedules and/or filed claims and/or otherwise indicated by the Debtor.  Contingent claims assumed to be payable (low recovery case) is based on the assumption the primary obligors on certain obligations, generally entities affiliated with the Debtor, such as. LBSX, LLC, Function(x), will not perform and the Estate will be liable for the full amount of the claim.  The high recovery case assumes all such contingent claims will be paid by the primary obligor.  Disputed claims reflect VisatJet claim (dispute indicated by the Debtor).  The low recovery case reflects the full filed claim amount.  The high recovery case reflects a zero allowed claim.

1807769