UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:

Robert Francis Xavier Sillerman                    Chapter 11
aka Robert F.X. Sillerman,
aka Robert F. Sillerman,                           Case No. 17-13633 (MKV)
aka Robert X. Sillerman,

                              Debtor.
----------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER GRANTING
## MOTION TO APPOINT A CHAPTER 11 TRUSTEE

APPEARANCES:

CULLEN and DYKMAN LLP
*Counsel for the Official Committee of*
*Unsecured Creditors*
100 Quentin Roosevelt Blvd.
Garden City, New York 11530
By: Jil Mazer-Marino, Esq.
    Elizabeth Usinger, Esq.

ROSEN & ASSOCIATES, P.C.
*Counsel for the Debtor*
747 Third Avenue
New York, New York 10017
By: Sanford P. Rosen, Esq.
    Paris Gyparakis, Esq.

SULLIVAN & CROMWELL LLP
*Counsel for ESFX Holdings LLC*
125 Broad Street
New York, New York 10004
By: Leonid Traps, Esq.

VEDDER PRICE
*Counsel for React Presents, Inc., Clubtix,*
*Inc., Lucas King, and Jeffrey Callahan*
1633 Broadway, 31st floor
New York, New York 10019
By: Kevin J. Etzel, Esq.

MONTGOMERY McCRACKEN
*Counsel for Luxury Properties, LLC,*
*Ultimate*
*Luxury Properties, LLC, Lance Lundberg,*
*and*
*Temenos Villa 22, LLC*
437 Madison Avenue
New York, New York 10022
By: Edward L. Schnitzer, Esq.

REID COLLINS TSAI LLP
*Counsel for Dean Ziehl, as Litigation*
*Trustee*
*of SPX Litigation Trust*
810 Seventh Avenue, Suite 410
New York, New York 10019
By: Yonah Jaffe, Esq.

| | |
|---|---|
| SEWARD & KISSEL LLP<br>*Counsel for Deutsche Bank Trust Company Americas*<br>One Battery Park Plaza<br>New York, New York 10004<br>By: Catherine V. LoTempio, Esq. | UNITED STATES DEPARTMENT OF JUSTICE<br>*Counsel for the Office of the United States Trustee*<br>201 Varick Street, Suite 1006<br>New York, New York 10014<br>By: Richard C. Morrissey, Esq. |
| IZOWER FELDMAN, LLP<br>*Counsel for OPW and Brett Torino*<br>11 Broadway, Suite 615<br>New York, New York 10004<br>1325 Franklin Avenue, Suite 255<br>Garden City, New York 11530<br>By: Ronald D. Lefton, Esq. | STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL<br>*Counsel for the New York State Department of Taxation & Finance*<br>28 Liberty Street<br>New York, New York 10005<br>By: Leo V. Gagion, Esq. |

**MARY KAY VYSKOCIL**
**UNITED STATES BANKRUPTCY JUDGE**


The Committee of Unsecured Creditors (the "Committee") has moved for an order appointing a chapter 11 trustee in the case of Robert Francis Xavier Sillerman (the "Debtor") or, alternatively, converting the chapter 11 case to a chapter 7 case (the "Committee's Motion"). [ECF No. 404]. In support of the its Motion, the Committee submitted a declaration of Jil Mazer-Marino [ECF No. 406] (the "Mazer-Marino Decl.") and a declaration of Neil Bivona [ECF No. 405] (the "Bivona Decl."). Two groups consisting of eight separate creditors joined the Committee's Motion.[1]

The Debtor opposed the Committee's Motion [ECF No. 425] (the "Opposition") and submitted a declaration of the Debtor Robert Sillerman in opposition to the Committee's Motion.

---

[1] The two groups of creditors joining the Committee's Motion are 1) Temenos Villa 22, LLC, Luxury Properties, LLC, Ultimate Luxury Properties, LLC, Lance Lundberg [ECF No. 416] and 2) React Presents, Inc., Clubtix, Inc., Lucas King, and Jeffery Callahan. [ECF No. 429].

2

[ECF No. 426] (the "Sillerman Decl.") The Committee filed a reply memorandum of law in further support of its Motion [ECF No. 437] and a reply declaration of Jil Mazer-Marino [ECF No. 462] (the "Mazer-Marino Reply Decl.").

## I.    PROCEDURAL BACKGROUND

This case was commenced against the Debtor on December 26, 2017 by four creditors[2] who filed an involuntary petition under chapter 7 of the Bankruptcy Code. [ECF No. 1]. The Debtor consented to the entry of an order for relief, but moved to convert the chapter 7 case to one under chapter 11. [ECF No. 6]. An Order for Relief under chapter 11 was entered on March 1, 2018. [ECF No. 26]. Soon thereafter, the Debtor filed his schedules of assets and liabilities [ECF No. 29] (the "Schedules"), statement of financial affairs [ECF No. 30] (the "SOFA"), creditor matrix [ECF No. 33], and his affidavit pursuant to Local Bankruptcy Rule 1007-2. [ECF No. 37] (the "1007-2 Affidavit").

After the Court twice granted motions by the Debtor to extend his exclusivity period for filing a plan, *see* ECF No. 98 and 121 ("Motions to Extend Exclusivity"), on October 31, 2018, the Debtor filed his first proposed plan of reorganization. [ECF No. 132] (the "First Plan"). Two months later, the Debtor filed the disclosure statement related to his First Plan. [ECF No. 144]. Shortly thereafter, the Debtor filed an amended disclosure statement relating to his First Plan. [ECF No. 173]. The First Plan and disclosure statements contemplated full satisfaction of claims against the estate, which the First Plan provided would be made possible by the large returns projected to be generated once the Debtor was able to secure financing to invest in certain of his affiliated entities. Confirmation of the First Plan was conditioned on the Debtor receiving

---

[2] The creditors that filed the involuntary petition against the Debtor are React Presents, Inc., Clubtix, Inc., Lucas King, and Jeffery Callahan (the "Petitioning Creditors"). *See* ECF No. 1.

3

financing and an entry of a Final Order settling several lawsuits against the Debtor. *See* First

Plan at 18-19. The Debtor moved for approval of his Disclosure Statement in January 2019 [ECF

Nos. 175 and 176], but subsequently adjourned the hearing on five different occasions. *See* ECF

Nos. 199, 255, 293, 345, and 392. A hearing on the Disclosure Statement relating to the First

Plan has never been held.

      Shortly after the Debtor filed the First Plan, the Petitioning Creditors moved for the

appointment of an examiner [ECF No. 136] (the "Examiner Motion").[3] The moving creditors

requested an examiner due to the "lack of oversight" over the estate and the Debtor's failure to

move the case forward. *See* Examiner Motion, at ¶ 2. The creditors alleged, in part, that the lack

of independent managerial oversight allowed the Debtor to avoid disclosing the true nature and

value of his assets and that the Debtor used multi-layered transactions involving complicated

corporate structures to make his assets difficult to find. *See* Examiner Motion, at ¶¶ 10 and 12.

The creditors also alleged that the Debtor delayed moving the case forward, as evidenced by his

First Plan, which provided only "an amorphous description of some theoretical financing

source." *See* Examiner Motion, at ¶ 43.

      During the same time frame as the Motions to Extend Exclusivity and the Examiner

Motion, members of the creditor body repeatedly requested, and the US Trustee ultimately on

January 11, 2019 appointed, a Committee of Unsecured Creditors. [ECF No. 177]. Once the

Committee was in place, the Examiner Motion was subsequently withdrawn. [ECF No. 215].

      The Committee promptly began to seek information from the Debtor. After the Debtor

announced that his original reorganization goals were no longer viable, the Court again entered

---

[3] Other creditors that subsequently joined the Examiner Motion are Dean Ziehl, as Litigation Trustee of the SFX
Litigation Trust, and the Guevoura Fund Ltd, plaintiffs in two of the lawsuits the settlement of which were
conditions to the First Plan. *See* ECF Nos. 149 and 152.

an order granting a further motion by the Debtor to extend his exclusivity period through March 9, 2019 for filing an amended plan. [ECF No. 224].

Within two months of being appointed, the Committee retained professionals and filed a motion for an order restricting the Debtor's use of estate property and requiring the Debtor to submit periodic disclosures concerning his affiliated entities [ECF No. 246] ("the Motion to Restrict"). The Motion to Restrict was predicated on information from the Debtor's Monthly Operating Reports (the "MORs"), reflecting that there had been transfers to insiders, payments to non-retained professionals, unauthorized sale of estate property, and failure to file financial reports. *See* Motion to Restrict, at ¶¶ 28-47. The Committee and the Debtor negotiated a Stipulation resolving the Motion to Restrict in which the Debtor agreed, among other things, to abide by a monthly budget, refrain from making certain transfers to insiders, and comply with deadlines for filing financial reports. *See* ECF No. 270. The Court entered an order approving the Stipulation. [ECF No. 277] (the "Restrict Order").

The Committee also moved for an order establishing procedures for monthly compensation and expense reimbursements for all professionals retained pursuant to Court order. [ECF No. 217]. The Court entered an Interim Fee Order to resolve the initial fee application. [ECF No. 305] (the "Interim Fee Order"). The Interim Fee Order directed the Debtor to remit, within three days, $150,000 to his attorney, who would then disburse a portion of those funds to professionals retained by the Committee. The Debtor and the Committee ultimately agreed to a protocol for payment of professional fees and expenses. Based on the agreed protocol, the Court entered a Final Order Establishing Procedures for Monthly Compensation of Professionals. [ECF No. 334].

During August 2019, a series of motion were filed. First, the Debtor moved for
authorization to incur post-petition financing [ECF No. 394] (the "DIP Motion"). The DIP
Motion contemplates a $14,390,000 loan to the Debtor, $12,500,000 of which would be allocated
to settle the claims of two secured creditors.[4] The DIP Motion is not based on a commitment by
a lender to provide DIP financing, but rather attaches only a non-binding "letter of intent" and
seeks authorization to make up to $250,000 in expense reimbursements to the putative lender in
anticipation of a loan commitment.

Shortly thereafter, the Committee filed the pending Motion to Appoint a Trustee, or
alternatively, convert the chapter 11 case to one under chapter 7 [ECF No. 404]. The Committee
also filed a liquidating chapter 11 plan [ECF No. 430] ("the Committee's Liquidating Plan") and
a disclosure statement related to that plan [ECF No. 432]. Subsequently, the Committee filed an
amended plan of liquidation [ECF No. 498] and an amended disclosure statement related to that
plan. [ECF No. 499].

Simultaneous with its opposition to the Committee's Motion, the Debtor filed a motion to
retain a tax accountant *nunc pro tunc* to the date of the Order for Relief [ECF No. 433] (the
"Retention Application"). Shortly before the Committee's Motion was scheduled for a hearing,
the Debtor submitted a modified plan of reorganization [ECF No. 454] (the "Modified Plan")
and a related modified disclosure statement [ECF No. 455] (the "Modified Disclosure
Statement").

While the Committee's Motion was pending, the Debtor filed: (1) a declaration in
response to Committee's motion for order compelling the Debtor to comply with fee payment
and reimbursement orders [ECF No. 444], (2) a motion to dismiss an adversary proceeding

---

[4] One of these two secured creditors, Iliad Research and Trading, L.P. ("Iliad"), had brought an adversary
proceeding against the Debtor concerning non-dischargeability of its claim against the Debtor's estate.

against the Debtor by Iliad [ECF No. 452], (3) a reply in connection with the Debtor's DIP

Motion [ECF No. 463], including a declaration of the Debtor in further support of his DIP

Motion [ECF No. 464], and (4) a motion to approve settlement agreements between the Debtor

and ESFX Holdings LLC and Iliad. [ECF No. 479].

The Court held a lengthy Hearing on the Committee's Motion for the Appointment of a

Trustee or conversion of the case, at which the Mazer-Marino Declaration, the Bivona

Declaration, the Mazer-Marino Reply Declaration and the Sillerman Declaration were offered

and admitted into evidence, *see* Transcript of September 25, 2019 Hearing, ECF No. 495, (the

"Sept. 25, 2019 Trans."), at 78:8-14, 133:7-20, and no one requested to cross-examine the

declarants.

Toward the conclusion of the Hearing, the Debtor orally asked for an evidentiary hearing

on the Committee's Motion, including the likelihood of confirmation of the Debtor's Modified

Plan. *See* Sept. 25, 2019 Trans., ECF No. 495, at 99:1-6. Because the record evidence (much of

which is uncontroverted), the undisputed facts, the case docket and the admissions by the Debtor

provide clear and convincing evidence to support a finding of "cause" to appoint a trustee or to

convert, there is no need for an evidentiary hearing.


## II.    FACTUAL BACKGROUND

The Debtor is an entrepreneur and businessman whose past work was concentrated in the

entertainment and media space, including ownership of SFX Broadcasting, Inc. (which he sold

for $2.1 billion in 1998 to Capstar Communication) and SFX Entertainment, Inc. (which he sold

for $4.4 billion in 2000 to Clear Channel Communications, which renamed the company "Live

Nation"). *See* 1007-2 Affidavit at ¶ 7. In one of his recent endeavors, the Debtor re-founded SFX

Entertainment, Inc. ("SFX") as a promoter of electronic music festivals. *See id.* at ¶ 9. That

venture proved unsuccessful, and the company filed for bankruptcy in 2016. *See id.* at ¶ 10.

Based on the Debtor's personal guarantee of an obligation incurred by SFX, certain creditors

were awarded a judgment against the Debtor personally, and those creditors subsequently

commenced this case by filing an involuntary chapter 7 proceeding against him. *See id.* at ¶ 12.

As noted, the proceeding was later converted to this chapter 11 case. [ECF No. 26].

According to the Debtor, his property consists largely of interests in limited liability

companies, most of which directly or indirectly own an interest in various assets. *See* 1007-2

Affidavit at ¶ 13. In his Schedules, the Debtor lists among his assets his interests in forty-seven

entities. *See* Schedules A/B, [ECF No. 29], Attach. 19.

Early in this case, the Debtor moved for authorization to direct one of his non-debtor

affiliates, RSFX, LLC, to retain Castle Placement, LLC, [ECF No. 56] to solicit financing so the

Debtor could invest up to $35 million in certain of his entities. In the motion, the Debtor

projected that these investments would yield returns in an amount more than sufficient to pay

creditors in full and fund a plan of reorganization. *See id.* at ¶ 15. Over the objection of several

creditors, the Court approved the motion. [ECF No. 91]. More than five months later, the Debtor

received a term sheet from a prospective lender in connection with a potential $30 million loan,

but the lender ultimately declined to issue a commitment. *See* Sillerman Decl., at ¶ 9.

After receiving two extensions to his exclusivity period for filing a plan, the Debtor filed

his First Plan. In his First Plan, the Debtor projected that the value of two of his entities, and a

capital raise with respect to another of his entities (collectively, the "Three Initiatives"), would

generate over $500 million, allowing for full satisfaction of all claims against the estate. *See* First

Plan, at 19-24. After the Committee was formed and its professionals retained, attorneys for the

Committee requested more information regarding the Three Initiatives. *See* February 6, 2019 E-mail from the Committee to Debtor's Counsel, Mazer-Marino Decl., Ex. D [ECF No. 406-5]. Subsequently, the Debtor conceded that these Three Initiatives, valued in his Schedules at $399,750,000, s*ee* Schedules A/B, Attach. 19, and the linchpin of his First Plan, were in fact worthless. *See* Sillerman Decl., at ¶ 26.

After the Debtor's initial strategy of funding a plan through lending obtained by Castle Placement and his Three Initiatives failed to materialize, the Debtor shifted his focus to another asset to fund his reorganization. Specifically, at hearings on February 28, 2019 and April 1, 2019, Debtor's counsel represented to the Court that the basis of funding a plan was instead going to be potential investments in, and subsequent returns from, his real estate development project on the island of Anguilla (the "Anguilla Project"). *See* Transcript of February 28, 2019 Hearing, Mazer-Marino Decl., Ex. F [ECF No. 406-7], ("Feb. 28, 2019 Trans."), at 15:10-17:1; *See also* Transcript of April 1, 2019 Hearing, Mazer-Marino Decl., Ex. G [ECF No. 406-8] ("April 1, 2019 Trans."), at 45:2-7.

It was subsequently revealed that, without the knowledge of the Committee or authorization from the Court, the Debtor had signed a Memorandum of Agreement, *see* Sillerman Decl., Ex. N (the "MOA"), to create an entity (the "Anguilla Entity") that would be responsible for developing the Anguilla property. [5] In the MOA, the Debtor agreed to direct his affiliate, Flag Pelican, Ltd., to transfer its title and interests in the Anguilla property to a newly-formed Anguilla Entity, along with land currently owned by the Anguillan government, which, according to the Debtor, has been promised to him by the Anguillan government. *See* Sillerman

---

[5] *See* April 3, 2019 E-mail from the Debtor to the Committee, Mazer-Marino Decl., at Ex. P (MOA sent to the Committee).

Decl., at ¶ 43; *see also* MOA at 4. The Anguilla Entity will use this property, the value and ownership of which have been the subject of conflicting disclosures in this case[6], as collateral to secure loans to develop the Anguilla property. *See* MOA at 5. Pursuant to the MOA, the Debtor also agreed to direct Flag Pelican, Ltd. to contribute $2 million to the Anguilla Entity. *See* MOA at 5.

After the pending motion by the Committee for appointment of a trustee or conversion and the Committee's Liquidating Plan were filed, the Debtor filed his Modified Plan built around the Anguilla Project. *See* Sept. 25, 2019 Trans., ECF No. 495, at 43:24 – 46:4. The Debtor's Modified Plan contemplates that the majority of the assets of the estate will be liquidated. *See* Modified Disclosure Statement, at 29-31; Sep. 25, 2019 Trans., ECF No. 495, at 44:1-8, 19-21. However, the Anguilla Project will not be liquidated under the Modified Plan, but will rather be taken by the Debtor from the estate, along with the $7 million encumbrance thereon. *See* Modified Disclosure Statement, at 29; Sept. 25, 2019 Trans., ECF No. 495, at 45:16-21 General unsecured creditors will have the option to elect to take shares in the Anguilla Entity in satisfaction of their claims. *See* Modified Disclosure Statement, at 3. In the event general unsecured creditors choose not to make this election, their claims will be satisfied from future proceeds projected to be generated from the development of the property or the sale of the Debtor's interest in the Anguillan entity. *See id.*

---

[6] *Compare* Schedules A/B, Attach. 19 (where Debtor lists non-debtor affiliated entity, MJX Venture, LLC, as the holder of a 75% equity interest in Flag Pelican LLC, which holds through Pelican Development, LLC, the property in Anguilla) *with* Sillerman Decl., at ¶ 38 ("[the Debtor] only recently learned that . . . my wife and I, not MJX, own Flag Pelican, LLC."); *Compare also* March 26, 2019 E-mail from the Debtor to the Committee, Mazer-Marino Decl., Ex. E. ("[t]he raw land has minimal value") *with* Schedules A/B, Attach. 19 (the Anguilla property is valued at $37,500,000).

## III. ANALYSIS

### A.  Appointment of a Chapter 11 Trustee

Chapter 11 allows a debtor to continue to manage and operate his business and any property of his estate. 11 U.S.C. § 1107; *see In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 665 (Bankr. S.D.N.Y.). However, a debtor-in-possession is obligated to perform all of the obligations of a trustee identified in Bankruptcy Code section 1106, *see* 11 U.S.C. § 1107, and owes fiduciary duties to his estate and creditors. *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005); *In re Centennial Textiles, Inc.,* 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989).

While there is a presumption that a debtor should be permitted to remain in possession of its business, that presumption is not absolute. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.); *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *8 (Bankr. S.D.N.Y. Mar. 31, 2015). The willingness to allow a Debtor to remain in possession of its assets is predicated upon the assumption that the Debtor will carryout its fiduciary obligations. *In re Centennial Textiles* 227 B.R. at 612.

A party in interest wishing to dispossess a debtor of management of its business and control over it estate must prove, by clear and convincing evidence, that appointment of a trustee (i) is warranted for "cause" under section 1104(a)(1), or pursuant to section 1104(a)(2) (ii) is in the best interest of creditors. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 167. These are two distinct and independent provisions; the court may order the appointment of a trustee pursuant to either 1104(a)(1) or 1104(a)(2), and is not required to consider both provisions together. *In re Taub*, 427 B.R. 208, 225 (Bankr. E.D.N.Y. 2010) (court considered the appointment of a trustee only pursuant to section 1104(a)(2) and not 1104(a)(1); *In re Ionosphere Clubs, Inc.*, 113 B.R. at 170

(appointment of a trustee was "warranted pursuant to both 1104(a)(1) and especially

1104(a)(2).").

Although the burden of proof under section 1104(a) is by clear and convincing evidence,

bankruptcy courts have wide discretion in considering the relevant facts and are not required to

conduct a full evidentiary hearing in considering a motion for the appointment of a chapter 11

trustee. *See In re The 1031 Tax Grp., LLC,* 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007) ("Although

section 1104 requires a bankruptcy court to appoint a trustee if the requirements of the statute are

met, a court has wide discretion in considering the relevant facts."); *see also In re Ionosphere*,

113 B.R. at 167 ("[i]n considering a motion for the appointment of a trustee, a bankruptcy court

is not required to conduct a full evidentiary hearing.").

### 1. Appointing a Trustee under Section 1104(a)(1)

The Bankruptcy Code provides:

> At any time after the commencement of the case but before
> confirmation of a plan, on request of a party in interest or the
> United States trustee, and after notice and a hearing, the court **shall**
> order the appointment of a trustee –
>
> (1) **for cause, including fraud, dishonesty, incompetence, or
> gross mismanagement** of the affairs of the debtor by current
> management, either before or after the commencement of the
> case, **or similar cause**, but not including the number of holders
> of securities of the debtor or the amount of assets or liabilities
> of the debtor.

11 U.S.C. § 1104(a)(1) (emphasis added).

Section 1104(a)(1) enumerates four types of misconduct that constitute cause: fraud,

dishonesty, incompetence and gross mismanagement. These examples are not exhaustive. *In re

Futterman*, 584 B.R. 609, 616 (Bankr. S.D.N.Y. 2018) ("[t]he particular items listed in

1104(a)(1) are not exclusive . . . ."); *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at

*9 ("The list of wrongs constituting 'cause' that warrants the appointment of a trustee is not exhaustive.").

The words "including" and "or similar cause" allow the court to consider other conduct in analyzing whether there is cause to appoint a trustee. *In re V. Savino Oil & Heating Co., Inc*., 99 B.R. at 525 ("[T]he words 'including' and 'or similar cause' before and after the enumerated examples of cause and 11 U.S.C. § 102(3) indicate that the grounds for appointing a reorganization trustee are not even limited to the derelictions specifically enumerated.").

Examples of non-enumerated misconduct found by courts to constitute cause include: (i) failure to comply with provisions of the Bankruptcy Code, *Id.*, 526-527 (cause found where Debtor failed to comply with section 363(b) of the Bankruptcy Code); (ii) failure to make required filings, *In re Grasso,* 490 B.R. 500, 520-523 (Bankr. E.D. Penn. 2013) (failure to file 2015.3 reports constituted a failure to disclose material information sufficient to support a finding of cause); (iii) failure to abide by Court Orders, *In re AG Serv. Centers, L.C*., 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) (debtor's failure to comply with court orders warranted appointment of a trustee); (iv) failure to file tax returns, *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 306 (Bankr. M.D. Pa. 2016) (Debtor's failure to pay taxes lead to a finding of cause); (v) conflicts of interest, *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *3 (cause found where the Debtor's diversion and commingling of funds between his affiliated entities indicated the Debtor's conflict of interest against the estate); and (vi) failure to discharge fiduciary duties. *In re Ionosphere Clubs, Inc.,* 113 B.R. at 169 ("When a debtor-in-possession is incapable of performing [its fiduciary duties], a Chapter 11 trustee may be appointed."). *See generally* 7 COLLIER ON BANKRUPTCY ¶ 1104.02 (16th ed. 2019).

The statute is mandatory and dictates that upon a finding of cause, the court is required to appoint a chapter 11 trustee. *See* 11 U.S.C. § 1104(a)(1) ("the Court shall order the appointment of a trustee (1) for cause . . . ."); *see also In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *9.

Non-Compliance with the Bankruptcy Code

Noncompliance with the Bankruptcy Code is conduct that clearly constitutes cause under section 1104(a)(1). *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989 (debtor's noncompliance with section 363(b) constituted cause under 1104(a)(1)); *In re AG Serv. Centers, L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) (cause found where debtor retained a professional despite never having received authority to do so under section 327(a)).

This case is replete with examples of the Debtor's failure to comply with the Bankruptcy Code and his obligations thereunder. For example, like the Debtor in *In re A.G. Service Centers*, the Debtor here has ignored the governing Bankruptcy Code provisions regarding the retention of professionals. Pursuant to section 327(a) of the Bankruptcy Code, a debtor-in-possession *with the Court's approval*, may employ professionals, such as accountants, attorneys, auctioneers, or appraisers, to represent the debtor or assist in carrying out its duties, provided they are disinterested and do not hold or represent an interest adverse to the estate. 11 U.S.C. § 327(a) (emphasis added). There is no question the debtor may retain professionals only with court approval. "No service performed by professionals is compensable until the court approves such retention." *In re CCT Communications, Inc.*, 2010 WL 3386947, at *5 (Bankr. S.D.N.Y. August 24, 2010); *see generally* 3 COLLIER ON BANKRUPTCY ¶ 327.03 (16th ed. 2019). In the Second Circuit, there is a *per se* prohibition against compensating professionals for services rendered prior to a retention order. *In re CCT Communications, Inc.*, 2010 WL, at *5.

14

In support of its request for appointment of a trustee, the Committee asserts that the

Debtor paid more than $86,000 to lawyers and accountants without Court authorization. *See*

Committee's Motion, at ¶ 46. The Debtor does not dispute that he paid professionals without

Court authorization, but claims that he thought retention applications were not required because

he was paying those professionals in the ordinary course. Sillerman Decl., at ¶ first 58.[7]

The Debtor is clearly aware of the Bankruptcy Code's retention requirements, since he

previously sought a Court order authorizing him to retain his attorney [ECF No. 38] and real

estate brokers. [ECF Nos. 228 and 325].  The Debtor even sought authorization to cause an

affiliate to retain a lending broker (Castle Placement, LLC), reflecting his sophistication and

understanding that assets of an affiliated entity in which the Debtor owns an interest may

constitute property of the estate and cannot be expended to retain professionals without Court

authorization.

In its argument that the Debtor retained counsel without Court authorization, the

Committee relies on the Debtor's MORs which disclose that post-petition payments were made

by the Debtor to an attorney who had not been retained pursuant to an order of the Court. *See*

Mazer-Marino Decl., Ex. Q at ¶¶ 25, 26. The Debtor claims he thought retention applications

were not required because "most of these professionals were an in-house lawyer and a

bookkeeping service that had replaced an employee." Sillerman Decl., at ¶ first 58. In direct

contradiction, in his 1007-2 Affidavit the Debtor did not disclose compensation to any

employees as required and stated, "Local Rule 1007-2(b)(1) is not applicable to my chapter 11

case." *See* 1007-2 Affidavit, at ¶ 25. Similarly, at the Hearing on the Committee's Motion,

Debtor's counsel tried to justify these unauthorized payments, arguing: "the Committee next

---

[7] In the Sillerman Declaration [ECF No. 426], there are a second set of paragraphs numbered 46-61 immediately following the initial paragraphs 1 through 61.

mentions the – Mr. Sillerman paid certain – a certain lawyer . . . [t]his has been an in-house counsel to Mr. Sillerman for many, many years. She is no longer employed by Mr. Sillerman, but during the course of her employment by him as in-house counsel, she was indeed paid." Sept. 25, 2019 Trans., ECF No. 495, at 40:69. This rationale is simply not credible given the Debtor's suggestion in his 1007-2 Affidavit at the start of the case suggesting that he has no employees. *See* 1007-2 Affidavit, at ¶ 25.

If the Debtor believed the attorney was an employee in the ordinary course, then he failed to comply with Local Rule 1007-2(b)(1) which requires a debtor to properly disclose the estimated amount of weekly payroll for employees during the 30-day period following the filing a of chapter 11 petition (or during the 30-day period following an order for relief converting of a chapter 7 case to one under chapter 11). Conversely, if the Debtor did not believe that the attorney was an ordinary course employee, then he violated section 327(a) of the Bankruptcy Code when he retained a professional without Court authorization.

Similarly, the Debtor's application to retain a tax accountant [ECF No. 433] (filed while the Committee's Motion was pending), contains admissions that the Debtor paid the accountant $42,062.56 for professional services rendered post-petition without court approval. *See* Retention Application, at ¶ 23.

Failure to Make Required Filings

Failure by a debtor-in-possession to disclose material and relevant information to the Court and creditors or make required filings supports a finding of cause. *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (where the Debtor fails to disclose "material and relevant information to the Court and creditors, a Chapter 11 trustee is required.");

*In re Grasso,* 490 B.R. 500, 520-523 (Bankr. E.D. Penn. 2013) (failure to file 2015.3 reports

constituted a failure to disclose material information sufficient to support a finding of cause).

Bankruptcy Rule 2015.3 mandates the filing of periodic reports with regard to entities in

which the Debtor has a substantial ownership interest. The Rule specifies that: the reports shall

be prepared as prescribed by Official Form 26; the reports shall supply information on any entity

in which the estate holds a controlling or substantial interest (presumptively 20% interest); the

first report is due not later than 7 days before the first date for the meeting of creditors; and

subsequent reports must be filed no less frequently than every 6 months until a plan is confirmed

or the case is converted or dismissed. Moreover, in connection with the Committee's earlier

Motion to Restrict, the Debtor was reminded of his obligation to make periodic disclosures

pursuant to Rule 2015.3 and he expressly agreed in the Stipulation resolving the Motion to

Restrict (which was approved by Court Order [ECF No. 277] to abide by the filing requirements

of Rule 2015.3. *See* Restrict Order, at ¶ 7.

Here, over nearly eighteen months since the order for relief, the Debtor has not filed a

single 2015.3 report. The Debtor's failure to file 2015.3 reports is particularly problematic

because the Debtor holds an interest in forty-seven entities and "with few exceptions [his]

property consists of interests in limited liability companies" which own the estate's substantial

assets. 1007-2 Affidavit, at ¶ 13. These reports would supply the Court and creditors with

relevant and material information regarding the Debtor's interest in his dozens of entities,

thereby enhancing transparency and potentially laying bare any improper transfers or self-

dealing.

In his Declaration, the Debtor acknowledges he has not complied with his Rule 2015.3

obligation. *See* Sillerman Decl., ¶¶ first 60-61. He argues that he nonetheless has satisfied his

filing requirements by submitting information in his MOR's regarding four of his numerous entities. *Id.* The Debtor also tries to excuse his conceded non-compliance by claiming that at the Initial Debtor Interview, the United States Trustee's office decided that he only needed to submit information on entities that had engaged in activity during the relevant reporting period. *See* i*d.* ("The decision to report on these affiliates was made by the Office of the United States Trustee during the Initial Debtor Interview that was convened in my case by an analyst of that office."); *see also* Sept. 25, 2019 Trans., ECF No. 495, at 65:11-15 ("I believe there were conversations with an analyst at the first debtor interviews. We went through all of the active entities and we were informed that we should be reporting on several entities that are active."). Even if this assertion were true and the Debtor did not mishear or misunderstand the U.S. Trustee's analyst, the reporting requirements contained in Rule 2015.3 cannot be ignored by the Debtor or excused by the U.S. Trustee's office. *See* Sept. 25, 2019 Trans., ECF No. 495. at 65:20 – 66:10 ("[The Court]: 'The code says you have to file under 2015 . . . . [Debtor's Counsel]: Yes it does. We included this information in the monthly operating reports. . . . [The Court]: No. I think the Bankruptcy Code is quite explicit that 2015.3 reports have to be filed as 2015.3 reports, on that exact form. [Debtor's Counsel]: 'Yes. I'm aware, Your Honor.'").

A debtor-in-possession is required to make other periodic filings which the Debtor has failed to make. For example, Local Rule 1007-2(b) of the Bankruptcy Rules of the Southern District of New York requires a debtor to submit an affidavit estimating the "amount of the weekly payroll to employees . . . for the thirty day period following the filing of the chapter 11 petition." Local Rule 1007-2(b)(1). Notwithstanding that he concedes he made payments to an attorney that he describes as "in house," *see* Sillerman Decl., at ¶ first 18, the Debtor failed to

disclose any employees, stating only "Local Rule 1007-2(b)(1) is not applicable to my chapter 11 case." *See* 1007-2 Affidavit, at ¶ 25.

In the Court's Order authorizing the Debtor's retention of Castle Placement [ECF No. 91], the Court directed the Debtor to file a report with the Court every forty-five days on the status of the efforts of the Debtor to obtain financing. *See id.* at 3. The Debtor filed untimely status reports on August 31, 2018 [ECF No. 113] and November 19, 2018 [ECF No. 140] and a report on December 28, 2018 [ECF No. 167]. Castle Placement continues to work on brokering the potential loan underlying the Debtor's pending DIP Motion. *See* ECF No. 394 at ¶ 41-43. The Debtor clearly has neglected to file timely status updates concerning the efforts of Castle Placement to solicit a potential lender. No report has been filed since the end of last year.

Failure to Comply with Court Orders

Noncompliance with court orders is conduct that similarly constitutes cause within the meaning of section 1104(a)(1). *In re TP, Inc.*, 455 B.R. 455, 459 (Bankr. E.D.N.C. 2011) (Debtor's failure to comply with consent order warranted the appointment of a trustee); *In re AG Serv. Centers, L.C.*, 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999). In *AG Service Centers*, the court appointed a chapter 11 trustee after learning that the Debtor failed to comply with two cash collateral orders the court had entered and neglected to file monthly operating reports and financial statements as mandated by the Bankruptcy Code and Rules. In ruling that a trustee be appointed, the Court stated, "[s]ection 1104(a)(1) does not specifically list 'noncompliance with court orders' or 'failure to comply with the Bankruptcy Code' as cause for the appointment of a trustee, but such conduct clearly falls within the scope circumscribed by the statute – either as 'similar cause' or as a permutation of 'incompetence, or gross mismanagement.'" *Id.*; *In re North*, 212 F. App'x 626, 627 (9th Cir. 2006) ("[Debtor's] non-compliance with the bankruptcy

19

court's January 7, 2004 order and repeated failure to comply with the bankruptcy code were good

cause to appoint a trustee and to support the bankruptcy court's finding that it was in the

creditors' best interests to have an independent and disinterested trustee to administer the

estate."); *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 306 (Bankr. M.D. Pa. 2016)

(Debtor's failure to comply with cash collateral orders and pay taxes constituted cause to appoint

a trustee pursuant to section 1104(a)(1).).

Here, the Court entered a consensual Interim Fee Order on May 9, 2019 [ECF No. 305],

that directed the Debtor to remit $150,000 within three days of the entry of the Order, to his

attorney, who would then disburse a portion of those funds to professionals retained by the

Committee. The Debtor admits he failed to comply with this Order. *See* Sillerman Decl., at ¶ first

49-50; *see also* Sept. 25, 2019 Trans., ECF No. 495, at 72:10-22. The Debtor attempts to justify

his non-compliance by claiming that his consent to the entry of the Interim Fee Order was made

under the assumption that the State of New York was about to remit to the Debtor a tax refund

that would provide the funds the Debtor was obligated to transfer to his attorney pursuant to the

Interim Fee Order. *See* Sillerman Decl., at ¶ first 49-50*; see also* Sept. 25, 2019 Trans., ECF No.

495, at 72:10-22. However, the Interim Fee Order contains no such condition, and it was not

until after the Committee brought the pending Motion to Appoint a Trustee or Convert the Case

that the Debtor mentioned this supposed condition. *See* Sept. 25, 2019 Trans., ECF No. 495, at

72:10-22 ("[The Court]: '[w]hy didn't you come back to the Court and say we can't satisfy our

obligations. We're waiting for the New York State refund. We can't satisfy our obligation

because we need to get financing. [Debtor's Counsel]: In hindsight, I should have. I can't argue

with that.'").

The Debtor also failed to comply with the Stipulation resolving the Motion to Restrict that was negotiated by the Committee and the Debtor and approved by Court Order. In the Restrict Order, ECF No. 277, the Debtor agreed, in relevant part, to timely file 2015.3 reports and to provide the Committee with seven days written notice prior to transferring any portion of any tax refund to his spouse. *See* Restrict Order ¶¶ 2-7. Since the Order was entered, the Debtor has not filed any 2015.3 reports. The Debtor also received a tax refund and remitted a portion of the tax refund to his wife without giving the Committee any written notice prior to the transfer. *See* Mazer-Marino Decl., at ¶¶ 3-4.

The Restrict Order also provides that the Debtor will not sell, assign, encumber or otherwise dispose of any asset or interest without Court approval. *See* Restrict Order, at ¶ 3. And yet, a mere two days before the hearing on the Motion to Restrict at which the Restrict Order was outlined on the record, the Debtor entered into the MOA, *see* Sillerman Decl., Ex. N, agreeing to transfer the Debtor's interest in property in Anguilla to a newly formed entity. The transfer of the Anguilla property was clearly not disclosed to the Court. *See* Sept. 25, 2019 Trans., ECF No. 495, at 63:8-64:2 ("[Debtor's Counsel]: '[Y]our Honor may recall signing a stipulation that the Court so ordered under which we agreed that any disposition of an asset of an affiliate . . . would be the subject of a motion before you. . . . [The Court]: Then how can he enter into an agreement . . . . regarding that property without violating that order? [Debtor's Counsel]: It was signed before your order was entered. [The Court]: And you didn't think it was appropriate to tell us about that at the time I entered the order, to say, by the way, there is this agreement that we entered into . . . .'").

As previously discussed, *see supra* at 19-20, in the Court's Order authorizing the Debtor or non-debtor affiliate's retention of Castle Placement [ECF No. 91], the Court directs the Debtor

to file a report with the Court every forty-five days on the status of the efforts of Castle

Placement to obtain financing. *Id.* at 3. The Debtor filed only three status reports over nearly

fourteen months and the first two were separated by a period of longer than forty-five days.

There have been no further reports for over nine months.

Failure to File Tax Returns

As a debtor-in-possession, the Debtor is required by the Bankruptcy Code and the

Internal Revenue Code to file tax returns on behalf of the estate. *See* 26 U.S.C. §§ 1398(c)(1) and

6012(b)(4). Courts routinely recognize that failure to file tax returns constitutes cause under

section 1104(a)(1). *In re Amerejuve, Inc.*, 2015 WL 2226344, at *10 (Bankr. S.D. Tex. Apr. 29,

2015); *In re Euro-American Lodging Corp.*, 365 B.R. 421, 423 (Bankr. S.D.N.Y. 2007); *In re

Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985).

Here, the Debtor's failure to fulfill the most basic obligation to file the tax returns is not

disputed. The Debtor concedes that he failed to file income tax returns for 2017 and 2018.

*See* Sept. 25, 2019 Trans., ECF No. 495 at 69:8-11 ("The Court: '[T]here is a 2017 return that

needs to be done? [Debtor's Counsel]: 2017 and 2018.'"). Although the Debtor may have

received an extension until October 15, 2019 to file his 2018 tax return, his failure to seek to

retain an accountant until the 11th hour casts serious doubt on his ability to file timely and

accurate returns.

Conflict of Interest

Courts may find a conflict of interest, which can constitute cause for appointment of a

trustee, where the debtor has inappropriate dealings with an entity in which the debtor has an

interest. *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar.

31, 2015) ("[f]actors relevant to the appointment of a trustee under 1104(a)(1) include conflicts

of interest . . ."); *In re SunCruz Casinos, LLC*, 298 B.R. 821, 827 (Bankr. S.D. Fla. 2003)

(numerous conflicts of interest is sufficient grounds to find cause to appoint a trustee); *In re*

*McCorhill Pub., Inc.,* 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) ("[w]here there are

questionable inter-company financial transfers and the principals of the debtor occupy

conflicting positions in the transferee companies, a trustee should be appointed in the best

interests of creditors and all parties in interest in order to investigate the financial affairs of the

debtor."). Conflict of interest necessitating the appoint of a trustee has also been found where the

Debtor will not fulfill its fiduciary duty to pursue potential causes of action on behalf of the

estate, *see In re Grasso,* 490 B.R. 500, 515 (Bankr. E.D. Penn. 2013), or otherwise puts its own

self-interest above that of its creditors. *In re Bellevue Place Assocs.*, 171 B.R. 615, 624 (Bankr.

N.D. Ill. 1994) ("[A] fiduciary—the debtor-in-possession—is proscribed from acting solely in its

self-interest to the exclusion of the other interests which the debtor-in-possession has the

fiduciary obligation to protect.").

 In a case such as this where an individual chapter 11 debtor remains in possession as a

fiduciary of his estate and his creditors, it appears to the Court that there is a heightened concern

for an inherent conflict of interest that may not exist in the case of a corporate chapter 11 debtor.

Tasking the individual debtor with the responsibility of bringing avoidance actions against a

family member or an entity in which the debtor has a substantial interest may be daunting.

Moreover, the temptation for self-dealing may be heightened in the case of an individual debtor

whose natural instinct is to protect his own self-interest. This scenario demands that the debtor

provide full transparency with regard to its activities and that the Court be vigilant where, as

here, allegations of conflict of interest or self-dealing are raised.

There is ample evidence in this case that the Debtor is conflicted and is unwilling or unable to act in the best interest of his creditors and the estate. Perhaps the clearest example is the stunning but candid admission in which the Debtor declared "[g]iven my obvious conflict as a putative plaintiff, I have no intention of suing my wife, our foundation or any other insider or affiliate for that matter." Sillerman Decl., at ¶ 22. Debtor's counsel has similarly conceded the Debtor's conflict of interest. *See* January 10, 2019 Hearing Transcript, ECF No. 258, at 41 ("[Debtor's Counsel]: 'And the Debtor is conflicted, frankly, from pursuing much of that [avoidance actions] in light of where the transfer went.'").

There is ample undisputed evidence of unauthorized transactions between the Debtor and non-debtor affiliated entities which evinces a conflict of interest. Certain of these entities have debt secured by the personal guarantee of the Debtor. *See* Schedules A/B, [ECF No. 29] Attach. 19. For instance, the Debtor holds a 50% interest in Elderberry X, LLC ("Elderberry") which has a mortgage of $4 million that is personally guaranteed by the Debtor. The Debtor has consistently transferred money to Elderberry throughout this case. According to the MORs, the Debtor has made repeated, unauthorized post-petition payments to Elderberry. *See* (February 2019 MOR) [ECF No. 248] ($9,233.13 payment to Elderberry); (March 2019 MOR) [ECF No. 278] ($60,000 payment to Elderberry); (April 2019 MOR) [ECF No. 317] ($69,000 payment to Elderberry); (May 2019 MOR) [ECF No. 353] ($89,744.69 payment to Elderberry); (June 2019 MOR) [ECF No. 367] ($4,733.88 payment to Elderberry).

Also troubling is the fact that, in addition to the debtor-in-possession bank account (the "DIP Account"), the Debtor also maintains a joint bank account with his wife (the "Joint Account"). Transactions in the Joint Account initially were disclosed in MOR's from April through May of 2018. *See* ECF Nos. 58 and 77. With no explanation, the Debtor's MOR for May

2018 includes the statement that the funds in the Joint Account belonged solely to the Debtor's wife. *See* May 2018 MOR [ECF No. 77]. Since that time, the Debtor has directed his tax refunds into the Joint Account and has made two transfers from his DIP Account to the Joint Account. *See* June 2018 MOR [ECF No. 97] ($18,500 transfer); September 2018 MOR [ECF No. 122] ($15,000 transfer).

Breach of Fiduciary Duty

While the Bankruptcy Code permits a debtor to operate its business and exercise control over its estate, the debtor-in-possession acts as a fiduciary of the estate and its creditors. *In re Futterman*, 584 B.R. 609, 618-19 (Bankr. S.D.N.Y. 2018) ("The point of bankruptcy is to marshal assets in a way that maximizes their value for the benefit, primarily, of creditors, and then once creditors are paid, for owners. When a debtor remains in possession of his businesses and properties in a chapter 11 case, he does so as a fiduciary for those creditors."). Among other responsibilities, a Debtor-in-possession has a fiduciary duty to: a) protect and conserve estate property for the benefit of creditors (including a duty to avoid self-dealing and to investigate and prosecute warranted avoidance actions); b) avoid damaging the estate; and c) refrain from acting in a manner that could hinder a successful reorganization. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.). The law is clear that if a debtor-in-possession neglects its fiduciary duties, the court should appoint a chapter 11 trustee. *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *8 (Bankr. S.D.N.Y. Mar. 31, 2015); *In re Ionosphere Clubs, Inc*., 113 B.R. at 169.

a. *Duty to Protect and Conserve Estate Property*

The duty to protect and conserve estate property includes the duty to conduct impartial investigations and decide whether to pursue claims on behalf of the estate. *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *8. The Debtor's failure to investigate and/or file avoidance and recovery actions manifestly could cause the estate to forfeit proceeds to which it would otherwise be entitled. Taken alone, the Debtor's failure to investigate avoidance actions signals a breach of fiduciary duty sufficient to justify a finding of "cause" under 1104(a)(1). *See In re Picacho Hills Utility Co., Inc.*, 518 B.R. 75, 82 (Bankr. D.N.M. 2014); *see also In re SRJ Enterprises, Inc.*, 151 B.R. 189, 194 (Bankr. N.D. Ill. 1993) (cause to appoint a trustee may exist when the debtor-in-possession fails to perform its fiduciary duty to bring a suit to recover a voidable preference.)

The Debtor has operated as a debtor-in-possession and controlled his estate since this case was initiated. Since that time, the Debtor has not brought, much less investigated, a single avoidance action. And, the Debtor has defiantly declared that he will not consider bringing any avoidance actions. *See* Sillerman Decl., at ¶ 22. This constitutes a flagrant dereliction of his fiduciary duty to the estate.

Failure to protect and conserve estate property constitutes a breach of fiduciary duty. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 169. To ensure assets are preserved for the benefit of creditors, the Debtor cannot dispense assets outside the ordinary course without court approval. *See* 11 U.S.C. § 363(b)(1). The Debtor does not seem to appreciate that he cannot freely transfer estate assets to his affiliated entities or otherwise dispose of estate property without leave of the Court. *See supra* at 25-26; *see also infra* at 29.

The Debtor consistently has refused to seek authorization for transfers, sales or retention of professionals. For example, it is undisputed that, without seeking Court authorization, the Debtor sold his golf memberships in October of 2018 and February of 2019 for nearly $500,000 each. The Debtor has never disclosed what he did with the proceeds of the golf memberships. And, as discussed, in March 2019, the Debtor entered into an agreement pursuant to which he transferred his interest in property in Anguilla to a newly formed entity and committed to contribute an additional $2 million to that entity. *See supra* at 10.

These are but a few examples. The Debtor appears to view estate assets as his own personal property rather than property of this estate. Based on this clear pattern of conduct, the Court has serious reservations regarding the Debtor's ability to administer the estate for the benefit of his creditors and to preserve and protect estate property.

b.  *Duty to Refrain from Acting in a Manner that Could Damage the Estate*

As a corollary, a debtor-in-possession also has a fiduciary duty to refrain from actions that could damage the estate. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.).

Here, the Debtor unquestionably has engaged in conduct that is manifestly damaging to the estate. For example, the failure to file tax returns is harmful to the estate. The refusal to investigate potential claims the estate may possess amounts to a harmful forfeiture of potential estate assets. In addition, there has been a disturbing lack of transparency throughout the life of this case concerning the Debtor's ownership interest in his dozens of affiliated entities. This problem has been exacerbated by the repeated transfers between the Debtor and those entities. In his MOR's, the Debtor included bank statements relating to certain of his entities. These

27

statements illustrate a series of transfers made from the Debtor's bank account to the accounts of

other entities in which the Debtor has an ownership interest:

- February 2019 MOR [ECF No. 248] shows a $9,233.13 payment to Elderberry X LLC ("Elderberry");

- March 2019 MOR [ECF No. 278] shows a $60,000 payment to Elderberry;

- April 2019 MOR [ECF No. 317] shows a $69,000 payment to Elderberry;

- May 2019 MOR [ECF No. 353] shows a $89,744.69 to Elderberry;

- June 2019 MOR [ECF No. 367] shows a $4,733.88 payment to Elderberry.

No explanation is provided in the MORs for any of these transfers and the Restrict Order

requires the Debtor receive permission from the Court before he transfers estate funds to an

affiliated entity. *See* Restrict Order ¶ 6. As discussed, the Debtor has not filed the required

reports relating to entities in which the Debtor holds a substantial interest, *See* Fed. R. Bankr. P.

2015.3, and without those reports, there is no explanation for the purposes or benefits to the

estate of these transfers. What is clear is that the money is no longer with the estate for the

benefit of creditors.

The Debtor also has damaged the estate by making inappropriate transfers to his wife.

*See supra* at 26. The Debtor has defended the transfers to his wife on the grounds that "[m]y wife

has made more transfers into my account and into the accounts of entities we own, than I have

made to her." *See* Sillerman Decl., ¶ first 55. Mrs. Sillerman's transfers to the DIP Account have

been characterized as "a gift." *See* Sept. 25, 2019 Trans., [ECF No. 495], 87:12-18. Regardless

of gifts that he might receive, the Debtor is not entitled to transfer money gratuitously to his wife

from the estate and any transfers to her need Court approval, and by agreement were to be

disclosed in advance to the Committee. *See* Restrict Order at ¶ 2.

c. *Duty to Refrain from Acting in a Manner that Could Hinder Reorganization*

Courts have also found a breach of fiduciary duty where the debtor is hindering a successful reorganization of his estate by submitting plans of reorganization that the debtor cannot fulfill and projecting financial performances that the debtor fails to obtain. *In re Ionosphere Clubs, Inc.*, 113 B.R. at 169-170; *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[I]f the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an independent trustee.")

In this case, the plans submitted by the Debtor and his repeated failure to achieve financial projections reflect a breach of his fiduciary obligation to advance this case. The Debtor has been similarly unreliable in advancing the case with regard to a successful reorganization. The Debtor published his First Plan on the final day of his exclusivity period, after obtaining two extensions of exclusivity. While the Debtor disputes that his First Plan was merely a placeholder, *see* Transcript of December 19, 2018 Hearing ECF No. 235 ("Dec. 19, 2018 Trans."), at 11:25-12:1, the reality is that no disclosure statement relating to the First Plan was filed for over two months and, as evidenced by the case docket, the Debtor never moved for approval of the First Plan or went forward with the belatedly noticed hearing on approval of the related Disclosure Statement.

Throughout this case, the Debtor's promises and projections have proven unreliable. At the outset of the case, the Debtor sought financing and repeatedly assured the Court for months that any day, the financing would be finalized. *See* Transcript of May 31, 2018 Hearing ECF No. 70, at 10. ("[Debtor's Counsel]: '[C]astle has told us to date, they have set up a data room. They have been working on this for the past month plus. 35 investors have expressed interest in

making the financing available. And of those 35, 18 have signed a non-disclosure agreement and

have been doing further due diligence with respect to the prospective lending.'"); *see also*

Transcript of August 28, 2018 Hearing, ECF No. 116, at 7:14-24 ("[Debtor's Counsel]: '[C]astle

Placement was in the process of synthesizing the terms of four letters of intent . . . . [S]peaking to

Mr. Sillerman, he told me this morning that he reduced the candidate pool, if you will, to two. He

was negotiating with both and he represented to me that he would make a decision with respect

to which particular proposed lender to pursue today or tomorrow.'"); *see also* Letter of Intent,

DIP Motion Ex. C, ECF No. 394-4, (letter of intent makes clear that there is not a loan

commitment and the terms are not binding); *see also* Letter to the Court [ECF No. 473]

(Debtor's counsel advises the Court that the commitment with Metropolitan Partners Group will

be finalized by October 9, 2019); *see infra,* at 36-37.

Moreover, early on the Debtor projected that his Three Initiatives would achieve

$500,000,000 in returns for the estate and he submitted the First Plan based on that projection.

[ECF No. 130]. Despite the Three Initiatives being contingent (even though they were not listed

as such in the Debtor's Schedules) and the Debtor needing financing to pursue this strategy, the

Debtor put forth a plan that relied on these Three Initiatives realizing large returns. The projected

financing never materialized and the Three Initiatives not only failed to achieve the projected

returns, they ultimately proved to be worthless. Sillerman Decl., at ¶ 26.

Many months later, and only after the Committee had submitted this Motion and its own

proposed Plan, the Debtor submitted a completely new plan. The Debtor's Modified Plan relies

on a different, yet still wholly speculative, strategy. The Debtor's Modified Plan is predicated on

the hope that the future development of his currently undeveloped Anguilla property, which he

transferred without authorization to a new formed entity (*see supra*, at 9-10 ), will yield returns

30

that can be used to satisfy claims of his creditors or that his creditors will elect to take an interest in his new enterprise, expressly described in the MOA as "a highly speculative venture with a material risk of loss." *See* MOA Sillerman Decl., Ex. N at ¶ 7. Essentially, the Debtor is asking creditors (to whom he owes a fiduciary duty) to shoulder the risks that his projections and plan will work this time. *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169-170 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.) ("That is not to say that the debtor may never right its ship. But it is to say on the evidence presented such a possibility is not reasonably likely and, accordingly, the creditors should not be asked to bear the risk that the debtor's projections . . . will somehow occur. . . ." (*citing In re Cardinal Industries, Inc.,* 109 B.R. 755 (Bankr.S.D.Ohio 1990)).

In short, the Debtor has made virtually no progress in moving the case to conclusion by way of a viable plan for more than eighteen months. He filed the First Plan because his exclusivity period was about to expire and never sought to confirm that Plan. He clearly filed the equally speculative Modified Plan and related Disclosure Statement in response to the Committee filing the pending Motion to Appoint a Trustee or Convert the Case and its own proposed Plan.

*          *          *

Based on the foregoing, the Court finds that the Committee has presented clear and convincing evidence demonstrating: (1) the Debtor's failure to comply with provisions of the Bankruptcy Code; (2) the Debtor's failure to make required filings; (3) the Debtor's failure to abide by Court Orders; (4) the Debtor's failure to file tax returns; (5) the Debtor's conflict of interests; and (6) the Debtor's failure to discharge his fiduciary duties. In addition, based on the Court's supervision of this case and the case docket, the Court takes judicial notice of the Debtor's failure to advance the case toward a successful reorganization. Singularly, each of these

failures demonstrates "cause" for the appointment of a Trustee under section 1104(a)(1).

Considered in the aggregate, the Debtor's conduct in managing his business and controlling his

estate as a debtor-in-possession rises to the level of incompetence, if not gross mismanagement.

In sum, the conclusion is inescapable that there is clear and convincing evidence that "cause"

exists for the appointment of a Trustee.

### 2.   Appointing a Trustee under Section 1104(a)(2)

Even if a court does not find that cause exists to appoint a chapter 11 trustee under section

1104(a)(1), the Court may nonetheless appoint a trustee "[i]f such appointment is in the interests

of creditors, any equity security holders, and other interests of the estate . . . ." 11 U.S.C. §

1104(a)(2). This provision "envisions a flexible standard" and gives the bankruptcy court

discretion to appoint a trustee when doing so would serve the interests of the parties and the

estate. *See In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 90 (Bankr. S.D.N.Y. 2007) (*citing In re*

*Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998)). "Courts construing this

subsection 'eschew rigid absolutes and look to the practical realities and necessities' of the

record to determine whether the appointment of a trustee is in the best interest of the estate." *In*

*re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010*) (citing In re Adelphia Commc'ns Corp.*, 336

B.R. 610, 658 (Bankr. S.D.N.Y.); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr.

S.D.N.Y. 1990) (Lifland, C.J.); 169 ("With respect to whether a trustee should be appointed

under Code § 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and

necessities." (*citing In re Hotel Associates, Inc*., B.R. 343, 345 (Bankr. E.D. Pa. 1980)).

Under the "interests of the estate" provision, courts have considered numerous factors

when assessing whether to appoint a trustee. These factors include: (a) the trustworthiness of the

debtor; (b) the debtor's past and present performance and prospects for rehabilitation; (c) the

confidence—or lack thereof—of the business community and of creditors in present

management; and (d) the benefits derived from the appointment of a trustee, balanced against the

cost of the appointment. *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *8 (Bankr.

S.D.N.Y. Mar. 31, 2011); *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y.

2007).

     All of the circumstances outlined above underlying the Court's conclusion that "cause"

exists to appoint a Trustee pursuant to section 1104(a)(1) compel the Court also to conclude that

the appointment of a Trustee is in the interest of creditors and the estate.

### a. The Trustworthiness of the Debtor

     The Debtor's failure to file income tax returns, make required filings and disclosures that

would enhance transparency, and his refusal to so much as investigate avoidance actions, each of

which is demonstrated by clear and convincing evidence and admitted by the Debtor, place the

Debtor's trustworthiness in doubt. *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985) ("The

trustworthiness of the Debtor to protect the interests of the estate is in doubt due to the Debtor's

failure to perform his duty of filing federal income tax returns for the estate and his failure to

investigate possible preferential transfers.").

     The Debtor has submitted (usually, but not always, in a timely fashion), MOR's for his

estate over the life of this case. According to these MOR's, the only consistent income the

Debtor receives is his monthly social security income of $3,721.00. *See* ECF Nos. 58, 77, 96,

117, 122, 139, 156, 179, 225, 248, 278, 317, and 353. Significant other income is derived from

the unauthorized sale of estate property and money transfers from the Debtor's affiliated entities

into the DIP Account. There are, as outlined above, also periodic transfers out of the DIP

Account to the Debtor's various entities. *See id; see also supra* at 28-29. Without filing any

disclosure explaining these transfers and other similar transfers, the trustworthiness of the Debtor

reasonably is called into question.

The lack of transparency is compounded by the Debtor's failure to file a single 2015.3

Report detailing the Debtor's interest in (and transactions with) non-affiliated entities. This lack

of transparency also casts doubt on the Debtor's trustworthiness. *See In re New Orleans*

*Paddlewheels, Inc.*, 350 B.R. 667, 678 (Bankr. E.D. La. 2006) (the Debtor's failure to disclose

ownership interests of a wholly owned subsidiary and other fundamental records indicates an

untrustworthy debtor for the purposes of appointing a Trustee).

The Debtor's trustworthiness is also suspect in light of the fact that he has made a series

of predictions and promises throughout this bankruptcy case that have proven inaccurate. As

previously outlined, in May 2018, the Debtor directed one of his non-debtor affiliates to retain

Castle Placement to secure financing, the proceeds of which the Debtor would invest in his Three

Initiatives. *See* Motion to Retain Castle Placement [ECF No. 56]. For several months thereafter,

the Debtor claimed that the return on this investment would satisfy all claims against his estate

and the Debtor's First Plan relied on these promised returns as the basis for what was

characterized as a fully funded plan. *See* Transcript of June 26, 2018 Hearing [ECF No. 97], at

23:23-24 ("[Debtor's Counsel]: 'Right now, the architecture of a plan that is being contemplated

is one where . . . loan proceeds would be made into certain investments, which Mr. Sillerman

contemplates will produce the liquidity necessary to fund a plan. Mr. Sillerman has told me that

with respect to the investments that would be made with the loan proceeds, he's talking about, or

contemplating a three or six-month window at most by which that liquidity will be realized.'");

*See also* First Amended Disclosure Statement (filed on January 9, 2019) [ECF No. 173]

("Significantly, the investments [in the Three Initiatives] will provide enough Cash to pay

holders of all reasonable anticipated Allowed Claims in full . . . .").

    After certain creditors filed the Examiner Motion [ECF No. 136], the Debtor continued to

assure the Court that financing was imminent, despite the admission by Debtor's counsel that he

had not demonstrated progress towards obtaining financing. *Compare* Dec. 19 2018 Trans., ECF

No. 235, at 25:17-25. ("[Debtor's Counsel]: 'In any event, the point is, [the Debtor] shared with

[Debtor's counsel], yesterday, an email from Silver Point Capital, the substance of which is that

they are prepared to provide a facility of $30 million, with an interest reserve of $2,500,000 for a

term of 18 months. And I am told that Silver Point will have a letter of intent for us today.'")

*with id.* at 11:14-23 ("[The Court]: '[Y]ou do keep coming before me telling me you're working

on financing, and I take that at face value, but in terms of a show of any progress, I haven't seen

it. [Debtor's Counsel]: I – no, well, you haven't – I haven't shown it to you.'"). That financing

never materialized. By no later than February 28, 2019, the Debtor changed course and began

referring to the development of his Anguilla property as the basis for funding a plan. *See* Feb. 28,

2019 Trans., ECF No. 257, at 15:10-17:1 ("[Debtor's Counsel]: 'And from what I've seen, the

Anguilla transaction – as I said a moment ago – will likely be the funding source of the plan.'");

*See also* April 1, 2019 Trans., ECF No. 310, at 45:2-7 ("[Debtor's Counsel]: '[S]ome real estate

in Anguilla, which right now is the primary focus of funding with respect to the plan.'").

    However, at the Hearing on the Committee's Motion to Appoint a Trustee or convert the

case, the Debtor once again changed course; at that Hearing, Debtor's Counsel advised that

"[the] Anguillan development is not the linchpin in terms of making distributions to creditors

under the debtor's plan, that's gone as a piece of architecture." *See* Sept. 25, 2019 Trans., ECF

No. 495, at 115:12-18.

This pattern of ever-shifting financial reporting, projections, and plans for reorganization, of which the Court can take judicial notice, also casts doubt on the trustworthiness of the Debtor and suggests that the appointment of a trustee is in the best interest of creditors.

Perhaps most glaring in terms of the Debtor's lack of trustworthiness is that in late March and early April 2019, the Debtor negotiated with the Committee a Stipulation resolving the Committee's Motion to Restrict. The details of that consensual resolution were put on the record at the April 1, 2019 Hearing on the motion [ECF No. 310] and later memorialized in a Stipulation that was So Ordered. The Restrict Order expressly provides "the Debtor shall not cause or permit any Related Entity to transfer cash or sell, transfer, assign, encumber, redeem, liquidate, or otherwise dispose of any asset or interest in any asset without prior Court approval or prior written consent of the Committee." Restrict Order at ¶ 3. Yet, two days before the Court hearing and obviously while he was negotiating the Stipulation that consensually resolved the Motion to Restrict, the Debtor had signed the MOA transferring the Anguillian property. Shockingly, the Debtor failed to disclose this transfer to the Court or the Committee at the Hearing on the Motion to Restrict. *See* Sept. 25, 2019 Trans., ECF No. 495, at 63:8-64:2.

b.   *The Debtor's Past and Present Performance and Prospects for Rehabilitation*

To determine past and present performance, the Court can examine both pre-and post-petition conduct of a debtor. *See In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007). In *In re L.S. Good & Co.*, the court determined that it was in the best interest of creditors to appoint a trustee where the debtor was suffering substantial operating losses, the inventory was being rapidly depleted and there were "no sources from which to borrow needed capital to purchase new inventory." 8 B.R. 312, 314 (Bankr. N.D.W. Va. 1980). There was also uncontradicted evidence in that case that an infusion of significant money was required for the

36

Debtor to undergo a successful reorganization, which led the court to conclude that the prospects of rehabilitation were "extremely remote." *See id.*

In this case, the estate is losing equity in the Debtor's townhouse and substantial real estate holdings. The Debtor did not put his Manhattan and two Southampton properties up for sale until the case had been pending for over a year. Further the estate bears the cost of carrying the properties, which were between $70,000 to $80,000 per month for the Southampton properties and $30,000 to $40,000 per month for the Manhattan townhouse. *See* Debtor's Budget, Restrict Order [ECF No. 277] at Ex. A. In addition, as reflected in the MORs, the cash on hand in the Debtor's estate has also fluctuated inexplicably, but overall there is a troubling decline since May 2018. [8]

The Court also finds that the prospects for rehabilitation do not appear to be favorable. There is no concrete or reliable plan put forth by the Debtor for how to provide maximum recovery for estate creditors. Although there is theoretically a potential source of capital if the Debtor's latest proposed financing materializes, *see* DIP Motion [ECF No. 394], the Debtor's pending motion for approval of the financing candidly admits that the most recent prospective lender has not yet committed to extend a loan and has issued only a non-binding letter of intent. *See* DIP Motion Ex. C [ECF No. 394-4]; *see also* Counsel's letter regarding financing [ECF No. 474]. The probability that the DIP Loan will prove rehabilitative is low. The Modified Plan is dependent on this DIP Loan and the success of the Modified Plan faces many other contingencies.

---

[8] *See* MORs at ECF Nos. 56, 77, 96, 106, 117, 122, 139, 156, 179, 225, 248, 278, 317, 353, 367, 411, and 458.

c.  *Lack of Creditor Confidence*

A trustee can be appointed based solely on the creditor's lack of confidence in the

Debtor's ability to effectively administer the estate. *In re Eurospark Indus., Inc.*, 424 B.R. 621 at

630 (Bankr. E.D.N.Y. 2010) (a "lack of creditor confidence" found where the creditors with the

greatest economic interest supported the motion to appoint a trustee); *In re Marvel Entm't*

*Group, Inc.*, 140 F.3d 463, 474 (3d Cir. 1998) (animosity between the creditors and the debtor

necessitated the appointment of a trustee); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 170

(Bankr. S.D.N.Y. 1990) (Lifland, C.J.) (Since the unsecured creditors are willing to risk the

costs, uncertainties and dislocations, occasioned by the appointment of a trustee, the Court will

exercise its equitable powers to order that appointment.")

The Committee's Motion to Appoint a Trustee or convert this case was filed on behalf of

the unsecured creditor body. Significantly, the Motion was joined individually by eight other

creditors holding an aggregate of $12,989,113.64 in secured and unsecured claims. *See* ECF Nos.

416 and 429; s*ee also* Schedules A/B, Attach. 19. It is noteworthy that among those joining the

Committee's Motion are the four petitioning creditors who commenced this case almost two

years ago and have been waiting to have their debts addressed. There is unquestionably strong

support from the creditor body to appoint a Trustee in this case.

d.  *The Benefits of Appointing a Trustee Weighed Against the Cost of Appointment*

Relevant to the analysis under section 1104(a)(2) of whether appointment of a trustee is in

the interest of the estate is an analysis weighing the costs against the benefits of appointment of a

trustee. *In re Microwave Prod. of America., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989)

("The court should balance the harm and benefit of removing or retaining current

management.").  In *In re Taub*, the court appointed a trustee after weighing the costs, including

the time needed for the trustee to become familiar with the estate and the costs of retaining

counsel, against the benefit of having an objective trustee, free from "the complex, familial,

reflexive, and often acrimonious relationships" standing in place of the debtor. 427 B.R. 208,

229 (Bankr. E.D.N.Y. 2010).

The cost of appointment is clear: a Trustee will have to familiarize him or herself with the

record and the Debtor's affairs. This involves both time and financial cost. However, the benefit

is also clear, and in the Court's view, far stronger. A Trustee will step into the shoes of the

debtor-in-possession and will immediately take control of the estate and the Debtor's affairs,

thereby putting in place an impartial fiduciary capable of preserving estate assets and

maximizing recovery for creditors. The benefit of such independent investigation and the related

protection and safeguarding of estate assets that will be facilitated by the appointment of a

trustee will far outweigh the costs to the estate associated with such appointment.

## B.  Conversion to a Chapter 7 Case

The Committee asks the Court, in the alternative, to convert this case to a case under chapter

7 pursuant to 11 U.S.C. § 1112(b) based on the same circumstances and conduct upon which it

relies for the appointment of a trustee.

Section 1112(b) of the Bankruptcy Code provides:

> [O]n request of a party in interest, and after notice and a hearing,
> the court shall convert a case under this chapter to a case under
> chapter 7 or dismiss a case under this chapter, whichever is in the
> best interests of creditors and the estate, for cause unless the court
> determines that the appointment under section 11104(a) of a
> trustee or an examiner is in the best interests of creditor and the
> estate.

11 U.S.C. § 1112(b)(1).

Section 1112(b)(4) lists examples of conduct that amounts to "cause" for conversion of a chapter 11 case. Most relevant to this case, "cause" for conversion under section 1112(b)(4) includes:

- substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

- gross mismanagement of the estate;

- failure to comply with an order of the court;

- unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; and

- failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief

11 U.S.C. §§ 1112(b)(4)(A-B;E-F;I).

Many of these circumstances similarly constitute "cause" for appointment of a trustee pursuant to section 1104(a). Unique to a conversion analysis is the ground set forth in section 1112(b)(4)(A), that: (1) the estate is suffering a substantial or continuing loss or diminution and (2) there is an absence of a reasonable likelihood of rehabilitation. This ground contains two prongs and both prongs must be satisfied in order to find cause under this subsection. *In re BH S & B Holdings, LLC,* 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010) ("A party seeking to demonstrate cause under section 1112(b)(4)(A) must establish both the 'substantial or continuing loss' prong as well as the absence of a reasonable likelihood of rehabilitation prong.").

The first prong, that "the estate is suffering a substantial or continuing loss or diminution," may be satisfied if the movant demonstrates that the debtor continues to incur monthly losses. *Id.* at 347. As explained above, the Debtor's only consistent source of income (that is disclosed) is his monthly social security payment of $3,721.00. *See supra* at 34. While

there were three instances of large sums being deposited in the Debtor's bank account, those

sums derived from the unauthorized sale of estate property and an unexplained transfer from one

of the Debtor's wholly owned affiliated entities, MJX LLC. *Id*. But for these transfers, the

MOR's reflect that the cash on hand in the estate has continued to decline throughout the life of

this case. *See supra* at 38. And, as discussed above, *see supra* at 38, the value of the Debtor's

Southampton real estate holdings and his Manhattan townhouse has declined due in part to the

Debtor's delay in seeking to sell those assets.

The second prong, regarding "the absence of a reasonable likelihood of rehabilitation,"

may be satisfied if the movant demonstrates that the debtor will not have cash flow from which

its current obligations can be met. *In re BH S & B Holdings, LLC,* 439 B.R. at 346. The Court

may find that the Debtor's intention to liquidate constitutes an absence of a reasonable likelihood

of rehabilitation. *Id.* at 348. While there are serious doubts about its viability, the Debtor has

described his pending Modified Plan as a Liquidating Plan. *See* Modified Disclosure Statement,

at 29-31; Sept. 25, 2019 Trans., ECF No. 495, at 43:24-44:10 ("[T]he debtor's plan is now a plan

of liquidation.").

Moreover, the Court also has found "cause" in connection with the request for

appointment of a trustee that would also support conversion of this case to a chapter 7. While the

movant has the burden to prove, by a preponderance of evidence, that conversion is warranted,

the record contains clear and convincing evidence of multiple bases to convert this case. Based

on the same factual record underlying its trustee analysis, the Court finds that the Debtor has

failed to: (i) comply with Court orders (§1112(b)(4)(E)), *see supra* at 20, (ii) make the timely

disclosures required of him by the Bankruptcy Rules and Code (§1112(b)(4)(F)), *see supra* at 17-

19, and (iii) file tax returns due post-petition (§1112(b)(4)(I)). *See supra* at 23. Finally, as

discussed above, the Court finds that the totality of circumstances of this case reflect gross mismanagement of the estate (§1112(b)(4)(B)). Each of these failings individually is sufficient cause to convert this case under section 1112, and certainly in the aggregate the conduct of the debtor establishes cause for conversion. The Court therefore concludes that the Committee has demonstrated by a preponderance of the evidence that cause exists to convert this case under section 1112.

## IV. CONCLUSION

The Committee brought the Motion to Appoint a Trustee, or, in the alternative, convert the case from one under chapter 11 to one under chapter 7, without stating in its Motion a preference as between the two forms of relief sought. At the Hearing on the Motion, the Committee expressed a clear preference for appointment of a chapter 11 trustee. *See* Sept. 25, 2019 Trans., ECF No. 495, at 25:11-15. The Court has found that the record evidence, including the undisputed facts, the case docket, and the admissions by the Debtor, provides clear and convincing evidence to support a finding of "cause" both to appoint a trustee or to convert. There is therefore, there is no need for an evidentiary hearing in connection with the Motion.

The language of 1104(a) compels the Court to appoint a trustee if "cause" is found. Section 1112(b) mandates conversion if "cause" is found under that provision, but authorizes the Court to exercise its discretion to instead appoint a trustee if it concludes it is in the best interest of creditors and the estate. 11 U.S.C. § 1112(b)(1) ("[T]he court shall convert a case . . . for cause unless the court determines that the appointment of a trustee under section 1104(a) is in the best interest of creditors and the estate."). Thus, even if the Court first determines that "cause" exists to convert under section 1112(b), the Court may still, in its discretion, appoint a chapter 11 trustee if it determines that it is in the best interest of the estate to do so.

42

Based on the foregoing Analysis, the Court finds "cause" under 1104(a)(1) to appoint a trustee and "cause" under 1112(b) to convert. In light of its finding of cause under 1104(a)(1), the Court is compelled to enter an Order appointing a chapter 11 trustee for the Debtor's estate. The Court also concludes under section 1112(b)(1) that given the totality of the circumstances of this case, appointment of a trustee, rather than conversion, is in the best interest of creditors and the estate.

For the foregoing reasons, the Court grants the Committee's Motion for an Order directing the appointment of a chapter 11 trustee and denies the Motion insofar as it seeks conversion of the case.

**IT IS SO ORDERED**

Dated: New York, New York
        October 8, 2019

_s/ Mary Kay Vyskocil_
Honorable Mary Kay Vyskocil
United States Bankruptcy Judge